1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Ramsey M. Al-Salam, Bar No. 109506
RAlsalam@perkinscoie.com
Christina J. McCullough, Bar No. 245944
CMcCullough@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, 49th Floor
Seattle, WA  98101
Tel:  206.359.8000
Fax:  206.359.9000

Daniel T. Shvodian, Bar No. 184576
DShvodian@perkinscoie.com
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA  94304-1212
Tel: 650.838.4300
Fax: 650.737.5461

Attorneys for Plaintiff
IMPINJ, INC.

David L. Witcoff (admitted *pro hac vice*)
Illinois State Bar No. 06183629
dlwitcoff@jonesday.com
JONES DAY
77 West Wacker Dr.
Chicago, IL 60601
T: (312) 782-3939
F: (312) 782-8585

Michael C. Hendershot, Bar No. 211830
mhendershot@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
T: (650) 739-3940
F: (650) 739-3900

Attorneys for Defendant
NXP USA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IMPINJ, INC.,

                    Plaintiff,

        v.

NXP USA, INC.,

                    Defendant.

Case No. 4:19-cv-03161-YGR

**REVISED JOINT CASE MANAGEMENT STATEMENT**

Date: November 6, 2019
Time: 10:30 a.m.
Courtroom: 1, 4th Floor
Judge: Honorable Yvonne Gonzalez Rogers

146103134

The parties hereby submit this Revised Joint Case Management Statement.

**JURISDICTION AND SERVICE**

1.     The Court has subject matter jurisdiction over Plaintiff's ("Impinj's") claims and Defendant's ("NXP's") counterclaims under 28 U.S.C. §§ 1331 and 1338 because they arise under the patent laws, and under 28 U.S.C. §§ 2201 and 2202 under the Declaratory Judgment Act.  The parties do not dispute personal jurisdiction or venue, and no parties remain to be served.

**STATEMENT OF FACTS**

2.     Impinj and NXP make and sell integrated circuits ("ICs") for use in radio frequency identification ("RFID") tags.  The Complaint was filed on June 6, 2019 and followed nearly two years of correspondence between the parties regarding Impinj's claims of infringement.  Impinj asserts that NXP has copied Impinj's patented designs and has infringed the asserted patents relating to those designs in two accused products:  NXP's UCODE7 IC and NXP's UCODE8 IC.  Impinj is seeking injunctive relief with respect to the UCODE8 IC, which Impinj contends is directly competing with Impinj's Monza R6 IC and has caused Impinj significant harm in the market.  NXP has denied copying and infringement and has asserted that each of the patents are invalid, that at least one of the patents was acquired by inequitable conduct, and that it is licensed to practice some of the asserted patent claims because they are necessary and required to practice the Gen2 V2 protocol and ISO/IEC 18000-63 standard pursuant to agreements Impinj made with these organizations.  NXP also has asserted fraudulent concealment, breach of contract, promissory estoppel, unclean hands, equitable estoppel, waiver and patent misuse relating to its Gen2 V2 and ISO/IEC 18000-63 defenses.  Impinj denies that any of the affirmative defenses or counterclaims have merit and specifically denies that any of the asserted claims are necessary to practice the Gen2 V2 protocol or required to practice the ISO 18000-63 standard.

**LEGAL ISSUES**

3.     The parties dispute whether NXP has infringed the patents under 35 U.S.C. § 271, and whether the patent claims are invalid under 35 U.S.C. §§ 101, 102, 103, and 112.  The parties might also dispute the meaning of "necessary" as it relates to the Gen2 V2 protocol, and "required"

as it relates to the ISO/IEC 18000-63 standard, and they might also dispute the proper construction of various claim terms. The parties may also dispute the proper damages and equitable relief if the patents are found infringed and not invalid.

## MOTIONS

4.      No motions have been filed. Based on the Court's rejection of a phased approach to the assertion of the patents-in-suit, Impinj anticipates filing a motion to amend its Complaint to assert fewer patents, presumably only the eight patents identified below. To the extent necessary, NXP anticipates filing a motion to dismiss Impinj's allegations of infringement of U.S. Patent Nos. 8,881,373, 9,436,902, and 9,460,380 for lack of standing. Impinj, International Ltd., a Cayman Islands limited liability company that is not a party to this litigation, owns all right, title, and interest in these three patents. However, these three patents are not part of the eight patents that Impinj proposes maintaining in the case so if their withdrawal is approved, a motion will not be necessary. Impinj reserves the right to seek preliminary injunctive relief. Both parties anticipate filing dispositive motions.

## AMENDMENT OF PLEADINGS

5.      The parties do not currently anticipate amending the pleadings other than Impinj anticipates filing a motion to amend the Complaint as referenced above. Otherwise, pleadings only may be amended subject to Federal Rule of Civil Procedure 15.

## EVIDENCE PRESERVATION

6.      The parties have reviewed the Guidelines Relating to the Discovery of Electronically Stored Information ("ESI Guidelines") and have met and conferred pursuant to Fed. R. Civ. P. 26(f) regarding reasonable and proportionate steps taken to preserve evidence relevant to the issues. The parties have instituted litigation holds to preserve relevant evidence.

## DISCLOSURES

7.      The parties have agreed to serve their Fed. R. Civ. P. 26(a) disclosures regarding the claims to be litigated three weeks after the patents being asserted against NXP in this matter have been finalized. For example, if the Court and the parties agree at the November 6, 2019 Case Management Conference that Impinj can proceed against NXP with the eight patents Impinj

1   proposes in Paragraph 16 below, then the parties' Fed. R. Civ. P. 26(a) disclosures shall be served

2   on November 27, 2019.  No other changes will be made in form or other requirements for Rule

3   26(a)(1).

4                                    **DISCOVERY**

5        8.      No discovery has been taken to date, but Impinj has served document requests.  At

6   NXP's request, Impinj has agreed that NXP's response to these requests will be due 24 days after

7   the patents being asserted against NXP in this matter have been finalized.  In turn, NXP has agreed

8   to hold off serving its document requests until these patents have been finalized.

9        9.      The parties' proposals herein are premised on Impinj's assertion of the eight patents

10  proposed by Impinj in Paragraph 16 below.  Assuming that the patents identified below are the only

11  patents that will actually be asserted against NXP in this case, the parties have agreed to the

12  following discovery limitations:

13       **<u>Depositions</u>**

14       The parties have agreed that each party may take up to 110 hours of depositions, with no

15  more than 75 hours of the opposing party, including Rule 30(b)(6) depositions.  In addition to these

16  hours, NXP may take up to seven hours of deposition for each named inventor, and three additional

17  hours for each additional patent on which an inventor is named, with a maximum of 16 hours.  The

18  only agreed-upon exceptions are that NXP may take up to 20 hours of deposition of John Hyde,

19  who is named on 6 of the 8 asserted patents, 17 hours of deposition of Harley Heinrich, who is

20  named on 4 of the 8 patents, and 14 hours of deposition of Chris Diorio.

21       The parties agree that each party also shall be entitled to take up to seven hours of deposition

22  on each expert report that is served that relates to damages.  As for non-damages expert reports, the

23  parties agree that each party also shall be entitled to take up to seven hours of deposition on each

24  expert report that is served.  However, NXP seeks an additional 5 hours for each additional patent

25  family included in each report.  Impinj believes that this is too many hours and has offered 3

26  additional hours for each additional patent family addressed by the expert, but a total of no more

27  than 16 hours for any given expert.  For example, if an expert addressed three patent families, NXP

28  would be entitled to take 13 hours of that expert.  Impinj believes this is sufficient where all of the

patents relate to the same general technology area — RFID circuits.  NXP believes this time may be too limited to properly defend itself because, for example, Impinj may serve a single expert report covering all eight asserted patents, six of which are wholly unrelated and all eight of which claim distinct and separate inventions.  NXP would be entitled to seven hours for a single patent expert report; barely more than double that very likely would not be sufficient for a report covering a large number of unrelated patent families.

If any party that believes there is good cause for additional deposition time, for fact or expert witnesses, the parties agree to discuss that issue in good faith and try to resolve it without court intervention.

**Service**

The parties agree to accept service by email or other electronic means including FTP transfer.  Each counsel will establish an email distribution list accessible through a single external email address.  Service by email or other electronic means including FTP transfer will be treated as service by hand delivery.  The parties agree that service by email by 6:00 p.m. Pacific time on a given day will be treated as service by personal delivery that day.  The parties agree that documents filed under seal or manually must be served by email or other electronic means including FTP transfer immediately following a related ECF filing, and that the email service of such documents shall relate back to the time of the related ECF filing.

**Written Discovery**

Interrogatories.  Each party shall be entitled to serve up to 25 interrogatories.

Document Requests.  Consistent with the Federal Rules of Civil Procedure, each party may serve an unlimited number of document requests.

Requests for Admission.  Each party shall be entitled to serve up to 25 requests for admission, excluding requests for admission directed exclusively to authentication of material evidence.

Authenticity of Documents.  The parties agree that documents produced by each party from its ordinary business records shall be presumed to be authentic within the meaning of Federal Rule of Evidence 901.  If a party serves a specific good faith written objection to the authenticity of a

produced document, the presumption of authenticity will no longer apply to that document.  Any objection to a document's authenticity must be provided prior to or with the exchange of objections to trial exhibits.  The parties will promptly meet and confer to attempt to resolve any authenticity objections.

### Expert Discovery

The parties agree that the provisions of Fed. R. Civ. P. 26(b)(4)(C), as modified or limited herein, will apply to expert discovery in this action.  Discovery of expert materials shall be limited to final expert reports and information and materials the expert considered in forming the opinions expressed in connection with those reports.  Communications with counsel, draft reports, and draft declarations or affidavits shall not be discoverable.

For the avoidance of doubt, no expert or party is required to produce or describe on a privilege log and no party may seek discovery, by any method (including by deposition), of the following, except to the extent that it constitutes factual information that the expert considered in forming his or her opinion: (i) any form of communication or work product between an expert (including his or her assistants, employees, or agents) and a party offering the testimony of such expert (including that party's employees, agents, consultants, and counsel, and their employees or agents); (ii) any form of communication or work product between an expert and his or her employees, assistants, or agents; (iii) drafts of any report, exhibit, study, work paper, computation, calculation, compilation, or any other material prepared by, for, or at the direction of an expert, regardless of the form in which the draft is recorded; or (iv) any notes or other writings made by, for, or at the direction of an expert.  Nothing in this paragraph relieves an expert or party from the duty to identify the facts, data, and assumptions that the expert considered in forming his or her opinions.  Nothing in this paragraph precludes discovery of the amount and form of compensation received by the expert for work undertaken on behalf of any party to this litigation.

### CLASS ACTIONS

10.     Not applicable.

### RELATED CASES

11.     There are no related cases.

- 5 -

**RELIEF**

12.    Impinj seeks damages for all past infringement pursuant to 35 U.S.C. § 284, and injunctive relief only with respect to the accused UCODE 8 IC product. Impinj seeks damages in the form of lost profits and/or a reasonable royalty. Impinj further seeks increased damages and attorneys' fees pursuant to 35 U.S.C. § 285 or as otherwise provided by law.  NXP seeks a declaratory judgment that it has not infringed the asserted patents, that the asserted patents are invalid, and seeks damages, certain injunctive relief and attorneys' fees in connection with its counterclaims.

**SETTLEMENT AND ADR**

13.    The parties have agreed to engage in mediation after discovery is complete.  The parties propose that a mediation deadline be two weeks after the close of discovery as set forth below.

**CONSENT TO MAGISTRATE JUDGE FOR ALL PURPOSES**

14.    Both parties have not consented to a magistrate judge to conduct all further proceedings including trial and entry of judgment.

**OTHER REFERENCES**

15.    The case is not suitable for reference to binding arbitration, a special master, or the Judicial Panel on Multi-District Litigation.

**NARROWING OF ISSUES**

16.    **Impinj's Statement.** Impinj appreciates the Court's concern regarding the potential confusion if a jury is presented with too many patents and claims.  Impinj is thus willing to file an amended complaint asserting only eight patents, to limit its initial infringement contentions to no more than 30 claims from eight patents in four technology areas, to further narrow the asserted claims to no more than 20 claims for purposes of claim construction (following some discovery from NXP) and anticipates proceeding at trial with no more than 10 claims.  At this point, Impinj proposes to narrow the asserted patents to only the following eight patents, with the identified subject areas:

    **a.**    **Large Pads: U.S. Patent Nos. 9,495,631 and 9,633,302**

    **b.**    **Automatic Tuning: U.S. Patent Nos. 9,471,816 and 10,002,266**

    **c.**    **Noise Reduction: U.S. Patent Nos. 8,600,298 and 9,031,504**

    **d.**    **Power Harvesting: U.S. Patent Nos. 8,115,597 and 8,344,857**

Impinj believes this reduction of patents and claims addresses the Court's concerns and is consistent with how other courts have handled cases with multiple patents and claims. Impinj's agreement to dismiss claims under other patents is premised, of course, on the dismissal being without prejudice. As the Court suggested, Impinj outlines below why it has asserted so many patents in the first place, the nature of the patents asserted, and why it should be allowed to proceed with eight patents and 20 claims for purposes of claim construction, with the acknowledgement that there will be further reduction before trial.

### An Overview of The Parties and Technology

The parties compete in the production and sale of RAIN RFID integrated circuits ("ICs"). RFID stands for "Radio-Frequency Identification." RAIN is a type of RFID technology that operates at a longer range than NFC (i.e., near-field communications). RAIN RFID tag manufacturers purchase RAIN RFID ICs and combine them with antennas to create RAIN RFID tags (e.g., product labels), which end users then attach to their products and assets in order to identify, locate and track them. RAIN RFID readers wirelessly power and communicate with RAIN RFID tags using radio waves. The RAIN RFID tags then respond by reflecting those radio waves to send codes and other identifying information to the RAIN RFID reader. RAIN RFID readers and tags communicate according to a protocol that was established by a working group of GS1 (and its predecessor EPCglobal) a global organization that established the barcode. Both Impinj and NXP participated in that working group.

Impinj and NXP are the two leading producers of RAIN RFID ICs, and both sell their ICs to the same customers, which insert the ICs into tags for sale to end customers. Impinj has only one principal place of business–in Seattle, Washington–and employs approximately 250 employees.

Defendants and its affiliates are a large multi-national organization, with approximately 30,000 employees and approximately $9.4 billion dollars in annual revenues in 2018. While RAIN RFID products are all of Impinj's business, RAIN RFID ICs are a small percentage of the business of the NXP family of companies. In particular, NXP sells a wide variety of products, including automotive products, processors and microcontrollers, audio products, interfaces, peripheral logic, power management and NFC products. Impinj introduced its first RAIN RFID IC product in 2006. NXP introduced a competitive RAIN RFID IC, its first, in 2008.

**Impinj's Pre-Litigation Attempts to Resolve the Issues**

Impinj did not bring this suit lightly. As reflected in the Complaint, Impinj initiated correspondence with NXP in August 2017, with the hope of resolving the issues without litigation. At NXP's demand, Impinj provided claim charts and repeatedly asked NXP if it would meet to try to address the issues. *See* Complaint, ¶¶9-13. Despite numerous and repeated requests, NXP has refused to meet with Impinj to address the infringement issues and continued with its introduction of its infringing UCODE8 product. *Id.*, ¶19. NXP's refusal to discuss Impinj's concerns and continued promotion and sale of the accused products left Impinj no option other than to seek a remedy in court.

**The Patents Currently Asserted**

The Complaint currently asserts that NXP infringes 26 of Impinj's patents, which cover eight areas of technology, all of which relate to optimizing the performance of RAIN RFID ICs. The specific claims are recited in full in the Complaint and despite NXP's cherry picking of two long claims, are generally not long or complex from an engineering perspective. *See, e.g.,* Complaint, ¶22-24; 30-32.

While all the patents relate to optimizing the performance of RAIN RFID ICs, they can be further simplified into different subject areas that differentiate Impinj's ICs in the marketplace, such as large pads, automatic tuning, noise reduction, and power harvesting (the four subject areas identified above), as well as circuits for measuring quantities (like time or power) and functions like calibration.

The four narrowed technology subject areas that Impinj proposes to proceed with in this litigation can be generally described as follows:

Large Pads:  Impinj's large pad patents relate to enlarged, enhanced antenna pads that make it easier for RAIN RFID tag manufacturers to assemble RAIN RFID tag antennas.

Automatic Tuning:  Automatic tuning is a feature in the RAIN RFID IC analogous to the "scan" feature on a car radio; it allows the RAIN RFID tag to optimize its tuning at low signal power to better communicate with the RAIN RFID reader in a given RFID environment.

Noise Reduction:  RAIN RFID tags operate in a noisy environment.  Noise reduction (also known as "pulse swallowing" or "noise mitigation") allows a RAIN RFID tag to remove unnecessary noise (i.e., RF signals that are like the "pop" noise from dust on an LP record) from its communication with the RAIN RFID reader.

Power Harvesting:  RAIN RFID tags operate at a very low power level because they are wirelessly powered by the radio waves from a RAIN RFID reader.  RAIN RFID tags are able to function at lower power levels through the use of enhanced rectifier technology.

Impinj's innovations in these areas differentiate Impinj's RAIN RFID ICs in the marketplace and are incorporated into its Monza R6 IC, which at the time it was released, was the most advanced chip on the market and gained rapid market adoption.  After that time, NXP released its UCODE8 IC (and retrofitted its UCODE7 IC), which incorporate many of Impinj's innovations, and has been competing directly with Impinj's Monza R6 IC and stealing its sales.  The launch of the UCODE8 IC is what led to this suit.

**<u>How Other Courts Have Treated Large Patent Cases</u>**

Impinj acknowledges that a jury will have a difficult time comprehending too many patents and claims.  Impinj thus proposes an approach that it believes fairly balances its need for relief with the need to not overwhelm the Court or the jury with too many patents or claims.  Impinj also believes its proposal of initially proceeding with no more than 30 claims of 8 selected patents, no more than 20 claims for claim construction, and no more than 10 claims for trial, is consistent with how other courts have proceeded in multiple patent cases.  In *In re Katz Interactive Call Proc. Pat. Litig.,* 639 F.3d 1303 (Fed. Cir. 2011), for example the Federal Circuit held that the patent owner

had not been denied due process where he originally asserted a total of 1,975 claims from 31 patents against 165 defendants, but was required to proceed with 40 claims per defendant group, and then reduce that to 16 claims per group by trial:

> [T]he district court required Katz initially to select no more than 40 claims per defendant group, and after discovery to narrow the name of selected claims to 16 per defendant group. The court further directed that the total number of claims to be asserted against all defendants could not exceed 64 (eight claims for each unique specification including four specifications not at issue in this appeal). However, the court added a proviso that the limitations on the number of claims were not immutable. The proviso permitted Katz to add new claims if they 'raise[d] issues of infringement/validity that [were] not duplicative' of previously selected claims. Katz added new claims to exceed a total of 64 across all the actions but the number of claims did not exceed 16 per defendant group.

639 F.3d at 1309.

The court held that this approach, even though the district court did not sever and stay the unselected claims, did not violate Katz's due process rights, particularly where the court "provided that more claims could be added if Katz could show that the additional claims presented unique issues." *Id.* at 1311-1312.

In 2013, a committee that included Chief Judge Randall Rader of the Federal Circuit, authored a proposed model order for limiting excess patent claims and prior art. *See.* Exh. 1. The model order provides that, in a first phase, the patent owner "shall assert no more than ten claims from each patent and not more than a total of 32 claims." *Id.* ¶2. Further, "[n]ot later than 28 days after the Court issues its Claim Construction Order, the patent claimant shall serve a Final Election of Asserted Claims, which shall identify no more than five asserted claims per patent from among the ten previously identified claims, and no more than a total of 16 claims." *Id.*, ¶3. Impinj's proposed approach to this case is well within the limits above.

### Impinj's Proposal

Consistent with the authorities above, Impinj respectfully requests that it be allowed to proceed in its initial infringement contentions with no more than 30 claims, from the eight patents identified above, with the understanding that, after discovery, it will narrow the asserted claims to no more than 20 for purposes of claim construction and with the further understanding that it will further narrow the claims (presumably no more than 10) at trial. Impinj respectfully submits that

- 10 -

1    this is consistent with the approaches by other courts above, and will be both manageable and

2    efficient, especially given that there are only two accused products.

3              **The Disposition of the Nonasserted Claims**

4              Under Impinj's proposal, it will have waived the right to assert additional claims from any

5    of the patents that proceed at trial.  With respect to the remaining patents, however, Impinj's

6    proposal is conditioned on an agreement that claims under those patents will be dismissed without

7    prejudice. Given that the case has just begun, and Impinj has had no opportunity for discovery, it

8    should be liberally allowed to amend its complaint to reduce the number of patents in view of the

9    Court's guidance that Impinj's Complaint asserted too many patents for practical administration of

10   this case.  Such a dismissal should not be with prejudice given that Impinj seeks this dismissal in

11   keeping with the Court's guidance on the scope of the case rather than because of any defect in its

12   claims.   It should not be obligated to identify infringed claims from the patents that it is

13   withdrawing.  This is particularly unnecessary given that NXP is in a better position than Impinj to

14   know which claims it is infringing.  In essence, NXP is demanding that Impinj provide "final"

15   infringement contentions without any opportunity for discovery.   Nevertheless, to avoid an

16   unnecessary dispute, Impinj will agree to eliminate claims from the unasserted patents by December

17   6th, 2019 but should not be limited to three claims or any other arbitrary number of claims.  Impinj

18   has not had an opportunity for discovery and should not be arbitrarily limited to the number of

19   claims it identifies.

20             **Impinj's Proposed Schedule**

21             As to the schedule, Impinj's schedule requires that it serve its infringement contentions by

22   November 14th, and will be limited to 30 claims under the patents above.  Before claim construction

23   but after appropriate discovery, Impinj will narrow its asserted claims to 20, with further narrowing

24   before trial. The schedule is consistent with the Local Rules and does not require NXP to respond

25   to any filing on an expedited basis.  Further, as NXP concedes, it has known of Impinj's assertions

26   of these patents for more than two years and has already investigated them and proffered defenses.

27   In addition, Impinj has agreed to limit the asserted claims to no more than 20 claims for claim

28   construction and with the goal of asserting no more than 10 claims at trial.  These are fewer claims

REVISED JOINT CASE MANAGEMENT
STATEMENT

than are often asserted in one or two patent cases.  To the extent NXP reasonably needs more time to meet a deadline, Impinj will be cooperative, and that issue should be addressed at the time.

17.  **NXP's Statement.**  NXP does not believe that this Revised Joint Case Management Statement is the appropriate place to respond to each of the allegations and arguments Impinj makes in its above Statement, and NXP does not agree with all of Impinj's factual and legal assertions above.  Suffice it to say that, as set forth in detail in its Answer, Affirmative Defenses, and Counterclaims to Impinj's Complaint, NXP denies infringement and any other improper conduct. NXP also denies that it refused to meet with Impinj concerning its allegations of infringement and further states that the parties had a number of substantive communications on the merits prior to this litigation.

Impinj started this litigation by asserting 26 patents, comprising a total of 691 claims. Impinj initially proposed a first phase containing eight patents and holding the other 18 patents "in abeyance" — which the Court rejected.  Dkt. No. 26 at 7.  Impinj is now proposing asserting eight patents — four of which are different from its originally proposed eight, and four of which are the same — and appears to be proposing moving to amend its Complaint to dismiss the other 18 patents only if the dismissal terms are acceptable to Impinj.  NXP addresses each of these categories of patents in turn.

**(a)  Impinj's Current Proposal To Litigate Eight Patents**

Impinj currently proposes litigating eight patents from six different patent families (there are two pairs of related patents, and the other four patents are from unrelated patent families), with a total of 147 claims.  Impinj further proposes limiting its Patent L.R. 3.1 infringement contentions to 30 claims from these eight patents, narrowing that to 20 claims prior to claim construction, and "anticipates" proceeding to trial with "presumably" no more than 10 claims.  NXP respectfully submits that this proposal does not go far enough in terms of efficiency and reducing the burdens on the Court and the parties.

First, although it obviously is better than the initial 26 patents, litigating these eight patents is still a very large and complex undertaking.  Contrary to the alleged simplicity Impinj has suggested its current proposal brings, these eight patents have six very different specifications,

which cover distinct technologies, and which focus on very different aspects of the accused products.  By way of example, the following claims identified in Impinj's Complaint come from two of the eight patents now proposed by Impinj:

Claim 6 of U.S. Patent No. 10,002,266 states:

A Radio Frequency Identification (RFID) integrated circuit (IC) requiring a minimum clock frequency to operate according to a protocol (MFOP), a sufficient power to tune a variable impedance (SPTT), and a sufficient power to operate according to the protocol (SPOI) greater than the SPTT, the IC comprising:

a tuning circuit configured to tune the variable impedance during a tuning phase; and

a processor block configured to:

    in the tuning phase:

        extract a first power at least equal to the SPTT from an RF wave; cause the tuning circuit to tune the variable impedance to increase power extraction from the RF wave; and

        operate at a first clock frequency less than the MFOP while causing the tuning circuit to tune the variable impedance, wherein the IC is unable to communicate with an RFID reader according to the protocol while operating at the first clock frequency; and

    in a protocol phase subsequent to the tuning phase: extract a second power at least equal to the SPOI from the RF wave;

        operate at a second clock frequency greater than or equal to the MFOP; and

        communicate with an RFID reader according to the protocol while operating at the second clock frequency.

*See* Complaint ¶58.

Claim 15 of the U.S. Patent No. 8,115,597 Patent reads as follows:

A rectifier for a Radio Frequency Identification tag circuit, comprising:

a first antenna input node for receiving a first phase of an alternating RF wireless signal;

a second antenna input node for receiving a second phase of the alternating RF wireless signal which is substantially opposite to the first phase;

a zeroth stage transistor having an input terminal connected to ground, an output terminal, and a gate coupled to receive the first phase;

a plurality of serially coupled stages, at least one of the stages including:

a first synchronous element with a first beginning coupled to receive the second phase and a first ending the first synchronous element including:

a first transistor having an input terminal at the first beginning coupled to the output terminal of the zeroth stage transistor, an output terminal, and a gate coupled to receive the first phase;

a second transistor having an input terminal, an output terminal at the first ending, and a gate coupled to receive the second phase, in which the input terminal of the second transistor is connected to the output terminal of the first transistor at a first intermediate node so as to form a first charge-accumulating path between the first beginning and the first ending, and there is no charge-accumulating path between the first beginning and the first ending other than the first path; and

a second synchronous element with a second beginning to receive the first phase and a second ending, the second synchronous element including:

a third transistor having an input terminal at the second beginning, an output terminal, and a gate couple to receive the second phase;

a fourth transistor having an input terminal, an output terminal at the second ending, and a gate couple to receive the first phase, in which the input terminal of the fourth transistor is connected to the output terminal of the third transistor at a second intermediate node so as to form a second charge-accumulating path between the second beginning and the second ending, and there is no charge-accumulating path between the second beginning and the second ending other than the second path; and

in which the second beginning is coupled to the first ending.

*See* Complaint ¶163.

<u>Second</u>, Impinj has expanded the number of asserted claims from 20 claims in its prior proposal (Dkt. No. 26 at 7-8) to 30 claims for the same number of patents. This expansion increases the burden on the parties, and Impinj's purported reason therefor (the need for discovery) conflicts with the Local Rules, under which Impinj is required to provide infringement contentions prior to taking discovery. NXP proposes that Impinj limit its Patent L.R. 3.1 contentions to 20 claims, as Impinj originally proposed.

<u>Third</u>, Impinj's proposal does not limit the number of asserted patents in any way, not even prior to claim construction or prior to trial. Not only does that significantly increase the burden on the parties, but it also will significantly increase the burden on the Court, particularly during and after the claim construction process.

At a minimum, to further narrow the issues in this case, NXP proposes that, after the parties have exchanged infringement and invalidity contentions and before claim construction proceedings begin, the Court order Impinj to further reduce its eight asserted patents to no more than four, and its 20 asserted claims to no more than ten.  This effort would result in a more efficient use of both the Court's and the parties' resources prior to the claim construction process.  Of course, the parties should also try to narrow the case further after the Court issues its Claim Construction Order.

### (b)  <u>The Handling Of The Other 18 Patents</u>

As for the 18 remaining patents, Impinj appears to be proposing moving to amend its Complaint to dismiss the other 18 patents only if the dismissal terms are acceptable to Impinj.  NXP is willing to agree to the dismissal without prejudice of the 18 remaining patents, but only, out of fundamental fairness, if Impinj will agree to reasonable limitations as to the claims of those patents it may assert in the future.  As Impinj knows and may well have intended, by bringing a lawsuit asserting 26 patents (even if it never intended to actually litigate all 26 patents), Impinj triggered the one-year time bar for NXP to file petitions for *inter partes* review of all 26 patents.  35 U.S.C. 315(b).  This clock continues to run even if the remaining 18 patents are dismissed without prejudice.  These 18 patents contain a total of 544 claims.  In this regard, NXP appreciates that Impinj previously agreed to identify the claims it will assert of the 18 patents it proposes dismissing, and also previously agreed to be bound by that identification in any future litigation.  However, Impinj refuses to limit itself to a reasonable number of asserted claims, such as up to three claims per patent (or a total of up to 54 claims).  In other words, Impinj could theoretically assert <u>all</u> <u>544</u> claims of the remaining 18 patents, which would circumvent Local P.R. 3-1's requirement of identifying "each claim of each patent that is allegedly infringed", as well as obviously defeat the point of narrowing the issues in advance of the one-year time bar.  Again, Impinj's purported reason for refusing to limit itself to a reasonable number of claims — the need for discovery — is refuted by the Local Rules' requirement for a patent plaintiff to provide its infringement contentions prior to taking discovery.  For these reasons, NXP respectfully requests that the Court order Impinj to identify asserted claims for the dismissed patents and to be bound to those asserted claims for any future litigation (as Impinj previously agreed), subject to a limit of no more than three claims per

patent, and to do so by the proposed Patent L.R. 3-1 Disclosure of Asserted Claims deadline, November 14, 2019.  Alternatively, if Impinj is unwilling to limit itself to a reasonable number of asserted claims, NXP respectfully requests that the Court dismiss the 18 remaining patents with prejudice.

**(c)  The Proposed Case Schedule**

The schedule Impinj proposes also is too accelerated to allow NXP sufficient time to fully and properly defend itself.  This matter involves a number of complex patents, and Impinj proposes asserting up to 8 patents at trial.  Moreover, considering that Impinj waited almost two years to bring this suit after notifying NXP of the alleged infringement, there is no compelling urgency to adopt Impinj's relatively speedy schedule to litigate the eight patents that Impinj has selected.

## EXPEDITED TRIAL PROCEDURE

18.     Neither party seeks an expedited trial position under the Expedited Trial Procedure of General Order No. 64 Attachment A.

## SCHEDULING

19.     The parties propose the following schedule:

| Event | Impinj Proposal | NXP Proposal |
|---|---|---|
| Rule 26(a)(1) Disclosures | November 14, 2019 | November 27, 2019, or 3 weeks after the patents to be asserted against NXP have been finalized, whichever is later |
| Patent L.R. 3-1 Disclosure of Asserted Claims and Infringement Contentions and Patent L.R. 3-2 Document Production | November 14, 2019 | November 14, 2019 |
| Patent L.R. 3-3 Invalidity Contentions and Patent L.R. 3-4 Document Production | December 31, 2019 | February 11, 2020 |
| **Case Narrowing Event:**  Impinj will identify the 20 claims for claim construction | 14 days before Patent L.R. 4-1 Disclosure | |

REVISED JOINT CASE MANAGEMENT
STATEMENT

| Event | Impinj Proposal | NXP Proposal |
|---|---|---|
| **Case Narrowing Event:**   Impinj will narrow its asserted claims to no more than four patents, and no more than 10 claims | | February 28, 2020 |
| Patent L.R. 4-1 Disclosure of Claim Terms for Construction | January 17, 2020 | March 20, 2020 |
| Patent L.R. 4-2 Disclosure of Preliminary Claim Construction and Extrinsic Evidence | February 10, 2020 | April 17, 2020 |
| Patent L.R. 3-8 Damages Contentions | January 28, 2020 | April 3, 2020 |
| Patent L.R. 4-3 Joint Claim Construction Statement | March 2, 2020 | June 2, 2020 |
| Patent L.R. 3-9 Responsive Damages Contentions | February 27, 2020 | May 4, 2020 |
| Patent L.R. 4-4 Completion of Claim Construction Discovery | March 18, 2020 | July 24, 2020 |
| Patent L.R. 4-5(a) Opening Claim Construction Brief | March 25, 2020 | August 7, 2020 |
| Patent L.R. 4-5(b) Responsive Claim Construction Brief | April 8, 2020 | September 9, 2020 |
| Patent L.R. 4-5(c) Reply Claim Construction Brief | April 15, 2020 | September 23, 2020 |
| Claim Construction Tutorial | At the Court's convenience | At the Court's Convenience |
| Claim Construction Hearing | [subject to Court's calendar, two weeks after Reply CC Brief] | At the Court's Convenience |
| **Case Narrowing Event:** The parties will submit a proposed case narrowing Order that limits the number of asserted patents at trial | 21 days after Court's Claim Construction Ruling | 21 days after Court's Claim Construction Ruling |

| Event | Impinj Proposal | NXP Proposal |
|---|---|---|
| Patent L.R. 3-7 Deadline to disclose intent to rely on Advice of Counsel for any patent-related claim or defense | 30 days after Claim Construction Ruling | 30 Days After Claim Construction Ruling |
| Fact Discovery Cutoff | 30 Days After Claim Construction Ruling | 30 Days After Claim Construction Ruling |
| Deadline to Participate in Mediation | 14 Days After Close of Fact Discovery | 14 Days After Close of Fact Discovery |
| Opening Expert Disclosures under Fed. R. Civ. P. 26(a)(2) (on issues for which a party bears the burden of proof) | 30 Days After Close of Fact Discovery | 45 Days After Close of Fact Discovery |
| Rebuttal Expert Disclosures under Fed. R. Civ. P. 26(a)(2) | 30 Days After Opening Expert Disclosures | 45 Days After Opening Expert Disclosures |
| Expert Discovery Cut-Off | 21 Days After Rebuttal Disclosures | 45 Days After Rebuttal Disclosures |
| Deadline to File Dispositive Motions, Motions to Strike Experts, or Daubert Motions | 21 Days After Close of Expert Discovery | 45 Days After Close of Expert Discovery |
| Deadline to File Response(s) to Dispositive Motions, Motions to Strike Experts, or Daubert Motions | 21 Days After Opening Motions | 35 Days After Opening Motions |
| Deadline to File Reply in Support of Dispositive Motions | 10 Days After Responsive Motions | 21 Days After Responsive Motions |
| Summary Judgment Hearing | At the Court's Convenience | At the Court's Convenience |
| Pretrial Conference | At the Court's Convenience | At the Court's Convenience |
| Pretrial Trial Disclosures Under Fed. R. Civ. P. 26(a)(3) | At the Court's Convenience | At the Court's Convenience |

| Event | Impinj Proposal | NXP Proposal |
|-------|-----------------|--------------|
| Final Pretrial Conference | At the Court's Convenience | At the Court's Convenience |
| Trial | At the Court's Convenience | At the Court's Convenience |

## TRIAL

20. **Impinj's Statement.** Impinj anticipates that this will be a jury trial that will require ten trial days.

**NXP's Statement:** Assuming the case has been narrowed at least to four patents with no more than 10 claims, NXP agrees that a jury trial will require ten trial days.

## DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS

21. Impinj has no parent corporation or publicly held corporation that owns 10% or more of its stock. NXP Semiconductors N.V., NXP B.V., and Freescale Semiconductor Holdings B.V, Inc. are corporate parents of NXP USA, Inc. or publicly held corporations owning 10% or more of NXP USA, Inc.'s stock.

## PROFESSIONAL CONDUCT

22. The attorneys of record have reviewed the Guidelines for Professional Conduct for the Northern District of California.

DATED: November 4, 2019

By:/s/ *Ramsey M. Al-Salam* _____
Ramsey M. Al-Salam, Bar No. 109506
Christina J. McCullough, Bar No. 245944
PERKINS COIE LLP
1201 Third Avenue, 49th Floor
Seattle, WA  98101
Tel:  206.359.8000
Fax:  206.359.9000
RAlSalam@perkinscoie.com
CMcCullough@perkinscoie.com

Daniel T. Shvodian, Bar No. 184576
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA  94304-1212
Tel: 650.838.4300
Fax: 650.737.5461
DShvodian@perkinscoie.com

Attorneys for Plaintiff
IMPINJ, INC.

/s/ *David L. Witcoff* _____
David L. Witcoff (admitted *pro hac vice*)
Illinois State Bar No. 06183629
dlwitcoff@jonesday.com
Jones Day
77 West Wacker Dr.
Chicago, IL 60601
T: (312) 782-3939
F: (312) 782-8585

Michael C. Hendershot
Bar No. 211830
mhendershot@jonesday.com
Jones Day
1755 Embarcadero Road
Palo Alto, CA 94303
T: (650) 739-3940
F: (650) 739-3900

Attorneys for Defendant
NXP USA, INC.

- 20 -

REVISED JOINT CASE MANAGEMENT
STATEMENT

1

**SIGNATURE ATTESTATION**

Pursuant to Civil L.R. 5.1, I hereby attest that I have obtained the concurrence in the filing of this document from all the signatories for whom a signature is indicated by a "conformed" signature (/s/) within this e-filed document and I have on file records to support this concurrence for subsequent production for the Court if so ordered or for inspection upon request.

Dated:  November 4, 2019          */s/ Ramsey M. Al-Salam*

REVISED JOINT CASE MANAGEMENT STATEMENT