1   David L. Witcoff (admitted *pro hac vice*)
    Illinois State Bar No. 06183629
2   dlwitcoff@jonesday.com
    Jones Day
3   77 West Wacker
    Chicago, IL 60601
4   T: (312) 782-3939
    F: (312) 782-8585
5
    Michael C. Hendershot
6   Bar No. 211830
    mhendershot@jonesday.com
7   Jones Day
    1755 Embarcadero Road
8   Palo Alto, CA 94303
    T: (650) 739-3940
9   F: (650) 739-3900

10  Attorneys for Defendant
    NXP USA, INC.
11

12              UNITED STATES DISTRICT COURT

13              NORTHERN DISTRICT OF CALIFORNIA

14                    OAKLAND DIVISION

15

16  **IMPINJ, INC.,**                    **Case No. 4:19-cv-03161-YGR**

17              **Plaintiff,**           **DEFENDANT NXP USA, INC.'S,
                                         ANSWER, AFFIRMATIVE**
18          **v.**                       **DEFENSES, AND
                                         COUNTERCLAIMS TO PLAINTIFF**
19  **NXP USA, INC.,**                   **IMPINJ, INC.'S SECOND AMENDED
                                         COMPLAINT**
20              **Defendant.**
                                         **DEMAND FOR JURY TRIAL**
21

22          Defendant NXP USA, Inc. ("NXP"), by and through its undersigned counsel, hereby

23  submits its Answer, Affirmative Defenses, and Counterclaims to the Second Amended Complaint

24  ("SAC") (ECF. No 71) filed by Impinj, Inc. ("Impinj" or "Plaintiff") on October 27, 2020, as set

25  forth below.  NXP denies that it has infringed or infringes any valid and enforceable claim of the

26  patents-in-suit, and NXP denies all allegations of the SAC that are not expressly admitted below.

27                          **NATURE OF THE CASE**

28          1.     NXP admits that the SAC purports to set forth a cause of action for patent

infringement.  NXP denies any remaining allegations of Paragraph 1 of the SAC.

**THE PARTIES**

2.     NXP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 2 of the SAC and therefore denies them.

3.     NXP admits that it is a Delaware corporation, with its corporate headquarters in Austin, Texas.  NXP admits that it is an indirect subsidiary of NXP Semiconductors N.V., which is a corporation headquartered in Eindhoven, the Netherlands.  NXP denies any remaining allegations of Paragraph 3 of the SAC.

4.     NXP admits that venue lies in this judicial district pursuant to 28 U.S.C. § 1400(b). NXP denies that it has committed acts of infringement in this judicial district.  NXP denies any remaining allegations of Paragraph 4 of the SAC.

**IMPINJ AND ITS ASSERTED PATENT RIGHTS**

5.     NXP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 5 of the SAC and therefore denies them.

6.     NXP admits that Impinj has received a number of U.S. patents.  NXP lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations of Paragraph 6 of the SAC and therefore denies them.

7.     NXP admits that Impinj sells RFID products including but not limited to Monza RFID tag chips.  NXP lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations of Paragraph 7 of the SAC and therefore denies them.

**IMPINJ'S CLAIMS OF INFRINGEMENT**

8.     NXP admits that it makes and sells ICs that are used in RFID tags, including UCODE 7 and UCODE 8 products.  NXP denies any remaining allegations of Paragraph 8 of the SAC.

9.     NXP admits that it received a letter from Impinj dated August 11, 2017 recommending that "competent patent counsel" review a number of identified patents "[i]n the hope of avoiding an unnecessary dispute based on inadvertent infringement."  NXP lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations

of Paragraph 9 of the SAC and therefore denies them.

10. NXP admits that it sent a letter dated September 7, 2017, to Impinj that, <u>inter alia</u>, requested a claim chart. NXP denies any remaining allegations of Paragraph 10 of the SAC.

11. NXP admits that Impinj sent a letter dated September 14, 2017, stating, <u>inter alia</u>, that it would be willing to meet and enclosing a document purporting to be a draft non-disclosure agreement. NXP denies any remaining allegations of Paragraph 11 of the SAC.

12. NXP admits that it advised Impinj that it does not enter into non-disclosure agreements or other like agreements in connection with patent accusations against NXP and that Impinj would need to provide the specified claim charts without any confidentiality requirement or use restriction. NXP denies any remaining allegations of Paragraph 12 of the SAC.

13. NXP admits that since September 14, 2017, Impinj and NXP have exchanged various correspondence. NXP also admits that Impinj provided purported claim charts for certain claims of its patents. NXP further admits that Impinj has requested an in-person meeting. NXP denies any remaining allegations of Paragraph 13 of the SAC.

14. NXP admits that it is the beneficiary of a license under the EPC™ Specification for RFID Air InterSACe Protocol for Communications at 860 MHz – 960 MHz ("Gen2 protocol"). NXP admits that Impinj agreed to license certain patent claims pursuant to that protocol. NXP denies any remaining allegations of Paragraph 14 of the SAC.

15. NXP denies the allegations of Paragraph 15 of the SAC.

16. NXP denies the allegations of Paragraph 16 of the SAC.

17. NXP admits that it has claimed that certain of Impinj's patents are invalid. NXP denies any remaining allegations of Paragraph 17 of the SAC.

18. NXP denies the allegations of Paragraph 18 of the SAC.

19. NXP denies the allegations of Paragraph 19 of the SAC.

20. NXP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 20 of the SAC and therefore denies them.

**IMPINJ'S CLAIM OF INFRINGEMENT OF U.S. PATENT NO. 10,002,266**

21. NXP lacks knowledge or information sufficient to form a belief as to the truth of

1    the allegations of Paragraph 21 and therefore denies them.

2          22.    NXP admits that Paragraph 22 appears to set forth the text of Claim 6 of U.S.

3    Patent No. 10,002,266 ("the '266 Patent").  NXP denies any remaining allegations of Paragraph

4    22 of the SAC.

5          23.    NXP admits that Paragraph 23 appears to set forth the text of Claim 8 of the '266

6    Patent.  NXP denies any remaining allegations of Paragraph 23.

7          24.    NXP admits that Paragraph 24 appears to set forth the text of Claim 10 of the '266

8    Patent.  NXP denies any remaining allegations of Paragraph 24.

9          25.    NXP denies the allegations of Paragraph 25.

10         26.    NXP denies the allegations of Paragraph 26, and further specifically denies that the

11   accused products infringe any valid and enforceable claim of the '266 Patent.

12         27.    NXP denies the allegations of Paragraph 27.

13   **IMPINJ'S CLAIM OF INFRINGEMENT OF U.S. PATENT NO. 9,031,504**

14         28.    NXP lacks knowledge or information sufficient to form a belief as to the truth of

15   the allegations of Paragraph 28 and therefore denies them.

16         29.    NXP admits that Paragraph 46 appears to set forth the text of Claim 1 of U.S.

17   Patent No. 9,031,504 ("the '504 Patent").  NXP denies any remaining allegations of Paragraph 29

18   of the SAC.

19         30.    NXP admits that Paragraph 30 appears to set forth the text of Claim 2 of the '504

20   Patent.  NXP denies any remaining allegations of Paragraph 30.

21         31.    NXP admits that Paragraph 31 appears to set forth the text of Claim 7 of the '504

22   Patent.  NXP denies any remaining allegations of Paragraph 31.

23         32.    NXP denies the allegations of Paragraph 32.

24         33.    NXP denies the allegations of Paragraph 33.

25         34.    NXP denies the allegations of Paragraph 34.

26         35.    NXP denies the allegations of Paragraph 35, and further specifically denies that the

27   accused products infringe any valid and enforceable claim of the '504 Patent.  NXP denies any

28   remaining allegations of Paragraph 35.

**IMPINJ'S CLAIM OF INFRINGEMENT OF U.S. PATENT NO. 9,633,302**

36.     NXP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 36 and therefore denies them.

37.     NXP admits that Paragraph 37 appears to set forth the text of Claim 1 of U.S. Patent No. 9,633,302 ("the '302 Patent").  NXP denies any remaining allegations of Paragraph 37 of the SAC.

38.     NXP admits that Paragraph 38 appears to set forth the text of Claim 3 of the '302 Patent.  NXP denies any remaining allegations of Paragraph 38.

39.     NXP admits that Paragraph 39 appears to set forth the text of Claim 4 of the '302 Patent.  NXP denies any remaining allegations of Paragraph 39.

40.     NXP admits that Paragraph 40 appears to set forth the text of Claim 7 of the '302 Patent.  NXP denies any remaining allegations of Paragraph 40.

41.     NXP denies the allegations of Paragraph 41.

42.     NXP denies the allegations of Paragraph 42, and further specifically denies that the accused products infringe any valid and enforceable claim of the '302 Patent.

43.     NXP denies the allegations of Paragraph 43.

**IMPINJ'S CLAIM OF INFRINGEMENT OF U.S. PATENT NO. 9,495,631**

44.     NXP lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 44 and therefore denies them.

45.     NXP admits that Paragraph 45 appears to set forth the text of Claim 13 of U.S. Patent No. 9,495,631 ("the '631 Patent").  NXP denies any remaining allegations of Paragraph 45 of the SAC.

46.     NXP admits that Paragraph 46 appears to set forth the text of Claim 14 of the '631 Patent.  NXP denies any remaining allegations of Paragraph 46.

47.     NXP admits that Paragraph 47 appears to set forth the text of Claim 15 of the '631 Patent.  NXP denies any remaining allegations of Paragraph 47.

48.     NXP admits that Paragraph 48 appears to set forth the text of Claim 16 of the '631 Patent.  NXP denies any remaining allegations of Paragraph 48.

1    49.   NXP denies the allegations of Paragraph 49.

2    50.   NXP denies the allegations of Paragraph 50.

3    51.   NXP denies the allegations of Paragraph 51, and further specifically denies that the

4    accused products infringe any valid and enforceable claim of the '631 Patent.

5    52.   NXP denies the allegations of Paragraph 51.

6    **IMPINJ'S CLAIM OF INFRINGEMENT OF U.S. PATENT NO. 8,115,597**

7    53.   NXP lacks knowledge or information sufficient to form a belief as to the truth of

8    the allegations of Paragraph 53 and therefore denies them.

9    54.   NXP admits that Paragraph 54 appears to set forth the text of Claim 1 of U.S.

10   Patent No. 8,115,597 ("the '597 Patent"). NXP denies any remaining allegations of Paragraph 54

11   of the SAC.

12   55.   NXP admits that Paragraph 55 appears to set forth the text of Claim 12 of the '597

13   Patent. NXP denies any remaining allegations of Paragraph 55.

14   56.   NXP admits that Paragraph 56 appears to set for the text of Claim 13 of the '597

15   Patent. NXP denies any remaining allegations of Paragraph 56.

16   57.   NXP admits that Paragraph 57 appears to set forth the text of Claim 15 of the '597

17   Patent. NXP denies any remaining allegations of Paragraph 57.

18   58.   NXP denies the allegations of Paragraph 58.

19   59.   NXP denies the allegations of Paragraph 59.

20   60.   NXP denies the allegations of Paragraph 60, and further specifically denies that the

21   accused products infringe any valid and enforceable claim of the '597 Patent.

22   61.   NXP denies the allegations of Paragraph 61.

23   **IMPINJ'S CLAIM OF INFRINGEMENT OF U.S. PATENT NO. 8,344,857**

24   62.   NXP lacks knowledge or information sufficient to form a belief as to the truth of

25   the allegations of Paragraph 62 and therefore denies them.

26   63.   NXP admits that Paragraph 63 appears to set forth the text of Claim 1 of U.S.

27   Patent No. 8,344,857 ("the '857 Patent"). NXP denies any remaining allegations of Paragraph 63

28   of the SAC.

1   64.   NXP admits that Paragraph 64 appears to set forth the text of Claim 3 of the '857

2   Patent.  NXP denies any remaining allegations of Paragraph 64.

3   65.   NXP admits that Paragraph 65 appears to set forth the text of Claim 4 of the '857

4   Patent.  NXP denies any remaining allegations of Paragraph 65.

5   66.   NXP admits that Paragraph 66 appears to set forth the text of Claim 6 of the '857

6   Patent.  NXP denies any remaining allegations of Paragraph 66.

7   67.   NXP admits that Paragraph 67 appears to set forth the text of Claim 7 of the '857

8   Patent.  NXP denies any remaining allegations of Paragraph 67.

9   68.   NXP admits that Paragraph 68 appears to set forth the text of Claim 8 of the '857

10  Patent.  NXP denies any remaining allegations of Paragraph 68.

11  69.   NXP admits that Paragraph 69 appears to set forth the text of Claim 9 of the '857

12  Patent.  NXP denies any remaining allegations of Paragraph 69.

13  70.   NXP denies the allegations of Paragraph 70.

14  71.   NXP denies the allegations of Paragraph 71.

15  72.   NXP denies the allegations of Paragraph 72, and further specifically denies that the

16  accused products infringe any valid and enforceable claim of the '857 Patent.  NXP denies any

17  remaining allegations of Paragraph 73.

## IMPINJ'S REQUEST FOR RELIEF

19  NXP denies that Impinj is entitled to any of the relief it seeks in Paragraphs (1) – (5) in

20  its Requests For Relief, or any relief whatsoever.  NXP denies all remaining allegations in

21  Impinj's Request For Relief.

## DEMAND FOR A JURY TRIAL

23  No response is required to Impinj's Demand For A Jury Trial.  However, to the extent

24  that a response is required, NXP admits that Impinj has demanded a jury trial.

## NXP'S AFFIRMATIVE DEFENSES

26  Subject to the responses above, and without assuming any burden not imposed by

27  operation of law, NXP asserts the following affirmative defenses in response to the allegations of

28  Impinj's SAC.  NXP expressly reserves the right to assert different and additional legal or

equitable defenses that may now exist or in the future be available based on discovery and further investigation in this case.

## FIRST AFFIRMATIVE DEFENSE - INVALIDITY

1. One or more claims of the patents-in-suit are invalid for failure to satisfy one or more of the requirements and/or conditions for patentability under Title 35, United States Code § *et seq*., including without limitation §§ 101, 102, 103, and/or 112.

## SECOND AFFIRMATIVE DEFENSE – PROSECUTION HISTORY ESTOPPEL

2. NXP re-alleges and incorporates by reference each allegation contained in Paragraph 1 of its Affirmative Defenses.

3. By virtue of statements made, amendments made, or positions taken during the prosecution of the applications of the patents-in-suit and/or any related patents or patent applications, Impinj is estopped from construing any claim of the patents-in-suit to cover or include, either literally or under the doctrine of equivalents, any of the products, systems, or processes sold by NXP.

## THIRD AFFIRMATIVE DEFENSE – ROYALTY-FREE LICENSE

4. NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1–3 of its Affirmative Defenses.

5. Impinj's claims for patent infringement are precluded in whole or in part to the extent that any allegedly infringing products or components thereof are subject to an express or implied license to the patents-in-suit and/or pursuant to the doctrine of patent exhaustion.

6. GS1 EPCglobal ("EPCglobal") is a standard setting organization that facilitates the development of certain industry standards. EPCglobal has an Intellectual Property Policy, by which all participants must abide. Agreement to the Policy is a binding and enforceable contract.

7. As part of EPCglobal, industry participants can join "Working Groups" that work to develop industry-specific standards. Industry participants need not participate in a Working Group to benefit from the standardization of the technology under consideration.

8. Impinj was a member and served in a leadership role of the Working Group responsible for developing multiple versions of the Class 1 Generation-2 UHF RFID Protocol for

Communications at 860 MHz – 960 MHZ ("Gen2 standard").

9.     As a participant in that Working Group, Impinj agreed to abide by certain IP Policies, including the EPCglobal Intellectual Property Policy, Working Group Declaration, Rev. 12/15/2003 A (the "EPCglobal IP Policy").

10.     Among other provisions, the EPCglobal IP Policy requires each Working Group member to license, royalty-free, any of its patent claims that are necessary to implement the Gen2 standard to other members of the Working Group.  The EPCglobal IP Policy also requires each Working Group member to declare any such necessary patent claims that they are not willing to license on these terms.

11.     While working on development of the Gen2 standard, Impinj confirmed to Working Group Members its commitment to abide by the EPCglobal IP Policy and license necessary patent claims royalty-free.

12.     NXP also was a member of this Working Group.  Pursuant to the EPCglobal IP Policy, NXP is entitled to a royalty-free license on patent claims necessary to implement the Gen2 standard.

13.     Impinj previously contended that NXP infringed the following patents based upon compliance with Version 2.0.0 of the Gen2 standard (Gen2 V2): U.S. Patent Nos. 7,215,251; 7,246,751; 7,388,468; 7,472,835; 7,773,227; 8,134,451; 8,390,431; 8,391,785; 8,600,298; 8,665,074; 8,952,792; 9,031,504; and 9,349,090 ("Gen2 V2 Patents").  Based upon these contentions, Impinj has admitted the claims of these patents are necessarily infringed by implementing the Gen2 V2 standard.  Impinj asserted all of the Gen2 V2 Patents in its initial Complaint against NXP dated June 6, 2019.  In its February 18, 2020 First Amended Complaint ("FAC"), Impinj dropped 11 of these 13 patents, but it previously advised the Court that Impinj was reserving the ability to assert these 11 patents in new litigation against NXP.  Impinj's FAC also continued to accuse NXP of infringing the other two Gen2 V2 Patents, U.S. Patent Nos. 8,600,298 and 9,031,504.  In its October 27, 2020 SAC, Impinj dropped an additional patent, U.S. Patent No. 8,600,298, but continues to accuse NXP of infringing U.S. Patent No. 9,031,504.

14.     Impinj did not declare it was unwilling to license any of the Gen2 V2 Patents

pursuant to the EPCglobal IP Policy.

15.  Under the terms of the EPCglobal IP Policy, Impinj is required to license the Gen2 V2 Patents to NXP, royalty-free.

16.  NXP already enjoys a license to the Gen2 V2 Patents, and the Gen2 V2 Patents are unenforceable against NXP.

**FOURTH AFFIRMATIVE DEFENSE – RAND LICENSE**

17.  NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1–16 of its Affirmative Defenses.

18.  Impinj's claims for patent infringement are precluded in whole or in part to the extent that any are subject to an obligation to license on reasonable and non-discriminatory ("RAND") terms.

19.  The International Organization for Standardization ("ISO") and the International Electrotechnical Commission ("IEC") are standard setting organizations that facilitate the development of certain industry standards.  Both ISO and IEC, along with other standard setting organizations, share a "Common Patent Policy" by which parties "participating in the work of the Organizations" are required to abide.  In conformance with the Common Patent Policy, patent holders must submit licensing declarations disclosing whether they are willing to license patent claims that are required to implement any ISO/IEC standard and, if they are not willing, disclosing which of its patent claims they believe are required to implement the standard but are unwilling to license.

20.  Impinj signed multiple declarations relating to ISO/IEC 18000-63 in which Impinj agreed to grant a license to an unrestricted number of applicants on a worldwide, RAND basis to any patent claims that would be required to implement ISO/IEC 18000-63.

21.  The Gen2 standard was transferred to ISO/IEC 18000-6 part C, which later became ISO/IEC 18000-63.  Impinj previously contended that NXP infringed the Gen2 V2 Patents based upon compliance with the Gen2 standard.  Based upon these contentions, Impinj has admitted the claims of these patents are necessary to implement the Gen2 V2 standard.  As such, to the extent the claims of the Gen2 V2 Patents are necessary to implement the Gen2 V2

standard, they are also required to implement ISO/IEC 18000-63.

22. Impinj did not declare it was unwilling to license any of the Gen2 V2 patents under the Common Patent Policy. Therefore, to the extent that the claims of the Gen2 V2 patents are required to implement ISO/IEC 18000-63, Impinj is obligated to offer a license to those patent claims on RAND terms.

23. Impinj has not offered a license to the claims of the Gen2 V2 Patents to NXP on RAND terms. Having failed to offer such a license to NXP, the claims of the Gen2 V2 Patents are unenforceable against NXP.

**FIFTH AFFIRMATIVE DEFENSE – UNCLEAN HANDS**

24. NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1–23 of its Affirmative Defenses.

25. NXP is barred, in whole or in part, by the equitable doctrine of unclean hands from asserting that any claim of the patents-in-suit is infringed by NXP.

26. Christopher J. Diorio, CEO of Impinj, assumed a leadership role in the Working Group responsible for developing multiple versions of the Gen2 standard.

27. Diorio also assumed a leadership role in the development of the EPCglobal IP Policy, which sets forth both the licensing requirements surrounding necessary IP and the terms governing what IP the members were obligated to disclose during the development of the Gen2 standard.

28. Diorio excluded NXP from critical stages of the development of the Gen2 standard.

29. During the development of the Gen2 standard, Diorio and Impinj filed multiple patent applications, including those that matured into the Gen2 V2 Patents asserted in this lawsuit.

30. Claims of the patents that ultimately issued from these applications are necessary for the practicable commercialization of products that comply with the Gen2 V2 standard.

31. On information and belief, Diorio knew at the time of filing these patent applications that they claimed subject matter that would be necessary to implement the Gen2

standard. For example, the provisional application that Impinj filed that matured into the '751 patent included, verbatim, large portions of a Gen2 standard Candidate Specification.

32. Therefore, while Diorio was serving in a leadership role for the development of the Gen2 standard, he and Impinj were simultaneously pursuing patents that, based on his involvement in and control of the development of the Gen2 standard, including Gen2 V2, he knew would be necessary to implement the Gen2 standard.

33. On information and belief, Diorio intentionally influenced the development of the Gen2 standard, including Gen2 V2, such that any industry participant that desired to commercialize a Gen2 V2-compliant product would be forced to use the technology on which Diorio and Impinj were concurrently seeking patent protection.

34. Diorio never disclosed to NXP that he and Impinj were concurrently filing patent applications related to the Gen2 standard.

35. On information and belief, Diorio did not disclose that he and Impinj were concurrently filing such patent applications because so disclosing would have resulted in modifications to the standard that would have avoided requiring the use of the technology Diorio and Impinj were attempting to patent.

36. These patent applications included those which eventually matured into the Gen2 V2 Patents that are now asserted against NXP.

37. As a result, according to Impinj's own contentions, NXP cannot commercialize Gen2 V2-compliant products without licensing the patent claims Impinj obtained while influencing the development of the Gen2 V2 standard.

38. On information and belief, Diorio improperly and deceitfully influenced the development of the Gen2 V2 standard with anticompetitive intent.

39. Impinj now unfairly asserts those same patent claims against NXP based on NXP's commercialization of Gen2 V2-compliant products and seeks not only monetary, but also injunctive relief.

40. Impinj has unclean hands with respect to the enforcement of these patents, and they are unenforceable against NXP.

## SIXTH AFFIRMATIVE DEFENSE – EQUITABLE ESTOPPEL

41.   NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1–40 of its Affirmative Defenses.

42.   NXP is barred, in whole or in part, by the equitable doctrine of estoppel from asserting that any claim of the patents-in-suit is infringed by NXP.

43.   Impinj's conduct in intentionally influencing the development of the Gen2 standard while simultaneously filing patents on the technology that would be required to implement the Gen2 standard without disclosing the filing of those patents to NXP, and its failure to otherwise fulfill its commitments to abide by the EPCglobal IP Policy and to license necessary patents royalty-free, were false representations and/or concealments of material facts that were calculated to convey the impression that the technology necessary to commercialize compliant products would be freely, or at least reasonably, accessible to NXP and other industry participants.

44.   On information and belief, Impinj intended for NXP to rely on this impression in adopting the Gen2 standard, including Gen2 V2.

45.   Impinj's assertion of the Gen2 V2 Patents here is inconsistent with the impression given by Impinj that the required technology would be freely, or at least reasonably, accessible to NXP and other industry participants.

46.   At the time of this conduct, NXP was not aware that Impinj was filing patent applications on technology that, according to its own contentions, would be necessary to commercialize Gen2 V2-compliant products.  NXP relied on the impression intentionally created by Impinj, and NXP developed at significant expense the Accused Products to comply with the Gen2 V2 standard.  NXP has been harmed as a result of its reasonable reliance on the impression intentionally created by Impinj and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image, among other things.

47.   NXP has been materially prejudiced by Impinj's conduct, and Impinj is equitably estopped from asserting at least the Gen2 V2 Patents against NXP.

## SEVENTH AFFIRMATIVE DEFENSE – WAIVER/IMPLIED WAIVER

48.    NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1–47 of its Affirmative Defenses.

49.    Impinj is barred, in whole or in part, by the equitable doctrine of waiver from asserting that any claim of the Gen2 V2 Patents is infringed by NXP.

50.    As both a leader and a member of the Working Group, Impinj had the duty to fully inform members of the Working Group, including NXP, about the patent protection it was seeking on technology germane to the commercialization of products compliant with the Gen2 V2 standard.

51.    On information and belief, Impinj was aware of this duty.

52.    Impinj failed to comply with its duty.

53.    Impinj did so with the knowledge that patent claims issuing from those applications would be reasonably necessary to implement the Gen2 V2 standard.

54.    Under the doctrine of waiver and/or implied waiver, at least the Gen2 V2 Patents are unenforceable against NXP.

## EIGHTH AFFIRMATIVE DEFENSE – PATENT MISUSE

55.    NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1–54 of its Affirmative Defenses .

56.    Impinj has misused each of its Gen2 V2 Patents by bringing litigation, by threatening litigation, and by seeking an injunction in this action in bad faith when it knew, as previously admitted, that its Gen2 V2 Patents were subject to contractual obligations requiring Impinj to license the Gen2 V2 Patents royalty-free to NXP.  By seeking an injunction, Impinj has attempted to broaden the physical scope of the Gen2 V2 Patents with anticompetitive effect.

57.    These improper acts by Impinj, among other conduct, impermissibly attempt to broaden the scope of the patent grants of at least the Gen2 V2 Patents and constitute patent misuse, rendering each unenforceable against NXP.

## NINTH AFFIRMATIVE DEFENSE – LIMITATIONS ON DAMAGES AND COSTS

58.    Impinj's right to recover damages, attorneys' fees, or costs, if any, is limited,

including without limitation by 35 U.S.C. §§ 286, 287, and/or 288.

**TENTH AFFIRMATIVE DEFENSE – NO ATTORNEYS' FEES**

59. Impinj cannot prove that this is an exceptional case justifying an award of attorney's fees against NXP under 35 U.S.C. § 285 or otherwise.

**ELEVENTH AFFIRMATIVE DEFENSE – LACK OF JURISDICTION**

60. To the extent Impinj may accuse products or services that are provided by or for the government of the United States of America, there is no jurisdiction over such claims, pursuant to 287 U.S.C. § 1498(a), outside of the U.S. Court of Federal Claims.

**TWELFTH AFFIRMATIVE DEFENSE – NO WILLFUL INFRINGEMENT**

61. NXP has not willfully infringed any of the patents-in-suit.

**THIRTEENTH AFFIRMATIVE DEFENSE – ADEQUATE REMEDY AT LAW, NO INJUNCTIVE RELIEF**

62. Impinj is not entitled to injunctive relief, including but not limited to, because any alleged injury to Impinj is not immediate or irreparable, Impinj has an adequate remedy at law, and/or public policy concerns weigh against any injunctive relief.

**OTHER APPLICABLE DEFENSES**

63. NXP expressly reserves the right to assert any other legal or equitable defenses to which it is shown to be entitled.

**NXP'S COUNTERCLAIMS AGAINST IMPINJ**

1. Under Rule 13 of the Federal Rules of Civil Procedure, Defendant and Counterclaim Plaintiff NXP USA, Inc., raise the following counterclaims against Plaintiff and Counterclaim Defendant Impinj, Inc.

**JURISDICTION AND VENUE**

2. NXP USA, Inc. is a corporation organized and existing under the laws of the State of Delaware, with a principal place of business in Austin, Texas.

3. In its SAC, Impinj states that it is a Delaware corporation with its principal place of business in Seattle, Washington.

4. NXP's declaratory judgment counterclaims arise under Title 35 of the United

States Code.  The Court has subject matter jurisdiction over them under 28 U.S.C. §§ 1331, 1338, 2201, and 2202 as they arise under an Act of Congress relating to patents and the Declaratory Judgment Act.

5.     The Court has personal jurisdiction over Impinj based on its filing of the SAC.

6.     Venue over NXP's counterclaims is proper under 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

### FIRST COUNTERCLAIM – DECLARATION OF NON-INFRINGEMENT OF THE '266 PATENT

7.     NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1-6 of its Counterclaims.

8.     An actual and justiciable controversy exists between Impinj and NXP concerning the '266 Patent because Impinj has sued NXP for alleged patent infringement, which NXP denies.

9.     NXP has not infringed any valid and enforceable claim of the '266 Patent and is entitled to a declaration to that effect.

10.    NXP seeks a judgment declaring that it does not infringe any valid and enforceable claim of the '266 Patent.

### SECOND COUNTERCLAIM – DECLARATION OF NON-INFRINGEMENT OF THE '504 PATENT

11.    NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1-10 of its Counterclaims.

12.    Pursuant to Impinj's "Preliminary Narrowing of Claims From 28 Claims to 20 Claims" dated February 21, 2020, Impinj is no longer asserting any claims of the '504 Patent against NXP.  However, to the extent that Impinj disagrees that it is no longer asserting any claims of the '504 Patent against NXP, an actual and justiciable controversy exists between Impinj and NXP concerning the '504 Patent because Impinj has sued NXP for alleged patent infringement, which NXP denies.

13.    NXP has not infringed any valid and enforceable claim of the '504 Patent and is entitled to a declaration to that effect.

14.    NXP seeks a judgment declaring that it does not infringe any valid and enforceable

claim of the '504 Patent.

**THIRD COUNTERCLAIM – DECLARATION OF
NON-INFRINGEMENT OF THE '302 PATENT**

15.   NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1-14 of its Counterclaims.

16.   An actual and justiciable controversy exists between Impinj and NXP concerning the '302 Patent because Impinj has sued NXP for alleged patent infringement, which NXP denies.

17.   NXP has not infringed any valid and enforceable claim of the '302 Patent and is entitled to a declaration to that effect.

18.   NXP seeks a judgment declaring that it does not infringe any valid and enforceable claim of the '302 Patent.

**FOURTH COUNTERCLAIM – DECLARATION OF
NON-INFRINGEMENT OF THE '631 PATENT**

19.   NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1-18 of its Counterclaims.

20.   An actual and justiciable controversy exists between Impinj and NXP concerning the '631 Patent because Impinj has sued NXP for alleged patent infringement, which NXP denies.

21.   NXP has not infringed any valid and enforceable claim of the '631 Patent and is entitled to a declaration to that effect.

22.   NXP seeks a judgment declaring that it does not infringe any valid and enforceable claim of the '631 Patent.

**FIFTH COUNTERCLAIM – DECLARATION OF
NON-INFRINGEMENT OF THE '597 PATENT**

23.   NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1-22 of its Counterclaims.

24.   An actual and justiciable controversy exists between Impinj and NXP concerning the '597 Patent because Impinj has sued NXP for alleged patent infringement, which NXP denies.

25.   NXP has not infringed any valid and enforceable claim of the '597 Patent and is entitled to a declaration to that effect.

26.     NXP seeks a judgment declaring that it does not infringe any valid and enforceable claim of the '597 Patent.

**SIXTH COUNTERCLAIM – DECLARATION OF**
**NON-INFRINGEMENT OF THE '857 PATENT**

27.     NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1-26 of its Counterclaims.

28.     Pursuant to Impinj's "Preliminary Narrowing of Claims From 28 Claims to 20 Claims" dated February 21, 2020, Impinj is no longer asserting any claims of the '857 Patent against NXP.  However, to the extent that Impinj disagrees that it is no longer asserting any claims of the '857 Patent against NXP, an actual and justiciable controversy exists between Impinj and NXP concerning the '857 Patent because Impinj has sued NXP for alleged patent infringement, which NXP denies.

29.     NXP has not infringed any valid and enforceable claim of the '857 Patent and is entitled to a declaration to that effect.

30.     NXP seeks a judgment declaring that it does not infringe any valid and enforceable claim of the '857 Patent.

**SEVENTH COUNTERCLAIM – DECLARATION OF**
**INVALIDITY OF THE '266 PATENT**

31.     NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1-30 of its Counterclaims.

32.     An actual and justiciable controversy exists between Impinj and NXP concerning the validity of the '266 Patent.

33.     The '266 Patent is invalid for failure to meet one or more of the conditions for patentability specified in Title 35 of the United States Code, or the rule, regulations and laws related thereto, including without limitation, 35 U.S.C. §§ 101, 102, 103 and/or 112.

34.     NXP seeks a judgment declaring that the claims of the '266 Patent are invalid.

**EIGHTH COUNTERCLAIM – DECLARATION OF**
**INVALIDITY OF THE '504 PATENT**

35.     NXP re-alleges and incorporates by reference each allegation contained in

Paragraphs 1-34 of its Counterclaims.

36.   Pursuant to Impinj's "Preliminary Narrowing of Claims From 28 Claims to 20 Claims" dated February 21, 2020, Impinj is no longer asserting any claims of the '504 Patent against NXP.  However, to the extent that Impinj disagrees that it is no longer asserting any claims of the '504 Patent against NXP, an actual and justiciable controversy exists between Impinj and NXP concerning the validity of the '504 Patent.

37.   The '504 Patent is invalid for failure to meet one or more of the conditions for patentability specified in Title 35 of the United States Code, or the rule, regulations and laws related thereto, including without limitation, 35 U.S.C. §§ 101, 102, 103 and/or 112.

38.   NXP seeks a judgment declaring that the claims of the '504 Patent are invalid.

### NINTH COUNTERCLAIM – DECLARATION OF INVALIDITY OF THE '302 PATENT

39.   NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1-38 of its Counterclaims.

40.   An actual and justiciable controversy exists between Impinj and NXP concerning the validity of the '302 Patent.

41.   The '302 Patent is invalid for failure to meet one or more of the conditions for patentability specified in Title 35 of the United States Code, or the rule, regulations and laws related thereto, including without limitation, 35 U.S.C. §§ 101, 102, 103 and/or 112.

42.   NXP seeks a judgment declaring that the claims of the '302 Patent are invalid.

### TENTH COUNTERCLAIM – DECLARATION OF NON-INFRINGEMENT OF THE '631 PATENT

43.   NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1-42 of its Counterclaims.

44.   An actual and justiciable controversy exists between Impinj and NXP concerning the validity of the '631 Patent.

45.   The '631 Patent is invalid for failure to meet one or more of the conditions for patentability specified in Title 35 of the United States Code, or the rule, regulations and laws related thereto, including without limitation, 35 U.S.C. §§ 101, 102, 103 and/or 112.

46.     NXP seeks a judgment declaring that the claims of the '631 Patent are invalid.

## ELEVENTH COUNTERCLAIM – DECLARATION OF INVALIDITY OF THE '597 PATENT

47.     NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1-47 of its Counterclaims.

48.     An actual and justiciable controversy exists between Impinj and NXP concerning the validity of the '597 Patent.

49.     The '597 Patent is invalid for failure to meet one or more of the conditions for patentability specified in Title 35 of the United States Code, or the rule, regulations and laws related thereto, including without limitation, 35 U.S.C. §§ 101, 102, 103 and/or 112.

50.     NXP seeks a judgment declaring that the claims of the '597 Patent are invalid.

## TWELFTH COUNTERCLAIM – DECLARATION OF INVALIDITY OF THE '857 PATENT

51.     NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1-50 of its Counterclaims.

52.     Pursuant to Impinj's "Preliminary Narrowing of Claims From 28 Claims to 20 Claims" dated February 21, 2020, Impinj is no longer asserting any claims of the '857 Patent against NXP.  However, to the extent that Impinj disagrees that it is no longer asserting any claims of the '857 Patent against NXP, an actual and justiciable controversy exists between Impinj and NXP concerning the validity of the '857 Patent.

53.     The '857 Patent is invalid for failure to meet one or more of the conditions for patentability specified in Title 35 of the United States Code, or the rule, regulations and laws related thereto, including without limitation, 35 U.S.C. §§ 101, 102, 103 and/or 112.

54.     NXP seeks a judgment declaring that the claims of the '857 Patent are invalid.

## THIRTEENTH COUNTERCLAIM – FRAUDULENT CONCEALMENT

55.     NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1-54 of its Counterclaims.

56.     GS1 EPCglobal ("EPCglobal") is a standard setting organization that facilitates the

development of certain industry standards. EPCglobal has an Intellectual Property Policy, by which all participants must abide. Agreement to the Policy is a binding and enforceable contract.

57.    As part of EPCglobal, industry participants can join "Working Groups" that work to develop industry-specific standards. Industry participants need not participate in a Working Group to benefit from the standardization of the technology under consideration.

58.    Christopher J. Diorio, CEO of Impinj, assumed a leadership role in both the development of the Gen2 standard and the development of the Intellectual Property Policy, which governed, among other things, IP disclosure requirements. Participation in the Working Group to develop the Gen 2 standard was conditioned on commitment to the terms of EPCglobal IP Policy.

59.    The EPCglobal IP Policy required each Working Group member to license, royalty-free, any of its patent claims that are necessary to implement the Gen2 standard to other members of the Working Group and to disclose all "present, pending and hereafter acquired patent claims that would be necessarily infringed" by implementing the Gen2 standard which that Working Group member was unwilling to license. This disclosure requirement applied not only to the final standard, but also to all drafts or works in progress. Under the terms of the EPCglobal IP Policy, failure to provide such a disclosure constituted consent to the royalty-free license of all necessary claims.

60.    The purpose for early disclosure of all necessary claims which a Working Group Member was unwilling to license was to allow the Working Group to redefine the standard around that intellectual property. Diorio knew that disclosure of necessary claims that a Working Group Member was unwilling to license would result in changes to the standard to design around the intellectual property because Diorio himself had made changes to the standard to design around patents disclosed by other Working Group Members. Diorio also was aware of Working Group Members' concerns with the use of "undeclared IP" to "hold the RFID manufacturing community hostage," as shown, for example, by an email to Diorio from Harley Heinrich of Intermec Technologies Corporation, on which NXP was copied. By way of further example, Heinrich also "urge[d] that [the group] not consider" a functionality that "may have issues with the referenced Atmel patent" in an email, to which Diorio responded on June 5, 2004.

61.     As part of a Unified Specification IP Declaration, Impinj disclosed three U.S. Patent applications as including necessary IP on or about April 14, 2004. Other Working Group members such as Intermec, Philips, Texas Instruments, and Rafsec, likewise submitted declarations concerning necessary IP as part of that Unified Specification IP Declaration. In that same Declaration, Impinj also declared: "All other Impinj IP is expressly excluded from this declaration and from the EPCglobal IP policy." In so declaring, Impinj represented that it did not have any other necessary IP that it was unwilling to license.

62.     By email dated May 21, 2004, Diorio confirmed to numerous Working Group Members, including NXP, that it agreed to abide by the EPCglobal IP Policy.

63.     As an example of Impinj's failure to abide by the EPCglobal IP Policy and fraudulent concealment, on October 26, 2004, Impinj filed provisional application No. 60/622,397 at the USPTO identifying Diorio as an inventor of "RFID Readers/Writers Communicating With RFID Tags." On October 24, 2005, Impinj filed a related patent application that claimed the benefit of, and incorporated by reference, the October 26, 2004 provisional application. This application matured into the '751 Patent, which was previously asserted against NXP. Despite affirmatively agreeing to be bound the EPCglobal IP Policy and to declare all necessary IP, and despite his awareness of the Working Group's IP concerns, at no time did Diorio disclose the filing of the '751 patent application, which Impinj has admitted contains necessary IP, to NXP or any other Member of the Working Group.

64.     Impinj and Diorio filed and prosecuted additional patent applications throughout the development of the Gen2 standard, including V2.0.0 of the Gen2 standard ("Gen2 V2"), none of which Diorio disclosed to NXP or declared as necessary IP pursuant to the EPCglobal IP Policy.

65.     On information and belief, Diorio knew at the time of filing these patent applications that they claimed subject matter that would be necessary to implement the Gen2 standard. For example, the provisional application that Impinj filed that matured into the '751 Patent included, verbatim, large portions of a Gen2 standard Candidate Specification.

66.     Diorio had a duty to disclose these patent applications due to his obligations under

the EPCglobal IP Policy, his leadership role in the development of the standard, and the conduct of the other members of the Working Group as to the disclosure of relevant IP.

67. Because of Diorio's significant involvement in all aspects of developing the Gen2 standard, including Gen2 V2, he was fully aware of all material design aspects of the standard. Diorio's intentional concealment of the Impinj patent applications was material because they are necessary to implement the Gen2 standard, and given the extensive discussions concerning designing around other parties' IP, the Working Group likely would have developed the Gen2 standard to also design around Diorio's patents.

68. On information and belief, Diorio intentionally influenced the development of the Gen2 standard, including Gen2 V2, such that any industry participant that desired to commercialize a Gen2 V2-compliant product would be forced to use the technology on which Diorio and Impinj were concurrently seeking patent protection. By concealing the patent applications, Diorio intended for NXP to rely on the impression that Impinj neither had nor was pursuing IP that would be necessary to implement the Gen2 standard.

69. Diorio excluded NXP from critical stages of the development of the Gen2 standard. NXP reasonably and justifiably relied on Diorio's concealment of the necessary IP on which Impinj was seeking patent protection by working towards the formal adoption of the standard and by designing and developing Gen2 V2-compliant products, which are now accused of infringement.

70. Impinj's assertion of the Gen2 V2 Patents here is inconsistent with the impression given by Impinj that the required technology would be freely, or at least reasonably, accessible to NXP and other industry participants.

71. NXP has been harmed as a result of its reasonable and justifiable reliance on Diorio's concealment and is threatened, for example, by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

## FOURTEENTH COUNTERCLAIM – BREACH OF CONTRACT

72. NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1-71 of its Counterclaims.

73. Impinj entered into express or implied contractual commitments at least with GS1 EPCglobal and their members, affiliates and adopters relating to the Gen2 standard, including Gen2 V2. Impinj was contractually obligated, among other things, to offer its intellectual property necessary to implement the Gen2 V2 standard on a royalty-free basis to other GS1 EPCglobal members, consistent with the EPCglobal Intellectual Property Policy, Working Group Declaration, Rev. 12/15/2003 A ("the EPC IP Policy").

74. The International Organization for Standardization ("ISO") and the International Electrotechnical Commission ("IEC") are standard setting organizations that facilitate the development of certain industry standards. Both ISO and IEC, along with other standard setting organizations, share a "Common Patent Policy" by which parties "participating in the work of the Organizations" are required to abide. The Gen2 standard, including Gen2 V2, was also transferred to ISO/IEC 18000-6 part C, which later became ISO/IEC 18000-63. In conformance with the Common Patent Policy, patent holders must submit licensing declarations disclosing whether they are willing to license patent claims that are required to implement any ISO/IEC standard and, if they are not willing, disclosing which of its patent claims they believe are required to implement the standard but are unwilling to license. Impinj entered into express or implied contractual commitments at least with the ISO and IEC, and their members, affiliates and adopters relating to ISO/IEC 18000-63. Impinj was also contractually obligated, among other things to offer its intellectual property required to implement ISO/IEC 18000-63 on a RAND basis to an unrestricted number of applicants, consistent with the Common Patent Policy.

75. Impinj previously contended that NXP infringed the following patents based upon compliance with the Gen2 V2 standard: U.S. Patent Nos. 7,215,251; 7,246,751; 7,388,468; 7,472,835; 7,773,227; 8,134,451; 8,390,431; 8,391,785; 8,600,298; 8,665,074; 8,952,792; 9,031,504; and 9,349,090 ("Gen2 V2 Patents"). Based upon these contentions, Impinj has admitted the claims of these patents are necessary to implement the Gen2 V2 standard. Impinj has admitted the claims of these patents are also required to implement ISO/IEC 18000-63. Impinj did not declare it was unwilling to license any of the Gen2 V2 Patents to NXP, royalty-free. In its February 18, 2020 FAC, Impinj dropped 11 of these 13 patents, but it previously

advised the Court that Impinj was reserving the ability to assert these 11 patents in new litigation against NXP. Impinj's FAC also continued to accuse NXP of infringing the other two Gen2 V2 Patents, U.S. Patent Nos. 8,600,298 and 9,031,504. In its October 27, 2020 SAC, Impinj dropped an additional patent, U.S. Patent No. 8,600,298, but continues to accuse NXP of infringing U.S. Patent No. 9,031,504.

76. NXP is, and was at the time the Gen2 V2 standard was adopted, a GS1 EPCglobal member and a beneficiary to Impinj's contractual obligation to license necessary IP. As such, NXP is entitled to a royalty-free license to Impinj's patents that are necessary to practice the Gen2 V2 standard. Impinj breached its contract at least with EPCglobal and their members, affiliates and adopters relating to the Gen2 V2 standard by refusing to offer NXP a royalty-free license on its necessary patent claims. Impinj has further breached its contractual obligations by filing this patent infringement action seeking monetary damages and to enjoin NXP's implementation of the technology of Impinj's Gen2 V2 patent claims.

77. NXP is, and was at the time the Gen2 V2 standard was transferred to ISO/IEC 18000-63, a participant in the work of ISO and/or IEC and a beneficiary to Impinj's contractual obligation to license required IP. Impinj signed multiple declarations relating to ISO/IEC 18000-63 in which Impinj agreed to grant a license to an unrestricted number of applicants on a worldwide, RAND basis to any patent claims that would be required to implement ISO/IEC 18000-63. Impinj did not declare that it was unwilling to license any of the Gen2 V2 patents under the Common Patent Policy. Thus, Impinj also has breached its contractual obligations by refusing to offer NXP a license on RAND terms on its patent claims required to implement ISO/IEC 18000-63. Impinj has further breached its contractual obligations by filing this patent infringement action seeking monetary damages and to enjoin NXP's implementation of the technology of Impinj's required patent claims.

78. NXP has been harmed as a result of its reasonable reliance on Impinj's promises and is threatened, for example, by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

79. Among other things, NXP is entitled to a preliminary and permanent injunction

prohibiting Impinj from enforcing the Gen2 V2 patent claims against NXP, or from excluding NXP from implementing the technology allegedly embodied in those patent claims.

**FIFTEENTH COUNTERCLAIM – PROMISSORY ESTOPPEL**

80.    NXP re-alleges and incorporates by reference each allegation contained in Paragraphs 1–79 of its Counterclaims.

81.    One of the goals for the development and implementation of the Gen2 V2 standard was to enhance the ability of all industry members to compete more efficiently and effectively to provide better value to the consumer or end user.  That goal would be achieved, among other ways, by ensuring that all industry participants would have access to the technology required by the standard, which would ultimately benefit consumers by reducing costs.  In the course of developing the Gen2 standard, including Gen2 V2, Impinj worked to convince other industry participants of the efficacy of Impinj's proposals and the resultant benefits to consumers and the general marketplace.

82.    Impinj assumed a leadership role in the development and adoption of the Gen2 V2 standard, and Impinj exercised control over the development of the Gen2 V2 standard.  By its participation in the development of the Gen2 V2 standard, Impinj made a promise to EPCglobal members that it would license patent claims necessary to implement with the Gen2 standard, royalty-free, to other members and that it would identify any such patent claims that it was unwilling to so license.  While working on the development of the Gen2 standard, Impinj confirmed to Working Group Members its commitment to abide by the EPCglobal IP Policy and license necessary patent claims royalty-free.

83.    On information and belief, the intended purpose of Impinj's promise was to induce EPCglobal members to rely on Impinj's promise that the standard would be accessible to all industry participants and adopt the standard developed under Impinj's leadership and control. Impinj knew or should have reasonably expected that this promise would induce EPCglobal members, such as NXP, to develop products compliant with the Gen2 V2 standard.

84.    Impinj's actual and threatened assertion of the Gen2 V2 Patents here is inconsistent with the impression given by Impinj that the required technology would be freely, or

at least reasonably, accessible to NXP and other industry participants.

85. NXP developed and marketed its Gen2 V2-compliant products in reliance on Impinj's promise that all necessary patent claims would be licensed on a royalty-free basis.

86. Under the doctrine of promissory estoppel, Impinj is estopped from breaching those promises by asserting the claims of the Gen2 V2 Patents against NXP.

87. NXP has been harmed as a result of its reasonable reliance on Impinj's promises and is threatened, for example, by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

88. Among other things, NXP is entitled to preliminary and permanent injunctions prohibiting Impinj from enforcing the claims of the Gen2 V2 Patents against NXP, or from excluding NXP from implementing the technology allegedly embodied in those patents.

## DEMAND FOR JURY TRIAL

NXP hereby demands a jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, NXP prays for relief against Impinj as follows:

1. Entry of judgment declaring that NXP does not infringe any valid and enforceable claim of the asserted patents;

2. Entry of judgment that the claims of each of the asserted patents are invalid or unenforceable;

3. Dismissal of Impinj's claims in their entirety with prejudice;

4. An award of damages in an amount sufficient to compensate NXP for the damages caused by Impinj's improper conduct;

5. A preliminary and permanent injunction prohibiting Impinj from asserting against NXP patents that are necessary to practice the Gen2 V2 standard and/or ISO/IEC 18000-63;

6. A judgment that this is an exceptional case and awarding NXP its costs, expenses, and reasonable attorney's fees pursuant to 35 U.S.C. § 285; and

7. Any further relief as the Court may deem just and proper.

Dated: November 10, 2020

Respectfully submitted,

Jones Day

*/s/ T. Kaitlin Crowder*

David L. Witcoff (admitted *pro hac vice*)
Illinois State Bar No. 06183629
dlwitcoff@jonesday.com
Jones Day
77 West Wacker
Chicago, IL 60601
T: (312) 782-3939
F: (312) 782-8585

Michael C. Hendershot
Bar No. 211830
mhendershot@jonesday.com
Jones Day
1755 Embarcadero Road
Palo Alto, CA 94303
T: (650) 739-3940
F: (650) 739-3900

Yury Kalish (admitted pro hac vice)
D.C. Bar No. 1020172
ykalish@jonesday.com
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001
T: (202) 879-3939
F: (202) 626-1700

Jeffrey M. White (admitted pro hac vice)
Texas State Bar No. 24064380
jwhite@jonesday.com
Jones Day
2727 North Harwood Street, Suite 500
Dallas, TX 75201
T: (214) 969-3723
F: (214) 969-969-5100

T. Kaitlin Crowder (admitted pro hac vice)
Ohio State Bar No. 0095796
kcrowder@jonesday.com
Jones Day
901 Lakeside Ave E.
Cleveland, OH 44114
T: (216) 586-7347
F: (216) 579-0212

Attorneys for Defendant
NXP USA, INC.