UNITED STATES DISTRICT COURT

*ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| Impinj, Inc., | ) | **Claims Construction** |
| | ) | **Hearing** |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. C 19-03161 YGR |
| | ) | |
| NXP USA, INC., | ) | Pages 1 - 69 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Friday, March 4, 2022 |

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiff:        PERKINS COIE
                      Washington Mutual Tower
                      1201 Third Avenue - 40th Floor
                      Seattle, Washington  98101
               BY:  RAMSEY M. AL-SALAM, ATTORNEY AT LAW

                      Perkins Coie LLP
                      1122 N.W. Couch Street, 10th Floor
                      Portland, Oregon  92709-4128
               BY:  MICHAEL C. HENDERSHOT, ATTORNEY AT LAW


For Defendant:        Jones Day
                      Silicon Valley Office
                      1755 Embarcadero Road
                      Palo Alto, California  94303
               BY:  THARAN GREGORY LANIER,
                      MICHAEL C. HENDERSHOT,
                      ATTORNEYS AT LAW

Reported By:       Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

```
1    Friday, March 4, 2022                           9:04 A.M.

2                     P R O C E E D I N G S

3         THE CLERK:  Now calling civil case 19-3161-YGR

4    Impinj, Inc. versus NXP U.S.A., Inc.

5       Counsel, if you please step forward to the podium, state

6    your appearance for the record starting with the plaintiff.

7         MR. AL-SALAM:  Ramsey Al-Salam of Perkins Coie, Your

8    Honor.  I'm accompanied by Daniel Keese of Perkins Coie.

9       And just so -- may I know -- may I remove my mask --

10        THE COURT:  So my rule is when you're in the --

11   outside, you have to follow the GAO's rule.  My rule is if

12   you're vaccinated and you want to take it off, that's fine

13   with me.

14        MR. AL-SALAM:  Thank you, Your Honor.  I'm fully

15   vaccinated.

16        MR. LANIER:  Good morning, Your Honor.  Greg Lanier

17   and Michael Hendershot of Jones Day for NXP.

18        THE COURT:  Mr. Lanier, I don't think I've seen you

19   in, I don't know, 20 years.

20        MR. LANIER:  That's about right.

21        THE COURT:  Yeah.  You look the same.

22        MR. LANIER:  Well, thank you very much.  As you do,

23   Your Honor.

24        THE COURT:  So Mr. Lanier and I used to be partners

25   together.
```

```
 1        Well, let's get started.
 2        Way I do these is we do them term by term, and I don't
 3   know if you've divided up terms or what your plan is, but I
 4   want both folks at the podium at the same time and we just go
 5   back and forth.
 6        I do have your PowerPoints, so to the extent that you want
 7   to use PowerPoints, that's fine.  But it is kind of a
 8   back-and-forth approach.
 9        So for Impinj, what's your plan?
10        MR. AL-SALAM:  Thank you, Your Honor.
11        I will argue the first three terms, and my colleague
12   Mr. Keese will argue the next three.
13        THE COURT:  Okay.
14        Mr. Lanier.
15        MR. LANIER:  And just so it's clear what three terms
16   we're talking about, are you planning to start with the '597
17   patent, the one remaining term?
18        MR. AL-SALAM:  Correct.  And then the first two terms
19   of the '266 patent.
20        MR. LANIER:  Thank you.
21        And Mr. Hendershot will argue the first term in the '597
22   patent, and I will take the terms in the '266 patent.  And it
23   sounds like we're going to go in the order that we presented
24   them, and that's great with us.
25        THE COURT:  Correct.  Okay.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
1          I think -- all right.  Well, let's get started there.

2              MR. AL-SALAM:  Shall I begin, Your Honor?

3              THE COURT:  Hold on.

4              MR. AL-SALAM:  Okay.

5              THE COURT:  Okay.  So as I understand it, with

6    respect to the '597, the claim term is "the first and second

7    intermediate nodes are coupled together and are coupled to

8    ground," correct?  We on the same --

9              MR. AL-SALAM:  Yes, Your Honor.

10             THE COURT:  So Impinj's proposal is just the

11   plain-and-ordinary meaning, that there is no construction

12   necessary.  And NXP wants me to construe it as "the coupling

13   of the first and second intermediate nodes via capacitors to

14   ground."

15        So you're -- you want me to include this limiting term

16   "via capacitors," correct?

17             MR. HENDERSHOT:  Correct, Your Honor.

18             THE COURT:  Okay.  My inclination is to not so limit

19   it, so you can go first.

20             MR. HENDERSHOT:  Thank you, Your Honor.

21        So I will refer to the hard copies of our slides, if

22   that's okay.

23             THE COURT:  I believe I have your hard copies.  And

24   do you want -- do you want them on the screen?

25             MR. HENDERSHOT:  I can work off a hard copy.  I'm
```

1    slightly old fashioned that way, if --

2             THE COURT:  Okay.  That's fine.

3             MR. HENDERSHOT:  So the -- the term in the

4    constructions begin on Slide 4 for the '597 patent.

5             THE COURT:  I have it.

6             MR. HENDERSHOT:  And it -- this appears in Claim 12,

7    and I -- I note that because this is a dependent claim.  This

8    is not a case where we're arguing to limit all the claims or

9    the whole of an invention to a particular embodiment disclosed

10   in the patent.

11       The patent has an independent claim, Claim 1, from which

12   12 depends, that is presumably broad enough to cover multiple

13   embodiments disclosed in the patent.  We're not trying to

14   limit Claim 1 in that regard.  The patentee could have stopped

15   there with Claim 1 and relied on a claim that covers the

16   embodiments in the patent, but it proceeded to add three

17   specific dependent claims, one of which is Claim 12 where this

18   term appears.

19       The patent we think is really clear.  It ties these

20   dependent claims to very specific embodiments and they're

21   directed to cover those for reasons the patent explains, so

22   we're just trying to construe is term in Claim 12, this

23   dependent claim, consistent with the disclosure to which it's

24   tied in the patent.

25       If I could refer to Slide 5.

1          And this is isn't on the slide here, but the -- the '597

2     patent at Column 8 beginning at line 49 through line 62

3     explains first with respect to these intermediate nodes that

4     we're dealing with in this -- in Claim 12 and how they're

5     coupled, there are three general configurations to treat these

6     intermediate nodes AN.

7          And it continues on.  Each of the configurations provides

8     unique performance advantages depending on the phase and

9     amplitude relationship between the negative and positive RF

10    antenna.

11         So it says for these intermediate nodes, there are three

12    general configurations, and each one has a unique performance

13    advantage.  So if you refer to Slide 5, there's a passage from

14    Column 9 on the left and then the three dependent claims I've

15    been referring to on the right.

16         You have Claim 10 that says the rectifier in which the

17    first and second intermediate nodes are floating, so they're

18    floating, which in the parlance of this patent means they're

19    not connected to ground and they're not coupled to one

20    another.

21         And the spec provides that Diagram 900C shows an

22    embodiment that is configured for what's called nodal

23    averaging.  They have three averaging techniques that are

24    three techniques that were referenced.

25         In the nodal averaging configuration, the individual nodes

```
 1    A1 -- AN1 to ANN are left to float so that -- that is the

 2    purple on the left from the spec.  It maps directly to

 3    Claim 10 on the right, which is a dependent claim from

 4    Claim 1.

 5        Similarly, the blue in the specification and in Claim 11.

 6    Claim 11 on the right provides the first and second

 7    intermediate nodes are coupled together and are floating

 8    together, which corresponds to the description for local

 9    averaging in the spec on the right which is the second of

10    those three configurations.  The patent talked about having

11    unique advantages.

12            THE COURT:  How's the court reporter doing with his

13    speed?

14                    (Off-the-record discussion.)

15            THE COURT:  You may proceed.

16            MR. HENDERSHOT:  Thank you.

17            THE COURT:  One of the reasons we have to get back in

18    the courtroom is so that people remember to slow down.

19            MR. HENDERSHOT:  Feel free to tell me when I need to.

20            THE COURT:  Go ahead.

21            MR. HENDERSHOT:  And then the third, the green

22    language from the spec and the Claim 12 on the right, Claim 12

23    is the one that we're dealing with here where this term

24    arises.

25            THE COURT:  Right.
```

1          **MR. HENDERSHOT:**  This is the global averaging

2     configuration where the specification provides the individual

3     nodes AN1 through ANN are coupled together, and they're

4     connected to ground.

5          So you have these three dependent claims, 10 and 11 and

6     12, that are very clearly drawn to three particular

7     embodiments that the patent teaches have unique performance

8     advantages.  We're dealing with Claim 12, this dependent

9     claim.

10          And quickly if you look at Slide 6, there are three

11     figures that are part of the Figure 9 that further illustrate

12     these embodiments that these claims are specifically drawn to.

13     On Claim 6, this is -- on Slide 6, this is Claim 10 where the

14     intermediate nodes are floating.  And you'll see the -- the

15     nodes are the AN items that we've put rectangles around in the

16     figure.  Those are floating, so they're -- they're not coupled

17     together in the claim, and they're not depicted as being

18     connected or coupled together or to ground.

19          Slide 7, similarly shows Claim 11 and Figure 9D.  And

20     Claim 11 talks about the first and second intermediate nodes

21     being coupled together and floating together.

22          And you can see the difference in this figure on the left,

23     is that you now have the nodes, which are those dots marked by

24     AN, connected to the same line, and each of those are coupled

25     to one another by a capacitor.  And they're floating together,

1 so they're coupled together by a capacitor but they're not

2 connected to ground.

3   And then Slide 8 is Claim 12, which is the claim we're

4 dealing with.  This is the third of those figures that the

5 specification shows on the right is --

6   God bless you.

7      **THE CLERK:**  Thank you.

8      **MR. HENDERSHOT:**  An embodiment that is configured for

9 global averaging, which we talked about where the nodes are

10 coupled together and connected to ground.

11   Now, this is --

12      **THE COURT:**  So I understand you had set this out

13 before.  The Federal Circuit law is that the claims of a

14 patent may not be limited to an embodiment, which is what

15 you're arguing, even if it is the only embodiment described in

16 a patent, unless there's disavowal.

17   So where's -- or -- I mean -- how do I get past that

18 established law in *Phillips*?

19      **MR. HENDERSHOT:**  So the quote that they provided from

20 *Phillips* in their brief, Your Honor, I would not dispute its

21 application to the independent Claim 1.  There are multiple

22 embodiments that independent Claim 1 embodies, and we've seen

23 three of them here.  We're not trying to limit that or the

24 invention to a single disclosed embodiment.

25   Here, we have dependent claims that are drawn to more

1   specific embodiments that we think are plainly linked and

2   clearly addressed to disclosures in the specification.  And

3   we're trying to construe --

4          THE COURT:  What's -- what's your best Federal

5   Circuit case that describes this as an appropriate analysis

6   for the court?  If I don't rely on *Phillips*, what -- what do

7   you want me to rely on?

8          MR. HENDERSHOT:  I think you can rely on *Phillips*,

9   Your Honor.  And if I could refer you to Claim 10 -- or

10  Slide 10, rather.  I apologize.  You need to construe the

11  plain, ordinary meaning of the term as *Phillips* instructs in

12  the context of the claim term.  Here -- and other claim

13  language.

14     Here, we have dependent Claim 12 talking about the

15  coupling of intermediate nodes.  And Claim 12 depends from

16  Claim 1, which we have excerpted here on the right-hand side.

17     Claim 1 provides that these nodes connect transistors in

18  what are these -- called these synchronous elements in the

19  image on the left.  And they need to form a charge

20  accumulating path between the beginning and the end of those

21  elements on the left.

22     So the way that works in this patent I'll try to be brief

23  is you build up charge on one capacitor on the left, and it

24  gets passed to the next one on the right, and then that gets

25  passed further down, and you build up and pass charge that

1    accumulates along the path as you go left to right in this

2    image.

3        If you are connecting these nodes, one of which is in the

4    middle of the orange path and one of which is in the middle of

5    the red path, to one another -- if you're coupling them, and

6    you just adopt a plain -- I guess my real issue is with the

7    plain-and-ordinary meaning that they're advancing 'cause if

8    you directly connect those -- sorry -- if you directly connect

9    those, as they're suggesting the plain-and-ordinary meaning

10   would cover, the invention wouldn't work, and it would break

11   the claim language from which Claim 12 depends.

12       Because if you're directly connecting the node at A1 to

13   ground and the node in the middle of the red path at -- at --

14   in the -- and AN2 to ground, that's a short circuit.  And all

15   of your charge halfway across the first orange path is going

16   to go straight to ground and not accumulate.  And all of your

17   charge halfway along the red path is going to go straight to

18   ground and not accumulate.

19           THE COURT:  Right.  But you want me to construe it to

20   include that the -- that the method includes capacitors.  And

21   that suggests that that's the only possible way that it could

22   happen or that someone skilled in the art would expect it to

23   happen, which limits, obviously, the construction.

24       So where -- how can I do that?

25           MR. HENDERSHOT:  Your Honor, I think a -- a person of

1    ordinary skill in the art reading the patent -- and our expert

2    testified to this -- would understand that dependent Claim 12

3    to be directed to that figure in 9E.  And 9E uses -- the

4    description of 9E uses the same language recited in Claim 12,

5    and it depicts this coupled by a capacitor.  That's the sole

6    embodiment, and I don't have the case in front of me from our

7    briefing, and I can pull that in a moment.

8            **THE COURT:**  If it's -- I don't happen to be looking

9    at it right now.  I'm just looking at my notes.

10           **MR. HENDERSHOT:**  Yeah.

11           **THE COURT:**  So if it's in your -- if it's in your

12   briefing, then you can rely on that.

13       All right.  A response.

14           **MR. AL-SALAM:**  Thank you, Your Honor.

15       Can you put up the slides.

16           **MR. KEESE:**  Absolutely.

17           **MR. AL-SALAM:**  The court is correct.

18                   (Demonstrative published.)

19           **MR. AL-SALAM:**  The only issue here is should this

20   claim be limited to coupling through capacitors.  And there is

21   nothing in the specification or file history that requires

22   that the claim language be limited in that manner.

23       I --

24                   (Demonstrative published.)

25           **MR. AL-SALAM:**  The -- the court is correct that the

1    presumption is that claim language should not be limited to

2    preferred embodiments.  And I have never seen a case and -- if

3    counsel corrects me, that's fine.

4        I have never seen a case that says that principle only

5    applies to independent claims and doesn't apply to dependent

6    claims.  It's a general principle of claim construction, that

7    you don't limit the claims to the preferred embodiment absent,

8    as you said, disavowal.  And there's no disavowal anywhere in

9    the specification or the prosecution history.

10       At no time did -- in the specification, does it say the

11   invention requires coupling to ground via capacitors.  And no

12   time in the prosecution history was prior art distinguished on

13   the basis that it didn't couple to ground via capacitors.

14       And -- that should be the end of it.  But -- but the fact

15   is that the -- the specific embodiments that are relied upon

16   by -- by defendant are described in the patent as embodiments.

17       They say for each, and there's two.  There's 9C, and -- I

18   mean, sorry 9E and 10C.  And for each, they're described

19   themselves -- as an embodiment.  They're not limiting the

20   claims.

21       In addition, there is no dispute -- now, the counsel was

22   arguing that, well, if there was -- if it just was connected

23   directly to ground, then it wouldn't work.  But that's not the

24   only option.

25       There are other ways to couple it to ground not using a

1    capacitor.  And our expert Dr. Smith has explained that, that

2    you can couple versus other elements, like transistors,

3    resistors, inductors.  I don't even think that issue is --

4    is -- is disputed.

5        In fact, NXP in their response says they're not arguing

6    that every coupling has to be via capacitor, so we know that

7    there are other ways to couple, including couple to ground.

8        And to go --

9                    (Demonstrative published.)

10       MR. AL-SALAM:  -- farther, there are other

11   illustrations of these -- this invention that don't even show

12   capacitors.

13       THE COURT:  I'm going to cut you off --

14       MR. AL-SALAM:  Okay.

15       THE COURT:  -- because it's now 9:20.  I understand

16   your arguments, and --

17       MR. AL-SALAM:  Thank you.

18       THE COURT:  -- I don't -- we have to finish by -- I

19   have another hearing at 11:30.  So the way I do these

20   things -- frankly, I haven't done one in such a long time in

21   person, I forgot to mention, I don't frankly care which --

22   which terms we do in terms of order.  The time is yours.

23       And so what I tell lawyers is that you pick the most

24   important ones that you want to talk about, and you've got the

25   time, and if you run out, you run out of time.  So I -- I

1      think I've heard what I need to hear on this one.

2          Where do you want to go next?

3              **MR. AL-SALAM:**  Thank you, Your Honor.

4              **MR. HENDERSHOT:**  Thank you, Your Honor.

5              **MR. AL-SALAM:**  The -- the next term, and this is the

6      order, is "processor block" for the '266 patent.

7              **THE COURT:**  Right.  And that's -- and I'll let you --

8      is that the one you want next?

9              **MR. AL-SALAM:**  Yes, Your Honor.

10             **THE COURT:**  Okay.  And then, Mr. Lanier, I'll let you

11     pick the next one.  It can be in order or not.  Whatever you

12     think's most important in case you run out of time, you run

13     out of time.  All right?

14             **MR. LANIER:**  Thank you, Judge.

15             **MR. AL-SALAM:**  And then to be -- maybe I'm overly

16     optimistic, but we only have five terms to go, and I think

17     disputes are relatively narrow, so I'm hopeful that we will

18     get through all of them within the court's time.

19             **THE COURT:**  I do, too.  But you're lawyers so --

20             **MR. AL-SALAM:**  So --

21             **THE COURT:**  Okay.  "Processor block."

22             **MR. AL-SALAM:**  So --

23                     (Demonstrative published.)

24             **MR. AL-SALAM:**  -- there's -- there ever been two

25     disputes on "processor block."  Well, there were three.

1   They -- they originally wanted the construction as reflected

2   on the screen, that the processor block has to receive power

3   from another subsection of the RFID IC.  They withdrew that,

4   and that left two disputes.  One is whether the processor

5   block has to be a portion of the claimed IC or can be an IC in

6   itself.

7       That's one of the disputes, and we, as I advised

8   Mr. Lanier at the beginning, are willing to withdraw that

9   argument because I don't think it has any relevance to the

10  dispute between the parties.  So we are willing to limit the

11  construction to a -- that the processor block is a portion of

12  the claimed IC.

13      And that narrows the dispute to one issue, Your Honor.

14  And that is whether the processor block has to contain a

15  processor.  And that's the only remaining dispute.

16          **THE COURT:**  Okay.

17          **MR. AL-SALAM:**  And the -- the -- the fact is there

18  are various reasons why the processor block does not have to

19  contain a processor, and the most -- the most persuasive is

20  that the specification describes the processor block that

21  maybe, quote, implemented in any way known in the art, for

22  example, by combinations of one or more of a processor memory

23  decoder, encoder, and so on, end quote.

24      Now, it says "processing block."  It doesn't say

25  "processor block."  But a key issue is whether there's a

1    dispute that the disclosure of a "processing block" in the

2    specification is meant to be the same as the claimed

3    "processor block."  And we -- we would submit that it is

4    because the functions are the exact same.

5        What these claims relate to is when -- and I don't think

6    we have to understand this in detail.  But when you have an

7    RFID tag, a passive tag, it gets all its power from the radio

8    waves it receives from the reader.  It has to harvest the

9    energy from those waves to power its own IC.

10       And the court will hear more about variable impedance, but

11   the essence is that if you can match the impedance between IC

12   and the -- the -- the resonant frequency of what's coming in

13   on the antenna, you can harvest more power.

14       So what this processor block does is it operates at a

15   lower frequency to try to -- when it doesn't have enough power

16   to operate, it operates at a lower frequency if it has enough

17   power to tune.  And hopefully if it can tune to therefore

18   harvest more power, then it is able to then switch to the

19   protocol phase where it can then communicate with the reader.

20       The -- the description of the processing block in the

21   specification explains that it can be implemented in any way

22   known in the art.

23       Now, defendants and their expert have relied on that

24   disclosure to interpret "processor block" in the claims in

25   various ways, including the original argument that it required

1     power from another subsection.  But they can't have it both

2     ways.

3         We -- we agree that "processing block" disclosed in the

4     specification is the same as the "processor block" that's

5     claimed.  And it makes it clear that that is not limited to a

6     processor.  And even just in common sense, neither of the

7     parties use processors in their -- in their -- in their IC's.

8     A processor, if we're talking about a general purpose

9     processor, consumes too much power and takes too much space to

10    be put into a small IC tag.

11        Nobody, even on their side, is disputing that people

12    commercially do not use processors in these tags and for the

13    IC's.  It is -- that's why it's referred to as a "processor

14    block."

15        Under their construction, we read out the word "block" and

16    we say, it should have just said processor, even though that

17    wouldn't make sense in terms of how the parties -- how the

18    parties' own products work and operate.

19        And for that reason, Your Honor, "processor block" should

20    not be limited to -- to having a processor.

21            **THE COURT:**  Mr. Lanier.

22        **MR. LANIER:**  Thank you, Your Honor.

23        And mindful of the court's time and trying to --

24            **THE COURT:**  It's your time.  I've blocked it out.

25        **MR. LANIER:**  Thank you.

1          If I could draw the court's attention to Slide 12 of our

2     slides.  And that just lays out the two competing

3     constructions as we walked in this morning.  Now, we've

4     resolved the portion issue.

5          We've explained at length in our papers why we think a

6     "processor block" or processing -- the "processing block" of

7     the specification and the "processor block" of the claims must

8     include a processor.

9          So I want to be clear about two things.  The first is that

10    we are not seeking a construction that the "processor block"

11    is only a processor.  We're asking for a construction that the

12    processor block includes a processor, because as

13    Dr. van der Weide explained without rebuttal from Dr. Smith,

14    that's what would be required to accomplish the job of the

15    technology.  It's all in our papers.  It's all in what's

16    submitted, so I won't repeat it.

17         What I did want emphasize, though, was what's on Slide 13.

18    And there, we depict a couple of different excerpts from the

19    reports of our two experts that were submitted to Your Honor.

20         And what we notice is that Dr. Van der Weide says

21    "processing block" or "processor block" is -- it's not a --

22    it's a coined term.  It's not a term of art.  It's not one

23    that persons of ordinary skill in the art would regularly use.

24    And then he explains why, and we put in our papers why it is,

25    that it would include a processor, not be limited to one.

1    Dr. Smith actually addresses a different question.  He

2  talks about what someone would have understood about how you

3  get the job done, a processor block or processing

4  functionality so he's not even actually addressing the claim

5  construction issue that's before Your Honor.

6    The last point I would like to make, because there's

7  extensive discussion in the argument slides that were

8  submitted to Your Honor about positions taken in another case

9  involving another patent and another court, that courts

10  regularly understand terms like this to include processors.

11    And I would draw the court's attention to the *Invensys*

12  case that was cited by Impinj.  It was cited at page 18 of its

13  opening brief.  It's a decision of Judge Davis in the Eastern

14  District.  But they cite it relating to the "configure to"

15  issue that we'll come to.

16    But if Your Honor is able to look back at page 671 of that

17  decision, "processing device" is readily recognized by those

18  skilled in the art as a processor, thereby evidencing

19  corresponding structure.

20    So the only things we have from any authority before the

21  court about what the structural language is, there the term

22  was "processing," but device -- here the term is "processor

23  block" in the claims -- evidences that it would either be or

24  at least include a processor.  And all we're asking is not a

25  construction to limit it to a processor but to include a

1    processor.

2        My final point on this one, Your Honor --

3        **THE COURT:**  I -- I'm not understanding the

4    distinction you're trying to make.  By definition, if it has

5    to include a processor, you're limiting it.

6        **MR. LANIER:**  Then let me be -- we are seeking not to

7    limit the processing block to be only a processor.  The

8    processing block must include a processor.  It may have other

9    circuit elements or other circuitry.  But it is not -- we are

10    not reading the term "processor" and "processor block" in this

11    patent to be exactly the same limits.

12        **THE COURT:**  Would your definition or construction, by

13    definition, require a construction of the word "processor"?

14        **MR. LANIER:**  We don't think so, Your Honor.

15    Processor is a term that I don't think there's any dispute is

16    well understood by a person of skill in the art.  There's been

17    no discussion about that.  "Processing block" or "processor

18    block" was the term that -- that Dr. Van der Weide addressed,

19    and other terms were what Dr. Smith addressed.

20        One final point on -- on this one, Your Honor.  Since

21    we've resolved the portion issue, if you look back at

22    Slide 12, that's where the two competing constructions are,

23    what we would offer is that if the court is not inclined to

24    construe "processor block" as requiring a processor, it should

25    however reject Impinj's proposed construction, which is

1    containing RF analog and/or digital processing limits, because

2    that provides precisely no guidance, no clarity, no additional

3    information.

4        It says it's anything.  That's literally what it says.

5    The world of RF analog and/or digital processing elements,

6    it's hard to imagine what could be there that's not -- what

7    exists in the universe in electronics that's not included

8    there, so that provides no guidance at all.

9        So having resolved the portion issue, we'd suggest that --

10   we ask that the court construe "processor block" to include a

11   processor and whether -- if the court's not inclined to do

12   that, we ask that it reject Impinj's additional language

13   "containing RF," et cetera.

14            **THE COURT:**  Okay.  A response.

15            **MR. AL-SALAM:**  Yes.  Thank you, Your Honor.

16       Mr. Lanier did remind me and I should have raised it

17   because it's not in the papers but it's in our slides.  We

18   did -- the parties did argue this same issue -- and when I say

19   "same," it's the same term in a patent that Impinj owns that

20   relates to the exact same technology.  And it's also --

21   relates to tuning, and they use the same language.  And we

22   made that argument to Judge Albright in the Western District

23   of Texas.  He adopted our position.

24       This court is not bound by that decision.  But I think

25   it's persuasive.  My own mind, it should be collateral

```
 1    estoppel, but I don't think it rises to that level.

 2        In terms of --

 3            THE COURT:  Collateral estoppel, did you -- so you

 4    were both litigating in front of --

 5            MR. AL-SALAM:  Yes.

 6            THE COURT:  And it's the same patent?

 7            MR. AL-SALAM:  It's not same patent.  It's -- it's a

 8    patent -- it's the '198 patent.

 9            THE COURT:  But this one says -- so I'm looking at

10    your Slide 12 now -- that the court just said

11    plain-and-ordinary meaning.

12            MR. AL-SALAM:  That's correct.  That -- but you'll

13    see that Impinj -- I mean --

14            THE COURT:  Why aren't you suggesting

15    plain-and-ordinary meaning here?

16            MR. AL-SALAM:  That's a good question, Your Honor.

17    I'm not sure why we're taking a different position.  We could

18    live with plain-and-ordinary meaning.

19        Because -- and to get back to -- because I understand

20    counsel's saying that we shouldn't have this -- this

21    discussion of what it could include.  And the other -- the

22    other option, to me, is it could be interpreted as it

23    specifically says in the specification.  A processor block --

24    processing block, which is the same, maybe implemented in any

25    way known in the art, for example, by combinations of one or
```

1    more of a processor, memory, decoder, encoder, and so on.

2        Now, the construction that we've -- that we proposed, we

3    think it's -- nobody disputes that these were known ways to

4    implement a processor block.  And that being, it contains

5    analog and/or digital processing elements.

6        **THE COURT:**  So Mr. Lanier, what about that definition

7    that's in the -- looks like Column 6, 60 to 7-5, right?

8        Processor block 444, which is the figure, maybe

9    implemented in any way known in the art such as by

10   combinations of one or more processor, memory, decoder, or

11   encoder -- I don't know what I would say for the "and so on."

12   But that has your processor in it.  And then it has other

13   elements.  And it's in the patent.

14       **MR. LANIER:**  That's -- that's correct, Your Honor.

15       I would respond in two ways.  First, I would suggest that

16   if there is -- having resolved the portion issue, if we are

17   not to construe "processor block" to include a processor, then

18   I agree with Mr. Al-Salam that there's no need to construe it

19   at all.

20       But if the court is inclined to construe it, it should

21   construe it consistent with that disclosure in the

22   specification and not with the language proposed by NX -- or

23   Impinj in their proposed construction.

24       **THE COURT:**  I think the question is if this case goes

25   to trial, are the experts going to be fighting about the

 1    meaning of a "processor block."  And if I look at your impact

 2    statement with respect to this term, I'm not sure that this

 3    tells me anything.

 4            **MR. AL-SALAM:**  May I --

 5            **MR. LANIER:**  Sorry.

 6            **THE COURT:**  So -- so is this going to really be an

 7    issue or not?  And if it is, then my inclination would be to

 8    go back to the -- to the language that's there.

 9            **MR. AL-SALAM:**  The way I understand it, Your Honor,

10    if the court were to adopt the NXP construction limiting it to

11    a -- to including a processor, it -- it would be dispositive

12    on infringement because they don't have a processor, neither

13    do we, in these IC's.  So that's where I think it would be

14    dispositive.

15        I do want to point out that if you really read the claim

16    this processor block is not really an important part of the

17    claim insofar as what's important is what it does.  I mean,

18    this -- it's -- delineates -- the claim delineates exactly the

19    functions of the processor block, which is what matters.

20        And I believe that there is no dispute that the processing

21    functionality in the NXP -- that -- well, I'll put it this

22    way, that NXP has processing functionality in their IC's.

23        And if it's -- if this term is not limited to "including a

24    processor," I do not believe NXP would have a non-infringement

25    position just on the meaning of "processor block."  They may

 1   have some others, but not on that meaning.  That's my

 2   understanding.

 3        **MR. LANIER:**  I believe that correctly summarizes what

 4   our position would be, that if the court construes "processor

 5   block" -- or -- yeah, "processor block" to "include a

 6   processor," that would be a non-infringement position for us.

 7        I do think, however, that at trial, what the parties may

 8   be arguing about is whether the -- whatever the circuitry that

 9   Impinj points to to say this is the processor block, however

10   it is construed or not construed by the court, whether it does

11   the things that are required by the claim.

12        And that's actually more related to the "configured to"

13   issue than the "processor block" issue.  So there will be a

14   fight about whether whatever is accused does those things.

15        But I don't think that once the court construes this term

16   or declines to construe this term, there'll be much of a fight

17   about the processor itself.

18        **THE COURT:**  Okay.  I think -- I need to go back and

19   look at it more closely, but I think I understand your

20   positions.

21        All right.  Next one.

22        **MR. LANIER:**  Thank you.  Your Honor, the next one in

23   order was "configured to."  There had been some discussion

24   about whether "processor block configured to" was one term or

25   three terms.  We treated "configured to" separately because

1   "configured to" appears at other places in the same claims

2   used with respect to other circuitry, so we thought it made

3   sense to talk about "configured to" separately.

4           **THE COURT:**  Okay.  That's the one you want to turn

5   to?

6           **MR. LANIER:**  Yes, please.

7           **THE COURT:**  Okay.  So let me ask you this question.

8   First of all, I construed "configure" the last time, I

9   believe.  But your construction seems to me to be repetitive

10  and unnecessary.  And I say that because when I try a case and

11  I've -- and I'm giving the jury terms that have been

12  construed, in effect what I'm telling them and what their --

13  what we explain is that they are separating the definition

14  that I am giving them and putting into the claim so that they

15  can understand it.

16       So when you say "made or designed to perform a specific

17  function," I don't know how that helps when in the claim

18  language, the specific function is defined because it follows

19  the word "to," so it adds nothing in my view.

20       And I don't think that there's a -- really a dispute

21  that -- with respect to "made" or "designed."  It's -- it's

22  this issue of "to perform a specific function," which I view

23  as repetitive to what follows the actual word.

24       Go ahead.

25           **MR. LANIER:**  Thank you, Your Honor.

1          I think that's an excellent point, Your Honor.  And in

2     thinking about this issue to come here this morning, I looked

3     back at Your Honor's claim construction order.  It's Docket

4     102, and the relevant pages are 10 and 11, and I looked back

5     at the transcript of the argument as well to see what the

6     discussion was about this point.

7          I do think Your Honor is correct, that it's not necessary

8     to include "to perform a specific function" because the claim

9     identifies the specific functions.

10         But I do think we need to look at "configured to," just

11    those words.

12         Now, in Your Honor's previous claim construction order,

13    there's actually two constructions of this term.  On page 10,

14    the court construction is -- this was in the context of a term

15    that had "protect" in it, so I'll use the word "protect."

16    It's not part of this claim we're talking about here.  "Is

17    made to protect" then it goes on.

18         At page 11, the court's construction was "is suitable for

19    protecting."  We think those are both almost all the way there

20    to what the construction would be because we think what the

21    court should do here with the benefit of that order and

22    thinking about it in terms of this patent is construe

23    "configure to" to be either or both of "is made to" or

24    "suitable for without modification."

25         And we ask that the court include those words in that

```
 1      construction.  And the reason that we're driven to do that is
 2      in part because of Impinj's reply and in part because of their
 3      argument slides.
 4          So if I could direct Your Honor to page 18.
 5              THE COURT:  Eighteen of...?
 6              MR. LANIER:  Of our slides.
 7              THE COURT:  Okay.
 8              MR. LANIER:  My apologies.
 9              THE COURT:  I'm there.
10              MR. LANIER:  And this is consistent with comments
11      Your Honor made talking about typhoon and other -- aspects in
12      other cases at the previous hearing.  Impinj is not taking the
13      position that the claims encompass IC's --
14              THE COURT:  Mr. Lanier.
15              MR. LANIER:  My apologies.
16              THE COURT:  When you read -- when any lawyer reads,
17      they go too fast.
18          Go ahead.
19              MR. LANIER:  I have been battling this for a long
20      time when I --
21              THE COURT:  You and lots of other lawyers.  You're
22      not the only one.
23              MR. LANIER:  Indeed.  My daughter suffers from the
24      same.
25          "Impinj is not taking the position that the claims
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    encompass IC's that are incapable of performing the recited

2    functions without being materially modified."

3        "On the other hand, if the ICs as sold can perform the

4    recited functions" -- goes on -- "then they are configured

5    to."  That's all written there so I didn't read every word

6    from that quote, but in its front of Your Honor.

7        Then on their argument Slide 15, Impinj says it slightly

8    differently but similarly.  And they say that "there's no

9    dispute that the product must be configured to as shipped to

10   directly infringe."  We agree.

11       So what we suggest is to avoid any confusion for the jury

12   consistent with Your Honor's construction, consistent with the

13   positions taken on reply and in the slide submitted to Your

14   Honor for argument, that the court's construction for

15   "configured to" be "is made to or suitable for without

16   modification."  That's it.

17       And then the -- the functions would follow, wherever that

18   term is used.  And if the court thinks --

19                     (Simultaneous colloquy.)

20           MR. LANIER:  Oh, my apologies.

21           THE COURT:  A response on that recommended change.

22           MR. AL-SALAM:  No, Your Honor.  We -- we would not

23   agree to that.

24       I want to be clear.  The claim is clear, as you said, what

25   the processing block must do.  It must perform those

 1    functions.  At trial, it either will be shown that it does

 2    that or it doesn't do that.

 3        I worry that what they're seeking, especially with this

 4    added language, is just to create mischief.  Let me give you

 5    the example.

 6        In the *Finjan* case, which has been cited to the court,

 7    the -- the issue was whether or not the -- it was configured

 8    to perform the claimed functions when it -- when as shipped,

 9    it wouldn't do that unless you had a key.  You had to unlock

10    that functionality with a key.

11        And what the court said was as long as you don't have to

12    reprogram it -- as long as you're just unlocking it, it's

13    still within the claim language.

14        Now, on the same time in the *Radware* case, which was also

15    cited by them, which I happened to be involved in litigating,

16    I know what the exact issue was.  F5 designed around the --

17    the patent by changing the code.  They took out one line of

18    code.  The plaintiff said, oh, well, that's still capable of

19    performing the -- the asserted method because all they have to

20    do is write one line of code.  And Judge Whyte, analyzing all

21    the cases, found that that's where you draw the line.

22        If -- if a computer inventions -- you draw the line

23    where -- whether or not you have to reprogram it.  And all of

24    their cases are consistent with that.  And what that relates

25    to is the ambiguity that arises in computers because computers

1    are always capable of being reprogrammed.  So what does it

2    mean when you say a computer is configured to do something?

3        Now, what I worry here is what they're talking about --

4                    (Simultaneous colloquy.)

5        **MR. AL-SALAM:**  -- something that you have to do to

6    make it work the way it says.

7        **THE COURT:**  You don't disagree with the phrase "made

8    to."  That is, you don't disagree that -- you had suggested in

9    the first round that "configured" was the same as "positioned

10   such that."

11       **MR. AL-SALAM:**  Yeah, that -- that first round -- let

12   me just mention that quickly.  "Made to" I think is fine.  But

13   I don't know what it adds to "configured to," but I think

14   "made to" is fine.

15       The first round, the real issue was -- it -- whether

16   that -- the contact pads were configured to protect the

17   passivation layer during etching, and the argument was whether

18   you actually had to do etching or whether it's just -- it

19   could have been done.

20       To me, it wasn't really an argument about "configured to"

21   as opposed to whether or not the etching method had to be

22   practiced to actually infringe the claim.  And we said no, all

23   that matters is that it could protect the passivation layer if

24   you did etching, that the method part shouldn't be included.

25       But you're right that "designed to" bothers me more than

1   "made to" because "designed to" seems to incorporate some

2   intent element about what exactly was the designer thinking.

3       If we can't prove that their ICs do this, then we -- we

4   can't prove infringement.  But I think we can prove their ICs

5   do this, and if they do it, this isn't like a computer that

6   somebody has to reprogram.  Maybe there is something the

7   customers have to do to turn this on.  I don't know.

8       But as long as they're not changing circuit design, then

9   it should be that it's configured to do this.  And I have no

10  doubt in my mind that -- in fact, that they're intending that

11  this tuning -- this tuning ability be in the circuit.

12          THE COURT:  In -- on page 10 of my claim construction

13  order from the first go-round, I provide you with the

14  authority in terms of how "configured to" has been construed

15  in other cases.  And that the -- doesn't generally require the

16  function to be actually performed.

17      It -- do you -- I mean, I'm going to go back and re-read

18  what I already provided you.

19      Do you take any issue with that paragraph at line 7

20  through 20 for me to consider this go-round?  Because it seems

21  to me that the issues are the same.

22      Anything to add?

23          MR. LANIER:  Something to add, Your Honor.  We take

24  no issue with that, what's there.  We do think the court

25  should add "without modification," and I will cite very

1    briefly to three things that are not mentioned in that

2    paragraph of the court's opinion.  So we don't take issue with

3    it.  We do think it should go one step further.

4        The three things I will cite are, in fact, the *Finjan* case

5    because the *Finjan* case relies heavily on the *Fantasy* case,

6    and all the main cites are in the record.  But we're talking

7    about pages [sic] 1205 basically.  And the key there, *Finjan*

8    relying on *Fantasy*, is -- the key sentence is "infringement

9    occurred because the code was written in such a way as to

10   enable a user of that software to utilize the function without

11   having to modify that code" -- modify.

12       The *Solocron* case that Impinj presented to the court at --

13   in their opening belief, again, on -- on this issue.  And

14   *Solochron* is interesting because there, the court did

15   determine that "configured to" has its plain meaning but it

16   said what the plain meaning was, which the court understands

17   to require not merely being capable of being configured but,

18   rather, being actually configured.

19       And then lastly, I would call the court's attention to

20   Your Honor's own comments at that last argument on pages 42 to

21   43 of the transcript.  And there, Your Honor, was in a

22   discussion with my now retired partner Mr. Whitcomb about

23   *Typhoon*, and you stated -- and we think -- we agree completely

24   with this, that *Typhoon* was rejecting an argument that a

25   device that could be modified -- and emphasis on "modified" --

1   to perform the function was sufficient.

2       We think that characterization of the law is exactly

3   right.  And that's why we suggest that "made to or suitable

4   for without modification," the common theme of all the cases

5   in Your Honor's own analysis should be the construction.

6           MR. AL-SALAM:  May I respond briefly?

7           THE COURT:  It's your time.  I think I understand the

8   argument.

9           MR. AL-SALAM:  Okay.  I'll just point out it was

10  without modification that the case that was cited, the *Finjan*

11  case and *Fantasy Sports*, they're talking about modification to

12  writing the code.

13      It doesn't mean -- and that's why I had "material

14  modification" in our brief.  And when I say "material

15  modification," what -- everybody can take almost anything -- I

16  can take a -- probably a cell phone and turn it into a bomb or

17  something.  I can take -- something on this table and make it

18  into a hammer, but --

19          THE COURT:  I get it.

20          MR. AL-SALAM:  Thank you.

21          THE COURT:  Do you --

22          MR. LANIER:  We would not dispute "material

23  modification."  We would -- we would accept that.

24          THE COURT:  Okay.  So everybody would agree to "made

25  to or suitable for without material modification"?

1          **MR. AL-SALAM:**  I would not, Your Honor.  I just want

2     to object because I think that creates an ambiguity that is --

3     is just mischief.

4          What I'm arguing is if they can show that their ICs have

5     to be changed by the customer, I -- I don't know how they're

6     saying they're changed.  In principle, I agree with that.  But

7     I don't want it in the construction.  I don't think it's

8     proper in the construction.  And it just adds an ambiguity as

9     what "material modification" means.

10         Are they redoing the circuit?  Are they rewiring it?

11         **THE COURT:**  Yeah, but isn't that what you just

12    argued?

13         **MR. AL-SALAM:**  Yes.

14         **THE COURT:**  That --

15         **MR. AL-SALAM:**  But then we're going to have interpret

16    "material modification."  And for me, if they have to rewire

17    the whole circuit, then I would agree that's a material

18    modification.

19         If they have to simply turn on the functionality, such as

20    was done in *Finjan*, that's not material.

21         If they have to do -- I mean, I know that the --

22         **THE COURT:**  It's -- the -- they're -- there is a

23    sweet spot in between, and it could be that -- that that

24    construction is appropriate and what we're -- what is required

25    is a further ruling as to whether or not in this particular

1   case, that modification was material.

2        I don't -- I don't know that it's the jury's decision in

3   that kind of case.  It seems to me to be -- it would require

4   an analysis as to whether or not in this particular case, the

5   patent covers whatever the modification was to the extent

6   there was a modification.

7        But it also seems to me that leaving it without refinement

8   may create more problems in a trial than not, so I'll have to

9   think about it.

10            MR. AL-SALAM:  Thank you, Your Honor.

11            MR. LANIER:  Thank you, Your Honor.

12            THE COURT:  Okay.

13        Next, we're at plaintiff's.  Which one would you like to

14   discuss next?

15            MR. AL-SALAM:  I'm going to defer to my colleague

16   Mr. Keese on this.

17            THE COURT:  Okay.

18            MR. KEESE:  Good morning, Your Honor.

19        The first term I will address is actually the fifth term.

20   We're continuing to go in order.  Apparently the prior -- or

21   the parties had prioritized the terms fairly effectively, and

22   that is "protocol phase."

23            THE COURT:  Okay.

24                 (Demonstrative published.)

25            MR. KEESE:  Do you want me to proceed first, Your

1    Honor?

2         **THE COURT:**  Yeah.  Let me just -- let me just refresh

3    here.

4      So as I'm understanding the dispute, you believe that NXP

5    is importing some kind of method requirement into how the

6    device is supposed to operate?

7         **MR. KEESE:**  That's -- that's one of the disputes

8    here.  I actually think the parties have -- have three

9    disputes.

10        **THE COURT:**  Okay.

11        **MR. KEESE:**  That's the primary and most important

12   dispute from our perspective.

13        **THE COURT:**  All right.  Go ahead then.

14        **MR. KEESE:**  So as I was saying, the -- as we see this

15   term, the primary dispute --

16              (Demonstrative published.)

17        **MR. KEESE:**  -- is whether -- is -- the

18   construction -- the parties' constructions differ on whether

19   the protocol phase requires a device that is configured to --

20   configured to, in other words, is able to perform certain

21   functions or whether it requires that the device actually

22   sends an -- or receives and responds to reader commands during

23   the protocol phase.  Our contention is it does not.

24      The claim language does not require actually receiving and

25   responding to commands during the protocol phase.  I'll note,

1   Your Honor, that Claim 6, which is the independent claim from

2   which the asserted claims 8 and 10 depend, is a device claim.

3   It's a device claim that recites devices configured to, in

4   other words, able to perform certain functions.

5      Claim 11 is a method claim.  Claim 11 actually has these

6   affirmative steps.  Under Claim 11, you would actually have to

7   communicate.  Actually to have send and receive commands to

8   the extent that was in the claim language.

9      But that's not what Claim 6 is.  Claim 6 is a device

10  claim.

11     I think it's also important to note here, Your Honor, that

12  a device configured to be able to do something might infringe

13  even though that device might not ever exit the tuning phase.

14  The device -- the circuit might not ever get tuned sufficient

15  to where you could enter the protocol phase.  You might never

16  get a sufficient impedance matching or sufficient power

17  extraction such that you actually could move on and

18  communicate.

19     And so you could have a device that's configured to be

20  able to do that.  But in a given situation, it might not do

21  that and it might not get to a protocol phase every single

22  time it receives a signal.

23     So we think that's an important distinction.

24              (Demonstrative published.)

25          MR. KEESE:  There's two other disputes.  Again, we

1     think those are a little less important.  The first one

2     concerns this idea we have in our construction a tag, you

3     know, able -- that the tag is able to receive and respond to

4     reader commands.  And they want to construe it to just the IC.

5         And, again, this is a little bit more secondary, but we

6     think that the tag being able to receive and respond to reader

7     commands is appropriate here because while an IC may receive a

8     signal and demodulate it and then create a response to send

9     back, it may be that there are components that are external to

10    the IC itself that are used and actually transmitting or

11    receiving the RF waves that carry those messages.

12        So, for instance, an antenna may be external to the IC

13    itself on a tag, and -- so we think it's important to

14    recognize that it isn't necessarily just the IC that would

15    send a message or receive a message -- receive through an RF

16    wave.

17        Now, whether the claim language includes a tag or not, we

18    just -- we want it to be clear that the IC itself doesn't

19    necessarily just stand alone in the sending and receiving of

20    messages.

21                   (Demonstrative published.)

22        **MR. KEESE:**  The third dispute is whether the phrase

23    "according to a protocol" should be added to this.  And we

24    think it shouldn't.  We think that's superfluous in view of

25    the remaining claim language of Claim 6 where it already

 1     recites this -- that -- that it is configured in a protocol

 2     phase to communicate according to the protocol, so we just

 3     think that this "according to the protocol" language --

 4           THE COURT:  Well, does it do -- does it do any harm?

 5     And -- and the reason I ask that, again, as I -- I know

 6     that -- I know that you all are -- and patent litigators are

 7     all focused on the -- the next step down the line.

 8        When I think about claim construction, I'm focused on what

 9     the jury has to see.  And so you -- NXP wants me to define a

10     term called -- in a patent that says a protocol phase, the

11     "phase" piece suggests -- seems as if you're addressing this

12     issue of the period, that is, the phase, but you -- where in

13     your construction do we get the issue of "protocol" defined?

14        And -- and, in effect, they're not defining "protocol."

15     They're just putting it back in the term, which is what the

16     jury is going to be instructed on.

17           MR. KEESE:  Yes.  So --

18                 (Demonstrative published.)

19           MR. KEESE:  -- again, we think looking at Claim 6,

20     that the "according to the protocol" language isn't

21     necessary -- isn't necessary for this particular portion of

22     the claim --

23           THE COURT:  My question was, does it do harm?

24           MR. KEESE:  I think it is awkward.  I'm not sure it

25     does harm.

1          **THE COURT:**  Okay.

2      Keep going.

3                          (Demonstrative published.)

4          **MR. KEESE:**  That is -- that sums up my argument on

5      "protocol phase," Your Honor.

6          **THE COURT:**  All right.

7      Mr. Lanier.

8          **MR. LANIER:**  Thank you, Your Honor.

9      I will take the three points Mr. Keese raised in order.

10     His first point was this actual receipt, that is, the concern

11     that the construction we propose would require that there --

12     that it do something rather than be configured to do

13     something.

14     And I would like to disabuse Impinj of that concern and

15     assure Your Honor that that's not our position.  We are not

16     importing a method step.  What we are simply seeking by our

17     construction is to give that term "protocol phase" its actual

18     meaning.

19     The device has to be -- whatever that device ends up being

20     with the other issues, has to be configured such that should

21     the protocol phase be triggered, those things then happen.

22     So I want to be crystal clear about that.  We are not

23     saying that it must happen to infringe.  It's an apparatus

24     claim.  We get that.

25     And I would draw the court's attention --

1        **THE COURT:**  Look.

2        **MR. LANIER:**  Oh, sorry.

3        **THE COURT:**  Deconstructing your constructions, the

4   only difference that I'm seeing is that Impinj wants to

5   include language "a tag is capable of," and NXP wants to say

6   the RFID C -- IC -- I'm sorry.  RFID IC.  That's the

7   difference.

8        **MR. LANIER:**  That's correct, Your Honor.

9        **THE COURT:**  That's the only difference between your

10  two constructions other than the last phrase which plaintiff

11  has said it's -- there's no harm but awkward.

12       So talk to me about that difference.

13       **MR. LANIER:**  Yes, Your Honor.

14       And so let's look, if we could, at our Slide 24 'cause

15  we -- we tried to break it down exactly like Your Honor just

16  did comparing the two constructions.

17       Let's start with RFID IC.  Claim 6, which is the

18  independent claim from which the two asserted claims depend,

19  starts off "a radio frequency identification, RFID, integrated

20  circuit, IT -- IC," and it goes on.

21       Claim 1 express- -- which is not asserted here and not at

22  issue here, expressly starts off with a tag.  So Claim 6 is

23  drawn to an RFID IC by its very terms.  We are not importing a

24  limitation.  We are not looking at the specification.  We were

25  reading the claim.  And we know that that's in the preamble

1    phrase, but we know that it matters because that's one of the

2    very few differences between Claim 6 and Claim 1.

3        So it does breathe life and meaning in there.  So we

4    suggest that its RFID IC because the patentee in drafting the

5    claim from which the two asserted claims depend used that

6    phrase.  They defined the thing as the RFID IC.  That's our

7    argument, sum and substance, on that one.

8            THE COURT:  Okay.

9        Response.

10           MR. KEESE:  Yes, Your Honor.  I think it's important

11   to recognize here that we aren't -- we are not contending that

12   RFID IC isn't -- isn't part of this, the part of receiving and

13   responding to messages.

14       What we're worried about is mischief where NXP says, well,

15   if the IC doesn't include an antenna, then it can't receive --

16   it can't actually communicate, and so as sold, it doesn't

17   include everything necessary and isn't configured to as sold.

18       Well, we are -- that's what we're worried about, is -- is

19   this mischief of the patent itself discussing that a tag might

20   include antenna components that are external to the IC itself.

21   And so that's why we -- we added a tag in here was because we

22   believe that the patent discloses an internal antenna in the

23   IC.  But it also discloses --

24           THE COURT:  But isn't Claim 1 different from Claim 6?

25           MR. KEESE:  Yes, Your Honor.

1          **THE COURT:**  So -- so if -- if that's the issue, you

2    would have an infringement claim under 1 but not 6?

3          **MR. KEESE:**  I would -- under their interpretation

4    potentially.

5          **THE COURT:**  Okay.  So Claim 1 and Claim 6, by

6    definition, have to be different.

7          **MR. KEESE:**  Yes, Your Honor.  But what I would say is

8    the claim language doesn't recite that the RFID IC must

9    receive and respond to commands.  It says that it's must

10   communicate and our argument here --

11         **THE COURT:**  Well, it says the RFID IC -- hmm.  I'm

12   going to have to sit back and look.

13         **MR. KEESE:**  So what we're really getting to here is

14   this idea that there is a phase where the tag is used as part

15   of this communication.  And so our -- our contention is that

16   as part of that communication, the tag overall -- the

17   structure overall, which could include an external antenna,

18   can receive and respond to commands.

19        But it doesn't have to be the IC itself that is sending

20   those waves.

21         **THE COURT:**  Okay.  Any response?

22         **MR. LANIER:**  Briefly, Your Honor.  On that first

23   point, I think what is called "mischief" is actually really a

24   recognition of the difference between the two claims and the

25   difference between direct and indirect infringement.

1          The asserted or the dependent claim for -- or the

2     independent claim from which have the two asserted independent

3     claims depend starts off, "a radio frequency identification,

4     RFID, integrated circuit," and it says that that IC comprises

5     a bunch of things, including a processor block configured to

6     in a protocol phase.  So whatever that processor block is

7     subject to the court's construction and their -- and their

8     response to that, that processor block must be able to do

9     these things.

10         So this isn't even really about the tag or the IC.  It's

11    about that processor block, which has to be in the IC, which

12    is the RFID IC.  That's why we put that in there.

13         I'm prepared to address the "is capable of" if Your

14    Honor's ready, but I'll wait.

15              **THE COURT:**  Go ahead.

16              **MR. LANIER:**  Okay.  On "is capable of," I would draw

17    Your Honor's attention to our Slide 26.  And there, we put the

18    parties two constracting [phonetic] -- contrasting

19    constructions of "protocol phase" and offer -- and also some

20    of the agreed constructions, including "tuning phase."  Now,

21    "tuning phase" sounds a lot like "protocol phase."  And that's

22    according to the parties' agreement "a period during which

23    tuning occurs."

24         So if it's triggered -- we're not arguing that it has to

25    happen for there to be infringement.  This is an apparatus.

1   It's a device.  We understand that.

2       But the device has to be configured such that the tuning

3   phase, it does the things in the tuning phase, which we've

4   agreed is the period during which tuning occurs, and it's not

5   "is capable of," but if triggered, there is a period during

6   which the things that are the protocol phase occurred.

7       That's why we reject "is capable of."  We don't think it's

8   necessary.  We don't think it does anything other than run

9   right into what Your Honor talked about with -- with the

10  *Typhoon* case or -- or aspects and acuity as well on the

11  "configured to" point, hypothetical possible infringe.

12      The device as configured must be able to do those things

13  if and when that phase is triggered.  We don't dispute that

14  it's an if and when.  But the device is at issue.  And that

15  device happens to be an RFID IC.

16          **THE COURT:**  Okay.  So it is true that the parties

17  agreed on -- on this term "tuning phase" --

18          **MR. KEESE:**  Yes.

19          **THE COURT:**  -- as being a period during which tuning

20  occurs?

21          **MR. KEESE:**  Yes, Your Honor.  And -- I would just

22  point -- I have a -- a couple of things that I'd like to say

23  on that.  The first is we agreed on "tuning phase."  We didn't

24  think it was material, so I just don't think our agreement on

25  that particular term on one -- on a -- on a issue we didn't

1   decide to fight about should -- should be imputed to this

2   second phase.  That's --

3          THE COURT:  Does anybody -- is anybody aware of any

4   case law, one way or the other, that I need to consider when

5   parties agree on some other phase and -- or some other

6   construction when I construe a different term?

7          MR. LANIER:  I think, Your Honor, there's the general

8   line of case law that says where a term is used more than once

9   within a claim, it should be given the same meaning.  So

10  that's, for example, why we treated "configured to" as

11  differently.  I can pull those cites, but Your Honor is well

12  aware of that general principle.

13     I would rely on that because that gets to "phase."

14  "Tuning" obviously is not what we're arguing matters here.

15  It's a protocol phase.

16          THE COURT:  Anything different?

17          MR. KEESE:  No, Your Honor.  I would just -- I think

18  the only thing that came to mind for me was the -- the idea

19  that you have to construe the -- the claim language as a

20  whole.  And I -- I don't think that's -- that's anything

21  particularly insightful or -- I would like to respond briefly

22  on the -- the "capable of" issue.

23     And to make one quick point, and that is the idea that

24  their construction, as I understand it -- and Mr. Lanier might

25  correct me -- as I understand it would require that once you

1    enter a protocol phase, the device is absolutely configured to

2    must receive and respond to commands, "commands" plural.

3        I think it is an overstatement of what a person of

4    ordinary skill in the art would understand from the patent

5    that you would have to receive multiple commands and respond

6    to multiple commands be configured to do so once you enter a

7    phase.

8        I think a person of ordinary skill in the art,

9    understanding the protocols that are discussed earlier in the

10   patent, would know that you wouldn't necessarily always

11   receive and respond to multiple commands as part of being --

12   trying to communicate according to a protocol.

13       You might not get a reader command asking for information

14   back, for instance.

15           **THE COURT:**  Okay.

16       Anything else on this one?

17           **MR. LANIER:**  No, Your Honor.  Not from us.

18           **MR. KEESE:**  No, Your Honor.

19           **THE COURT:**  All right.  Who's up next?  I think,

20   Mr. Lanier, back to you.

21           **MR. LANIER:**  Yes, Your Honor.

22       And that's "tuning circuit."

23           **THE COURT:**  Okay.

24           **MR. LANIER:**  Your Honor, "tuning circuit" -- the

25   slides start on Slide 27 of our slides that identifies the --

1    the dispute here.

2         And really, just summing it down, because I -- I don't

3    know that I have much new to add to you beyond what we've

4    briefed, so I will really just sum it up this way:  Impinj's

5    construction removes all certainty or meaning from this term

6    "tuning circuit," and it does it in two ways.

7         It says "circuit elements" -- we don't know why there

8    needs to be "circuit elements" as opposed to "circuit."  We

9    didn't propose to construe the term "circuit."  We just used

10   the word "circuit" to identify the circuit that was relevant.

11   "Circuit elements," we have no idea what that means.  The

12   experts are perfectly capable of saying "that's a circuit."

13   And juries -- there's no need here to construe the term

14   "circuit."  There's no suggestion "circuit" requires

15   construction or substitution with "circuit elements."

16        The other problem with their proposed construction is it's

17   used for "tuning," and if the court were to stop there, I

18   think the risk is that it's -- it's implicitly that the --

19   it's tuning anything.  There's no definition to what the

20   tuning is, and we just think that the claim term, which

21   requires a specific kind of tuning, is explained in the

22   specification.

23        And, again, as Mr. Al-Salam kindly explained what the

24   purpose of these -- or what these IC's do, they operate at

25   different levels of power.  Sometimes when they're waiting to

```
 1  get signals, they operate at low power --

 2          THE COURT:  Well --

 3          MR. LANIER:  Oh, sorry.

 4          THE COURT:  So I'll just interrupt.  In terms of

 5  Impinj's construction, I agree.  I don't know -- I don't know

 6  why you didn't suggest plain-and-ordinary meaning --

 7          MR. KEESE:  Your Honor, so --

 8          THE COURT:  -- given what it is you're suggesting.

 9          MR. KEESE:  Yeah.  So I -- the reason why we didn't

10  suggest plain-and-ordinary meaning was to include this

11  clarification on the first point, which is that a tuning

12  circuit can include multiple elements.  If we look at the

13  disclosure --

14                    (Demonstrative published.)

15          STPHAO:  -- of the tuning circuit at column 9, 45 to

16  55, what we see is that there's at least three different

17  potential modules or parts of a circuit that are identified.

18  And it -- and it allows for other parts.  So we think that

19  that clarification that there can be multiple elements is

20  helpful.

21      On the other issue --

22                    (Demonstrative published.)

23          MR. KEESE:  -- the idea of -- where they argue that

24  "tuning circuit" is a circuit that tunes specifically this

25  impedance matching between the RFID IC and a tag antenna, we
```

1    think that's wrong for several reasons.

2        The first is it's totally unnecessary.  If you look at the

3    claim language, the claim language says what the tuning

4    circuit is tuning.  It says it's configured to tune the

5    variable impedance.

6        You don't need to add additional language about what the

7    circuit does.  It's right there in the claim language already.

8        **THE COURT:**  So respond -- respond there.  So I -- I'm

9    looking at the claim -- claim language.  Every time, you know,

10   we get to "tuning circuit," it's followed by language saying

11   what it's doing.

12       Mr. Lanier, so why do I need -- why do I need more than

13   that?

14       **MR. LANIER:**  Your Honor needs only the tag antenna

15   for a reason I'm prepared to explain.  But you don't need it

16   otherwise than that.

17       We also don't need "circuit elements" because there's no

18   mystery or confusion there.  But I do think, frankly, the

19   parties have already agreed with you that you need "tag

20   antenna."

21       **THE COURT:**  I didn't -- you think I need "tag

22   antenna"?

23       **MR. KEESE:**  I -- I disagree with that.

24       **THE COURT:**  I thought so.

25       **MR. LANIER:**  Well, except that the parties' joint

1    tutorial that was submitted to Your Honor to tell you what the

2    technology is here, what we're talking about, describing

3    what's happening, at Slide 17 talks about RFID tags and what

4    happens if you have to harvest impedance.

5        And then it -- then turns immediately to the '266 patent

6    as directed to tuning the impedance of the IC to match the

7    antenna's impedance.  And the antenna that's referred to is

8    the antenna of the RFID tag in the immediately proceeding

9    bullet.  That's tutorial Slide 17.  That's the parties' joint

10   submission, not only talking about the background of the

11   technology, but the '266 patent itself.  It's directed to that

12   tuning.

13       **MR. KEESE:**  Your Honor, if I may respond briefly on

14   that point.

15           **THE COURT:**  You may.

16       **MR. KEESE:**  So I agree that generally a tag will have

17   an antenna that's external to the IC.  But the '266 patent is

18   clear that that is not the only disclosure.  The '266 patent

19   makes clear that the antenna segment may be part of the IC

20   itself.

21       And in that case, what I'm worried about is that they will

22   argue that "tag antenna" requires these external antennas.

23   Now, I don't think that's an issue necessarily in this case.

24   But I do think it would be an issue to limit the claim

25   language in that way because that is not what the '266 patent

1    teaches.  It's not that narrow.

2              THE COURT:  Any response?

3              MR. LANIER:  Your Honor, I would simply refer Your

4    Honor to the pieces of the specification in Dr. Smith's

5    declaration at our slides 30 and 31.  The disclosure is

6    clearly -- consistently, there's the RFID IC.  And there is a

7    tag antenna.  Doesn't always say the word "tag antenna," but

8    the specification at lines 9, 28 to 32, 10, 57 to 63, and on

9    and on.

10        And, again, the parties have described not only the

11   background of the technology but talked about what the '266

12   patent -- or to what it is directed.  And we do think that

13   "tag antenna" is an appropriate and necessary clarification.

14        Because, otherwise -- well, I'm not going to speculate.

15   We do think that's appropriate.  That's what should be there.

16   It will give the jury some guidance.

17             MR. KEESE:  Your Honor, I just have two sentences in

18   response there.  And that's first, that obviously we've cited

19   to column 5, lines 4 to 6, where it discloses an internal

20   rather than an external antenna on the tag.

21        And what I'll note is the term "tag antenna" just doesn't

22   appear in the patent whatsoever so we just don't think it

23   belongs here.

24             THE COURT:  Okay.

25        Next?

1    **MR. KEESE:**  And this is last term, Your Honor.  It's

2    "variable impedance."  And I'm happy to go first or to have

3    NXP go first depending upon your preference.

4         **THE COURT:**  Well, NXP is arguing that there doesn't

5    need to be a construction, so why don't you go first.

6         **MR. KEESE:**  Yes, Your Honor.

7                   (Demonstrative published.)

8         **MR. KEESE:**  I'm not sure that the parties are hugely

9    far apart about what a "variable impedance" here is.

10     We do think that our construction clarifies a couple of

11   points.  The first is it makes absolutely clear that the

12   variable impedance isn't limited to a single element so that

13   would be a continuously variable impedance element.

14     Think of that like a knob on a grill where you can tune

15   the grill's gas to any point from zero to a hundred and where

16   that analog tuning allows you to hit basically any point,

17   any -- any point on that continuum.

18     The '266 patent is clear that that is one embodiment of a

19   variable impedance.  But there's also embodiments that involve

20   multiple fixed-value impedances.  So, for instance, multiple

21   fixed capacitance values that can be then switched in and out

22   of the circuit to allow you to get different values.

23     So think of that like adding additional segments of -- of

24   rope or taking them out of a loop.  And -- and so then you

25   have specific different values that can be reached, but you

1    still have a variable impedance there.

2        So we think the idea of having multiple circuit elements

3    clarifies that issue.  I'm not sure that there's a dispute

4    from them that -- that a switchable bank of capacitors is a

5    variable impedance, but we think that the construction

6    clarifies that.

7            **THE COURT:**  So, Mr. Lanier, is -- the briefing

8    suggested that the dispute here is whether variable impedance

9    means the provision of multiple values versus a single

10   variable value.

11       Do I understand the argument, or is there something else?

12           **MR. LANIER:**  We think that the common -- you don't

13   misunderstand our argument, Your Honor.

14       But I think the emphasis may have been misplaced.  That's

15   really designed not to have Your Honor decide and tell the

16   jury what a "variable impedance" is but to explain that no

17   construction is necessary, right?

18       There is no -- no evidence in the record, no expert

19   testimony, no nothing, that suggests that a person of skill

20   would not understand "variable impedance."

21       The only evidence, as we cited in our briefs, on our

22   Slide 33 as well, is that a person of skill would understand

23   "variable impedance."

24           **THE COURT:**  Well, the question is would the jury.

25   You don't have to have someone skilled in the -- in the art

1    to -- that -- you don't have to have a debate there for the

2    court to construe a term that the jury wouldn't otherwise

3    understand.

4    **MR. LANIER:**  So at some level, that's true.  At some

5    level, we always have to do some explaining to juries in these

6    cases, consistent with the court's constructions.  But I do

7    think an elemental or group --

8    **THE COURT:**  But, Mr. Lanier, if you're going to

9    explain something to the jury that is inconsistent, that you

10    both don't agree on, whether or not the experts dispute it is

11    irrelevant.  It's still a problem because the court is the one

12    that sets the metes and bounds of the patent.

13    So do you agree -- if -- if he stands up to the jury and

14    with respect to this claim says, well, ladies and gentlemen,

15    "variable impedance" means an element or group of elements

16    that's capable of providing multiple impedance values, are you

17    going to object?

18    **MR. LANIER:**  Well, we'd object to that now because

19    that doesn't actually tell the jury anything.

20    If the court is inclined to resolve any potential

21    confusions for the jury, the definition ought to be "a circuit

22    that varies the impedance" because "an element or group of

23    elements that is capable of providing multiple impedance

24    values," that goes far beyond any clarification that's

25    necessary and -- and truly, the dispute that will be in front

1    of Your Honor, either on motions or in front of the jury,

2    depending on those motions, isn't really what the "variable

3    impedance" is but whether the variable impedance to which they

4    are pointing does the impedance matching that's claimed.

5        That's a different dispute.  But there's not going to be a

6    dispute about what the variable impedance is, so we don't

7    think any construction's required.  If the court's inclined to

8    construe to avoid uncertainty, we don't "an element or group

9    of elements" helps at all.  A circuit's a circuit that is --

10   that varies the impedent [phonetic] -- and, again, that

11   doesn't mean we have to -- they have to prove that here's a

12   circuit and here, watch it varying the impedance, it's just

13   that the device must be configured with that.

14           **THE COURT:**  What's wrong with that construction.

15         **MR. KEESE:**  Well, Your Honor, I think what's --

16   what's wrong with that construction is that the variable

17   impedance is the thing that's is being varied.  So the patent

18   discusses the tuning circuit varying the impedance of the

19   variable impedance.

20       And so the variable impedance itself is --

21           **THE COURT:**  So here's -- here's the thing:  Is it

22   right that we aren't going to have experts come in and dispute

23   what -- what "variable impedance" means?

24         **MR. KEESE:**  According to what I'm hearing from

25   Mr. Lanier, that -- that may be the case.  They may not

1   dispute the idea that a bank of switchable capacitors is a

2   variable impedance.

3       I still think that the term "variable impedance" could be

4   slightly confusing for a jury --

5           **THE COURT:**  Right, but I don't know that your

6   construction explains it.  So -- and you did this on the other

7   one in terms of wanting "circuit" to be defined as "circuit

8   elements."

9       I mean, I -- an -- if you're using it that way, then your

10   element or group of elements, isn't that a circuit?

11           **MR. KEESE:**  Not --

12           **THE COURT:**  If it's not, there -- we have problems

13   here because now, you're being inconsistent between your

14   terms.

15           **MR. KEESE:**  I -- I don't know that that is

16   necessarily -- I think you can have multiple elements that are

17   part of a circuit.

18       I think you could have multiple elements that aren't

19   necessarily within the conventional understanding of what a

20   circuit is, if that makes sense.  I apologize if that's --

21           **THE COURT:**  Well, the problem is that if it's not

22   clear to me, it's not going to be clear to a jury, because you

23   all strike all of the technical people from my juries.  So you

24   aren't going to have technical people on that jury.

25           **MR. LANIER:**  Your Honor, if -- if I may offer this:

1    You know, the time for the experts to say there's a

2    misunderstanding or dispute or confusion about what "variable

3    impedance" means is now.

4         That's the purpose of this exercise we're going through.

5    One expert offered an opinion on that topic.  That opinion was

6    the term "variable impedance is a known, widely used and

7    well-understood term."  That was Dr. Van der Weide.

8         Dr. Smith did not dispute that.  He just said lots of

9    things can vary an impedance.  But that's a different issue.

10   That's not what a "variable impedance" is.  That's what might

11   we accuse of varying the impedance consistent with the claims.

12   That's a different issue.  The only dispute in front of Your

13   Honor, it -- I'm -- and I want to address the jury confusion

14   issue, but the only dispute in front of Your Honor right now

15   is, is a construction of "variable impedance" required, and

16   that -- their evidence is undisputed.  That is a term well

17   understood by one of skill in the art.

18        We think that should end it, but to address Your Honor's

19   concern, a variable impedance, even though it is something

20   that's understood, an elements an/or group of elements that is

21   capable of providing multiple impedance values, I -- I

22   actually don't see that that adds to the word "variable."  I

23   think a jury will understand that.  We are not going to strike

24   people that don't understand the word "variable."

25             THE COURT:  Well, that's why I asked originally

1     whether the -- the institute here was multiple vs. single.

2     And if that's not really the dispute, then I'll have to go

3     back to the drawing board.  And it doesn't sound like that's

4     the dispute.

5          MR. KEESE:  I -- I think that isn't the dispute.

6     And -- and, honestly, if that is not the dispute, I think as

7     long as there is that clarification in the order, we could go

8     with plain-and-ordinary meaning, as long as there's the

9     clarification that it could include a structure with multiple

10    switched elements.

11         MR. LANIER:  Well, that's a -- that's a different

12    point, Your Honor.  Right?

13         That's -- that's -- see, that's exactly the summary

14    judgment argument they want to make down the road potentially

15    or response to a summary judgment argument.

16         So the clarification might be the parties are not taking

17    the position that the -- that there is a dispute as to whether

18    either multiple values or a range of values or adjustable

19    values are a variable impedance.  That's not the dispute we're

20    presenting to Your Honor this morning.

21         But there's a -- it's a different issue as to whether a

22    variable impedance can be a bank of switched capacitors.

23    That's something they're asking you to opine on with no need

24    and without adequate evidence in the record about that.

25         And, frankly, because we still don't yet know for sure

 1   what they're going to accuse as the processor block that

 2   includes all these things, we have to see what they're

 3   pointing to within that processor block.

 4          **THE COURT:**  Okay.  Anything else you want me to

 5   consider?

 6          **MR. KEESE:**  No, Your Honor.  I think that's all of

 7   the -- the claim terms.

 8          **MR. LANIER:**  Not from us, Your Honor.  Thank you very

 9   much for the time.

10          **THE COURT:**  So you all were very quick.  Great.

11   Gives me time.  Every minute counts.

12      You all charge by the six minutes.  I'm just trying to --

13   I charge by the number of orders I can get out the door, so --

14   so minutes are precious.

15      One of the things that -- since I have you here, we've

16   gone through all the terms, right?

17          **MR. LANIER:**  Yes, Your Honor.

18          **THE COURT:**  I'm going to give you a schedule.  Let's

19   get that out.  One of the things that I do try to do -- I try

20   to get these orders out pretty quickly while -- while the

21   arguments are still fresh in my mind.  So I expect, you know,

22   I should have this order out in the next week or so.

23      Given that, I pulled your -- your case schedule.  And

24   we're just going to go through it so that we can get the -- we

25   can keep this thing moving.  And I'm going to -- I'll give you

```
 1    dates.  And I'm operating off of an --
 2        And, Mr. Garcia, maybe you can just bring it up on the
 3    screen, Docket 97.  Can you bring that up on the screen?
 4            THE CLERK:  Sure.
 5            THE COURT:  So Docket 97 is your case schedule.  And
 6    page 2 of 5 when you get there.  I don't know who has the
 7    operative document.  But if you can send it to us, we can --
 8    we can put these dates in.
 9        I'll give you an --
10                    (Document displayed.)
11            THE COURT:  I really do hope to have this out by next
12    week, but I will give you -- an extra week doesn't hurt.  So
13    we'll assume that the claim -- you'll receive the claim
14    construction ruling no later than the 18th, and you will
15    likely get it well before then.
16        But that means that the case-narrowing event, the bottom
17    of that sheet, Mr. Garcia, the deadline, then, will be
18    April 8th, 21 days after.
19        Then the next one, Patent Local Rule 3.7, 30 days after
20    the ruling, that will be April 18th.
21        The next date, fact discovery cutoff, April 25th.
22        Next deadline to participate in mediation, May 9th.
23        That is -- that's right around the corner.  So what I am
24    going to do is add on here -- well, do you know who you're
25    going to mediate in front of?
```

```
 1              MR. AL-SALAM:  We've already scheduled it, Your
 2    Honor.
 3              THE COURT:  And when is it scheduled for?
 4              MR. AL-SALAM:  This -- next week.
 5              THE COURT:  Oh, great.  Okay.
 6         And do you have a -- do you have enough from me to do
 7    that?  When --
 8              MR. LANIER:  Yes.
 9              MR. AL-SALAM:  Yes.
10              THE COURT:  -- in terms --
11              MR. AL-SALAM:  Because the dispute is large, so --
12    but yes, we have enough from you, Your Honor.
13              THE COURT:  Okay.
14         And when you say "the dispute is large," are there other
15    cases pending other than these ones?
16              MR. LANIER:  Yes.
17              MR. AL-SALAM:  Two -- two others.  Well, three if you
18    include China.  There's one in Seattle, and there's one in
19    Waco, Texas.
20              THE COURT:  Okay.
21              MR. LANIER:  And there are some ancillary IPR's and
22    proceedings following that as well.
23              THE COURT:  Okay.
24              MR. LANIER:  But we are meeting next week and talking
25    about all of that.
```

1        **THE COURT:**  Terrific.

2        **MR. LANIER:**  Including specifically this case.

3        **THE COURT:**  Okay.

4     So opening disclosures, then, June 8th.

5     Rebuttal experts would be August 15th.

6     Expert discovery cutoff, September 12th.

7     Deadline to file dispositive motions, motions to strike,

8  and *Daubert*s, October 10th.  Now, that's a federal holiday.

9  Is it a holiday for you all?  It's Veteran's Day.

10        **MR. LANIER:**  What federal holiday is it?

11              (Off-the-record discussion.)

12        **MR. AL-SALAM:**  It doesn't bother us if that's the

13  deadline, either way --

14        **THE COURT:**  Okay.  'Cause it's -- ECF is open.

15        **MR. LANIER:**  Okay.

16        **THE COURT:**  I was explaining to some law clerk how we

17  used to rush to the courthouse with bikers and try to get

18  those things on file before the courthouse doors closed.  Now

19  you get to stay up till midnight.

20     Okay.  Deadline to file responses, then, as November 7th.

21     The deadline to file replies -- and this is a little harsh

22  because under the protocol, it would be the Monday after

23  Thanksgiving.  So unless you -- unless you object, I would

24  give that a few extra days.

25        **MR. AL-SALAM:**  That's fine, Your Honor.

1          **MR. LANIER:**  No objection.

2          **THE COURT:**  Okay.  December 2nd.

3          **MR. AL-SALAM:**  Your Honor, I don't want to interrupt

4     you, but just for clarity, that's -- that's a deadline to file

5     a summary judgment motion.

6        Could you file one earlier, or do you prefer they not be

7     filed until --

8          **THE COURT:**  Oh, no.  You can file earlier.

9          **MR. AL-SALAM:**  Yeah.

10         **THE COURT:**  All I would say is that -- I would say a

11    couple of things.  One is just remember you still have to

12    comply with my standing order on summary judgments.  It's --

13    and I remind people because it's not routinely used in this

14    district, but I find it to be very helpful.  It also allows us

15    to make sure that the schedule works for everybody in terms of

16    responses.

17       If you're going to file motions to strike and/or *Dauberts*,

18    they have to be filed at the same time.  If you're going to do

19    it later --

20         **MR. AL-SALAM:**  I see.

21         **THE COURT:**  -- then the problem is if I see them

22    coming in, I'm just going to collapse them.

23         **MR. AL-SALAM:**  I see.  Okay.  I understand.

24         **THE COURT:**  You have to get -- you know, it takes a

25    lot of time for us -- maybe not Judge Albright.  He seems to

1    be able to generate lot of orders very quickly, but for us, it

2    takes a lot of time.

3        And if I'm going into your space, then I want to do it all

4    at once.  It's more efficient.

5            **MR. AL-SALAM:**  Understood, Your Honor.

6            **MR. LANIER:**  Understood.

7            **THE COURT:**  And I think that's -- that's the reason.

8    It doesn't -- look, I would also say you only get one so --

9    but if you think, like, this whole thing is being held up on

10   one issue, then come and talk to me.  Okay?

11       December 12th is when everything is ripe.  It's going to

12   take us a while to -- to look at it, plus then there are the

13   holidays, so I'm setting your summary judgment hearing for

14   January 11th, 2023, which is about a month later.

15       Are your trial calendars all booked up, or do you want a

16   trial date now?

17           **MR. AL-SALAM:**  Happy to have the trial date now.

18           **MR. LANIER:**  I'm happy to have a trial date.

19       I do want to let the court know that, unless the court

20   objects, I want to talk with Mr. Al-Salam over the next day or

21   so about the fact discovery cutoff in view of the court's -- I

22   hear that the court issued an order on the motion to amend.

23       And then Mr. Al-Salam mentioned this morning they may seek

24   an additional amendment to accuse some additional products.

25   And I haven't had a chance to talk with the team about whether

```
 1   we think that changes the scope of discovery.  I'm not saying
 2   it will, but I simply have not been able to think about it.  I
 3   apologize.
 4       So we may want to talk with Mr. Al-Salam about the fact
 5   discovery cutoff.  I'm not suggesting changing the other dates
 6   except that any of them that don't affect the court might slip
 7   a little or something, but I would like to talk with him about
 8   that and if we're agreeable, perhaps come back to Your Honor,
 9   if that's okay.
10           THE COURT:  That's fine.  Would -- in this case,
11   given the various issues, if -- you know, my preference is
12   that you agree on something.  If you agree on it, then it's
13   generally not a problem.
14       And given -- given my calendar, I can't give you a date --
15   a trial date until June anyway, so --
16           MR. LANIER:  Okay.
17           THE COURT:  Your trial date, then, is June 5th, 2023.
18   Your pretrial conference is May 5th, 2023.  That means that
19   all your disclosures are due on April 21st.  I do these patent
20   cases a little early 'cause sometimes it takes more than one
21   conference.
22       You'll be placed on a compliance calendar for April 20 --
23   I mean, April 14th.  I don't expect to see you on April 14th.
24   What I expect is that five business days prior, by April 7th,
25   you'll file a joint statement saying that you've read my
```

1    standing orders on trials; everybody is complying; and there

2    are no issues.

3        If there are issues, that's when I want to know, in April.

4    Not after the fact, okay?

5            **MR. AL-SALAM:**  Thank you, Your Honor.

6        And to be clear, you want us to send you the Word document

7    on which this --

8            **THE COURT:**  Yeah.

9            **MR. AL-SALAM:**  -- current schedule is.

10           **THE COURT:**  Correct, 'cause then we can just pop it

11   into an order without having to retype anything.

12           **MR. AL-SALAM:**  That's fine.  We will do that.

13           **THE COURT:**  Okay.  Anything else we can do today?

14           **MR. LANIER:**  Other than expressing my sheer delight

15   to be back in a courtroom, nothing else from us, Your Honor.

16           **THE COURT:**  You know, it's very funny --

17       Well, we're adjourned.

18           (Proceedings were concluded at 10:41 A.M.)

19                           --o0o--

20

21

22

23

24

25

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter. I further certify that I am neither counsel for, related to, nor employed by any of the parties to the action in which this hearing was taken, and further that I am not financially nor otherwise interested in the outcome of the action.

_____

Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

Tuesday, March 15, 2022