UNITED STATES DISTRICT COURT      *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| IMPINJ, INC., | ) | **Jury Trial** |
| | ) | |
| Plaintiff, | ) | **Volume 1** |
| | ) | |
| vs. | ) | NO. C 19-03161 YGR |
| | ) | |
| NXP USA, INC., | ) | Pages 1 - 193 |
| | ) | |
| Defendant. | ) | Oakland, California |
| _____ | ) | Wednesday, July 5, 2023 |

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

APPEARANCES:

For Plaintiff:          Perkins Coie
                        Washington Mutual Tower
                        1201 Third Avenue, 40th Floor
                        Seattle, Washington  98101
                   BY:  RAMSEY M. AL-SALAM,
                        JESSICA (JESSIE) DELACENSERI,
                        CHRISTINA J. McCULLOUGH,
                        STEVAN R. STARK, ATTORNEYS AT LAW

                        Perkins Coie LLP
                        1900 Sixteenth Street, Suite 1400
                        Denver, Colorado  80202-5255
                   BY:  KEVIN BOULLY, PHD, SENIOR LITIGATION
                         CONSULTANT

(Appearances continued next page)

Reported By:       Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1

2                       **A P P E A R A N C E S (CONT'D.)**

3

4       For Plaintiff:          Perkins Coie LLP
                                405 Colorado Street, Suite 1700
5                               Austin, Texas  78701
                         BY:    M. CRAIG TYLER, ATTORNEY AT LAW
6
                                Impinj, Inc.
7                               400 Fairview Avenue N
                                Seattle, Washington  98109
8                        BY:    YUKIO MORIKUBO, GENERAL COUNSEL

9

10      For Defendant:          Jones Day
                                Silicon Valley Office
                                1755 Embarcadero Road
11                              Palo Alto, California  94303
                         BY:    MICHAEL C. HENDERSHOT,
12                              THARAN GREGORY LANIER, ATTORNEY AT LAW

13                              Jones Day
                                110 N. Wacker Drive, Suite 4800
14                              Chicago, Illinois  60606-7223
                         BY:    LISA FURBY,
15                              TIMOTHY J. HEVERIN,
                                JOHN M MICHALIK,
16                              THOMAS W. RITCHIE, ATTORNEYS AT LAW

17                              Jones Day
                                North Point
18                              901 Lakeside Avenue
                                Cleveland, Ohio  44114
19                       BY:    ROBERT M. BREETZ,
                                T. KAITLIN CROWDER, ATTORNEYS AT LAW
20
                                Jones Day
21                              555 South Flower Street
                                Los Angeles, California  90071
22                       BY:    JONATHAN MCNEAL SMITH, ATTORNEY AT LAW

23                              Jones Day
                                51 Louisiana Avenue, N.W.
24                              Washington, D.C.  20001
                         BY:    R. LEVENT HERGUNER ATTORNEY AT LAW
25

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1
2                    **A P P E A R A N C E S  (CONT'D.)**
3
4    ALSO PRESENT:            Chris Diorio, Impinj, Inc.
5                             Ralf Kodritsch, NXP USA, Inc.
6                             Steve Paterson, Jury Consultant
7                                  --o0o--
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

<u>I N D E X</u>

|                                             | <u>PAGE</u> | <u>VOL.</u> |
|---------------------------------------------|-------------|-------------|
| JURY INSTRUCTIONS                           | 94          | 1           |
| OPENING STATEMENT BY MR.  AL-SALAM          | 111         | 1           |
| OPENING STATEMENT BY MR. HENDERSHOT         | 142         | 1           |

--o0o--

```
 1   Wednesday, July 5, 2023                            8:03 a.m.
 2                        P R O C E E D I N G S
 3                             --o0o--
 4
 5       (The following proceedings were heard out of the presence
 6   of the jury:)
 7           THE CLERK:  Your Honor, calling the matter of
 8   Impinj, Inc. vs. NXP Incorporated, 19-cv-03161-YGR.
 9       Parties, please state your appearance for the record.
10           MR. AL-SALAM:  Ramsey Al-Salam of Perkins Coie for
11   plaintiff, and I'm accompanied by Kevin Boully,
12   Christy McCullagh, Jessica Delacenserie, Stevan Stark, and
13   Marvin Craig Tyler.
14           THE COURT:  Okay.  Good morning, everyone.  And if
15   you haven't already, I think -- I think my courtroom deputy's
16   trying to get all of the names of yours so that I can try to
17   memorize them.  So I'll get the list soon.
18       All right.  Good morning, Mr. Hendershot.
19           MR. HENDERSHOT:  Yes, Your Honor.  Good morning.
20   Mike Hendershot of Jones Day on behalf of NXP with me are
21   Greg Lanier, Lisa Furby, John Michalik, and Tom Ritchie.
22           THE COURT:  Okay.  Good morning.
23       So I have -- we have a couple of other people on this side
24   of the bar.
25           MR. HENDERSHOT:  I'm sorry.  Do you want the -- in
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1    front of bar or in the gallery?

2              THE COURT:  In the front of bar.

3              MR. HENDERSHOT:  Derrick will be working our video.

4    His last name is escaping me at the moment.  I haven't had

5    enough coffee.

6              MR. LEWIS:  Lewis.

7              MR. HENDERSHOT:  Lewis.  There you go.

8        And Lori Murray of Jones Day, as well, will be here

9    supporting us.

10             THE COURT:  Is lawyer or nonlawyer?

11             MR. HENDERSHOT:  A paralegal from Jones Day.

12             THE COURT:  Okay.  Everybody's here.  So, you know,

13   you're real people.  I like to be able to say good morning to

14   people.

15       Okay.  So let's see what issues, if any, you have.  I have

16   a couple of questions myself.  We'll start every morning just

17   with what I -- just with the list.  We have a little bit more

18   time right now because jurors are getting checked in.  So this

19   morning, we'll have a bit more time.  But, in general, we only

20   have 30 minutes.  And I will figure out what's the most

21   important thing that -- if any, that we need to deal with.  So

22   we'll always start with the plaintiff.

23       Mr. Al-Salam, give me your list.

24             MR. AL-SALAM:  I don't have anything to raise,

25   Your Honor.

```
 1              THE COURT:  Perfect.

 2         Mr. Hendershot?

 3              MR. HENDERSHOT:  Two issues, Your Honor.  The first,

 4    before the jurors come in, there is one juror, Number 15,

 5    Dan Bass, that we had proposed the parties should stipulate

 6    should be excused for cause.  Impinj did not agree.  He --

 7    Mr. Bass indicated in his survey questionnaire that he has

 8    adverse feelings towards the law firm Jones Day, representing

 9    NXP.  His response is to question 28 said, "In a prior role, I

10    worked with the legal industry.  I found Jones Day to be one

11    of those companies I didn't like to work with.  I found that

12    they used their size to push people and vendors around."

13              THE COURT:  Okay.  You represent a billion-dollar

14    company?

15              MR. HENDERSHOT:  Yes, Your Honor.

16              THE COURT:  You represent a billion-dollar company?

17              MR. AL-SALAM:  I don't know if it's a billion, but

18    it's -- it's a large company.  I mean, in terms of --

19              THE COURT:  Size.  Give me size.

20              MR. AL-SALAM:  In terms of annual revenues, I think

21    it's 300 million, something like that.

22              MR. HENDERSHOT:  Their market cap is between 2 and

23    $3 billion, Your Honor.

24              THE COURT:  Okay.  Two very large companies.  So I

25    saw the note.  I will ask him questions, and we'll go from
```

1    there.  I will not excuse him on the front end.  Okay?

2            **MR. HENDERSHOT:**  One other issue, Your Honor?

3            **THE COURT:**  Yes.

4            **MR. HENDERSHOT:**  There are objections that the

5    parties cannot resolve to some demonstratives that they've

6    disclosed for use with a witness, Mr. Ron Oliver.

7            **THE COURT:**  Okay.

8            **MR. HENDERSHOT:**  Mr. Ritchie from our team is

9    prepared to address those.  I believe he's disclosed for

10   testifying this afternoon.

11           **THE COURT:**  We won't -- well, we won't get to him

12   this afternoon, I don't think.

13      But is he your first witness?

14           **MR. AL-SALAM:**  Second witness.

15           **THE COURT:**  All right.  Tell me who your witnesses --

16   who your witnesses are.

17           **MR. AL-SALAM:**  We have -- Chris Diorio is our first

18   witness, and we have no -- there's no disputes regarding

19   exhibits for Mr. Diorio.  And then it would be Mr. Oliver.

20           **THE COURT:**  Okay.  Okay.  And you gave me -- so are

21   you using -- on a separate topic -- and we'll get to the

22   demonstratives.

23      And that's the only other thing you have?

24           **MR. HENDERSHOT:**  Yes, Your Honor.

25           **THE COURT:**  Okay.  Are you all using witness binders?

```
 1              MR. AL-SALAM:  Yes.
 2              THE COURT:  So you will have -- I just want to go
 3    through this because you gave me a thumb drive with all of
 4    your exhibits, which is fine.  And I see you've got, you know,
 5    two bookshelves full of hard copies.  But I'm obviously not
 6    printing hard copies, so I don't have your exhibits other than
 7    in an electronic format.
 8         We will need -- so you will have a witness binder, I'm
 9    assuming, for me?
10              MR. AL-SALAM:  Yes, Your Honor.
11              MR. HENDERSHOT:  Yes, Your Honor.
12              THE COURT:  And in terms of the exhibits for
13    appellate purposes, the official exhibit, you will be giving
14    those to Mr. Cuenco, right?
15              MR. AL-SALAM:  Yes, Your Honor.
16              MR. HENDERSHOT:  Yes, Your Honor.
17              THE COURT:  Okay, just to make sure.
18         All right.  Let's see the demonstratives.
19              MR. HENDERSHOT:  Your Honor, there will be one other
20    quick issue that I'll want to raise after this that I've been
21    told about.
22              THE COURT:  Give me the list.
23              MR. HENDERSHOT:  It is a -- we have a pro hac vice
24    application pending for Tim Hebron.  He -- we were planning
25    for him to maybe be active today, so if we could get that
```

1    granted, it would be much appreciated, Your Honor.

2            **THE COURT:**  Okay.  We'll take a quick look.

3            **MR. HENDERSHOT:**  Thank you.

4            **MR. RITCHIE:**  Good morning, Your Honor,

5    Thomas Ritchie on behalf of NXP.  If I may hand up a copy for

6    the deputy and a copy for the court.

7                    (Off-the-record discussion.)

8            **THE COURT:**  And can I have the list of names?

9            **MR. RITCHIE:**  I'm handing up copies of demonstratives

10   and exhibits that were disclosed for.

11           **THE CLERK:**  I've not checked everyone yet,

12   Your Honor.

13                   (Off-the-record discussion.)

14           **THE COURT:**  Okay.  So I have your -- I have your

15   documents here.

16      So where -- where do you want me to look?

17           **MR. RITCHIE:**  So, Your Honor, these -- these

18   demonstratives were disclosed to us last night.  As

19   Mr. Hendershot said, we met and conferred, could not reach

20   resolution.  We object to the exhibits that we've given you as

21   well as the testimony that it foreshadows from Mr. Oliver for

22   two reasons.  One, it's expert testimony.

23           **THE COURT:**  You deposed him?

24           **MR. RITCHIE:**  He was deposed, yes, ma'am.

25           **THE COURT:**  Yeah.  I saw references to this in your

1   pending motions.  The reason that I require -- and it's always

2   around patent cases.  This is why it happens.

3       Internal witnesses, obviously, they are the experts in

4   what they do, right?

5           **MR. RITCHIE:**  Yes, Your Honor.

6           **THE COURT:**  I require early disclosures for one

7   purpose, and that is so that you can depose the person.  You

8   deposed him.  You know what he's going to say.  You're on

9   notice.

10      So what's the problem?

11          **MR. RITCHIE:**  So, Your Honor, the issue that you're

12  referring to was related to the damages.  These are new issues

13  that have not been raised before relating to the meaning of

14  term "charge-accumulating path."

15      Mr. Oliver's testimony and the exhibits relate to how

16  Impinj's products practice the claims.  They compare the

17  accused products to Impinj's own products.  And they relate to

18  how the term is used or would be used in the prior art.

19          **THE COURT:**  How do you know this?

20          **MR. RITCHIE:**  So for instance, Your Honor, if you

21  turn to Slide 18 of the deck.

22      We see the slide, 18, is titled, "Impinj Monza R6

23  Charge-Accumulating Path."  And at the left, there's a --

24  there's a bubble, and it speaks of charge accumulating path

25  and synchronous switching transistors on the right.  It talks

1   about a bias circuit.  And it says, "The bias circuit is not

2   synchronous and not charge accumulating."

3       Now, as you know, the parties have disputed whether a

4   leakage path is charge accumulating or not, and the Court has

5   said that that's an issue of fact for the jury to decide.

6   This is a new issue now.  They're pointing to a bias circuit,

7   and they're saying a bias circuit is not charge accumulating.

8       On Slide 20, it talks about how the Impinj Monza R6 charge

9   flows.  And on the left, it refers to one path as being

10  dominant, and on the right, there's a bubble that says, "A

11  bias circuit has a tiny charge flow."

12      So we're getting into interpreting the meaning and

13  requirements of a term "charge-accumulating path" through

14  their products in these particular two slides.

15      The next slide, Slide 21, again does the same thing by

16  comparing the accused product to the products of the plaintiff

17  with numbers, metrics, and characterizations of bias circuits

18  and so on.

19      Your Honor, this is not --

20          **THE COURT:**  I hear you.  Okay.

21  Where has this been disclosed, this exact testimony?

22          **MR. AL-SALAM:**  He was deposed four times.  They asked

23  him all about this invention.

24          **THE COURT:**  Okay.

25          **MR. AL-SALAM:**  This is describing --

| | |
|---|---|
| 1 | **THE COURT:**  Stop. |
| 2 | **MR. AL-SALAM:**  Okay. |
| 3 | **THE COURT:**  I want to see deposition testimony where |
| 4 | he discloses this particular information, or I want it from an |
| 5 | expert.  If you can't find it, then it's not been disclosed, |
| 6 | and it will be excluded. |
| 7 | **MR. AL-SALAM:**  Can I explain? |
| 8 | **THE COURT:**  I -- you can explain, but I am telling |
| 9 | you now that if you cannot show me, pretrial, where he has |
| 10 | disclosed this specific issue and where I can either see it in |
| 11 | the form of a report or in deposition testimony, if you can't |
| 12 | show it to me, it can't come in. |
| 13 |   Trials are not time for surprises.  Trials are time for |
| 14 | those 14 -- or those 8 individuals to decide a case that all |
| 15 | of you can't decide.  And by the way, who is the -- where -- |
| 16 | do we have -- do I have corporate representatives yet, here? |
| 17 | **MR. RITCHIE:**  Mr. Kodritsch from Austria NXP is here |
| 18 | in the courtroom, Your Honor, as well as other representatives |
| 19 | from -- from the legal team on behalf of NXP. |
| 20 | **THE COURT:**  How about your client?  You said -- |
| 21 | **MR. RITCHIE:**  On behalf of NXP, our client, my |
| 22 | client. |
| 23 | **THE COURT:**  Okay.  And your client? |
| 24 | **MR. AL-SALAM:**  Mr. Diorio is not here.  The general |
| 25 | counsel of Impinj is sitting in the back. |

1      **THE COURT:**  And -- well, then I'll talk to him when

2    he gets here.  I'll talk to both of you.  It is interesting to

3    me -- it will be interesting to me who -- who you all pick

4    and -- you know, which jurors you choose to -- to decide this

5    billion-dollar case.  I hope the board knows, of your

6    companies.

7      Anyway, go ahead and explain, but you're going to have to

8    provide me with --

9      **MR. AL-SALAM:**  I can -- I can look for that, if he

10    was asked.  But to be clear --

11      **THE COURT:**  No.  No.  No.  No.  Not if he was asked.

12      **MR. AL-SALAM:**  Okay.

13      **THE COURT:**  Because these are specific opinions.  So

14    whether or not he was asked is irrelevant to me.  If you're

15    using him as a back door for expert testimony, and it looks

16    like from these charts you are, then they have to be

17    disclosed.  And if they are not disclosed, they do not come

18    in.

19      Go ahead.

20      **MR. AL-SALAM:**  Mr. Oliver is going to testify as to

21    what he invented and what was created.  This is the circuit he

22    created.  He -- well, one of the -- depending on which slide

23    you're looking at, the circuit he created.  He's going to

24    explain how it practices his invention.  So --

25      **THE COURT:**  But he is using critical terms that are

1    at issue in this trial, right?

2           MR. AL-SALAM:  But these are terms that are -- that

3    was used in the patent, so a charge --

4           THE COURT:  Okay.  So if he has an opinion with

5    respect to whether or not something is not charge

6    accumulating, and that is a key issue in the trial, which I

7    believe it is, then it should have been disclosed as an

8    opinion that needs to be tried.

9        And if he did not do that, there's a problem.

10          MR. AL-SALAM:  But can he testify factually about how

11   his own circuit accumulates charge?  And on the last slide,

12   it's talking about -- it's for copying.  He's talking about

13   the resemblance of the NXP rectifier to what is in our

14   products.

15       So he is -- to me, it's factual testimony about --

16          THE COURT:  It doesn't sound like factual testimony.

17   It sounds to me like a backdoor for expert testimony.

18          MR. AL-SALAM:  When we explain how he created the

19   invention, I think he has to use the terms in the patent.

20   "Synchronous" is a part of the patent, and

21   "charge-accumulating path" --

22          THE COURT:  Well, when you talk about if -- maybe so.

23   We'll see.  But if he is then opining as to whether or not

24   NXP's product does the same thing, that certainly goes beyond

25   the scope of what he created because he -- because it's a

```
1    comparison by definition.

2            MR. AL-SALAM:  It not a comparison to the patent.

3    It's a comparison to our --

4            THE COURT:  To someone else's product.

5            MR. AL-SALAM:  -- rectifier.

6            THE COURT:  It is a comparison to someone else's

7    product, so that certainly has nothing to do with what he was

8    thinking when he invented this.

9            MR. AL-SALAM:  But may he explain his own circuit and

10   product?

11           THE COURT:  I don't know.  I don't know.  I need to

12   see what it is he's disclosed.

13           MR. AL-SALAM:  I mean, I'm sure he was asked about

14   the invention --

15           THE COURT:  Well, then, I'm sure you'll find

16   something for me, right?

17           MR. AL-SALAM:  I guess.  He's been deposed four

18   times.  I will --

19           THE COURT:  Great.  Then you'll have all of this on

20   your laptops, and you can do searches.

21           MR. AL-SALAM:  Okay, Your Honor.

22           THE COURT:  Like I said, this is not -- no surprises.

23           MR. AL-SALAM:  I don't think any of this is a

24   surprise.

25           THE COURT:  Great.  Then you'll have information for
```

```
1    me.
2        Okay.  We'll go look at that pro hac vice application.  We
3    will keep you informed when we hear about the jurors.
4        We'll stand in recess until then.
5            THE CLERK:  Court is in recess.
6        (Recess taken at 8:19 A.M.; proceedings resumed at
7    9:06 A.M.)
8            THE COURT:  Let's go back on the record.
9        I have with me one of the prospective jurors.
10       Sir, if you'll -- sir, if you could come forward, please.
11                   (Pause in the proceedings.)
12           THE COURT:  Just come to the microphone right here.
13       And it's Mr. An, is it?
14           PROSPECTIVE JUROR:  Yes, that's right.
15           THE COURT:  Okay.  So, Mr. An, tell me what's going
16   on.  We typically don't have people show up with their
17   children.
18           PROSPECTIVE JUROR:  Yeah, it was -- I'm sorry about
19   that.  It was really difficult for me to get baby care the day
20   before the holiday -- for the day after the holiday.
21           THE COURT:  Okay.  And with respect to --
22           PROSPECTIVE JUROR:  On short notice, yeah.
23           THE COURT:  So with respect -- like, do you -- do you
24   have -- if you're seated as a juror in this case, do you --
25   are they in camp?  What is the plan for them?
```

```
 1            PROSPECTIVE JUROR:  So school starts -- they're at
 2    home with me right now during the summer.
 3            THE COURT:  Okay.  And are you still working for
 4    Wells Fargo?
 5            PROSPECTIVE JUROR:  Yes.
 6            THE COURT:  Okay.  And how is it that you work and
 7    still take care of your kids?
 8            PROSPECTIVE JUROR:  Yeah.  I'm able to work remotely
 9    from home for like, you know, certain days a week.
10            THE COURT:  So you don't work full-time, or you do
11    work full-time?
12            PROSPECTIVE JUROR:  I do work full-time.
13            THE COURT:  And all of that's remote for Wells Fargo?
14            PROSPECTIVE JUROR:  It not all remote.  It -- so
15    to -- they -- they want people in the office three days a
16    week.
17            THE COURT:  Okay.
18            PROSPECTIVE JUROR:  And a day of PTO counts as a day
19    in the office.  And so this summer, I'm taking two and a half
20    days off each week to check that box.  And then my manager has
21    also allowed me work from home two out of six weeks this
22    summer.
23            THE COURT:  Okay.  And --
24            PROSPECTIVE JUROR:  So between all that, I'm able to
25    satisfy the work from office requirement and be at home with
```

```
 1    the kids.

 2            THE COURT:  And then what are the kids doing while

 3    you're working?

 4            PROSPECTIVE JUROR:  They play with each other.  They

 5    watch TV.  They -- you know, do reading, coloring.

 6            THE COURT:  And what is the plan for your kids for

 7    this week and next week?

 8            PROSPECTIVE JUROR:  So we actually fly to Dallas on

 9    July 7th, and then we come back on July -- sorry.  We don't

10    come back.  Then we go to Phoenix on July 15th.

11            THE COURT:  Okay.  You didn't mention that in your

12    questionnaire.

13            PROSPECTIVE JUROR:  No, I didn't.  No.

14       I didn't know what constituted a hardship or not, so -- I

15    didn't want to make that determination.

16            THE COURT:  Well, I -- I am not sure that your kids

17    are going to be able to sit through a patent trial.  It's hard

18    for adults to sit through.

19                          (Laughter.)

20            THE COURT:  Now, with your background, I was actually

21    kind of hoping you might be chosen as a juror.  I mean, you

22    know, you've got a math background, went to Harvard.

23    Obviously, must be very smart.

24            PROSPECTIVE JUROR:  Thank you.

25            THE COURT:  But I don't know -- I -- yeah, I don't
```

1    know how this could be managed.

2              **PROSPECTIVE JUROR:**  Yeah, it -- it -- I didn't want

3    to claim a hardship, so that's why I -- you know, I wanted to

4    present the facts here.  I know -- maybe I should have done

5    that at the form.  I apologize, but -- yeah.

6              **THE COURT:**  Okay.  Well, I appreciate you coming in.

7    This trial won't be over until next week.  So I take it that

8    you purchased your tickets before?

9              **PROSPECTIVE JUROR:**  That's right.  Um-hmm.

10             **THE COURT:**  So I am going to excuse you on a hardship

11   basis and hope that you take this opportunity to show your

12   kids what a courtroom looks like and a courthouse, and they

13   can learn something about civics.

14             **PROSPECTIVE JUROR:**  Yes, thank you, Your Honor.

15             **THE COURT:**  All right.  You're excused.  Thank you.

16        That's juror number 12, Counsel.

17             **THE COURT:**  Okay.

18        Are the -- are the rest of the jurors ready?

19             **THE CLERK:**  They're ready, Your Honor.

20             **THE COURT:**  All right.  Counsel, so what will happen

21   here is that the balance of jurors will come in.  As I

22   mentioned to you before -- how many pages to the judge's list

23   did I give you, two or three?  Three?  Okay.

24        So we'll seat the first 16, which takes us to

25   Juror Bautista on the third page.  They will be re-sorted, as

1    I told you, alphabetically.  All right?

2        So I'll come back in once we're all seated, and we'll get

3    started.

4                    (Prospective Juror An left the courtroom.)

5        (Recess taken at 9:12 A.M.; proceedings resumed at

6    9:30 A.M.)

7        (The following proceedings were heard in the presence of

8    the jury venire:)

9                          (Roll call.)

10

11       **THE COURT:**  You may be seated, so maybe not too

12   excited, I take it.

13       Well, welcome to the United States District Court for the

14   Northern District of California.  I spent my weekend reading

15   all of your questionnaires.  And so that you know, right, the

16   federal court, unlike your state courts, in this particular

17   district extends -- you take the State of California, cut in

18   it four, our district extends from Monterey, all the way up to

19   the Oregon border, straight down the middle.  On the east is

20   the Eastern District, and the Northern District is the other

21   side.  So slightly different -- slightly different court

22   system.  But we share lots of principles.

23       In any event, I hope you enjoyed your Fourth of July

24   weekend.  As you were probably, or some of may have been

25   complaining you had to come to the jury duty, part of you

```
 1    really realized, right, we -- our independence, rah, rah.
 2    We're glad to be Americans.  We'll talk a little bit more
 3    about that.
 4        But why don't you all -- first, everybody, on the --
 5    stand, and you'll be sworn in.  Not the lawyers, just the
 6    jurors, all the jurors.  All the jurors back in the back, too,
 7    you need to stand, and you'll be sworn in.
 8             THE CLERK:  Please raise your right hand.
 9        (Venire sworn).
10             THE CLERK:  Thank you.  Please be seated.
11             THE COURT:  Well, you've been called as prospective
12    jurors in the case of Impinj Inc., vs. NXP U.S.A. Inc.  Let me
13    start, really, just by thanking you.  Thanking you for
14    honoring your citizenship because that is what you've, in
15    fact, done today.  I know that you're not here voluntarily.
16    And other than my kids, I don't know too many people who would
17    be excited to be jurors.  But they -- they really would be
18    excited to be a juror.  They've never gotten picked.
19        But let me just remind you, right, the right to a trial by
20    jury in the United States is guaranteed to us by the
21    Constitution.  And that right can't be effectuated in
22    courtrooms across the United States unless people like you
23    honor your citizenship and come to the courthouse.  So again,
24    let me thank you.
25        If anyone can't hear me, just let me know.  We do have
```

1    some assistive listening devices, which we can provide you if

2    you're having any problems.

3        So this is an old copy of the Constitution, and I keep it

4    up here with me to remind me of that right to a trial by jury.

5    Every week in courtrooms across the United States, judges and

6    parties are trying to effectuate the rights that we've held so

7    dear for hundreds of years.

8        I just got back from a trip in east Asia, and I was, every

9    day, reminded that this right does not exist in other

10   countries.  The rights that we have in our Constitution are

11   not guaranteed to people in other parts of the world.  But

12   they are here.  And I think sometimes we take that for

13   granted.

14       We take for granted that democracy is ours, and once in a

15   while, we get to engage in that democracy.  And that is what

16   you are doing here today.  And it's not convenient.  It's not.

17   I understand that.

18       But all of you as citizens enjoy the right to serve.  It's

19   actually something that belongs to you.  And no one can take

20   that away from you.  It cannot be denied to you on the basis

21   of color, race, creed, national origin, sexual orientation, or

22   economic status.  In fact, it wasn't that long ago in our

23   history that many people in this courtroom did not have the

24   right to serve, myself included.  We didn't have that right.

25   So thank you.

1          Let me share just a little bit of information about your

2     jury service and what really it means to be on a -- on a jury,

3     having read some of your answers to the questions that I asked

4     in the Survey Monkey questionnaire.

5          It is the duty of the jury to decide what the facts are in

6     a case.  That's really what you're doing.  These parties

7     dispute that certain evidence conclude -- you know, relates to

8     a particular fact.  And in this case, it's a patent case.  I'm

9     actually going to talk to you about it, but whether the

10    patent's infringed or not.  They dispute that.  They have

11    evidence, and one side says they believe the evidence shows

12    that they didn't infringe.  And the other side believes that

13    they did.  Kind of really basic.

14         It's the jury's job to decide the facts.

15         Jurors are what we call the judges of the weight and

16    effect of all of the evidence that's going to be presented to

17    you.  And there's a limitation on what a jury can do.  And

18    that limitation is what we call the law.

19         Now, it's my job as a judge to explain to you what the law

20    is so that you can do your job.  It is the parties' -- the --

21    the lawyers' role, separate and distinct, to present the

22    evidence and to represent their clients.

23         As jurors, you must follow the law.  I have to follow the

24    law, the parties follow the law.  We are -- we are not a

25    democracy based upon what any jurors happen to think on any

1    given day.  That's not how it works.

2        We have laws.  We elect officials and they -- and laws are

3    passed.  So that's my job.  The juror's job is to determine

4    the facts.  And the parties' job is to present the evidence.

5    And the end result of this is what we call -- we have a

6    verdict.  And the end result of a jury trial where everybody's

7    doing their job fairly and impartially, that's what we believe

8    gets us to the right answer.  That's how the system works.

9    It's not perfect, but I do believe it's the best system out

10   there.

11       It is really important, and vitally important, that a

12   juror -- that each juror open -- maintain an open mind at all

13   times and not decide the case until the very end.

14       I've tried a lot of -- I've tried a lot of cases, and I

15   can tell you sometimes when I'm the trier, when I don't have a

16   jury and I'm just trying it and I have to decide, you hear one

17   side and you think, gosh, that sounds pretty good.

18       But then you hear the other side and you think, well,

19   yeah, that sounds pretty good too.  So then you have to

20   weigh -- you have to weigh the evidence and you have to figure

21   it out.

22       And what we ask jurors to do is to go back there and to

23   talk about it -- when it's all said and done, once you have

24   the arguments and the instructions -- to go back there and to

25   talk together, to use your collective expertise, your

```
1    collective wisdom, on whether or not to believe somebody.  We
2    ask you to deliberate in that way to get an answer to our
3    questions.
4         So what this next process is about, voir dire -- I didn't
5    see any Texans, but I grew up in Texas.  So if you ever move
6    to Texas, down there they say "voir dire."  That's where they
7    say "voir dire."  But that's just the Texas way of saying the
8    French.  Because this is French, old French, and it means to
9    speak the truth.  That's what we're asking you to do.
10        I need to have just some basic questions answered.  You've
11   answered many already.  This process is going to go by very
12   quickly 'cause you've answered so many questions.  But we just
13   need to have -- we want to make sure that all of you are, and
14   can be, fair and impartial to each side.
15        One of the reasons this will go a little bit faster is
16   because it's a patent dispute.  Like, how -- how can -- you
17   know, it's not like I have police officers.  It's not like
18   a -- no one has died.  It's not like a civil rights.  It's not
19   a criminal defense case where people -- people have strong
20   opinions.
21        Nobody had very strong opinions about patents, and that's
22   okay.  Most people don't.  Most people don't spend their free
23   time thinking about patents.  So I expect that this will go by
24   pretty quickly and then you can go about your day.
25        But that's what this next part's going to be about.  Let
```

```
 1    me shift some gears and talk a little bit about the case, but,

 2    first, I'm going to let the parties introduce their teams.

 3    We'll start with the plaintiff.

 4         Mr. Al-Salam, if you could introduce your team, please.

 5              MR. AL-SALAM:  Thank you, again, for doing your duty.

 6    I echo those comments.

 7         My name is Ramsey Al-Salam.  I'm accompanied by

 8    Kevin Boully, Christina McCullagh, Hunter Blackburn,

 9    Amy Stanton, Rachel Hand is in the first row,

10    Ruben Tyler Kendrick is right there, Jessica Delacenserie,

11    Stevan Stark, and Marvin Craig Tyler, who does say "voir

12    dire."

13              THE COURT:  Okay.  Mr. Hendershot, for the defense,

14    if you'll come to a mic somewhere, that'd be helpful.  Thank

15    you.

16              MR. HENDERSHOT:  Sure.

17         I'll also echo what the Court said.  I think we do have

18    the best system, and you guys are a critical part of that with

19    your service and time and attention, and for that, I thank

20    you.

21         My name is Mike Hendershot.  I'm with the law firm of

22    Jones Day here in the Bay Area.  I'm representing NXP U.S.A.,

23    the defendant in this matter.  With me on the team are

24    Steven Patterson, John Michalik, Tom Ritchie, Lisa Furby, Greg

25    Lanier, and some other members in the crowd.
```

1        And also here is Ralf Kodritsch who's in from NXP who's

2   the business leader globally for this business you're going to

3   be hearing about in this case.  So, again, thank you for your

4   time and your service.

5        **THE COURT:**  Okay.

6        So what am I looking for?  I'm only looking for eight

7   jurors.  This is a -- this is going to be a short trial.

8   And -- and I really do mean that.  If you were selected to

9   come in a few months, you'd be here potentially for six weeks.

10  If you were coming in January, I'm looking at a three- to

11  four-month trial.  So as federal trials go, this one's pretty

12  short.  And it's only eight jurors.  As you can tell, there

13  are going to be more lawyers in this room than jurors.

14       So, the timing, I expect this case will conclude by next

15  Friday.  Depends, really, on how long the jury deliberates.

16  But the jury should have the case by Wednesday/Thursday and

17  then deliberate Thursday/Friday.  If you need more time, that

18  would be up to the juror -- jury.

19       My trial day.  We start promptly at 8:30 in the morning.

20  I actually start before that with the lawyers, but with the

21  jury I start at 8:30 and we go straight until 1:40.  Two

22  20-minute breaks.  We don't take lunch.

23       Why is that?  I have hundreds of cases.  And a federal

24  judge, our cases do not go away when we're in trial.  So just

25  like your lives, you all have jobs.  Your lives don't go away

1    either.  So when I release you at 1:40 I work with the lawyers

2    to make sure there are no things that are going to come up the

3    next trial day, but then I have to go take care of my other

4    cases.  So I work in the evening and late in the afternoon and

5    on the weekends when I'm in trial, just like jurors have to,

6    because that's what the job is, that's my duty.  So that's the

7    way my trial day works.

8        Once you start deliberating, you can deliberate all day.

9    And that's fine, too.  That's up to the jury.

10       With respect to hardships, at this point, you know, it's a

11   pretty short trial.  So I can -- I'm happy to talk to you

12   about any hardships you might have, but I am pretty stringent

13   on giving hardships and I narrowly grant them.  Only -- I can

14   tell you there was a gentleman here today.  He had two

15   six-year-olds, and there was no daycare for them, and he

16   worked out of the house, and he took care of his kids.  So I

17   let him -- I excused him.

18       If you're the sole caregiver of an elderly person for whom

19   you couldn't have -- there's no one else that can take care of

20   them, that kind of person I would let off for hardship.

21       I will -- you can tell me about any economic hardship, but

22   that in and of itself is not necessarily a reason to let you

23   off jury duty.  Okay?

24       So just the one thing I want you to do on that regard is

25   take a look to your left and right.  Just right now, look at

 1    your neighbor.  When you ask me about your hardship, the
 2    question's going to be, right, what makes you so special that
 3    you should get off but your neighbor should not.  That will be
 4    the question.  Again, I understand it's inconvenient.  But
 5    that's where we are.
 6        So a little bit about the case.  As I mentioned, this is a
 7    lawsuit between Impinj and NXP U.S.A.  It's a patent trial.
 8    Impinj alleges that NXP is selling products that infringe on
 9    their patents.  NXP disagrees.  They say that they don't
10    infringe and, in fact, the patents aren't valid.  And Impinj
11    obviously disagrees with that.  So that's basically the
12    dispute.
13        The attorneys and parties have been in previously
14    introduced.  You saw all the names of people on the
15    questionnaire.  My courtroom deputy, who you've met,
16    Edwin Cuenco, he's the person with whom you will have the most
17    interaction.  My courtroom court reporter is Raynee Mercado,
18    who's been with me many, many years.  And I will say this
19    about court reporters, I have to take a break once in a while
20    because as long as someone's talking, she's working.  And she
21    needs a break once in a while, so just -- just know that.
22    Okay?
23        So let's get started.
24        If I -- one other note.  If at any time during this
25    process I ask you for an answer to a question that you feel

```
 1   like it's too personal or -- or maybe is embarrassing, you
 2   don't really want to talk about it in front of people, that's
 3   okay.  I understand that.  Just let me know.  I'll make a
 4   note, and I'll try to give you some privacy so you can answer
 5   the question.  But I still need to have the information,
 6   right?  So if you need privacy, you just let me know.
 7       Okay.  Let's go ahead and I'm going to go your
 8   questionnaires.
 9       Mr. Cuenco, if you can give them that -- that microphone.
10       Do they have it?
11       Okay.  Here we are.  Terrific.
12       And it's Sinan --
13           PROSPECTIVE JUROR:  Sinan Alobaide.
14           THE COURT:  Tell me again.
15           PROSPECTIVE JUROR:  It's an Arabic name.  You can say
16   Alobaide.
17           THE COURT:  Alobaide?
18           PROSPECTIVE JUROR:  Yeah, that works.
19           THE COURT:  So with respect to your questionnaire,
20   you were born in Baghdad, then?
21           PROSPECTIVE JUROR:  Yes, ma'am.
22           THE COURT:  And when did you come to the States?
23           PROSPECTIVE JUROR:  I immigrate from -- I went from
24   Baghdad to Dubai and then from Dubai to here.  I arrived in
25   2011 with my family.
```

```
 1              THE COURT:  Okay.  In 2011.

 2        When did you become a U.S. citizen?

 3              PROSPECTIVE JUROR:  I believe in -- I believe it was

 4      after five years, so that will be around 2015.

 5              THE COURT:  Okay.

 6        All right.  And then what do you do for Accenture?

 7              PROSPECTIVE JUROR:  I work as a team lead for a

 8      content moderator team.

 9              THE COURT:  And in -- content moderation of what kind

10      of content?

11              PROSPECTIVE JUROR:  It's with a big tech company.

12              THE COURT:  Which kind of company?

13              PROSPECTIVE JUROR:  Meta.

14              THE COURT:  Okay.

15        So you're doing content --

16              PROSPECTIVE JUROR:  Moderation.

17              THE COURT:  -- review of Meta data.

18              PROSPECTIVE JUROR:  Yeah.

19              THE COURT:  And this is coming out of like

20      Facebook -- or not Facebook but --

21              PROSPECTIVE JUROR:  Basically Accenture is a

22      consultation company, and we contract with Meta to do this

23      job.  We have a contract with Meta.

24              THE COURT:  And the content that you're reviewing,

25      though, or that your team is reviewing, is what kind of
```

 1   content?

 2          **PROSPECTIVE JUROR:**  It's confidential to announce it

 3   in public.

 4          **THE COURT:**  I've had some cases where people are

 5   being hired to review content to determine whether or not it

 6   should be published or not.

 7      Is that the kind of content you're talking about?

 8          **PROSPECTIVE JUROR:**  Pretty similar to this, yeah.

 9          **THE COURT:**  Okay.

10      And how many people do you lead?

11          **PROSPECTIVE JUROR:**  Around 31.

12          **THE COURT:**  Thirty-one?

13          **PROSPECTIVE JUROR:**  Yeah.

14          **THE COURT:**  Okay.

15      All right.  Is there anything you want me -- do you think

16   that you could serve on this jury?

17          **PROSPECTIVE JUROR:**  Yes.

18          **THE COURT:**  Okay.  Anything I should know?

19          **PROSPECTIVE JUROR:**  No.

20          **THE COURT:**  Okay.

21      Perfect.  Let's go ahead and pass it.

22      And Behnaz Banishahab?

23          **PROSPECTIVE JUROR:**  Banishahab.

24          **THE COURT:**  Okay.  Great.  And let me see.  All

25   right.

```
 1            And you were born in Tehran?

 2                    PROSPECTIVE JUROR:  Yes.

 3                    THE COURT:  Okay.  And when did you come to the

 4       States.?

 5                    PROSPECTIVE JUROR:  2011.

 6                    THE COURT:  And when did you become a U.S. citizen?

 7                    PROSPECTIVE JUROR:  2018.

 8                    THE COURT:  All right.

 9            And in terms of being an architect, are you -- are you a

10       fully licensed architect, or are you still in your courses?

11                    PROSPECTIVE JUROR:  I'm still doing my exams --

12                    THE COURT:  Okay.

13                    PROSPECTIVE JUROR:  -- for licensure.

14                    THE COURT:  And what kind of -- what kind of work do

15       you do?

16                    PROSPECTIVE JUROR:  Restaurants and residentials.

17       Little bit of winery.

18                    THE COURT:  Okay.  I will tell you, people think the

19       bar exam is difficult.  I think your exams are incredibly

20       difficult.

21                    PROSPECTIVE JUROR:  It's a very lengthy process.

22                    THE COURT:  Yes, it's a very lengthy process.  It's

23       amazing to me that they get all that great work out of you and

24       then they say you're not licensed, but -- that's -- that's not

25       my call.
```

```
1         Okay.  I didn't have really any other questions for you.
2         Do you think that you could serve on this jury?  Any
3    concerns you might have about serving?
4              PROSPECTIVE JUROR:  No.  I think I can.
5              THE COURT:  Okay.  Terrific.  Thank you.
6              PROSPECTIVE JUROR:  You're welcome.
7              THE COURT:  Dan Bass?
8              PROSPECTIVE JUROR:  Yeah.
9              THE COURT:  Okay.
10        And then what does Deque Systems sell?
11             PROSPECTIVE JUROR:  Pretty good job on the
12   pronunciation.  Most people go "Deck"?  It is "Deque."
13        We work with large corporations to help them make websites
14   and native applications accessible for people with
15   disabilities.
16             THE COURT:  Okay.
17        That has -- that's a really hot area this time, right now,
18   isn't it?
19             PROSPECTIVE JUROR:  Yeah, it is.
20             THE COURT:  I can tell because when I have lots of
21   lawsuits about it, then I know that it's a hot topic.
22             PROSPECTIVE JUROR:  Yeah, the lawsuits are driving a
23   lot of the growth.  We're not thrilled that that's what's
24   driving the awareness, but we are glad for the awareness.
25             THE COURT:  Okay.  And then you say you're doing
```

1    sales.

2        Can you tell me kind of what that means?  Do you work

3    alone?  Do you work with a group?

4            **PROSPECTIVE JUROR:**  Primarily I'm self-directed.

5            **THE COURT:**  Okay.

6            **PROSPECTIVE JUROR:**  But I have teams of people that

7    support me.

8            **THE COURT:**  Okay.

9            **PROSPECTIVE JUROR:**  And so I'll call on resources

10   from the company to work with my prospects and my clients to

11   help them define what it is they're trying to accomplish and

12   how best to achieve their goals.

13           **THE COURT:**  Okay.

14       With respect to the lawsuit that you were involved in, did

15   that go to trial or did you settle?

16           **PROSPECTIVE JUROR:**  We settled.

17           **THE COURT:**  Okay.

18       Now, you're one of the few folks who has some, maybe,

19   background in patent law.  You've got perspectives that you

20   think they need to be updated, et cetera.

21       Tell me what -- where you said,"Patent laws need to be

22   updated."

23           **PROSPECTIVE JUROR:**  Oh, I know what you're asking

24   about.  It's just in relation to how as a -- as just a normal

25   citizen, I hear things about how or if patent law applies to

```
1   so many of the things that are going on in life today.

2           THE COURT:  Okay.

3           PROSPECTIVE JUROR:  Sometimes some of the structures

4   and controls don't --

5           THE COURT:  Do you have a particular one in mind that

6   you're thinking about?

7           PROSPECTIVE JUROR:  Not any -- it -- not a specific

8   one.  It's just more just a general sense that there are

9   things -- a lot of the laws were written -- and I guess maybe

10  it's sort of a bleed over from copyright as well in the

11  digital world, how the laws were written before what we have

12  today.  You know, my daughter's 24, 25 years old, and she

13  doesn't -- she thinks, well, everybody's had a smart phone

14  forever.  I'm like, yeah, no.

15          THE COURT:  I did an antitrust trial with iPods

16  and -- and we had -- we brought the iPods out because no one

17  remembered what they were like.

18          PROSPECTIVE JUROR:  Right, you know.

19          THE COURT:  And, in fact, I had forgotten, and I was

20  like why isn't there a speaker?  And they are like, no, you

21  need headphones.  Oh.

22          PROSPECTIVE JUROR:  So it's more just a general sense

23  that they need to update the laws rather than a specific,

24  like, okay, this -- this patent law is wrong.

25          THE COURT:  Okay.
```

```
 1              PROSPECTIVE JUROR:  More that I think that there are

 2    to many cases where life has changed so fast -- you know,

 3    maybe a good example might be with AI, you know, 'cause that's

 4    starting to come online.  We don't know anything about it.

 5              THE COURT:  Okay.

 6              PROSPECTIVE JUROR:  How could the laws know anything

 7    about it.

 8              THE COURT:  So this -- this case involves

 9    semiconductor's chips, kind of a sweet spot for patent law,

10    and how they're designed and things like that.  Ultimately,

11    though, you know, the Federal Circuit, primarily, and then the

12    Supreme Court, you know, they make rulings about how we

13    interpret the statutes that are many times pretty bare bones.

14    And I will instruct the jury on what the law is with respect

15    to this particular dispute.

16       Do you have any concerns about following my instructions?

17              PROSPECTIVE JUROR:  I think I'm pretty good at

18    parsing, but I -- as my father would tell me, he said, Dan,

19    when you get a position, you can be a real pain in the --

20              THE COURT:  Okay.  Well, that's fine.  I'm sure many

21    of us probably fit that bill, right?  But ultimately -- and,

22    look, judges are here to answer questions about the law.  So

23    if there's any question, then you can always ask a question.

24    But ultimately, the jury has to -- the jury has to decide

25    facts in the context of the way the law is as it sits today.
```

1    And I will instruct you on what that law is.

2        Can you follow those instructions?

3            PROSPECTIVE JUROR:  Yeah.

4            THE COURT:  Okay.  The other things is it looks like

5    may have had kind of some -- you said in a prior role you

6    worked with the legal industry.

7        Can you tell me what you meant by that?

8            PROSPECTIVE JUROR:  I was a salesman for a company

9    that made a red lining tool for the legal industry.  And --

10           THE COURT:  Okay.

11           PROSPECTIVE JUROR:  -- so I worked with --

12    extensively and primarily with the legal community.

13           THE COURT:  Okay.

14       You don't know any of the lawyers on either side, right?

15           PROSPECTIVE JUROR:  No.

16           THE COURT:  Okay.  But you have had experience with

17    one of law firms?

18           PROSPECTIVE JUROR:  Yes.

19           THE COURT:  Okay.  Now, these -- these are both big

20    law firms, and they are both big companies.  And this is a

21    dispute not between a big company and a little company, it's a

22    dispute between two big companies.

23       So my question to you is -- 'cause I know your experience

24    doesn't sound like it was great with respect to one of law

25    firms.  And I'm not mentioning names.

```
 1            PROSPECTIVE JUROR:  Yeah, yeah, I hear that.

 2            THE COURT:  Okay.  Do you think you can put aside

 3    that prior experience and -- and sit in -- in this case,

 4    right, where we don't have a big company, little company, but

 5    it's two big companies, and we don't have a big law firm,

 6    little law firm, it's two big law firms.

 7         And you don't know any of these particular lawyers?

 8            PROSPECTIVE JUROR:  Not a one of them.

 9            THE COURT:  Okay.  So I -- I need to know because

10    obviously, you know, one side might be concerned.

11         Can you be fair to both sides or not?

12            PROSPECTIVE JUROR:  In that video you showed us, talk

13    about put aside biases, that will be one I have to put aside.

14            THE COURT:  Correct.

15         And -- and let's talk about biases, right.  Because the

16    video that you all saw, we all have biases.  We all have it.

17    That's how we get through life.

18         The question is you have to -- so no one's saying that

19    you -- I'm never going to have a jury without any bias.

20    That's kind of -- that's not how things work.  But can you --

21    part of the putting aside one's bias is, first, to identify

22    it, and then consciously put it to the side and focus on

23    what's in front of you.

24         Because this trial is going to be about evidence.  And the

25    lawyers don't testify, right, the lawyers give you nothing in
```

1    terms of evidence.  The evidence comes in the form of

2    testimony by witnesses who swear an oath and it comes in the

3    form of, maybe, it's physical things, but in this kind of

4    case, a lot of documents, and the decision is made based upon

5    that evidence.  The lawyers are there just to ask questions to

6    get you the evidence, but they themselves have nothing to

7    offer in terms of actual evidence.

8        So do you want to think about it?

9        It's important.  But you sound like a reasonable person.

10   And so I just need to know whether, understanding that, you

11   can put it aside and focus just on what's on -- on the

12   evidence in front of you.

13           PROSPECTIVE JUROR:  Good news, bad news in my life is

14   I can be incredibly focused to the point that my daughter can

15   come up behind me while I'm focused on a topic and stand

16   behind me waiting for me to know that she is and then she can

17   scare me.

18           THE COURT:  And that's the bad news?

19           PROSPECTIVE JUROR:  Yeah, because I don't see

20   anything else outside.

21           THE COURT:  So it sounds like -- well, you tell me.

22           PROSPECTIVE JUROR:  I can focus.

23           THE COURT:  Can you?

24           PROSPECTIVE JUROR:  I think I can focus.  It will be

25   something I have to work through during the trial, but I can

```
 1      focus --

 2              THE COURT:  Okay.

 3              PROSPECTIVE JUROR:  -- and I do.

 4              THE COURT:  All right.  Thank you.

 5      Okay.

 6      Trini Bautista.

 7              PROSPECTIVE JUROR:  Yes.

 8              THE COURT:  Good morning.

 9              PROSPECTIVE JUROR:  Good morning.

10              THE COURT:  And you were born in the Philippines?

11              PROSPECTIVE JUROR:  Yes.

12              THE COURT:  And when did you come to the States?

13              PROSPECTIVE JUROR:  1972?

14              THE COURT:  Nineteen?  I didn't hear you.

15              PROSPECTIVE JUROR:  1972.

16              THE COURT:  1972.

17              PROSPECTIVE JUROR:  Um-hmm.

18              THE COURT:  And when did you become a citizen?

19              PROSPECTIVE JUROR:  I was carried over with my

20      parents when -- I want to say -- hmm --

21              THE COURT:  In the '70s or '80s?

22              PROSPECTIVE JUROR:  Yes, it's been that long.

23              THE COURT:  Okay.  Now, you are a buyer for?

24              PROSPECTIVE JUROR:  Byer California.  It's a women

25      and children's clothing manufacturer.
```

1          **THE COURT:**  Okay.  And what is your role as an

2    allocator/distributor?

3          **PROSPECTIVE JUROR:**  Distribution?

4          **THE COURT:**  Um-hmm.

5          **PROSPECTIVE JUROR:**  We -- I -- we allocate to the

6    stores.  We have manufacturer like Macy's, J.C. Penney and we

7    try to ship to our -- goods to those -- to those stores.

8          **THE COURT:**  Okay.

9          **PROSPECTIVE JUROR:**  And I work with -- you know, we

10   have a -- our distribution is also out of L.A., so those are

11   the people that I work with online.

12         **THE COURT:**  Okay.  And do you think, given what I --

13   what I've said about our trial day, that you can manage kind

14   of doing your work when you're not in trial and just for a

15   week here?

16         **PROSPECTIVE JUROR:**  I can try, yes.

17         **THE COURT:**  Okay.  In terms of the jury that you did

18   serve on, do you recall -- you said it was a civil jury.

19      So what -- can you just tell me the basics of the trial?

20         **PROSPECTIVE JUROR:**  Hmm.

21         **THE COURT:**  Do you remember?

22         **PROSPECTIVE JUROR:**  You want what -- what was the --

23         **THE COURT:**  What kind of case was it?

24         **PROSPECTIVE JUROR:**  It was civil.  It was regarding

25   about elderly abuse.

1          **THE COURT:**  Okay.

2          **PROSPECTIVE JUROR:**  Um-hmm.

3          **THE COURT:**  And you said there was a mixed verdict.

4     So did you ultimately -- so you found for the plaintiff on

5     some claims and for the defense on other claims?

6          **PROSPECTIVE JUROR:**  Yes.

7          **THE COURT:**  And did you award money damages?

8          **PROSPECTIVE JUROR:**  No.

9          **THE COURT:**  Okay.  Okay.

10     Do you have any concerns that I should know about in terms

11     of serving on the jury?

12          **PROSPECTIVE JUROR:**  No.

13          **THE COURT:**  Okay.

14     All right.  Thank you, Ms. Bautista.

15     James Blum.

16          **PROSPECTIVE JUROR:**  Yes.

17          **THE COURT:**  Good morning.

18          **PROSPECTIVE JUROR:**  Morning.

19          **THE COURT:**  All right.  So what -- what do you do in

20     terms of information technology, and what kind of company is

21     Walters & Wolf?

22          **PROSPECTIVE JUROR:**  Walters & Wolf is an engineering

23     construction company.  I'm the director of IT.

24          **THE COURT:**  Okay.  So you don't have a -- you're not

25     an engineer by background?

```
1              PROSPECTIVE JUROR:  No, I'm not.

2              THE COURT:  Okay.

3              PROSPECTIVE JUROR:  And it's like civil engineering.

4              THE COURT:  Civil engineering.

5         And how big is that group?

6              PROSPECTIVE JUROR:  The group that works for me is

7    roughly seven or eight people.  There are some interns and

8    stuff like that on top of that.

9              THE COURT:  Okay.  And you manage all of their

10   technology systems?

11             PROSPECTIVE JUROR:  Yes.

12             THE COURT:  How did you get into that field?

13             PROSPECTIVE JUROR:  I -- while I was in college, I

14   worked for like a service bureau that printed out like

15   technology manuals for -- for technology companies, and one of

16   the people that I -- was a customer -- was a -- she was a --

17   like an account manager for PeopleSoft.

18             THE COURT:  Okay.

19             PROSPECTIVE JUROR:  And she offered me a job, and

20   then I went over there and then kind of jumped around from

21   there.

22             THE COURT:  Okay.  So do you like tech issues?

23             PROSPECTIVE JUROR:  Yeah.

24             THE COURT:  So talk to me about your view on patents.

25             PROSPECTIVE JUROR:  Patents in -- in -- kind of what
```

```
 1    he -- he mentioned how the speed of technology is changing
 2    quite a bit.  And I've just -- and this is -- obviously, this
 3    is anecdotal and through the news, but it seems to me that
 4    companies that will -- will take out patents or -- or own a
 5    piece of IP.  And they've got it for 20 years, and nobody else
 6    can really use it or -- or kind of build on it.  It's one --
 7    you know, it's kind of stifling the innovation for that
 8    particular -- particular piece of technology.
 9               THE COURT:  Do you think that -- do you have any --
10    well, let me just -- do you have any concerns about sitting on
11    this jury, given the kind of issues that I've raised?
12               PROSPECTIVE JUROR:  No.
13               THE COURT:  Okay.  Any -- any concerns about serving
14    otherwise just in terms of timing or anything like that?
15               PROSPECTIVE JUROR:  No.
16               THE COURT:  All right.  Okay.  Thank you.
17       Let's go ahead and -- Elizabeth Gonzalez?
18               PROSPECTIVE JUROR:  Yes.
19               THE COURT:  And you spell Gonzalez correctly.  I
20    can't tell you how often I get it with the S, but I
21    understand.  I understand.  All right.  Let's look at yours.
22    I tell people it's E-Z to remember.
23               PROSPECTIVE JUROR:  I'll have to remember that.
24               THE COURT:  Yeah.  Yeah.  EZ.
25       So you work for FEMA.
```

 1          Can you tell me what you do for FEMA?

 2          **PROSPECTIVE JUROR:**  Yeah, I'm part of their reservist

 3     program, so I only go out when there's a disaster that's been

 4     declared, and we're needed based on the unit that I work in.

 5     I'm in their individual assistance cadre, so we're there to

 6     help those who have applied for the individuals and households

 7     program, which is pretty much an insurance alternative.  So if

 8     they're -- if they have coverage, if they don't have coverage

 9     for their home, flood, homeowners, wind, things like that,

10     they come to us.  We help them with -- through the application

11     process, if they need to register or what's missing, why

12     hasn't their case gone through.  So we're just -- we're an

13     in-person presence there --

14          **THE COURT:**  Okay.

15          **PROSPECTIVE JUROR:**  -- on the ground.

16          **THE COURT:**  And you said you're a reservist.

17          So what do you do, if anything, when you're not working

18     for FEMA?

19          **PROSPECTIVE JUROR:**  So I -- for the last couple

20     years, I've pretty much been out.  I've been home for like a

21     month or so.  So I'll catch up on doctor's appointments, visit

22     friends and family, so I haven't been working when I've been

23     home.  At this point, I've applied for an MBA program, so I'm

24     waiting to hear from that to -- and then make moves

25     accordingly depending on what the outcome is there.

```
 1            THE COURT:  Well, good luck on that.  Terrific.

 2            PROSPECTIVE JUROR:  Thank you.

 3            THE COURT:  Do you have any concerns about serving?

 4            PROSPECTIVE JUROR:  No.

 5            THE COURT:  All right.  Thank you.  Let's go ahead

 6    and pass it.

 7         Edgar Hernandez.

 8            PROSPECTIVE JUROR:  Yes.

 9            THE COURT:  Okay.  And first of all -- and I know we

10    get your questionnaire this morning.  There was that long list

11    of people.

12         Did you know anyone on that list?

13            PROSPECTIVE JUROR:  No.

14            THE COURT:  Okay.  You indicated that you came

15    from -- you were born in Guatemala, correct?

16            PROSPECTIVE JUROR:  Yes.

17            THE COURT:  When did you come to the States?

18            PROSPECTIVE JUROR:  1992.

19            THE COURT:  1992.

20         And when did you become a citizen?

21            PROSPECTIVE JUROR:  Nineteen -- 2003.

22            THE COURT:  Okay.  And in terms of your role at

23    Enterprise, what do you do for them?

24            PROSPECTIVE JUROR:  Mostly driving.

25            THE COURT:  And what does that mean?  What --
```

```
 1              PROSPECTIVE JUROR:  Pick up and drop off people to
 2     their places or home.
 3              THE COURT:  Okay.  And it looks like you've been
 4     doing that for quite a while?
 5              PROSPECTIVE JUROR:  Yes, 11 years.
 6              THE COURT:  Now, is -- let's see.  You have a bit of
 7     an accent, Mr. Hernandez.
 8        Is Spanish your first language, or is --
 9              PROSPECTIVE JUROR:  Actually, it was dialect,
10     K'iche'.
11              THE COURT:  Okay.
12              PROSPECTIVE JUROR:  And then Spanish.
13              THE COURT:  Okay.
14              PROSPECTIVE JUROR:  A little bit of English.
15              THE COURT:  And do you -- I mean, you obviously work
16     for Enterprise.
17        Do you have any problems understanding English?
18              PROSPECTIVE JUROR:  Yes.  I -- it's -- you know, I
19     have a basic English, not high level or academic level.
20              THE COURT:  Okay.  Have you been able to understand
21     everything that I've been talking about?
22              PROSPECTIVE JUROR:  Some.
23              THE COURT:  How about -- tell me what percentage do
24     you understand of what I've said?
25              PROSPECTIVE JUROR:  About 70 percent.
```

```
 1              THE COURT:  Okay.  All right.
 2         Do you have any concerns about serving?
 3              PROSPECTIVE JUROR:  It just my English.  I think
 4    that's --
 5              THE COURT:  Okay.  All right.  Thank you,
 6    Mr. Hernandez.
 7              PROSPECTIVE JUROR:  Thank you.
 8              THE COURT:  Okay.  Next, I have Andrew Hu; is that
 9    right?
10              PROSPECTIVE JUROR:  Yes.
11              THE COURT:  All right.  Okay.
12         So you're still at U.C. Santa Cruz; is that right?
13              PROSPECTIVE JUROR:  Yes.
14              THE COURT:  Okay.  But you're here for the next week;
15    is that -- as I understand your schedule, correct?
16              PROSPECTIVE JUROR:  I'm here until about
17    mid-September.
18              THE COURT:  Okay.  So this is only going to go about
19    a week.
20         And then you go back to Santa Cruz, correct?
21              PROSPECTIVE JUROR:  Yeah.
22              THE COURT:  Okay.  And are -- are you, then, living
23    with your folks at this point?
24              PROSPECTIVE JUROR:  Yeah.
25              THE COURT:  Okay.  And you're studying computer
```

```
1    science?
2              PROSPECTIVE JUROR:  Yes.
3              THE COURT:  And what is the -- what is the research
4    that you're doing with Professor Lintz?
5              PROSPECTIVE JUROR:  Simulating processors for server
6    workload.
7              THE COURT:  Okay.  I want to you speak a little bit
8    louder.
9         You're simulating what?
10             PROSPECTIVE JUROR:  Simulating, basically, the
11   processors involved in servers and giving them realistic
12   workloads.
13             THE COURT:  Okay.  Do you have any concerns about
14   serving on this jury?
15             PROSPECTIVE JUROR:  It was just with the timing.  But
16   I think if it wraps up before the -- I have to go back to
17   Santa Cruz, then no.
18             THE COURT:  Absolutely going to wrap up.  I am not
19   sitting here for a patent trial for that long.  I guarantee
20   you.
21        The other thing that happens in federal court quite a bit
22   is that we -- we give lawyers in the civil cases time limits.
23   So they only have so much time to present their case.
24        Do you know anything about the architecture of
25   semiconductor chips?
```

 1              **PROSPECTIVE JUROR:**  A little bit.  It would depend on

 2    what the architecture was.

 3          **THE COURT:**  Okay.  Have you taken some courses that

 4    deal with the design of semiconductor chips?

 5              **PROSPECTIVE JUROR:**  Yeah, I've taken a computer

 6    architecture.

 7          **THE COURT:**  Computer architecture.

 8      Anything else that might touch on those issues?

 9              **PROSPECTIVE JUROR:**  Another course about the physics

10    fundamentals behind how the components are made.

11          **THE COURT:**  Okay.  Anything else you can think of?

12          **PROSPECTIVE JUROR:**  Nothing else I can think of.

13          **THE COURT:**  Okay.  Great.  Thank you.

14      And we're going to bring it all the way back over here if

15    we can pass that mic.

16      And it's Tiffany Liu?

17          **PROSPECTIVE JUROR:**  Yes.

18          **THE COURT:**  Okay.  Do you need some more water?  Are

19    you okay?  Are you okay?

20          **PROSPECTIVE JUROR:**  Yes.

21          **THE COURT:**  Okay.  All right.  So you're a full-time

22    student down in San Luis Obispo, right?

23          **PROSPECTIVE JUROR:**  Yes.

24          **THE COURT:**  And how many years there of -- well, how

25    many years have you done at -- at the university?

1              **PROSPECTIVE JUROR:**  One.

2              **THE COURT:**  One year.

3          So you're an arising sophomore?

4              **PROSPECTIVE JUROR:**  Yes.

5              **THE COURT:**  And what kind of civil engineering

6      courses have you taken?

7              **PROSPECTIVE JUROR:**  I've mainly just taken intro

8      courses, just up like an intro course about civil

9      engineering --

10             **THE COURT:**  Okay.

11             **PROSPECTIVE JUROR:**  -- in the different disciplines.

12             **THE COURT:**  Okay.  Have you taken any -- any courses,

13     whether in -- in college or just for fun, that involve

14     semiconductor chips or how they're manufactured, anything like

15     that?

16             **PROSPECTIVE JUROR:**  No.

17             **THE COURT:**  Have you watched any videos or YouTubes

18     about that?  Do you do that kind of thing for fun?

19             **PROSPECTIVE JUROR:**  No.

20             **THE COURT:**  And you could.  You know, there are some

21     people who are like -- who do that kind of thing.  Seriously.

22         My son has this T-shirt, and there's an equation on it.

23     And it says, "What?  It's not rocket science."  And then in

24     paren, it says, "Okay.  It is."  Because that's what he likes

25     to do.  So, you know, it could be something you enjoy doing.

1   Do you have -- 'cause you're going back to school in -- in
2   the fall, right?

3        PROSPECTIVE JUROR:  Yes.

4        THE COURT:  Okay.  Do you have any concerns about
5   serving on the trial?

6        PROSPECTIVE JUROR:  I have to travel here, and my
7   parents have to bring me here every single time because I'm
8   from San Francisco.  So...

9        THE COURT:  Well, San Francisco's pretty close as it
10  goes.  There are some people who drive over an hour to get
11  here, as I said.

12      What about BART?

13       PROSPECTIVE JUROR:  They believe that it's unsafe,
14  and I also feel unsafe on BART.

15       THE COURT:  Okay.  And what do your parents do?

16       PROSPECTIVE JUROR:  My dad is construction, and my
17  mom, I think, she's cleaning.

18       THE COURT:  Okay.  I'll keep that in mind.

19      Let's go ahead -- any -- any other concerns other than
20  getting here?

21       PROSPECTIVE JUROR:  I also have a job interview on
22  Friday.

23       THE COURT:  On what day?

24       PROSPECTIVE JUROR:  Friday.

25       THE COURT:  Okay.  What time?

```
1              PROSPECTIVE JUROR:  3:00.

2              THE COURT:  All right.  You'll be out if you're -- if

3     you're seated.

4         Okay.  Any other concerns?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  Okay.

7         All right.  Let's pass it, then -- is it Bethany --

8              PROSPECTIVE JUROR:  Onywera.

9              THE COURT:  Onywera?

10             PROSPECTIVE JUROR:  Onywera, yes.

11             THE COURT:  So how do you -- so the "Y" is in there.

12    Ony --

13             PROSPECTIVE JUROR:  It is in there, yes.  Onywera.

14             THE COURT:  Onywera.

15             PROSPECTIVE JUROR:  Um-hmm.

16             THE COURT:  Okay.  Let's see, questions that I had

17    for you.

18        Okay.  So now, your concerns -- tell me about your

19    concerns about serving in terms of this one week, if any.

20             PROSPECTIVE JUROR:  Yes.  I am the sole caretaker of

21    a 15-month-old who is breastfeeding, and I got lucky in

22    finding someone to watch him today.

23        And then I am also in charge of a two-week camp that

24    actually starts on Monday for a total of 100 kids over the two

25    weeks.  And so starting today -- well, today is one of my prep
```

1    days that I'm missing to be here.  I have prep the rest of

2    this week, and then I am running that camp.

3            **THE COURT:**  Okay.  And this is like a Bible camp?

4            **PROSPECTIVE JUROR:**  Yes.

5            **THE COURT:**  Okay.  All right.

6        Any -- any other concerns?

7            **PROSPECTIVE JUROR:**  I also did not list that my son

8    is in a wedding next Friday out of town, so we'll be traveling

9    next Thursday.

10           **THE COURT:**  Your 15-month-old is in a wedding?

11           **PROSPECTIVE JUROR:**  He's the ring bearer, yeah.

12           **THE COURT:**  They're trusting a ring with a

13   15-month-old?

14           **PROSPECTIVE JUROR:**  It should be interesting.  I'm

15   sorry?

16           **THE COURT:**  I said they're trusting a ring with a

17   15-month-old?

18           **PROSPECTIVE JUROR:**  I'm hoping they don't give to it

19   him.  I'm hoping it's fake.

20           **THE COURT:**  Okay.  All right.  Let's go ahead and

21   pass it.

22       I take it there's nothing else, right?

23           **PROSPECTIVE JUROR:**  Not that I can think of.

24           **THE COURT:**  Okay.

25       Gina Pelican?

```
 1                    PROSPECTIVE JUROR:  Yes, Judge.

 2              THE COURT:  Okay.  And you were born in the

 3    Philippines?

 4                    PROSPECTIVE JUROR:  (Nods head.)

 5              THE COURT:  And when did you come to the States?

 6              PROSPECTIVE JUROR:  '91.

 7              THE COURT:  1991?

 8              PROSPECTIVE JUROR:  Yes, ma'am.

 9              THE COURT:  And when did you become a citizen?

10              PROSPECTIVE JUROR:  Like, I think 2000.

11              THE COURT:  Okay.  Around 2000?

12              PROSPECTIVE JUROR:  Yeah.

13              THE COURT:  What is PF Management?

14              PROSPECTIVE JUROR:  It's a management for -- we

15    manage a company.

16              THE COURT:  What is it that it manages?

17              PROSPECTIVE JUROR:  Like their -- day-to-day

18    business.  Like, I take care of, like, payroll, payable,

19    receivable.

20              THE COURT:  Okay.  And as an office manager, how many

21    people do you manage?

22              PROSPECTIVE JUROR:  There's, like, less than 15.

23              THE COURT:  Okay.  But in that role, I would take it

24    that you have to -- you know, you're -- you're constantly

25    evaluating people who come in front of you, right?
```

1  That is, you're assessing people's credibility as part of

2  the -- as part of being a manager?

3  **PROSPECTIVE JUROR:**  Well, mostly, my job is like --

4  like do receivable, payable -- it's a small company -- and

5  payroll.  And I do a little bit of that.

6  **THE COURT:**  Okay.  I see.

7  You've served on a jury before, right?

8  **PROSPECTIVE JUROR:**  Yes, Judge.

9  **THE COURT:**  And it was a civil jury, so what was the

10  case about?  Do you remember?

11  **PROSPECTIVE JUROR:**  Let's see.  It's civil lawsuit,

12  like someone got hurt on a job.

13  **THE COURT:**  Okay.  Do you remember whether you ruled

14  in favor of the plaintiff or defendant?

15  **PROSPECTIVE JUROR:**  I believe it's the plaintiff.

16  **THE COURT:**  Okay.  And did you award money damages?

17  **PROSPECTIVE JUROR:**  No.

18  **THE COURT:**  Were you the foreperson?

19  **PROSPECTIVE JUROR:**  No.

20  **THE COURT:**  All right.  Do you have any concerns

21  about serving on the jury?

22  **PROSPECTIVE JUROR:**  I'm going to do payroll this

23  Friday, and my -- my drive is -- I live in Livermore.  It's

24  like so stressful just to get here.

25  **THE COURT:**  Okay.  Anything else for us to think

1  about?

2          **PROSPECTIVE JUROR:**  Just I'll be buried with

3  paperwork when I get back to work.

4          **THE COURT:**  I -- I understand.  I understand.

5     Okay.  Anything else?  No?

6          **PROSPECTIVE JUROR:**  I don't think so.

7          **THE COURT:**  Thank you.

8     Rebecca Poon?

9          **PROSPECTIVE JUROR:**  Yes.

10          **THE COURT:**  Good morning.

11          **PROSPECTIVE JUROR:**  Good morning.

12          **THE COURT:**  All right.  Your -- your significant

13  other is an attorney at Alston Bird?

14          **PROSPECTIVE JUROR:**  Correct.

15          **THE COURT:**  And what kind of law?  Or -- yeah.

16          **PROSPECTIVE JUROR:**  Patent.

17          **THE COURT:**  Patent law?

18          **PROSPECTIVE JUROR:**  Litigator.

19          **THE COURT:**  Okay.  So if you are -- if you are chosen

20  as a juror, you will be instructed that you cannot have any

21  discussion about any topic, including that this is a patent

22  case, with anyone including your spouse.

23     Can you follow that instruction?

24          **PROSPECTIVE JUROR:**  I can try very hard.  But, you

25  know, he's wondering who's here already.

 1          **THE COURT:**  Well --

 2          **PROSPECTIVE JUROR:**  I'm sure.

 3          **THE COURT:**  Let me be clear.

 4          **PROSPECTIVE JUROR:**  And he knows the rules, too.

 5          **THE COURT:**  He knows the rules, one.  Second, he

 6    can -- he know -- he actually knows how to check.

 7          **PROSPECTIVE JUROR:**  He already has, I'm sure.

 8          **THE COURT:**  I'm sure he already has.  Okay.

 9      And in any event, if he says anything, you can just look

10    at him and say, you know the rules.  I can't say anything.

11          **PROSPECTIVE JUROR:**  We know.

12          **THE COURT:**  Okay.  All right.  In terms of -- in

13    terms of the knowledge of -- or you highlighted one particular

14    witness.

15      How did you know that your husband may have worked with

16    that person?

17          **PROSPECTIVE JUROR:**  They were in London together

18    recently for work.

19          **THE COURT:**  Okay.  So you knew that?

20          **PROSPECTIVE JUROR:**  I just -- and the name was

21    very -- like, there's -- it stood out to me.

22          **THE COURT:**  Okay.  Now, again, these are two big

23    companies suing each other over a patent.  And there are going

24    to be experts on both sides.

25      Can you, with the other jurors, you know, evaluate the

```
 1     testimony of this particular person and decide whether you

 2     agree with that person or not and not be influenced by the

 3     fact that your husband might have been in London with that

 4     person?

 5             PROSPECTIVE JUROR:  Like others have said, it would

 6     be difficult, but I can try my best.

 7             THE COURT:  Okay.  Do you believe in patent laws?

 8             PROSPECTIVE JUROR:  Yes.

 9             THE COURT:  Do you have -- do you have lots -- do you

10     have many conversations with your spouse over kind of the pros

11     and cons of patent law?

12             PROSPECTIVE JUROR:  Yes, because it gives him work,

13     and it helps our family.

14             THE COURT:  Do you -- do you have conversations

15     with -- with him about kind of, you know, the specific

16     interpretation of particular patent laws?  I mean, do you feel

17     like you're versed in patent law?

18             PROSPECTIVE JUROR:  Oh, no.

19             THE COURT:  Okay.  So do you have -- if you were

20     chosen, do you ever any concerns that -- well, are you -- you

21     will be instructed to follow the law as I give it to you.

22        Can you do that?

23             PROSPECTIVE JUROR:  Yes.

24             THE COURT:  Okay.  Anything else you'd like me to

25     think about in terms of you serving?
```

```
 1              PROSPECTIVE JUROR:  Yes.  I'm the primary caregiver

 2    to my five-year-old child.  Luckily, like somebody else, I

 3    found somebody to watch him today; however, I don't have

 4    that --

 5              THE COURT:  But how about your spouse?

 6              PROSPECTIVE JUROR:  He is working.

 7              THE COURT:  Yeah.  So I have to tell you I don't have

 8    a lot of sympathy because if he has to sit at home and take

 9    care of the child for a week while you're in a patent trial,

10    so be it.  Because one day, he might be in a courtroom and

11    asking other individuals to sit on his patent trial.

12              PROSPECTIVE JUROR:  So we have camps lined up and

13    activities lined up for him.

14              THE COURT:  Yeah.

15              PROSPECTIVE JUROR:  So he wouldn't just be sitting at

16    home with the child.  The child has to be taken.

17              THE COURT:  Right.  But he could take them.  I mean,

18    he is a parent.  I just -- just so that you know, if you're

19    seated, you can just tell him the judge didn't have a lot of

20    sympathy for him because he could have been one of these

21    lawyers asking other citizens to serve in juries for his own

22    case.

23              PROSPECTIVE JUROR:  Okay.

24              THE COURT:  So -- just to be honest.

25              PROSPECTIVE JUROR:  Okay.
```

1          **THE COURT:**  All right.  But I don't know that you'll

2     get picked, but that's -- at least that's what I'm thinking.

3        Any other concerns?

4          **PROSPECTIVE JUROR:**  Yes.  When will there be a

5     recess?  I kind of need to use the restroom very soon.

6          **THE COURT:**  Okay.  You're going to pass the mic and

7     go through that door, and there's a bathroom right there.

8          **PROSPECTIVE JUROR:**  Thank you.

9          **THE COURT:**  You're welcome.

10        Okay.  Next, I have Bernadette Richard?  No.

11         **PROSPECTIVE JUROR:**  I think we're in the wrong seats,

12    then.

13         **THE COURT:**  So what's your name?

14         **PROSPECTIVE JUROR:**  I'm Susan Preston.

15         **THE COURT:**  My mistake.  I jumped forward.  So yes,

16    Susan Preston.

17        You're both teachers.  No.  No.  No.  You and Ms. Poon are

18    both teachers.

19        All right.  So let me get yours.

20        Okay.  I've said a lot about the nature of the case and

21    the trial.

22        Do you have any concerns about serving?

23         **PROSPECTIVE JUROR:**  The only concern I have is I was

24    in a skiing accident, and I'm in severe pain.  I have ice on

25    my shoulder, and I've been taking painkillers.  So I'm really

1    drowsy.  My husband's driving me to court.

2           THE COURT:  Okay.

3           PROSPECTIVE JUROR:  So I do have to keep ice on my

4    arm like every hour.

5           THE COURT:  Okay.  Well, I can help with that.

6       Any other concerns?

7           PROSPECTIVE JUROR:  I'm supposed to be starting

8    summer school next week, and it's not a contract.  It's a day

9    rate.  And if you don't show up, there's no subs.  Thus, I

10   have a bunch of third graders who are fragile and at risk who

11   will have no teacher for four weeks.

12          THE COURT:  Well, it's not -- it's just one week.

13          PROSPECTIVE JUROR:  I know.  But if I don't show up

14   next Monday, there's no teacher.  Thus, they'll cancel their

15   four weeks.

16          THE COURT:  I see.

17          PROSPECTIVE JUROR:  These are our kids who are at

18   risk, who are below grade level, like, first grade, going into

19   third grade.

20          THE COURT:  Okay.

21                   (Off-the-record discussion.)

22          THE COURT:  All right.  Any other issues you'd like

23   me to think about?

24          PROSPECTIVE JUROR:  No, just that I am on painkillers

25   and sleepy.

1          **THE COURT:**  Okay.  All right.

2       Now, let's go to Ms. Richards.

3       All right.  Can you tell us what you do in terms of your

4   job at S.F. General?

5          **PROSPECTIVE JUROR:**  Sure.  I'm a medical evaluations

6   assistant.

7          **THE COURT:**  And what does that mean?

8          **PROSPECTIVE JUROR:**  San Francisco General is a trauma

9   center, so we receive all emergencies and traumas in the -- in

10  the area.  And I help with physician orders and nursing orders

11  to help save patients' lives.

12         **THE COURT:**  Okay.

13      And you've been doing that for five years?

14         **PROSPECTIVE JUROR:**  Yes.

15         **THE COURT:**  Okay.

16      Okay.  Do you have any concerns about serving?

17         **PROSPECTIVE JUROR:**  I do not.

18         **THE COURT:**  Okay.  Let's go ahead and pass it then to

19  Francois Rose.

20         **PROSPECTIVE JUROR:**  Yes, good morning.

21         **THE COURT:**  Good morning.

22      You were born in Montreal.  So when did you come to the

23  States?

24         **PROSPECTIVE JUROR:**  '91.  And became citizen in 2016.

25         **THE COURT:**  See, this is the great thing.  You

```
 1    already knew what my follow-up question was going to be, and

 2    that's why jury selection gets much quicker.

 3              PROSPECTIVE JUROR:  But I don't know what's next,

 4    though.

 5              THE COURT:  Are you still a professor at Stanford?

 6              PROSPECTIVE JUROR:  Yes.  Yes.

 7              THE COURT:  Okay.

 8         And by the way, congratulations on your upcoming

 9    anniversary.  We'll totally being done by the 25th.

10              PROSPECTIVE JUROR:  Thank you so much.

11              THE COURT:  Now, you've got some, you know, thoughts

12    about intellectual property.  Again, this is a patent case in

13    a semiconductor industry.

14         Do you have any concerns about serving?

15              PROSPECTIVE JUROR:  No.

16              THE COURT:  By the way, it's my 35th, too, so there

17    you go.

18              PROSPECTIVE JUROR:  Congratulations.

19              THE COURT:  All right.

20         And then we have Christine Sun?

21              PROSPECTIVE JUROR:  Yes.  Good morning.

22              THE COURT:  Good morning.

23         Okay.  And I take it you don't -- you are a normal

24    pharmacist, right?  We all know what you do, I think.

25              PROSPECTIVE JUROR:  The only addition is narcotic
```

1    auditing, but other than that, it's pretty -- a staff

2    pharmacist role.

3            **THE COURT:**  Okay.  And then, you know, you obviously

4    know what an RFID tag is.

5            **PROSPECTIVE JUROR:**  Yes.

6            **THE COURT:**  You -- many of us use this kind of

7    technology.  But it doesn't sound like you have any

8    specialized expertise.

9            **PROSPECTIVE JUROR:**  No.

10           **THE COURT:**  Do you have any concerns about serving?

11           **PROSPECTIVE JUROR:**  No, I do not.

12           **THE COURT:**  All right.  So we're going to go 30 more

13    minutes, and then we'll take a break.

14       I am going to let each side ask questions for 15 minutes.

15    They're on a clock.  I guarantee you that they would have

16    loved to have spent at least an hour or more talking to you

17    all.  They don't get to do that.  So do not hold it against

18    them if they don't ask you any questions because they're on

19    strict time deadlines.  Okay?

20       So -- we'll start with Mr. Al-Salam.  You're on the clock,

21    sir.  You may proceed.

22           **MR. AL-SALAM:**  Thank you, Your Honor.

23       Does Your Honor care if I ask general questions or --

24           **THE COURT:**  You've got 15 minutes.  If it's

25    objectionable, I'll -- I'll strike the question.

1     **MR. AL-SALAM:**  First of all, I heard Mr. Blum, you --

2  let's start with you.  I think you said that patents can --

3  can tamper down innovation.

4     Did you say something like that?

5          **PROSPECTIVE JUROR:**  Yeah, words to that effect.

6          **MR. AL-SALAM:**  And so do you not -- do you feel there

7  are too many patents out there?

8          **PROSPECTIVE JUROR:**  Not that there's --

9              (Off-the-record discussion.)

10          **THE COURT:**  That's better.  Thank you.

11          **PROSPECTIVE JUROR:**  Sorry.

12     I'm sorry, could you repeat the question.

13          **MR. AL-SALAM:**  Sure.

14     I think you were just about to say you don't think there

15  are too many patents out there, but you think that they can

16  stifle innovation.

17          **PROSPECTIVE JUROR:**  Yes.  I don't necessarily know

18  how many patents there are or if there's too many or too

19  little, but just maybe the way we are using them is -- could

20  be changed a little bit to allow more -- more innovation.

21          **MR. AL-SALAM:**  Does anybody else have any feelings

22  about whether the patent office grants too many or too few

23  patents?

24     I know your husband gets -- gets a job from that, but does

25  anybody else have any feelings about patents generally?

```
 1        Yes.  Mr. Bass.
 2             PROSPECTIVE JUROR:  It's the way you asked that
 3    second part of it.  It's not a question of the volume of them.
 4    It goes back to the original question that I raised, which was
 5    the appropriateness of some of the patents.  And even some of
 6    the people who actually take them out, you know, 'cause I've
 7    heard stories of people who've taken them out as sort of like
 8    a -- a financial thing.  They -- they just want to hold onto
 9    that for financial reasons and so I've seen that happen.
10        I don't -- specifics, I don't have that.
11             MR. AL-SALAM:  Ms.  -- is it Banishahab?
12        Yes, you're an architect.
13        Have you ever had a situation where somebody's copied your
14    design or accused you of copying a design?
15             PROSPECTIVE JUROR:  I work with -- in a large firm,
16    and we see like smaller companies, they try to copy.  But it's
17    never going to be the same.
18             MR. AL-SALAM:  Do you have any strong feelings about
19    whether those designs should be available to anyone or whether
20    someone should be able to protect their designs in
21    architecture?
22             PROSPECTIVE JUROR:  Well, in school we used to be
23    upset when someone copied our design just because of the
24    competition.  But we've been told that maybe like, first, it's
25    your idea, your brain so it's not copyable to, like, the
```

```
 1    exact, like, design.  But I don't think -- I don't think --
 2    for our work, I don't think they can copy exact, like,
 3    outcome --
 4              MR. AL-SALAM:  They aren't --
 5              PROSPECTIVE JUROR:  -- and quality and details of the
 6    work.
 7              MR. AL-SALAM:  Does anybody else have just general
 8    feelings about whether patents should be more available to be
 9    used?
10              PROSPECTIVE JUROR:  Can you ask that question --
11              MR. AL-SALAM:  Sure.
12              PROSPECTIVE JUROR:  -- maybe a little better?
13              MR. AL-SALAM:  You know, there's some people in the
14    tech industry that worry that maybe -- maybe patents are
15    preventing more -- more use or innovations and other people
16    think, no, if you come up with an idea, you should be able to
17    protect it.  It's your idea.  Somebody shouldn't be able to
18    copy it.
19       Does anybody have any feelings going either of those ways?
20       Yes?
21              PROSPECTIVE JUROR:  If it is truly intellectual
22    property, then I think it needs to be protected.
23              MR. AL-SALAM:  And you're in music?
24              PROSPECTIVE JUROR:  Yes, I'm a composer.  So I think
25    that that's the one who's talking now.
```

 1          **MR. AL-SALAM:**  Okay.

 2      And so you don't like it if people take your music or

 3  compositions without authorization?

 4          **PROSPECTIVE JUROR:**  No.

 5      Before we go to your next question, I would at least like

 6  to add that while I believe that people do need the right to

 7  protect their creative whatevers, whether it's music or

 8  technology or whatever, I also question the length of -- of

 9  protections.  And -- and I think about pharmaceuticals when it

10  comes to that.  But, you know, so --

11          **MR. AL-SALAM:**  I see.

12      So Ms. Poon, you do know one of the witnesses -- or your

13  husband.

14      Do you know that witness personally?

15          **PROSPECTIVE JUROR:**  No, no.  I just heard his name.

16          **MR. AL-SALAM:**  Okay.

17          **PROSPECTIVE JUROR:**  When I saw it, you know, it's not

18  a -- to me it wasn't a common name, so it stuck out.

19          **MR. AL-SALAM:**  And so do you think you could judge

20  fairly that person's testimony versus another person's

21  testimony if they disagreed?

22          **PROSPECTIVE JUROR:**  Like I said before, because he

23  works with my husband, I would try to put aside that bias.

24          **MR. AL-SALAM:**  Ms. Pelican, I think you said in your

25  review that you feel sorry for companies that are being sued

```
 1      for money because it might hurt the company.

 2          Do you remember saying that?

 3              PROSPECTIVE JUROR:  Yes.

 4              MR. AL-SALAM:  Do you feel the same way if they're a

 5      large company?

 6              PROSPECTIVE JUROR:  The same, small or big.

 7              MR. AL-SALAM:  You just don't think they should have

 8      to pay money?

 9              PROSPECTIVE JUROR:  Yes.

10              MR. AL-SALAM:  If it's a lawsuit between a larger and

11      a smaller company, would that change things in any way?

12              PROSPECTIVE JUROR:  No.  I think it's the same, small

13      or big company.

14              MR. AL-SALAM:  Okay.

15          Ms. Sun, you mentioned on your questionnaire that you feel

16      patents cater to people with money.

17          In a case like this where they're both public companies,

18      do you think it favors one company versus the other?

19              PROSPECTIVE JUROR:  No.  I think I was more thinking

20      like pharmaceuticals.

21              MR. AL-SALAM:  Okay.

22          And I think you also mentioned you don't feel comfortable

23      coming up with a dollar amount to award in a lawsuit.

24              PROSPECTIVE JUROR:  Yeah, I just don't really feel

25      comfortable with that.
```

1        **MR. AL-SALAM:**  Is it because you're just worried

2   about getting the amount right?

3        **PROSPECTIVE JUROR:**  I don't know.

4        **MR. AL-SALAM:**  Okay.  And I think you mentioned your

5   religious views might affect your jury service.

6        **PROSPECTIVE JUROR:**  I wasn't sure what kind of case

7   it would be.

8        **MR. AL-SALAM:**  Excuse me?

9        **PROSPECTIVE JUROR:**  I wasn't sure what kind of case

10  it would be.

11       **MR. AL-SALAM:**  Okay.

12       **PROSPECTIVE JUROR:**  I don't think it would affect

13  this one.

14       **MR. AL-SALAM:**  Ms. Gonzalez, you work for a

15  government agency, correct?

16       **PROSPECTIVE JUROR:**  Correct.

17       **MR. AL-SALAM:**  Do you think that would affect your

18  views at all, positive or negative, regarding the U.S. Patent

19  and Trademark Office?

20       **PROSPECTIVE JUROR:**  No.

21       **MR. AL-SALAM:**  Okay.

22     Mr. Hu, do you like digging into technical details?

23       **PROSPECTIVE JUROR:**  I can do it, but I wouldn't say I

24  like it.

25       **MR. AL-SALAM:**  You don't like it.

 1          Do other people -- like, you know, I remember I always

 2     used to play this cartoon thing where you have to look at two

 3     cartoons and try to find the differences.

 4          Does anybody really like doing that, like trying to find

 5     the differences in things?

 6          Okay.  That's good.

 7          How about other people -- other people think they're more

 8     big-picture thinkers?

 9          Anybody think of themselves more as a big picture thinker

10     versus a really detailed person that can't see the forest

11     through the trees, or are you more looking for the forest for

12     the trees?

13               **UNIDENTIFIED SPEAKER:**  Do both.

14                    (Off-the-record discussion.)

15               **THE COURT:**  So the other thing is, if you use the

16     juror number, that will help her.

17               **MR. AL-SALAM:**  Okay.

18          Let me see, I may be done.

19          Those are all my questions, Your Honor.  Thank you very

20     much.

21               **THE COURT:**  Thank you.

22          Mr. Hendershot, you have 15 minutes, sir.

23               **MR. HENDERSHOT:**  Thank you, Your Honor.  You've done

24     a great job, as have you.  I don't think I'm going to take the

25     15.

 1          Mr. Rose, the composer, so you said your intellectual

 2     property has been impacted by the Internet.

 3          Can you elaborate on that a little bit?

 4          **PROSPECTIVE JUROR:**  Yes.  So it has been for composer

 5     a double side.  So we got something which is absolutely

 6     fantastic, exposure, thanks to the Internet.  But we had to

 7     pay a big price because today people expect music for free.

 8     So if people don't buy any -- in fact, I don't know if there

 9     are any dinosaurs in the room.  Who is -- remember last time

10     bought a CD or DVD?  I'm probably the only one.  So this is

11     the price that composers have paid.  And so -- so why

12     intellectual property I feel needs to be protected.

13          **MR. HENDERSHOT:**  I actually have an audio cassette in

14     my car.  I know those well.

15          So given your thoughts and your views, do you think you

16     can remain objective and open-minded and hear the evidence

17     from both parties before reaching --

18          **PROSPECTIVE JUROR:**  I think I can.

19          **MR. HENDERSHOT:**  -- a decision?

20          **PROSPECTIVE JUROR:**  I think I can.

21          **MR. HENDERSHOT:**  Okay.

22          Ms. Richard.

23          **PROSPECTIVE JUROR:**  Hi.

24          **MR. HENDERSHOT:**  Hi, how are you?

25          **PROSPECTIVE JUROR:**  Good.

 1          **MR. HENDERSHOT:**  You mentioned you considered a

 2    business trademark at one point in your survey.

 3       Do I have that right?

 4          **PROSPECTIVE JUROR:**  Yes.

 5          **MR. HENDERSHOT:**  Oh, good.  Can you elaborate on that

 6    a little bit?

 7          **THE COURT:**  We can't hear you.  Just a little bit

 8    closer.

 9          **PROSPECTIVE JUROR:**  I'm in healthcare but I went to

10    business school initially at Berkeley, and so my passion is in

11    business.  And although I seem to be a nurse, I have a CPR

12    company and I do yoga for fun, which I may end up monetizing.

13    And it comes with a trademark and so I've looked into that,

14    but nothing further.

15          **MR. HENDERSHOT:**  Okay.  And so you've looked into it

16    some.

17       What -- do you think your looking into that and what

18    you've learned would impact your ability to keep an open mind

19    and follow the Court's instructions about the law?

20          **PROSPECTIVE JUROR:**  Absolutely.

21          **MR. HENDERSHOT:**  No problem with that?

22          **PROSPECTIVE JUROR:**  No problem.

23          **MR. HENDERSHOT:**  Okay.

24       Ms. Poon, you talk to patent litigators at home.  I'm

25    sorry you've got to deal with one here.

 1          Given your husband's job and your exposure to it -- and I

 2     don't know what he does or who he represents -- do you think

 3     you would have an inclination or a leaning to favor a

 4     plaintiff versus a defendant?

 5               **PROSPECTIVE JUROR:**  No.

 6          **MR. HENDERSHOT:**  Do you think you could keep an open

 7     mind and wait for all of the evidence to come in and render a

 8     decision based on a full picture with an open mind?

 9               **PROSPECTIVE JUROR:**  Yes.

10          **MR. HENDERSHOT:**  Okay.

11          Ms. Pelican, so I've heard some of your answers, and I

12     wanted to ask you, you have some views, but would those views

13     prevent you from taking an objective look at the evidence,

14     weighing it, and following the Court's instruction and making

15     a decision with an open mind one way or the other?

16               **PROSPECTIVE JUROR:**  I -- I'm not sure I'm

17     understanding the question.

18               **MR. HENDERSHOT:**  It was --

19               **PROSPECTIVE JUROR:**  I'm sorry.

20               **MR. HENDERSHOT:**  It was kind of a long one.  Let me

21     shorten it a little bit.

22               **PROSPECTIVE JUROR:**  I'm sorry.

23          **MR. HENDERSHOT:**  Do you think, despite your views and

24     the answers you've given, you can keep an open mind in this

25     case?

```
 1              PROSPECTIVE JUROR:  Well, I'll -- I guess.  I'll try.

 2         MR. HENDERSHOT:  Do you think you'll have any issue

 3    looking at the evidence yourself and following the

 4    instructions the Court -- the judge gives you on the law?

 5              PROSPECTIVE JUROR:  Like my decision?

 6         MR. HENDERSHOT:  Yeah.

 7       Do you think you'll be able to base your decision on and

 8    follow the instructions that the judge gives you?

 9              PROSPECTIVE JUROR:  I will.  Yeah, I could.

10         MR. HENDERSHOT:  Okay.

11       And then a broader one.  And this is going to seem really

12    oddly specific, but I've seen it come up in my career a few

13    times.  One of issues in this case is going to be whether the

14    patents that are asserted are valid or invalid.  And that

15    question is whether the patent office, the United States

16    Patent and Trademark Office should have issued those to begin

17    with.

18       Now some people have really strong feelings about

19    government agencies and think it's a government agency, they

20    know what they're doing, they get it right all the time or

21    nearly all the time.  And the judge will tell you a number of

22    reasons why a patent may or may not be invalid.  I don't want

23    to get into that.

24       But for purposes of this, does anyone have strong feelings

25    that a government agency, like the United States Patent
```

1    Office, gets things right all the time to the point where you

2    couldn't assess yourselves whether this patent is valid and

3    should have issued?

4        And what I've heard sometimes is, well, the patent office

5    issued this patent, they had to get it right.  It's got to be

6    valid.

7        Does anybody have strong feelings of deference to a

8    government agency like that or to the patent office where you

9    think there's no way they got something wrong?

10           **PROSPECTIVE JUROR:**  Can I just ask you a process

11   question?

12           **THE COURT:**  Hold on.  Hold on.

13       Okay.  Go ahead.

14           **PROSPECTIVE JUROR:**  For me, in principle, I don't

15   have a problem, but I don't know the process.  For example, if

16   something has been issued and can be contested, is there a

17   process that could have prevented -- do you see where I'm

18   aiming at?

19       Is that -- is there a process that could have prevented

20   where we get at one point where we don't meet each other?

21           **MR. HENDERSHOT:**  So I think that there are.  And I

22   don't want to get too far afield with processes, but there is

23   a process by which a patent is reviewed at the patent office

24   and it issues as a patent.

25       And then it issues as a patent so someone can assert it.

1   But an open question remains for you all to decide, whoever

2   gets seated, should that patent have issued?  Was it new?  Is

3   it valid?  And that's our chance to present that question for

4   you to decide.

5       And my question and concern is sometimes people think,

6   look, it's a government agency, they know what they're doing,

7   they're going to get it right, so I don't really want to

8   question that.  I think you'll be instructed by the judge in

9   this case that you need to consider that, and I just want to

10  make sure everyone feels they can keep an open mind about

11  that.

12      Raise your hand if you have a problem with that, and I'm

13  happy to follow up.

14      Okay.

15      With that, I thank you guys for your time.

16          **THE COURT:**  All right.

17      So I have one follow-up, if we'll pass it to Ms. Poon,

18  before our break.

19      It's just -- a question I want to ask you occurred to me

20  while I was listening to the lawyers.  Let's say

21  hypothetically you're on the jury and that individual

22  testifies.

23      Are you the kind of person who could independently

24  evaluate, and if you think they did a terrible job, after this

25  is all said and done and I release you and you can talk to

1    your husband, you could then tell your husband what are you

2    thinking, that witness is terrible, he's totally not

3    convincing to juries?  Could you do that?

4             **PROSPECTIVE JUROR:**  Hypothetically?

5             **THE COURT:**  Hypothetically if you did not believe

6    him, could you trust and move forward with your own

7    independent belief knowing that at some time in the future you

8    could, in fact, tell your husband that witness that you're

9    talking to is not believable?

10            **PROSPECTIVE JUROR:**  Yes.

11            **THE COURT:**  Okay.

12            **PROSPECTIVE JUROR:**  I believe so.

13            **THE COURT:**  So just because your husband's working

14   with him -- I mean, I have to tell you, lots of lawyers would

15   like to be jurors 'cause they like to see what's actually

16   happening back there.

17            **PROSPECTIVE JUROR:**  Oh, he would like to take my

18   place right now, I'm sure, but that wouldn't work out here in

19   this case.

20            **THE COURT:**  Exactly.  But if you did serve, you would

21   obviously have the ability, right, to tell him if you didn't

22   believe that juror or that particular witness, right?

23            **PROSPECTIVE JUROR:**  Correct.

24            **THE COURT:**  All right.

25        So I'm going to let you all take a short break.  Before I

```
 1    let you go, I've got some "do not" orders for you.  So this
 2    is -- let's move to my slides on do not.  You're going to be
 3    released for a -- for a recess.
 4                        (Demonstrative published.)
 5         THE COURT:  And while and until you are excused, it
 6    is incredibly important that you not talk to anyone.
 7         First slide.
 8         Do not discuss this case or any matters with it with any
 9    person in any way during your break or otherwise until you are
10    released.  Not in writing, by phone, smart phone.  No email,
11    no text, no chat rooms, no blogs, no websites, no social
12    media, like Facebook, Snapchat, LinkedIn, YouTube, Twitter or
13    any other new thing that might be out there.  Nothing.  This
14    applies to everyone.
15         Next slide.
16                        (Demonstrative published.)
17         THE COURT:  Do not talk to your fellow jurors, the
18    participants, the witnesses, the lawyers, spectators, family,
19    friends, your employer.  If someone asks you, just tell them
20    you're seated as a juror and that's all you can say right now.
21         Next slide.
22                        (Demonstrative published.)
23         THE COURT:  Do not do any research or investigation
24    on this case or any topics that we have discussed during this
25    voir dire process.  Again, you are not released and we need to
```

1    have your own independent opinions.

2        Next slide.

3                    (Demonstrative published.)

4        **THE COURT:**  You are ordered not to read, watch, or

5    listen to any news or media accounts or anything to do with

6    this case.  I do not know whether this case is getting picked

7    up by the news, but it is not uncommon for federal cases to

8    get picked up.

9        Okay.  So during the break, what are you going to do?

10   You're going to check your email, get a snack, go to the

11   bathroom.  Do what you want to do as long as it has nothing to

12   do with this case.

13                   (Demonstrative published.)

14       **THE COURT:**  If something happens, and I don't think

15   it will, but if something accidentally happens, please let me

16   know.  I don't anticipate any violation of the rule, but it is

17   important that each side have a fair trial.  And if you

18   violate these rules, you could impact the ability for someone

19   to get a fair trial.  Okay?

20       So it is 10:55.  We are going to stand in recess for 30

21   minutes until 11:25.  All prospective jurors should leave the

22   courtroom because I need to speak with the lawyers while you

23   are gone, and the parties.  We have work to do while you're

24   gone.

25       When you come back, do not come back into the box.  You

1    will all sit in the gallery.  Okay?

2        So any questions before I release you for 30 minutes?

3        Yes, sir?

4        Okay.  You want to chat with me about something?  So you

5    stand back.

6        All right.

7        Everyone else is released for 30 minutes only.  We'll

8    stand in recess with the jury.

9        (The following proceedings were heard out of the presence

10   of the jury venire:)

11           THE COURT:  All right.  Mr. Bass, I can't talk to you

12   alone, but you can come to this front mic here.

13       Everyone else can be seated.

14           PROSPECTIVE JUROR:  Thank you, Your Honor.

15       I have prostate cancer, and I have two meetings, one next

16   Monday.  I didn't think about it until somebody talked about

17   their schedules for going forward.

18           THE COURT:  So Monday, this coming Monday?

19           PROSPECTIVE JUROR:  The 10th and then on the

20   following Monday.  I have two appointments --

21           THE COURT:  Okay.

22           PROSPECTIVE JUROR:  -- that took months to get.

23           THE COURT:  It's okay because next Monday we're not

24   in session.  So you can make that Monday.

25           PROSPECTIVE JUROR:  And then the following one we're

1  expected to be --

2          **THE COURT:**  You should be done.  And if we're not

3  done, we'll work around your schedule.

4          **PROSPECTIVE JUROR:**  It's just all of a sudden I went,

5  ah.

6          **THE COURT:**  I appreciate you saying that.  Thank so

7  much.

8      (Bass left).

9          **THE COURT:**  Okay.  Can I have the lead lawyers at the

10  mics, please.

11      So the record will reflect that the jury has gone.

12      You're going to be asked to -- to make strikes very soon

13  so people at your table should be figuring this out.

14      I am going to strike the following:  Mr. Hernandez.  I

15  just don't think that his English is good enough and that

16  concerns me.  If it was some different kind of case, I might

17  not be so concerned, but in this case, I am concerned.  So

18  Juror 14, Mr. Hernandez, is struck for cause.

19      Ms. Onywera, who's running that Bible study for one week,

20  the timing just didn't work.  I'm striking her for hardship.

21  Don't need to have 40 kids without something to do.

22      And then the other person I'm going to strike is

23  Ms. Preston.  This is -- she's a problem juror.  I thought

24  that in her survey questions.  She's -- I like jurors to have

25  a good experience, and she created more excuses today.  I am

 1    not going to dignify much of what she said with a response,

 2    and did not do that today, in terms of her questionnaire.  But

 3    I'm not going to see her in one of my juries.  So Ms. Preston

 4    is excused for cause.

 5       Okay.  Are there others that you want me to consider for

 6    cause, hardship?

 7       I can tell you, I'm not excusing Ms. Poon.  You can make a

 8    record later if you'd like.  And I'm not going to excuse -- is

 9    it --

10             **MR. HENDERSHOT:**  Mr. Bass.

11             **THE COURT:**  Mr. Bass.  I'm not going to excuse

12    Mr. Bass.

13       So you can make a record later if you like with respect to

14    those two.

15       Are there others that you want me to consider?

16             **MR. AL-SALAM:**  The only one for plaintiff,

17    Your Honor, is Ms. Pelican who said she couldn't award

18    plaintiffs money whether it was a large or small company.

19             **THE COURT:**  I disagree.  I think that she ultimately

20    will, but I'm not going to excuse her.

21             **MR. AL-SALAM:**  Okay.

22             **MR. HENDERSHOT:**  None from defendants, Your Honor.

23             **THE COURT:**  Okay.  So you have -- I'll give you about

24    five, six minutes.

25             **MR. HENDERSHOT:**  Thank you, Your Honor.

 1          **MR. AL-SALAM:**  May I run to the restroom?

 2          **THE COURT:**  You may, and you can use this restroom

 3     here.

 4       Okay.  All right.  We'll stand in recess for about

 5     five minutes.

 6       (Recess taken at 11:00 A.M.; proceedings resumed at

 7     11:07 A.M.)

 8          **THE COURT:**  So just so that everybody's clear, the --

 9     the eight that are on the jury right now are number 2,

10     Richard; number 3, Sun; number 4, Banishahab; number 6,

11     Gonzalez; number 8, Tiffany; number 10, Pelican; number 11,

12     Rose; and number 13, Blum.  Those are our eight at this point.

13          Plaintiff, first peremptory.

14          **MR. AL-SALAM:**  So, Your Honor, I'm just curious.  If

15     we go through more than that are in here, then is there a voir

16     dire for the -- for the next ones in line?  Or are we taking

17     the next ones line without --

18          **THE COURT:**  So if you -- if I don't have a jury -- so

19     let me be very clear.  I have more jurors.  I can --

20          **MR. AL-SALAM:**  Yeah.

21          **THE COURT:**  -- voir dire them.

22       But if somebody passes -- if I have two passes, I have a

23     jury.  So -- and I think I explained this before.  So if you

24     pass and defense has another strike, then you can -- and you

25     have strikes left, then you can use it.  But once I get two

1   strikes, I have a jury.  So we'll see where we are.

2           **MR. AL-SALAM:**  Okay.

3           **THE COURT:**  And whether you have any strikes left or

4   not.

5       All right.  So I have --

6           **MR. AL-SALAM:**  We'll strike Mr. Blum.

7           **THE COURT:**  All right.  Plaintiff strikes Mr. Blum,

8   number 13.  That puts Mr. Bass on the jury.

9           **MR. HENDERSHOT:**  Defendants strike Mr. Bass, Juror

10  15, Your Honor.

11          **THE COURT:**  All right.  Mr. Bass is struck by the

12  defense, Juror 15.

13      So that -- that puts Sinan Alobaide on the -- on the jury.

14      Plaintiff?

15          **MR. AL-SALAM:**  Strike Ms. Pelican.

16          **THE COURT:**  Pelican is struck; that's Juror 10.

17  Plaintiff has one left.

18      Defense?  And that -- that then puts Andrew Hu on the

19  jury.

20          **MR. HENDERSHOT:**  Defense strikes Juror 11, Mr. Rose.

21          **THE COURT:**  Okay.  Mr. Rose is struck by the defense,

22  number 11.  And that puts Ms. Poon on the jury.

23      Plaintiff has one strike left.

24          **MR. AL-SALAM:**  So just so I understand, Your Honor,

25  if both parties strike another person, then we're left with

```
 1   too few jurors, correct?

 2            THE COURT:  Then you're left with whoever comes up

 3   next.  You have their questionnaires, and all you have are

 4   for-cause challenges left.  That's it.  You do not have

 5   peremptories left.

 6            MR. AL-SALAM:  We will pass, Your Honor.

 7            THE COURT:  Plaintiff passes.  Defense has one

 8   peremptory left.

 9            MR. HENDERSHOT:  Your Honor, defense strikes

10   Juror number 8, Ms. Liu.

11            THE COURT:  Okay.  Defense used its last peremptory

12   with Ms. Liu.  And that then brings Trini Bautista.

13            MR. AL-SALAM:  Pass, Your Honor.

14            THE COURT:  Okay.  That's our jury.  So we will

15   stand -- you'll have 10 minutes.  Just be back so that the

16   jury's -- so that you're here before the jury gets back at

17   11:25.

18        When the jury gets back, we'll bring up these eight.

19   We'll swear them in, and then I will -- then I'll let them

20   take lunch.  And -- well, you're ready to open, right?

21            MR. AL-SALAM:  Yes, Your Honor.

22            MR. HENDERSHOT:  Yes, Your Honor.

23            THE COURT:  But that's another -- okay.  I'll give

24   them a 45-minute break.  Then we'll come back, and we'll

25   instruct and do openings today, witnesses tomorrow.
```

```
 1              MR. AL-SALAM:  Thank you, Your Honor.

 2              MR. HENDERSHOT:  Thank you, Your Honor.

 3              THE COURT:  Stand in recess.

 4              THE CLERK:  Court is in recess.

 5          (Recess taken at 11:12 A.M.; proceedings resumed at

 6      11:25 A.M.)

 7          (The following proceedings were heard in the presence of

 8      the jury venire:)

 9              THE COURT:  If the following jurors will come back

10      up.

11          Bernadette Richard.  Ms. Richard, you're going to take the

12      first seat in the first row.

13          Christine Sun.

14          Behnaz Banishahab.  And if you want to go the other way,

15      you can take the second seat.

16          Elizabeth Gonzalez.

17          Sinan Alobaide.  If you'll come forward and take the first

18      seat in the back row.

19          Andrew Hu.  And, Mr. Hu, you can go through the back.  No.

20      Take -- into the box, yeah.

21              PROSPECTIVE JUROR:  Sorry.  The next one?

22              THE COURT:  In the box, yeah.  And then Mr. Hu is

23      going to sit next to you.

24          Rebecca Poon.

25          And Trina Bautista, you'll take the third seat in the
```

1    back.

2         And you'll take the fourth seat in the back.  Okay.

3         If the eight of you will please stand to be sworn.

4              **THE CLERK:**  Please raise your right hand.

5         (Jury sworn).

6              **THE CLERK:**  Thank you.  Please be seated.

7              **THE COURT:**  Okay.  So to the rest of you, you are now

8    all excused from jury service.  Again, thank you very much for

9    honoring your citizenship, coming in today.  I hope you have a

10   wonderful day.  You may all leave other than these eight.

11        (Rest of the venire leaving).

12             **THE COURT:**  All right.  It is 11:30.  What we are

13   going to do is take a 45-minute break so that you can go if

14   you want to get a snack or something like that, a cup of

15   coffee.  When you come back, I'll have 30 to 45 minutes of

16   instructions for you, probably 30 minutes.  And then each side

17   will give their opening statement, and then we'll be done for

18   today.

19        Tomorrow, then, we'll come in.  As I indicated, we'll

20   start at 8:30, and they'll start taking evidence.  So as just

21   a reminder, we end at 1:40 in the afternoon.  So you'll be

22   done at 1:40 each day.  You'll hear evidence on Thursday and

23   Friday.  Monday, we do not have court.  And you'll hear more

24   evidence Tuesday.  You should have the case by Wednesday

25   afternoon for deliberations.  Okay?  And then you'll be done

 1    once you finish deliberating.

 2        So, again, my do not orders still apply.  Do not talk to

 3    anybody about anything related to this case.  I'll give you

 4    some more instructions when you're back.  But the courtroom

 5    deputy will take you into the jury room, give you your badges,

 6    and then you need to be back in the jury room no later than

 7    12:15.  Okay?

 8        So he's just going to give you a few instructions, but

 9    then you can go out, get something to eat if you want.  We

10    have snacks back there, but they may not be good the first

11    day.  And then -- and then I'll see you at 12:15.

12        Okay.  All right.

13            **THE CLERK:**  Please rise for the jury.

14        (The following proceedings were heard out of the presence

15    of the jury:)

16            **THE COURT:**  Okay.  Any -- the record will reflect

17    that the jury is gone.

18        Is there anything you want to discuss right now?

19            **MR. AL-SALAM:**  Your Honor, I just want to confirm,

20    did they already see the -- the patent video?

21            **THE COURT:**  No.  They'll see it when I instruct them.

22            **MR. AL-SALAM:**  Thank you.

23            **MR. HENDERSHOT:**  Nothing from defendant, Your Honor.

24            **THE COURT:**  Okay.  Well, Ms. Poon is not very happy,

25    but I have to tell you I do have -- I really do not have

```
1    sympathy for any of you litigators.  If your spouses get

2    called, they should serve.

3       So we'll see you at 12:15.  We'll stand in recess.  You're

4    welcome to stay in the courtroom if you need to test

5    equipment, et cetera.  We're off the record.

6       (Recess taken at 11:30 A.M.; proceedings resumed at

7    12:24 P.M.)

8            THE COURT:  -- without those computers, but I did --

9    you have to have protectors -- that the jurors are not in the

10   courtroom.

11      Mr. Al-Salam?

12           MR. AL-SALAM:  Mr. Oliver's testimony, you wanted the

13   excerpts of where he had testified in deposition on the

14   subject matter that we were talking about.

15           THE COURT:  Yes.

16           MR. AL-SALAM:  Should those be sent to chambers by

17   email, or what's the best way to submit them?

18           THE COURT:  Well, unless you have copies for me right

19   now, that would probably be the best way to submit them.

20           MR. AL-SALAM:  Yeah.  I don't have hard copies.  We

21   just have the email.

22           THE COURT:  All right.  Bring them in.

23      (The following proceedings were heard in the presence of

24   the jury:)

25           THE COURT:  All right.  You may all be seated.  You
```

1    can be seated.  Everyone's standing for you.

2        All right.  You may all be seated.

3        Okay.  I have some instructions for you.  You have a

4    binder there.  We're actually going to go through that in a

5    moment, and I have a patent video for you, which you'll see in

6    a moment.

## **JURY INSTRUCTIONS**

8        **THE COURT:**  But first, now that you are the jury in

9    this case, it is my duty to instruct you on the law.  It is

10   your duty to find the facts from all the evidence in this

11   case.  To those facts, you will apply the law as I give it to

12   you.  And you must follow the law as I give it to you, whether

13   you agree with it or not.

14       You must not be influenced by any personal likes or

15   dislikes, opinions, prejudices, or sympathy.  That means that

16   you must decide the case solely on the evidence before you.

17   You will recall that you took an oath to do so.

18       At the end of the trial, I will give you final

19   instructions and it is the final instructions that will govern

20   your duties.

21       Please do not read into these instructions or anything

22   that I may say or do that I have an opinion regarding the

23   evidence or what your verdict should be.

24       So let's start with patents.

25       This case involves a dispute relating to United States

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1  patents -- patents.  Let me -- I'm going to take a moment to

2  explain what a patent is and how one is obtained.  Patents are

3  granted by the United States Patent and Trademark Office,

4  sometimes called the PTO.  A valid United States patent gives

5  the patent holder the right to prevent others from making,

6  using, offering to sell, or selling the patented invention

7  within the United States or from importing it into the

8  United States during the term of the patent without the patent

9  holder's permission.

10     A violation of the patent holder's rights is called

11  infringement.  The patent holder may try to enforce a patent

12  against persons believed to be infringers by means of a

13  lawsuit filed in federal court.  To obtain a patent, one must

14  file an application with the PTO.  The process of obtaining a

15  patent is called patent prosecution.

16     The PTO is an agency of the federal government and employs

17  trained patent examiners who review applications for patents.

18  The application includes what is called a specification, which

19  means -- or which contains a written description of the

20  claimed invention telling what the invention is, how it works,

21  how to make it work, and how to use it so others skilled in

22  the field will know how to make or use it.

23     The specification ends with one or more numbered

24  sentences.  And these are called patent claims.  When the

25  patent is eventually granted by the PTO, the claims define the

1    boundaries of its protection and give notice to the public of

2    those boundaries.

3        After the applicant files the application, a PTO patent

4    examiner reviews the patent application to determine whether

5    the claims are patentable and whether the specification

6    adequately describes the invention claimed.  In examining a

7    patent application, the patent examiner reviews information

8    about the state of the technology at the time the application

9    was filed.  As part of that effort, the patent examiner

10   searches for and reviews information that is publicly

11   available, submitted by the applicant, or both.  That

12   information is called prior art.

13       Prior art is defined by law, and I will give you, at a

14   later time, in specific instructions, as to what constitutes

15   prior art.  However, in general, prior art includes things

16   that existed before the patent invention or the -- before the

17   claim invention that were publicly known or used in a publicly

18   accessible way in this country or that were patented or

19   described in a publication in any country.

20       The patent examiner considers, among other things, whether

21   each claim defines an invention that is new, useful, and not

22   obvious in view of the prior art.  A patent lists the prior

23   art that the examiner considered, and this list is called

24   cited references.  After the prior art search and examination

25   of the application, the patent examiner then informs the

 1    applicant in writing what the examiner has found and whether

 2    any claim is patentable and thus will be, quote, allowed, end

 3    quote.

 4         This writing from the patent examiner is called an office

 5    action.  If the examiner rejects the claims, the applicant has

 6    an opportunity to respond and sometimes changes the claims or

 7    submits new claims.  This process, which takes place only

 8    between the examiner and the applicant -- patent applicant,

 9    may go back and forth for some time until it the examiner is

10    satisfied that the application and claims meet the

11    requirements for a patent.

12         Sometimes patents are issued after appeals with the PTO or

13    to the court.  The papers generated during this time of

14    communicating back and forth between the patent examiner and

15    the applicant make up what is called the prosecution history.

16    All of this material becomes available to the public no later

17    than the date when the patent issues.

18         A patent is presumed to be valid, but the fact that the

19    PTO grants a patent does not necessarily mean that any

20    invention claimed in the patent, in fact, deserves the

21    protection of a patent.

22         For example, the PTO may not have had available to it all

23    the information that will be presented to you.  A person

24    accused of infringement has the right to argue in federal

25    court that a claimed invention in the patent is invalid

1    because it does not meet the requirements for a patent.

2        As I mentioned, this case is about patents.  And before I

3    summarize the parties' opinion, I'm going to show you a short

4    video called "The Patent Process."  This is an overview for

5    jurors -- stop, not quite yet -- that has been prepared by the

6    Federal Judicial Center for the purposes of providing jurors

7    like you some background on the patent system.

8        Now, I'm going to stop it or -- my courtroom deputy's

9    going to stop it, and then, if you will, open up your binders,

10   you should -- after the protective sheet -- you have a

11   document there.  It says, "The Patent Process:  An Overview

12   for Jurors."

13       Do you see that?  Okay.

14       So you're going to turn to the second page, and this is

15   the patent that's going to be discussed in the jury video.  So

16   we're going to stop it.  We're going to pause it so that we

17   can go back and forth, and I can show you where the stuff is.

18   Okay.  It goes pretty fast in the video otherwise.  All right.

19       Let's go ahead.

20                    (Patent video was played.)

21       **THE COURT:**  Okay.  So keep -- no, not quite yet.

22   Keep going, Edwin, another 10 seconds.

23                    (Patent video was played.)

24       **THE COURT:**  Okay.  Stop there.

25       All right.  So do you see on your patent, you've got it on

1   the top right hand, that's the number, right?  The date of the

2   patent is right underneath it.

3        Do you see that?

4        And then the title is there on the left, right?

5        And the inventor is right underneath it, okay?

6        All right.  Let's keep going.

7                    (Patent video was played.)

8        **THE COURT:**  Okay.  So now turn your page.  And I

9   should have the record reflect a couple of things.  One is

10  that I told the court reporter she didn't have to transcribe

11  the video.  You all have that video.  Although, she's

12  transcribing what I said.

13       And the second thing, just a point of personal pride,

14  Jeremy Fogel, who's talking, he was a judge in our district

15  many years ago.  He used to sit down in San Jose.  He's since

16  retired from the bench, so he's not -- no longer doing this.

17  But this was his -- we do a lot of patent cases in this

18  district, and this was something he really wanted to do to

19  explain this process to jurors.  He's a terrific trial judge.

20       All right.  So the next page, if you go to number 3,

21  Page 3, you'll see -- is everybody there?  Where it has the

22  big 1, the first column?

23       So on that page, you have two columns.  That's where we

24  are.  Everybody with me?  Yeah?

25       Okay.  Go ahead.

1           (Patent video was played.)

2           **THE COURT:**  All right.  So it's just the little

3     summary is the abstract.

4        Okay.  Keep going, Ed.

5               (Patent video was played.)

6        **THE COURT:**  And now we're with him again, and it

7     says -- do you see highlighted -- he'll talk about that.

8        It says, "We claim."  This is the important part of this

9     patent, which is where they identify their claims.

10       All right.  Go ahead.

11              (Patent video was played.)

12              (Pause in the proceedings.)

13       **THE COURT:**  Okay.  So a few more instructions for

14    you.  As I mentioned already, right, the plaintiff here is

15    Impinj, Inc.  The defendant is NXP U.S.A.

16       This case involves two patents.  The first, U.S.

17    Patent Number 8,115,597, names Ronald Oliver, John Hyde, and

18    Charles Peach as the inventors.  For convenience, the parties

19    and I will often refer to this patent by the last three

20    numbers of its patent number; that is the '597 patent.

21       The second, Patent Number 9,633,302, names Harley Heinrich

22    as the inventor.  And, again, we'll refer to this patent by

23    the last three numbers of its patent number, the '302 patent.

24       Impinj has filed suit in this court, and in this trial it

25    seeks monetary damages from NXP for allegedly infringing these

1    two patents.

2       You're going to be here for a number of days, and these

3    folks are going to give you a lot of details.  So I'm just

4    going to give you a snippet as you don't need to hear from me

5    on this stuff for too, too long.  But, in short, Impinj

6    alleges that NXP directly infringes the '597 patent because

7    NXP sells, offers for sale, and imports products that are

8    covered by claims 1, 12, and 15 of the '597 patent.

9       Impinj claims those products are the UCODE 8, UCODE 8m,

10   UCODE 9 products, and NXP denies that it is infringed and also

11   argues that the claims are invalid.  Now, I have the parties

12   in the book that I've given you.  If you'll turn past the

13   first tab, right, they have -- identified those claims for

14   you.

15       Do you see that in your binder?

16       All right.  If you go to the next pad -- tab, you'll see

17   the actual patent is there.  You don't have to, obviously,

18   memorize any of this.  This is all going to be for your

19   convenience.

20       And if you flip to the very end, you'll see that's where

21   the claims begin, and they're highlighted.

22       Okay.  Very end -- so we're still on Tab 1.  Okay?  The

23   '597 patent is the first patent in your book.  Right before

24   the blue sheet of paper, those last few pages, that's where

25   the claims are for the '597 patent.

1          Okay.  Here we go.  Look -- look up here, then.  There's

2     the '597 patent, right?  You've got that behind your tab,

3     first tab?  Okay.  There are two patents there, the '597, and

4     behind the blue sheet, that's the '302 patent.

5          The claims are always at the end of the patent, so if you

6     look at the last couple pages, you'll see some highlighting.

7     That's where the claims are.  Okay?

8          All right.  So now, the '302 patent, again, Impinj argues

9     that NXP directly infringes, again, because it claims that NXP

10    sells, offers for sale, and imports products that are covered

11    by claims 1, 3, 4, and 7 of the '302 patent.  And Impinj

12    claims those products include the UCODE 7 with big pads, the

13    UCODE 8, the UCODE 8M, and the UCODE 9 products.

14         The Court previously found, as a matter of law, that NXP

15    products do infringe the claims.  But for purposes of this

16    trial, NXP also argues that the claims are invalid, and you

17    will decide that issue.

18         Next, Impinj claims that NXP's also willfully infringed

19    each of the asserted claims of both the '597 patent and the

20    '302 patent.

21         With respect to the '597 patent, it will be your job to

22    decide whether claims 1, 12, and 15 of that patent have been

23    infringed and whether they are invalid.

24         With respect to the '302 patent, your job is to decide

25    whether claims 1, 3, 4 and 7 of that patent are invalid.

1          Now, depending on your answers to those questions, you may

2     or you may need to decide whether to award monetary damages to

3     Impinj to compensate it for any infringement.  You'll also

4     need to decide whether any infringement was willful.

5          However, if you decide that infringement was willful, that

6     decision does not and should not affect any damages awards you

7     give.  I will take that information into account later.  To

8     make these decisions, you will need to understand the patent

9     claims.  And as I mentioned, the patent claims are the

10    numbered sentences at the end of the patent that describe the

11    boundaries of the patent's protection.  It is my job to

12    explain to you the meaning of any language in that claim that

13    needs interpretation.

14         I have determined the meaning of one term in the '302

15    patent, and you'll be given a document to explain that

16    meaning.  You are to apply my definition of this term

17    throughout this case.  However, my interpretation of the

18    language of this claim should not be taken as an indication

19    that I have a view regarding any issues you are -- you are

20    asked to decide.

21         For any claim term for which I have not provided a

22    definition, you should apply its ordinary meaning.  And I'll

23    provide you with more detailed instructions on the meaning of

24    the claims before you retire to deliberate.

25         There are two -- as -- as Judge Fogel mentioned, there are

1   two burdens of proof in this case.  The first is preponderance

2   of the evidence.  And that means that you must be persuaded by

3   the evidence that the claim is probably more true than not.

4   You should base your decision on all the evidence regardless

5   of who presents it.

6        However, when a party has the burden of proving any claim

7   or defense by clear and convincing evidence that means that

8   the party must present evidence that leaves you with a firm

9   conviction or belief that it is highly probable that the

10  factual contentions of claim or defense are true.

11       This is higher standard than preponderance of the evidence

12  but is lower than the criminal standard where we require proof

13  beyond a reasonable doubt.

14       So what is the evidence you're to consider?

15       The evidence that you are to consider includes the sworn

16  witness testimony or the sworn testimony of any witness, the

17  exhibits that are admitted into evidence and that you will

18  have with you back in the jury room, any facts to which the

19  lawyers have agreed, and any facts that I instruct you to

20  accept as proof.

21       Now, with respect to the facts to which they've already

22  agreed, if you will turn to your last tab in your binder, the

23  first page gives you the constructions of -- that is, the

24  meanings of certain terms, which we'll talk about later.  And

25  after the pink page, you'll see a whole bunch of undisputed

1  facts.  I'll give you more instructions on that later but the

2  parties will refer to those and ultimately they'll -- you'll

3  be instructed that all of those are deemed to be proved.  It

4  just makes a trial go faster.  Okay?

5      So what's not evidence?

6      In reaching your verdict you may consider only the

7  testimony and exhibits received into evidence, but certain

8  things are not evidence and you may not consider them in

9  deciding what the facts are.

10     First, arguments and statements by the lawyers are not

11  evidence.  The lawyers are not witnesses.  What they may say

12  in their opening statements and closing arguments and at other

13  times is just there to help you interpret the evidence, but

14  it's not evidence.

15     If your memory of the facts control -- or if your -- if

16  the facts as you remember them differ from the way the lawyers

17  state them, your memory of them controls.

18     Questions and objections by the lawyers are not evidence.

19  The lawyers have a duty to their clients to object when they

20  believe a question's un -- improper under the Rules of

21  Evidence.  And you should not be overly influenced or be

22  influenced at all by the objection or the Court's ruling on

23  it.

24     If testimony is excluded or stricken, you're instructed to

25  disregard it and cannot consider that as evidence.

1          In addition, some evidence may be received for only a

2     limited purpose.  And when I instruct you to consider it for

3     that limited purpose, you may do so.  When I do that, I'll

4     stop and I will try to explain it to you.  That is, I'll

5     explain my evidentiary ruling.

6          You may not consider the evidence for any other purpose.

7          Anything you see or hear when Court is not in session is

8     not evidence.  You are to decide the case solely on the

9     evidence received at trial.  It is because you all to have see

10    and hear the exact same things so that you can deliberate

11    together.  Okay?

12         Evidence can be direct or circumstantial.  Direct evidence

13    is direct proof of a fact such as a testimony by a witness

14    about what that person, that witness personally saw or

15    personally did.  Circumstantial evidence is proof of one or

16    more facts from which you could find another fact.

17         You should consider both kinds.  The law makes no

18    distinction between the weight to be given to circumstantial

19    versus direct evidence.  It is for to you decide how much

20    weight to give it.

21         So let me give you an example.  This is a little bit

22    theoretical, right?  If you wake up in the morning and you

23    find that there is water -- or that there is -- the sidewalk

24    is wet, you could find, by seeing the sidewalk wet, that it

25    rained during the night.  On the other hand, there could be

1  other evidence, like a turned on garden hose that might

2  provide a different explanation for the presence of water on

3  the sidewalk.  You should consider all the evidence before

4  deciding that a fact has been proved by circumstantial

5  evidence.  You should consider all the evidence in light of

6  reason, experience, and your common sense.

7      There are Rules of Evidence that control what can be

8  received into evidence.  And when a lawyer asks a question or

9  offers an exhibit into evidence and the other lawyer objects,

10  I'll have to rule on that.  If I overrule the objection, the

11  question can be answered, the exhibit received.  If I sustain

12  the objection, the question cannot be answered or the exhibit

13  will not be received.

14      I won't explain the Rules of Evidence to you; otherwise,

15  we'll be here for a semester, right?  But if I sustain an

16  objection, you have to ignore the question and not guess what

17  the answer would be.  So as part of this, you might have to

18  decide which testimony to believe and which testimony not to

19  believe.  You can believe -- you have the right to believe

20  everything a witness says or part of it or none of it.

21      So what do you consider?

22      One, the opportunity or ability of a witness to see, hear

23  or know the things about which they are testifying to; two,

24  the witness's memory; three, a witness's manner while

25  testifying; four, the witness's interest in the outcome of the

1    case, if any; five, that witness's bias or prejudice, if any;

2    six, whether other evidence contradicts the witness's

3    testimony; seven, the reasonableness of the testimony in light

4    of all the evidence; and, finally, any other factor that bears

5    on believability.

6        Sometimes a witness may say something that is not

7    consistent with something else he or she said.  Sometimes

8    different witnesses will have different versions of what

9    happened.  People forget things.  And they make mistakes about

10   what they remember.  Also, two people could see the exact same

11   event but remember it differently.  So before you consider

12   these differences -- or you may consider those differences,

13   but do not decide the testimony as untrue simply because it

14   differs from other testimony.

15       However, if you decide that a witness has deliberately

16   testified untruthfully about something important, you may

17   consider and choose not to believe anything that witness says.

18   On the other hand, if you think they testified truthfully

19   about some things and untruthfully about the others, you can

20   accept the part you think is true and just disregard the rest.

21       The weight of the evidence does not -- as to a fact does

22   not necessarily depend on the number of witnesses who testify.

23   What's important is how many -- how believable the witnesses

24   were, and how much weight you think their witness -- their

25   testimony deserves.

1           Okay.  You see my court reporter.  She's transcribing but

2    do not -- you will not have a trial transcript, so you have to

3    pay close attention to the trial testimony.  All right?

4           If you wish to take notes, you can.  We've given you

5    little stenograph notebooks.  If you take notes, please keep

6    them to yourself until you go into the jury room to

7    deliberate.  Do not let note taking distract you.  When you

8    leave each day, leave your notes in the jury room.  No one

9    will read your notes.  Whether or not you take any notes, you

10   should rely on your memory of the evidence.  Notes are there

11   to assist your memory, but you shouldn't be overly influenced

12   by your notes or those of other jurors.

13          I do allow jurors to ask questions, not all judges do.  In

14   your binders tomorrow, you'll see a sheet.  That sheet will

15   have where you can write down questions and give them to Edwin

16   at the break or at the end of testimony.  Understand that if

17   the Rules of Evidence do not permit a particular kind of

18   question, it won't be asked.  And I'll advise you of that.

19   But I also always talk to the lawyers before any of your

20   questions are asked.  Okay?

21          So I'll have some more instructions for you later, but

22   let's -- let's get started here.  Each side is going to make

23   an opening statement.  An opening statement is not evidence.

24   It's simply an outline to help you understand what that party

25   expects the evidence will show.

1        After that -- we'll get the openings today.  Presentation

2    of evidence will start tomorrow.  Witnesses will take the

3    stand, documents offered and admitted into evidence.  Impinj

4    will present its case first.  The witnesses are then

5    questioned by Impinj's counsel, that's direct examination.

6        After that's complete, NXP gets to cross-examine to prove

7    infringement.  Impinj will have to persuade you that it's more

8    likely than not that NXP infringed.

9        After Impinj presents its case, NXP will call its

10   witnesses who it will also examine and be subject to

11   cross-examination.  Same kind of process.  NXP's going to

12   claim that the patent's invalid.  They need to persuade you

13   that it's highly probably that those claims are invalid.

14       After that, Impinj will return and put on its evidence

15   claiming that the patents are valid.  So we'll go back and

16   forth.

17       All right.  At this point then -- or once all that's done,

18   I'll give you final instructions.  You'll get the final

19   closing arguments by the lawyers and then you'll go decide the

20   case.

21       So what we're going to do now is we're going to stand and

22   stretch 'cause I know it's the afternoon, and Mr. Al-Salam is

23   going to give you his opening.

24       Okay.  So let's stand and stretch.  He'll get ready.

25       Can we have the -- Mr. Al-Salam, do you have control of

1    the --

2         **MR. AL-SALAM:**  Can it be published now?

3         **THE COURT:**  And then once he finishes, we'll take a

4    short break before we hear from the other side.  Okay?

5         All right.  Everyone can be seated.

6         Mr. Al-Salam --

7         **MR. AL-SALAM:**  Thank you.

8         **THE COURT:**  -- you may proceed.

9                          **OPENING STATEMENT**

10        **MR. AL-SALAM:**  And thank you again for the attention

11   you've already given and that you will be giving in this case.

12   This is an important case for everyone involved, but, in

13   particular, my client, Impinj.

14        And my client, we've talked about big companies, but

15   they're actually -- they just have one office.  It's in

16   Seattle.  They have about 400 employees.  And what I want to

17   talk about on this opening statement is to give you an

18   understanding of what the -- what the technology is they're

19   arguing about, what the patents are, what you need to decide.

20   So...

21                     (Demonstrative published.)

22        **MR. AL-SALAM:**  So this is the big picture.  The

23   technology relates to something called RAIN RFID.  It's a

24   specific type of radio frequency identification.  And it's

25   better than any radio frequency identification you may know

1    about.  It's more interesting, it works better, and it has

2    great, great possibilities to -- for the future to help people

3    and businesses.

4        Impinj is a 400-person company, as I mentioned, in Seattle

5    that has led the way in this industry.  They have more patents

6    than any company in the world has in this industry.

7        Now, NXP, they have a lot to be proud of.  They're a lot

8    bigger than Impinj.  They have lots of patents themselves on

9    lots of things.  But in this industry, Impinj is the leader.

10   And the only reason we're here is because when Impinj comes

11   out with a new product, NXP copies those features and

12   infringes those features, and we couldn't get it resolved

13   without a lawsuit.  That's why we're here.

14       Now, here's what I want to do today.  I want to tell you

15   the questions you have to answer.  The judge has already

16   talked about them.  I want to talk about this technology.  I

17   want to talk about -- a little bit about the people you're

18   going to meet.  Because I can guarantee you this:  There's not

19   much I can promise, but when you get finished with this trial,

20   you'll know a lot more about RFID than you ever knew.  You'll

21   have met some amazingly accomplished interesting people.

22   You'll have learned about this little company in Seattle that

23   is doing cutting-edge stuff in the industry.  And you will

24   know what a rectifier is.  And you will be able to impress

25   your family and friends about what you know about both RFID

1    and rectifiers.

2        I want to talk a little bit about the two patents at

3    issue, and I want to talk about the evidence that we'll

4    present.

5                    (Demonstrative published.)

6            **MR. AL-SALAM:**  So let's first start with -- we're

7    going to talk about them in a different order.  The judge

8    mentioned the '597 patent first and then the '302 patent.  The

9    '302 patent issues are simpler, so we're going to start with

10   the '302 patent.  I'll explain what -- what that's about and

11   the issues and then we'll do the '597.  It also simpler

12   because, as the judge told you, she's already decided that NXP

13   infringes that patent, so you don't have to decide

14   infringement.

15       What you're going to be asked is, has NXP proven by clear

16   and convincing evidence that that patent is invalid.  And

17   we'll go through what their arguments are, but I'll tell you

18   now what they're doing is they're relying on a combination of

19   what some other people did and said, oh, well, it could have

20   been obvious.  That's what they're relying on to say it's

21   invalid.  And you have to decide is that clear and convincing

22   evidence that it's obvious.

23       Then you have to decide whether we have proven that they

24   willfully infringed.  It's -- there's difference between just

25   infringement, as the Court has found, and something called

1   willful infringement.  And the judge will instruct you as to

2   what willful infringement is.  But that's the second thing

3   you'll have to decide.

4       And, lastly, it -- you'll have to decide -- unless you

5   find that they have proven that the patent is invalid, you'll

6   to have decide damages.  So that's on the '302 patent.

7                    (Demonstrative published.)

8           MR. AL-SALAM:  We sometimes call it the Enduro '302

9   patent because it describes what the feature is.  And I'll

10  explain that to you.

11      Now, this is what we call the '597 patent or the Oliver

12  '597 patent.

13                   (Demonstrative published.)

14          MR. AL-SALAM:  Once again, there's the issue of

15  validity.  Have they proven by clear and convincing

16  evidence -- that's a higher standard as the judge mentioned --

17  that this patent shouldn't have been issued, and have we

18  proven that the patent is infringed?

19      And if you say no to the first and yes to the second, then

20  you'll also decide whether the infringement has been willful

21  and what damages should be awarded to Impinj.

22      Okay.

23                   (Demonstrative published.)

24          MR. AL-SALAM:  Let's go back and talk about the

25  technology.  RFID stands for radio frequency identification.

OPENING STATEMENT \ AL-SALAM

```
1    And it's -- you've probably seen it -- like I have a keycard
2    somewhere.  When I want to get in my building, I can just hold
3    this up and the door sort of magically unlocks.  And you can
4    do it -- to get in a hotel room, you can use it.
5        What's amazing is there's no battery in here.  What
6    happens is there's a reader, what's called a reader that emits
7    radio waves.  It just emits radio waves.  In this little thing
8    there's a little -- there's a little IC and there's a
9    little -- a little antenna.  And it can take those radio waves
10   and it can power a little circuit that then sends something
11   back and says I should be let in or whatever that it's going
12   to send.  It has information on the tag that it can then emit
13   back.
14       What's amazing about it is it can do it without a battery.
15   It's what they call passive RFID.  And the way it works -- we
16   have a little image here -- this reader emits the waves,
17   they're picked up by the antenna.  And then the antenna, it
18   powers it -- it goes through what's called a rectifier.  And
19   we're going to talk a lot about a rectifier.  What a rectifier
20   does is it can convert those waves that it's got coming in
21   into power to power that circuit.  It's -- you know, some
22   people say it's almost like magic.  It's just taking something
23   out of air and getting power to power the integrated circuit,
24   which we call IC, by the way.  If I say "IC," I'm referring to
25   the integrated circuit.
```

 1           And it transmits it back to the reader.

 2                        (Demonstrative published.)

 3           **MR. AL-SALAM:**  This is how big these ICs are.

 4   They're tiny.  They have thousands, tens of thousands of

 5   electrical components on them when they're actually that

 6   small.  I mean, this is an aside, but humankind has done a lot

 7   of stuff.  We've gone to the moon.  We've cured diseases.

 8   We've had done everything else.  This has to be in the top 10,

 9   putting tens of thousands of little electrical components on

10   something that small is truly amazing.

11       So -- but now let's talk about what -- what we're talking

12   about.

13                        (Demonstrative published.)

14           **MR. AL-SALAM:**  So to be clear -- I just want to be

15   clear.  The parties, this is what they make.  Both parties,

16   Impinj and NXP, make these little integrate circuits.  And

17   they made them especially for this RAIN RFID that I'm going to

18   talk about a little more.

19       But they won't work just like that because to -- to get

20   those waves out of the air, they need an antenna.  So this is

21   what we call an RFID tag.

22                        (Demonstrative published.)

23           **MR. AL-SALAM:**  A tag means the IC and the antenna.

24   And this is what they look like.  They're really small

25   (indicating) but the IC is tiny.  The antenna's a little

1    bigger because the antenna needs to -- to be able to receive

2    the waves of -- of radio frequency and then send it to the

3    rectifier where it's converted into power.  And we're looking

4    at the '597 patent title there.  It says "RFID tags with

5    synchronous power rectifier."  So we'll talk about what that

6    means, but that's what that patent relates to.

7                    (Demonstrative published.)

8            MR. AL-SALAM:  So then what is RAIN RFID?  You know,

9    I said this is a special type of RFID.  And what it is, is you

10   can have RFID at different frequencies.  The frequency of the

11   radio -- of RF waves or radio frequency waves coming in can be

12   different.  You can have low.  You can have high.  This is

13   ultra-high frequency and it follows a specific protocol called

14   the Gen2 protocol. And -- and so what it is, is these are

15   ultra-high frequency RFID ICs or tags that follow the specific

16   protocol called the Gen2 protocol.  It works much better --

17   it's sort of like Uber or super bar code scanning.

18        But you know why it's better than bar code scanning?

19        Nobody has to hand-scan anything.  You can actually just

20   roll a big -- a big pallet of materials through a fixed

21   scanner.  It can read them all.  It -- nobody has to do

22   anything.  It can read stuff from a distance.  Unlike --

23   unlike my thing to get in my office, it doesn't -- I don't

24   have -- you don't have to push it right up to it.  It has

25   great robustness.  And that's why it can be used in all kinds

 1    of ways.

 2        For example -- these are just some examples.

 3              (Demonstrative published.)

 4        **MR. AL-SALAM:**  They really are just examples.  Newark

 5    airport uses them to track bags.  In fact, if you fly Delta,

 6    Delta has a bag tracking system.  And what it does is they put

 7    in -- in your baggage tag something that looks like this.

 8              (Demonstrative published.)

 9        **MR. AL-SALAM:**  And they can then, with the readers,

10    know exactly where your bag is at all times.  So they can --

11    it's connected -- it's connecting these types of products to

12    the Internet.

13              (Demonstrative published.)

14        **MR. AL-SALAM:**  Hospitals use them so that no one has

15    to sign out when they take medicine or they take something

16    else.  They can just pull some medicine out and it knows it's

17    gone and it will know where it goes.  It tracks it because

18    they each have one of these little tags in them.

19              (Demonstrative published.)

20        **MR. AL-SALAM:**  Carvana uses them to track where cars

21    are and when they come in and to identify -- and you've

22    probably figured it out by now.  It can stop counterfeits,

23    right?  Because if somebody -- like Walmart is the biggest

24    users of these tags in the world.  So if somebody takes a

25    product from Walmart, takes it out, Walmart knows specifically

1    what the product is.  Not just that it's jeans or a purse,

2    they know the individual product.  And when somebody wants to

3    bring it back, they know whether it's a counterfeit or

4    knockoff or not what they brought in because all they have to

5    do is put it near the reader and the reader can say, yep,

6    that's what we sold to that person.

7        These are just some examples.  The L.A. marathon uses it

8    to track runners.  As the runners go through stations, they

9    can keep track of every runner that's gone through.  It is

10   amazing technology.

11       UPS is using it.  And here's a commercial where they talk

12   about how they use this technology.

13                   (Demonstrative published.)

14       **MR. AL-SALAM:**  Whoops.  Okay.  There we go.  See if

15   we can play it.

16       We don't have sound.

17                   (Video recording was played.)

18       **MR. AL-SALAM:**  I feel like I should be telling you,

19   but what they're talking about is -- is -- what their ability

20   to do is to track --

21                   (Pause in the proceedings.)

22       **MR. AL-SALAM:**  Well, if we don't get it.  It -- what

23   they're doing is they have a new tracking system using my

24   client's ICs that can follow where every single package is or

25   is going and they can -- let's see if we can get it.

1   (Video recording was played.)

2   **MR. AL-SALAM:**  So, again, these are just examples,

3   but I wanted you to see some examples of what this technology

4   can do.

5   And now let's go back to who Impinj is because Impinj has

6   done more than anyone to push the technology.  In fact, it's

7   called RAIN.

8   Do you think it's a coincidence that Impinj is in Seattle?

9   It's not.

10  This gentleman here is Chris Diorio.  I'll talk a little

11  bit more about him, but he's the one that coined the name

12  RAIN.  Impinj sold the very first of these RAIN RFID ICs and

13  this technology requires both an IC and a reader.  They are --

14  Impinj is the leading seller of readers and reader chips.

15  Now, NXP is also a big seller of the RAIN RFID ICs and

16  that's what this dispute's about.  Both parties, Impinj and

17  NXP, have about 50 percent, little less each, perhaps, of that

18  market, of the RAIN RFID IC market -- just for ICs.  Again,

19  NXP doesn't sell readers; they just sell the ICs and the ICs

20  are what's at issue in this case.

21  Dr. Diorio, we call him doctor -- you're going to hear

22  about a lot of doctors because if you have a Ph.D. -- he's got

23  one from Cal Tech -- they call them doctors.  They're not

24  medical doctors, but a Ph.D. is technically a doctor.  So he

25  played a key role in developing the Gen2 protocol.  He's the

```
1    one that founded what's called the RAIN Alliance, and he'll be

2    the first witness you see tomorrow.

3                    (Demonstrative published.)

4         MR. AL-SALAM:  As I mentioned, they have 300 patents

5    directed to this RAIN RFID technology.  This case only

6    involves two, but they have 300.  They have been the leader.

7         This was taken a few years ago.

8                    (Demonstrative published.)

9         MR. AL-SALAM:  They have more employees now.  About

10   400, I mentioned.  But at the time, these were essentially all

11   their employees on the roof of their building in Seattle.

12   That's the Space Needle in the background.

13        You're going to meet Dr. Diorio tomorrow.  What can I tell

14   you about him?  He's quite accomplished.  He's named as an

15   inventor on 175 patents.  He -- as I mentioned, he has a Ph.D.

16   from Cal Tech.  He's won lots of industry awards.  Just last

17   year -- this year he won the Geekwire CEO of the Year award in

18   the Northwest.  He's been invited to the White House.  He is

19   an impressive person.

20                    (Demonstrative published.)

21        MR. AL-SALAM:  You're also going to hear from

22   Ron Oliver.  It's called a technical fellow.  That is a title.

23   It's not like he is a fellow and kind of technical.  It's the

24   highest in engineering you can get.  And he's been there as

25   long as Dr. Diorio has.  For 20 years he's been working at
```

1    that company.  And a lot of their employees have been there

2    for that long.  He's a named inventor on 88 patents.

3         And you're also going to meet Jeff Dossett, who's the

4    chief revenue officer.  He's not a patent guy, doesn't have a

5    lot of patents, but he chose -- when he was trying to look for

6    a place to land, a place that was up and coming, a place that

7    was doing interesting things -- he chose Impinj.  And you'll

8    hear from him as well.  So you'll meet all three of them.

9                    (Demonstrative published.)

10            **MR. AL-SALAM:**  Now you're also going to meet some

11   independent experts.  When I say "independent," there's no

12   question that Dr. Diorio and Mr. Oliver are experts.  They

13   probably know more about this technology in this industry than

14   anyone.  But you'll meet some others.

15        You'll meet Dr. Greg Durgin, who's in the audience, and

16   he's going to talk to you about the -- the issues of

17   infringement on the '597 patent and validity on the '302 and

18   '597.  He's a very accomplished person you'll hear more about.

19        You'll see Dr. Thompson at the end.  He is just going to

20   discuss whether or not NXP has rebutted or has -- has found

21   clear and convincing evidence that the '302 patent is invalid.

22   Again, there's no infringement issue on that patent so we

23   don't need to prove infringement on our case in chief, what

24   they call our case in chief.  That will just be for the

25   rebuttal.

 1        And you'll hear from Lauren Kindler.  She is an economist

 2   who will talk about damages and what damages Impinj should

 3   receive for the infringement that's occurred.

 4                    (Demonstrative published.)

 5        **MR. AL-SALAM:**  Now, who's NXP?

 6        We're not trying to say NXP is a terrible company or

 7   anything like that.  They're going to talk to you all about

 8   their history, and they have a great history in

 9   semiconductors.  They have 33,000 employees.  They are in

10   NFC -- called Near Field Communications.  They have been

11   making semiconductors for many, many years, and they -- and

12   they do a great job at what they do.

13        This -- our dispute with them is only in this little field

14   called RAIN RFID where they compete with us on the sale of ICs

15   and where we believe, and at least have shown for one patent,

16   they infringe our patents.

17        And we have something down on the bottom here.  It says:

18   The UCODE 8 must defend our UCODE 7 position and needs to

19   target the Impinj R6.  Let's start talking about the products

20   that you're going to hear about because that's -- that's one

21   of issues.

22                    (Demonstrative published.)

23        **MR. AL-SALAM:**  Our -- we have various ICs.  They're

24   called different things.  We're going to focus a lot in this

25   case on the launch of what's called the Monza R6 IC.  That was

1    the first to have the '302 invention, one of first to have the

2    '597 invention.

3        And the UCODE 8 is one of accused products.

4        NX- -- this, by the way, what I have on the bottom is from

5    a NXP document.  But when UCODE 8 was launched, we believe

6    that it had incorporated lots of features from the Impinj

7    Monza R6, including the patented features you're going to hear

8    about today.

9                    (Demonstrative published.)

10       **MR. AL-SALAM:**  So here's the timeline.  The '597

11   patent issued way back in 2012.  In March 2014, we introduced

12   our Monza R6, a product that, as you will see, was cutting

13   edge, revolutionary in this field.  It was the best IC that

14   had ever been made for a RAIN RFID IC.

15       Within one year, NXP paid tens of thousands of dollars to

16   have it torn apart.  They call them teardowns.  They -- they

17   take them apart, and they try to figure out how they work,

18   what's in there.

19       A couple years later, they introduced the UCODE 8 product.

20   The UCODE 8, as we'll see, had the same type of pads as are

21   claimed -- or same shaped pads as are claimed in the '302

22   patent and the same rectifier that's claimed in the '597

23   patent.

24       On October 6, 2017, Impinj, by a letter written by me,

25   said, you know what, you're infringing our '302 patent.  Will

1   you stop?  They didn't stop.  In fact, in 2021, they came out

2   with new product, the UCODE 9.  It has the same pads.

3       In February 14, 2019, after we had to do a teardown to

4   figure out how their rectifier worked because Impinj isn't in

5   the business of doing teardowns, they did -- we did a teardown

6   just to figure out -- because they said, well, you've got to

7   show us specifically how we're infringing.  We did that, and

8   we said, okay, we did the teardown.  You're infringing.  Will

9   you stop?  They haven't stopped.

10      We spent two years trying to talk to them in -- in

11  correspondence, trying to avoid having to file suit.  Impinj

12  is a small company, 400 people.  They don't really have the

13  time or money or desire to just pay lawyers like me and my

14  colleagues.  They have better things to do.  But they had to

15  file suit because they couldn't get it resolved.

16                  (Demonstrative published.)

17          **MR. AL-SALAM:**  So now, let's talk about the specific

18  patents.  It's time to get to the patents.  As I said, the

19  '302 is relatively straightforward.  What you have is it's --

20  when you have to -- what you got, these ICs, I told you, you

21  have to attach them to an antenna like here.  They're tiny

22  little things.  How do they attach them?  They glue them.  I

23  know it sounds crazy, but that's what they really do.  They

24  glue them to the antenna, and what -- to make that work, that

25  process work better, Impinj invented this idea of having

1   larger pads on the -- on the IC itself.  Because they used to

2   have bumps, and I'm going to show you all that.

3       This patent doesn't relate just to big pads, but it

4   relates to the way you shape the channel between the pads.

5   But let's -- let's -- this was what they called the prior art.

6   Now, the IC is at the top, and the antenna connection's on the

7   bottom.

8                   (Demonstrative published.)

9       **MR. AL-SALAM:**  Obviously, the IC doesn't look like,

10  you know, a square like that.  This is just for illustration.

11  But what the prior art was is they used -- in RAIN RFID ICs,

12  they use these what they call bumps, and they use those bumps

13  to connect the IC to the antenna.  And -- and that's what had

14  been used exclusively in the RAIN RFID field before Impinj

15  launched the Monza R6.  There's a problem though.

16                  (Demonstrative published.)

17      **MR. AL-SALAM:**  This what happens if -- if the glue --

18  if you have those big pads and you put it down on glue, it's

19  sort of the like hydroplaning, right?  It's sort of can -- it

20  can turn and get misaligned as you're trying to stick those IC

21  on the pads.

22      So that was the problem, and so Impinj said, how about if

23  we flair the channels to make the glue push out easier and

24  better?  And it worked.  And you're going to hear from

25  Mr. Oliver, among others, that it worked.  If you do those

1    flared channels, it pushes the glue out better, and you get

2    more reliable connections between the IC and the antenna

3    contacts.

4        And that's what the patent says.

5                        (Demonstrative published.)

6        **MR. AL-SALAM:**   It says, "During attachment of the IC

7    to an inlay or strap" -- and that's what the antenna contacts

8    are on -- "the channel may facilitate the flow of liquid

9    adhesive so as to reduce the turbulence and propagation

10   velocity associated with the liquid adhesive, thereby reducing

11   this alignment caused by the movement of the IC with respect

12   to the inlay or strap."

13       So that's what this patent's about.  And, again, you don't

14   have to determine infringement; that's been determined.  The

15   only issue for you will be whether there was willful

16   infringement, whether they have proven it's invalid, and then

17   damages.

18                        (Demonstrative published.)

19       **MR. AL-SALAM:**   So when we came out with this

20   invention on the Monza R6, we refer to -- we came out at the

21   same time we came out with the big pads.  It was big pads with

22   the -- with the shaped channel, and we called that the Endura

23   feature.  And we -- we -- we promoted it.  We said, listen,

24   this is going to make all our customers' lives better.

25       You know what?  I haven't talked about the customers.  Who

1    do the -- who do these companies sell these ICs to?  They sell

2    them to companies that attach them to antennas.  So neither

3    NXP nor Impinj actually do the gluing to the antenna.  They

4    sell them to something called inlay manufacturers.

5    Avery Dennison, you might have heard of them.  They're the

6    biggest customer for both companies.  They're the ones that

7    actual glue the ICs to the antennas.

8         So we promoted this to the inlay manufacturers.  And we

9    advertised that this was patented.  *It's a patented new*

10   *high -- high performance attach technology to connect a Monza*

11   *IC to an inlay.  It replaces commonly used bumps with large*

12   *metal -- flat metal pads that are lithographically defined and*

13   *form the connection between the IC and the antenna.*

14                    (Demonstrative published.)

15        **MR. AL-SALAM:**  And this is more promotion when

16   this -- the Monza R6 came out.  And the Monza R6 was a very,

17   very popular product.  In fact, it won -- from one -- one

18   award is the "Internet of Things Product of the Year."

19        And it said the Monza R6 tag chip from Impinj was named

20   Internet of Things Product of Year in the Annual ACE Awards,

21   and, in part, for the company's sustained efforts nurture the

22   fledgling market for UHF RFID tags.

23                    (Demonstrative published.)

24        **MR. AL-SALAM:**  So what did NXP do?  NXP said, okay,

25   we're going to coming out with our UCODE 8.  It's going to be

1    the next generation of their product.  And they said, this is

2    a document they have we need to target, the Monza R6.  And as

3    I told you, they did a teardown in March of 2015 where they

4    paid a company to tear apart the Monza R6.  They -- they said

5    they did a full analysis by Science Vision of all the aspects

6    of that -- of that IC.  And then they said, what are customers

7    telling us?  What are our inlay customers telling us?

8                      (Demonstrative published.)

9         **MR. AL-SALAM:**  Well, here's the key requirements from

10   the customers.  And they said -- it says, "Easy to handle.

11   Insensitive to production tolerances."

12       And then this is an NXP document.  It says, "Impinj

13   introduced, with their Endura technology, two big copper pads,

14   a complete" -- means completely -- "new concept into the UHF

15   market, which, based on feedback from the field, is helping

16   with respect to handling, assembly tolerances and reliability.

17   UCODE 8 project should deliver a competitive bump technology."

18       In their own documents, they say this was completely new

19   in the field.  And they're also saying, our customers are

20   telling us we need to do this.

21       So what did they do?  They came out with a very similar

22   shaped big pads.  So the Monza R6 is on the left.  The

23   UCODE 8's on the right.  Now, they do have that channel that

24   goes in between.  That's -- that's not relevant for purposes

25   of infringement of this patent.  That's what they came out

 1    with, and look at the difference between their earlier

 2    product.

 3                    (Demonstrative published.)

 4         **MR. AL-SALAM:**  The UCODE 7 is on the left.  It has

 5    those four little bumps compared to the UCODE 8, which has a

 6    big pads with the flared channels.

 7        And they promoted it.  They said that, "The new chip's pad

 8    structure is designed to better accommodate the application of

 9    glue in order to ensure a better connection between the chip

10    and the antenna, thereby allowing for a higher assembly speed

11    and more reliable, robust label."

12        And they talk in the bottom about the shape of the pads.

13                    (Demonstrative published.)

14         **MR. AL-SALAM:**  So as I said, October 6, 2017, I wrote

15    them, and this is a letter from me.  There's a -- what we call

16    a claim chart, which explains why they're infringing on the

17    right.  And we said, you're infringing, but they later came

18    out with the UCODE 9 in 2021.  It looks almost the exact same.

19        Here's one figure from the patent, Figure 13 on the left,

20    the Monza R6 which looks very much like it, and the UCODE 9,

21    which also looks very much like it.

22                    (Demonstrative published.)

23         **MR. AL-SALAM:**  And there's the timeline we talked

24    about before.

25        We assert that this was willful infringement.  They saw

```
 1        our product.  They knew it worked better.  Their customers

 2        were asking.  We called it patented.  We wrote them a letter,

 3        and they still took that design.  And they're still using it.

 4            Now, they're going to say it's invalid.  They're going to

 5        say, well, that was a mistake.  The patent office shouldn't

 6        have granted that.  That's why we get to use it.  But, you

 7        know, let's put some things into context.

 8                        (Demonstrative published.)

 9            MR. AL-SALAM:  They're not saying it's ever been done

10        before.  They're not saying anybody ever did it before.  What

11        they're saying is, oh, some people did things like it.  It

12        would have been obvious.  If it's so obvious, why didn't they

13        come up with it?  In this RAIN RFID field, they didn't.  And

14        their own document says it was a completely new concept.

15            And then they rely on this patent again by somebody else

16        called Eberhardt.  This is -- they have two combinations for

17        obviousness.

18            There's two reasons why this doesn't work.  One, it

19        doesn't have flared channels.  That's a picture of it.  That's

20        why they can't say it anticipates.  They have to try to

21        combine it with something else because it doesn't even have

22        flared channels.  But more importantly, it teaches away from

23        the very technology that the '302 patent's directed to, which

24        is called flip chip technology.  They take that IC, and they

25        flip it over and they glue it.  That's why they call it flip
```

1    chip.

2        And I'm not going to read all of this, but you'll see that

3    what this patent says is we've got a better solution than flip

4    chip.  We can print it, and it's better off.  And therefore,

5    you shouldn't even worry about flip chip.  And -- ours is

6    cheaper, so that's -- so this -- they cannot prove that this

7    patent is invalid based on this obviousness combination of a

8    patent that doesn't even have flared channels.  And it teaches

9    away from flip chip technology to begin with.

10       So for all those reasons, we ask that you find there was

11   willful infringement and grant damages to Impinj.

12       Now, we're going to get to the rectifier patents.  I said

13   you'd learn about rectifiers -- and I know I'm going a long

14   time here, but this one is more complicated than just shapes.

15   But let's talk about what a rectifier does.

16       I already mentioned it.  It takes -- it takes radio

17   frequency waves that it's receiving through the antenna, and

18   it converts them into direct current to power the circuit.

19   It's sort of amazing.

20       The way -- here's the way you could look at.  It's like a

21   dim light is coming in, just a dim little flashlight.  And by

22   just collecting -- collecting all those waves coming in,

23   storing them on little batteries called capacitors, I can keep

24   upping the amount of light until I can produce a spotlight.

25   That it's -- that's sort of what it's doing.

```
 1                    (Demonstrative published.)

 2        MR. AL-SALAM:   And the -- the -- so it talks about

 3   harvesting sufficient power from the RF wave can be difficult.

 4   This is the problem, since usually the RF signal is about

 5   200 millivolts, and we need to get this up to 1 volt.  So it

 6   means they have to make it five times stronger.

 7        Now, we didn't invent rectifiers.  Rectifiers have been

 8   around.  There's no question about that, but this is what the

 9   invention is.  There -- there was -- rectifiers were known to

10   be either single path or double path, but the earlier single

11   path rectifiers didn't use the RF signals themselves to open

12   the transistors.  And I'm going to explain this more, but this

13   is the way I think about it.

14                    (Demonstrative published.)

15        MR. AL-SALAM:   When you're trying to create this

16   charge that's building and building, and it's building as it's

17   going, you have to use transistors to keep it from falling

18   back.  You open a gate.  It's like a door.  This -- this

19   charge goes through, and you got to shut it right away or else

20   it will leak back out.  So a lot of the invention relates to

21   the timing of these doors that are opening, the transistors.

22   Opening and closing, opening and closing.

23        And what's called synchronous means they're actually using

24   the RF signals that are coming in to help open and close those

25   gates because if you do that, they're in time.  These -- these
```

1   antennas have two -- two poles.  So it's like one's up, and

2   one's down.  And you're -- and you're going like this

3   (indicating), and you're pumping those transistors at the same

4   time you're adding charge.

5       And that's -- that's how they do it.  So let me give

6   you -- show you -- and nobody had put together a single path

7   rectifier with -- using the synchronous RF signals.

8                       (Demonstrative published.)

9           MR. AL-SALAM:  Here's an example of the two types of

10  prior art.  The one on the left is right from the patent.

11  It's called a -- it's single path.  But as you see, what's

12  happening there is that RF is coming in the bottom, and in

13  that -- those two lines are capacitor.  It can charge that --

14  that capacitor with some -- it's like a little battery.  But

15  then on the top, it says, "DC bias."  Those are transistors,

16  the doors, but they're not using the RF signal.  They're using

17  just a direct current, what they call bias, to open and close

18  those gates.

19      It worked.  There were some advantages.  But -- and then

20  on the -- on the right-hand side, notice that RF didn't say

21  plus or minus.  It just says RF because the one signal coming

22  in there was just going up and down, up and down into that

23  capacitor.

24      Now, on the right, we have RF plus on the bottom, RF minus

25  on the left, on the top.  But this is creating what they call

1  dual path, and what you got to think of it is sort of -- the

2  way I think about it is at some point, the RF plus is pulling

3  the -- the charge down.  And then the RF minus is pushing the

4  charge through.  And they have to close the gates behind them

5  and things like that.  But it results in two paths, one on the

6  top, one on the bottom, and so it's called dual path.

7      Now, keep in mind the transistors are the same size for

8  bottom and the top.  The paths are the same, and they're both

9  accumulating charge as they go because this is just one stage,

10  we call it, of -- of this rectifier.  And it's going to be

11  accumulating charge as it goes.

12                  (Demonstrative published.)

13      MR. AL-SALAM:  Here's showing -- the old single path

14  goes -- you're heading down, and you see the little -- all the

15  pluses on the far right?  It says plus, plus, plus 3 and then

16  the -- then the 5.  That's because it's accumulating charge as

17  it goes.

18                  (Demonstrative published.)

19      MR. AL-SALAM:  And here's the double path.  Again,

20  it's -- it's accumulating charge as it goes, but it is using

21  the RF signal synchronously in time, out of phase, but in

22  time, to sort of the pump -- pump that charge down -- going

23  downstream across those two paths.

24                  (Demonstrative published.)

25      MR. AL-SALAM:  Here's the invention.  The solution

 1    that Mr. Oliver and his two other inventors came up with was,

 2    we're going to make it so it's going to be a single path, but

 3    we're going to have it synchronous.  The RF minus, RF plus are

 4    going to be timed.  And it turns out if you do that, you can

 5    open and close those gates or doors much more strongly and

 6    quickly than you could otherwise.  And it makes it a better

 7    rectifier.

 8                    (Demonstrative published.)

 9         **MR. AL-SALAM:**  So here's -- it says, "The synchronous

10    element has RF coupled to Gates G1 and G2."

11         So G1 and G2, if you can see them on the far left, those

12    are what operates the transistors.  It's what opens and closes

13    the doors.  So they're using the RF, and they say, to

14    "Increase the overdrive when the transistor should be on, and

15    decrease it when it should be off.  This improves the power

16    conversion efficiency."

17         That's just a way of saying if we use those RF signals, we

18    can open and close those easier and better than the way it was

19    done before.

20                    (Demonstrative published.)

21         **MR. AL-SALAM:**  The claim is long.  You have the claim

22    in your -- in your binders.  But let me just try to map it to

23    you.

24         It says, "A first antenna input node" and "a second

25    antenna input node."  And that's what's shown.  These are all

1    figures from the patent.  So you have the antennas bringing in

2    RF signals on both.  You have a plurality of coupled stages.

3    Plurality is just a fancy thing patent lawyers say to have --

4    to mean more than one.  So you have more than one stage.

5        And then each stage is what's below.  And it says, in each

6    stage -- because it says at least one of stages -- you have a

7    first synchronous element with a beginning and an ending.

8    That's that.

9                    (Demonstrative published.)

10           MR. AL-SALAM:  Then you have a first transistor.

11   That's those things that open and shut the doors.

12                   (Demonstrative published.)

13           MR. AL-SALAM:  You have a second transistor, and you

14   have an intermediate node, which is what's in between A and 1.

15   But what's happening here is the charge is going down this

16   path (indicating), and as soon as it gets by that first

17   transistor or it's being pulled through, that's going to

18   close.  The other one's going to open, let it through, close.

19   And they're all working in synch to pump this charge as it

20   goes down this path.

21       So first accumulating -- charge-accumulating path, that's

22   important.  And no other charge-accumulating path.  And this

23   is where they're going to say, oh, well, we have another

24   charge-accumulating path.  And we dispute that.

25       You'll see what they are talking about is something called

1    bias circuitry.  And then it says a second synchronous

2    element -- and we don't have to go through this.  It's the

3    same thing.  It just means that in each stage, you have two of

4    these synchronous elements, meaning you have RF minus and RF

5    plus at each one and that you are pumping that charge down one

6    path.

7                    (Demonstrative published.)

8          **MR. AL-SALAM:**  That's the claim.  That's the way it

9    works.  I know it seems complicated now, but you're going to

10   know -- you're going to understand this by the time this

11   trial's done.

12      Now, I told you they did a -- a teardown of our Monza R6,

13   so they had this circuit.  They knew about it as of 2015.  And

14   that -- sure enough, they come out with -- now, they --

15   they'll say, oh, there's one main path.  But then there's a

16   second leakage path.

17      We dispute whether that second leakage path is a

18   charge-accumulating path.  And what you're going to find out

19   is, whether it's what they call leakage or bias, it doesn't

20   have the same size transistors.  It has little transistors

21   because what it is -- when you're talking about bias

22   circuitry, it's like a helper.  It's a little helper.  It

23   like -- it reminds me of the -- the choke on a car.  And

24   nobody has them anymore, so you probably don't even know what

25   I'm talking about.

1      But it's -- it's like you prime it to get it ready to go,

2    and then the RF wave comes in and opens or closes it.  But it

3    gets it warmed up.  It gets it to where you're about to use

4    it.  That's what bias circuitry is.

5                    (Demonstrative published.)

6         MR. AL-SALAM:  And we have mapped this claim to their

7    product in the same way as -- that we mapped it to ours.

8    There's just one charge accumulating path.  There's this stuff

9    on the bottom that's going to be what I call the bias

10   circuitry.

11                   (Demonstrative published.)

12        MR. AL-SALAM:  It's going to be opening -- it's going

13   to be opening or helping open the -- those transistors.  But

14   it's not a second -- it's not accumulating charge.  And, in

15   fact, the patent says you can have predetermined voltages

16   applied to those gates.  That's the same thing as this bias

17   stuff.

18                   (Demonstrative published.)

19        MR. AL-SALAM:  We told them they're infringing on

20   February 14th, 2019.  They haven't stopped, and the UCODE 9 is

21   exactly like the UCODE 8.  This is one of their witnesses.

22                   (Demonstrative published.)

23        MR. AL-SALAM:  Now, they're going to say this Mandal

24   reference is -- this is their -- this is their invalidity

25   argument.  They're going to say, well, this invalidates it, or

1  we're doing the same thing as Mandal.  But Mandal -- it's not

2  the exact same patent, but it's the exact same disclosure

3  that's in relevance was already considered by the patent

4  examiner.  So they're having to rely on prior art that was

5  considered by the patent examiner.  And the Mandal reference

6  really is just the dual path approach.  And -- and we'll be

7  able to show that.

8                    (Demonstrative published.)

9         **MR. AL-SALAM:**  It's -- notice on -- their two

10 paths -- it's just like what I said before, because that was

11 Mandal -- the transistors are the same size, top and bottom.

12 It's not like this is just bias circuitry on the bottom with

13 little transistors.  So that's it on the two patents for

14 damages.

15     I'm not going to spend a lot of time on this.  But it's

16 lost profits or reasonable royalty.  That's what you end up

17 having to award.  If we can prove lost profits because we

18 would have made these sales, at least of some of our sales,

19 but for their infringement, we're entitled to lost profits.

20     Otherwise, the minimum that we get is a reasonable

21 royalty.  We're going to show that they made additional sales

22 and we lost market share because of this infringement.  Now,

23 they're going to say, oh, there's other stuff.  You guys had

24 other problems.  And we might have had other problems.  We did

25 have other problems, but this infringement took market share

1    from us, maybe not 100 percent.  I think we're asking for

2    57 percent.  But it took market share from us.

3        And we're only seeking a -- a percentage of the overall

4    sales.  I said that our market shares are about equal, but

5    most of those sales that they're making are outside the U.S.

6    by foreign affiliates.  So when you see the numbers, you might

7    say, wow, for -- for how much I thought this market was, it's

8    not that much because we're seeking a total of $18.9 million.

9    And that includes a part that they will say are foreign sales.

10       And -- but you can make that decision.

11                    (Demonstrative published.)

12           MR. AL-SALAM:  And -- so that's it.  I hope I taught

13   you something.  Thanks again.  And we'll -- I'll see you

14   tomorrow when we put on Dr. Diorio.

15           THE COURT:  Okay.  Why don't we go ahead and just

16   take a 15-minute break?  Then you'll hear from the other side.

17   So it's 1:50.  We'll have you come back in about 15 minutes

18   just to stretch, go to the bathroom, freshen up.  All right.

19       Edwin.

20           THE CLERK:  All rise for the jury.

21       (The following proceedings were heard out of the presence

22   of the jury:)

23           THE COURT:  Okay.  1:52, we'll stand in recess for

24   15 minutes.

25

```
 1          (Recess taken at 1:52 P.M.; proceedings resumed at

 2     2:07 P.M.)

 3          (The following proceedings were heard in the presence of

 4     the jury:)

 5             THE COURT:  Okay.  You may all be seated.  The record

 6     will reflect the jury is back with us, and we are back in

 7     session.

 8          The defense opening.
```

**<u>OPENING STATEMENT</u>**

```
10             (Demonstrative published.)

11             THE COURT:  You may proceed.

12             MR. HENDERSHOT:  Thank you, Your Honor.

13          Hi.  I introduced myself earlier.  My name is

14     Mike Hendershot.  I'm representing NXP.  I want to take some

15     of my time to make sure I do this.  I want to thank you,

16     again, for your service and attention and time in the matter.

17     I really believe that the system we have in the United States

18     to resolve parties' disputes is the best.  There are a lot of

19     them out there, but it's the best because people like you take

20     time, pay attention, and look at the evidence, get the full

21     picture, hear from both parties before they're allowed to make

22     a decision.

23          And you make that decision based on the evidence, guided

24     by instructions from the Judge as to how to apply the law.

25     You don't get to decide it after the gentleman from Impinj
```

 1   finishes speaking.  You don't get to decide it after I'm

 2   finished speaking.  What we say is not evidence.  You need to

 3   look at the evidence, and I tell you that's a great system.

 4   So I thank you for that, and it is a privilege to stand, every

 5   time I get to do it, up in front of jurors and talk to you.

 6   So thank you.

 7       It's also a privilege to stand here for NXP.  NXP is one

 8   of world's greatest innovators.  They're a worldwide company

 9   based mainly in the Netherlands and in the United States.  And

10   the Netherlands is a country in Europe known for windmills and

11   tulips, which is why you have them in the picture here and

12   you'll see some references to that throughout the case.

13                   (Demonstrative published.)

14          MR. HENDERSHOT:  NXP is represented here by

15   Ralf Kodritsch.  He's the global leader of the RAIN RFID

16   business.  He lives and works in Austria, but he'll be here

17   for us -- with us for trial, along with some others.

18       So who is NXP?

19                   (Demonstrative published.)

20          MR. HENDERSHOT:  It's a worldwide leader in

21   semiconductor chips.  It got its roots in two of the great

22   innovative companies in the world, Motorola in the United

23   States and Philips in Europe.  Those both -- both those

24   companies have been around the world innovating in many ways

25   that have touched our lives.

1              (Demonstrative published.)

2         **MR. HENDERSHOT:**  Now, I talked about tulips and

3    windmills, but NXP is still very much a U.S. company as well.

4    Are they successful?  Absolutely.  And they're proud of it.

5    They employ workers across the United States, including 500

6    here in the Bay Area, roughly, just off 237 down in San Jose.

7              (Demonstrative published.)

8         **MR. HENDERSHOT:**  Now, you'll hear in this case some

9    evidence and testimony about NXP and its predecessors and its

10   history.  I'm going to give you a little preview here of some

11   highlights.

12        Motorola Semiconductor was founded in 1949 in Arizona.

13   Philips Semiconductor was founded in 1955.  That is very early

14   in the semiconductor industry.  NXP has decades of expertise

15   and experience in designing and optimizing these little ICs.

16   The gentleman for Impinj said that's one of top 10

17   accomplishments in the world, putting these little transistors

18   on these chips.  That's been driven by NXP historically and

19   companies like them.

20        In 1969, the first words relayed to the Earth from the

21   moon were relayed using Motorola radio technology.  In 1993,

22   getting into RFID, you'll hear from a gentleman named

23   Franz Amtmann.  He developed a technology called MIFARE.  It's

24   used in I.D. badges but also to pay fares on public transit.

25   If you use a Clipper Card in the Bay Area to get around,

1    that's technology Franz Amtmann invented in 1993.

2        He also developed something called near-field

3    communications or NFC.  If you've used your phone to pay for

4    something in a contactless way, checking out, that's using

5    technology that Mr. Amtmann developed.

6        You see him in the little picture to the right there in

7    2015, winning the European Inventor of the Year Award for his

8    contributions to that mobile pay, contactless payment.  He's

9    an impressive guy, and you're going to get to meet him.  I've

10   met him.  I think you'll enjoy his testimony.

11       And he's going to be testifying here, not because of what

12   NXP's done in the past, which is great.  He's the system

13   architect for these UCODE products that you'll hear about here

14   that they've accused of infringement.  He's responsible for

15   their design and implementation.  And he's going to come here

16   and explain that and answer some of these accusations you've

17   heard.

18                        (Demonstrative published.)

19       **MR. HENDERSHOT:**  And NXP does have a great history,

20   but they didn't stop innovating in the 50's.  They didn't in

21   the '60's; and they didn't in the 2010's.

22       In 2018, NXP was recognized as one of top global

23   innovators in the world, and they got that award again just

24   this year.  They're still an innovative company, building on

25   this proud history.  Now, NXP is a company, as you might

1     guess, that is built in many respects on IP.  It has tons of

2     patents and halls of patents in some of its buildings.  It's

3     really impressive to see.

4         But because of that, they respect intellectual property.

5     They don't willfully go out and try to infringe people's

6     patents, and you're going to hear evidence about that.

7                    (Demonstrative published.)

8              **MR. HENDERSHOT:**  So who are you going to hear from

9     here?

10        NXP is not just products and places.  You're going to hear

11    Ralf Kodritsch, who you've met a couple of times.  He stood

12    up.  He's the -- he's a senior director and global leader of

13    RAIN RFID business.  He's been at NXP for 16 years.

14        You're going to hear from Christian Zenz who's a

15    technology manager responsible for these pads, for the shape

16    patent that you've heard about.  He's going to come here from

17    Austria and testify about how NXP designed those.  He has been

18    at NXP for 23 years.

19        Sy Rajen is the next one listed there.  He's going to come

20    up from Austin, Texas.  He's a senior VP in finance who's

21    going to come here and talk to you about some of the work at

22    NXP and their sales and how they're structured.  He's first

23    joined NXP 15 years ago.  He's also a director of the NXP

24    charitable foundation, which is a nonprofit that is designed

25    to foster representation and female leadership in STEM --

1   which is science, technology, engineering and mathematics --

2   and promoting educational initiatives in that space.

3      Franz Amtmann, I just told you about, system architect for

4   these, came up with the technology underlying your Clipper

5   card that's used in the Bay Area and 750 other cities, NFC,

6   which is the mobile payment, and is the system architect for

7   these products.  He's been at NXP for 30-plus years.  He's

8   been designing RFID tags for 30 years.  Long before Impinj

9   existed, Franz Amtmann was working on this technology.

10     We also have some experts you'll hear from.  Dr. Dan

11  van der Weide is in the gallery today.  He just waved to you.

12  He's a professor at the University of Wisconsin.  He's one of

13  those Ph.D.s that you heard referenced.  He's an expert in

14  electrical engineering and RFID technologies, and he's going

15  to talk to you about these rectifier issues.

16     There's also Dr. Vivek Subramanian, who's also in the

17  gallery.  He's trimmed his beard since the photo.  He teaches

18  just up the road at Berkeley.  He's another one of those

19  Ph.D.s you've heard about.  He focuses on RFID, electrical

20  engineering, and also fluid dynamics.  You heard them talk

21  about how fluid would flow with these pads and they would

22  hydroplane, he researches that.  He's going to talk to you

23  about these pad patents -- the pad patent.

24     And, lastly, David Haas.  He's a highly trained economist.

25  He will be here to talk to you about some of the financials

1    and damages issues you'll see in the case.  And David is right

2    in the audience as well.

3         So RFID, you get power from radio waves over the air

4    without a battery.  Honestly, when I first learned about it in

5    this case, I said to my wife, it's kind of like magic, it's

6    really neat.  They get power without a battery from something

7    over the air.  I don't want to disappoint you.  I think they

8    noted this in their opening, this case is not about that

9    magic.  That magic was invented long before these patents,

10   solved by people in passive RFID tags, like Franz Amtmann, who

11   you'll hear from.

12        We talked about MIFARE, in 1993, that was a passive RFID

13   chip that had to gather power from the air using a rectifier.

14   We talked about NFC, another NXP product; HSL; HITAG, you'll

15   hear about, from 2010.  HITAG is a passive RFID product that

16   NXP marketed, published about, and sold starting in 2010 and

17   to this day.  And it is used in some badges, but it's also

18   used to track animals.  It's pretty cool technology.  That,

19   again, passive RFID that gets power from the air.

20        I want to jump ahead to 2013 and UCODE 7.  Counsel for the

21   other side talked about UCODE 8 and UCODE 9.  I want to talk

22   about UCODE 7.  It was a groundbreaking chip, the first truly

23   global UHF RAIN RFID tag that could be used across any

24   spectrum, any radio spectrum anywhere around the world.  It

25   was the first one in the industry that did that.  Impinj

1    hadn't done it.  NXP had the first truly global chip.  Best

2    performing chip in the world when it was released.

3        UCODE 8 continued the NXP design.  When it was released --

4    best performing chip in the world when it was released.

5    Better than what Impinj had on the market.

6        And UCODE 9 was released in 2019.  It's a streamlined

7    version, kind of a condensed version of UCODE 8.  No better

8    performing chip in the world when that was released.

9        And now I've talked about the performance of these chips.

10   That's not me bragging.  That's not NXP bragging.  You're

11   going to see evidence in terms of Impinj documents.  And this

12   is an internal strategy document from the company.

13                    (Demonstrative published.)

14            **MR. HENDERSHOT:**  And I want you to look at the

15   evidence, look at the documents, and understand it because if

16   you do, I think you're going to get to the right result here.

17       Now, this document tells a story.  This is the

18   sensitivity, which is a way to measure the performance of

19   these chips of company's products over time.

20       NXP's products are in blue.  Impinj's products are in

21   orange.  So I'm going to move over here -- Madam Court

22   Reporter.  Let me know if you can hear me.

23       Monza 5 is an Impinj product that they say was a product

24   that used their rectifier invention.  It embodied their

25   rectifier invention.  It performed at that level.  And lower

1    on this chart is better in terms of performance.

2                    (Demonstrative published.)

3        NXP released UCODE 7.  Outperformed it.  Best performing

4    chip in the world at the time.  They don't even contend that

5    UCODE 7 uses their rectifier invention or their pad

6    inventions.  That is the best performing chip in the world

7    that doesn't use their rectifier, that's beating a product

8    they had that uses their rectifier invention.

9        So when they tell you all of the value in these products

10   is about this rectifier, this tells a different story.

11                   (Demonstrative published.)

12        **MR. HENDERSHOT:**  Impinj released Monza R6.  Good

13   chip, good product.  Better performance than the UCODE 7.  It

14   used, according to them, the same rectifier invention as the

15   Monza 5.  It's performing a lot better even though it's

16   supposed to be using the same invention.  So when they talk

17   about how important this rectifier invention is to the

18   performance of these tags, remember, it's got to be something

19   else driving that performance there between Monza 6 and Monza

20   5 other than the invention 'cause they're using the same one.

21        Now NXP releases UCODE 8.  Best performing chip in the

22   world in history at the time it was released.  Better than the

23   Monza R6.  Now, they say NXP copied the Monza R6.  It's really

24   easy for a lawyer to stand up here and throw out an accusation

25   about copying.  I think he didn't get five sentences into his

1   opening before he said, NXP copies.  There's an issue with

2   that.  An accusation isn't proof.  An accusation isn't

3   evidence.  What the lawyers say isn't evidence, much as I

4   would like it to be sometimes.

5        This tells the story of the performance of these chips.

6   And I want to ask you -- I want to ask you, when they say NXP

7   copied their technology, think about three questions.

8        Did NXP lack expertise and need to copy from somebody else

9   to build a product?

10       Did NXP have their own designs at the time that they could

11  work off, or did they need to start from scratch copying

12  something else?

13       And third, did NXP make a better performing product than

14  what it supposedly copied?

15       'Cause here's the thing about copying.  If you copy off

16  somebody on a test, you copy their answers, you're never,

17  never -- I can guarantee you one thing, you're never going to

18  score better than that person on that test.  You'll have the

19  same answers and the same performance.

20       They said UCODE 8 copied their Monza 6?

21       Well, we got a better score on the most important test for

22  these chips, the sensitivity.  If we copied them, we didn't

23  match their results, we didn't get a carbon copy.  We built a

24  better chip.  And I think when you see the evidence you'll see

25  that's because NXP has different ideas and different designs

1    and didn't copy their answers to the test.

2                    (Demonstrative published.)

3           **MR. HENDERSHOT:**  So this is the '597 patent claim

4    one.  I'm not going to walk you through all the words, but

5    these are the elements that they need to prove, each one of

6    them, to prove infringement by NXP.  Those will get presented

7    and explained to you in this case, but they need to run the

8    table.  They can't miss out on any one of them.  Every one has

9    to be met to prove infringement.

10          And there are two that I do want to talk to you about

11   'cause I think they're important.  First is a

12   charge-accumulating path and the second is a capacitor.  As

13   they said in their opening, and you'll see from the witnesses

14   and the evidence, their invention in this was to have a single

15   charge-accumulating path.  The patent says, "no other

16   charge-accumulating path" in this claim.  None.

17          So if you see -- that's called a neglective limitation to

18   patent lawyers.  They need to prove the negative for that.

19   They need to prove that there's not another path in the

20   relevant space in these chips that accumulates charge.  That's

21   what they need to do.  That's their burden, and I don't think

22   they can meet it when you guys review the evidence.  So that's

23   charge-accumulating path.

24          Let's talk about capacitors.  I hope you'll learn a little

25   bit about capacitors in this case, too, in addition the

1  rectifiers 'cause they're important to it.  So we talked about

2  a charge-accumulating path.  How does charge accumulate on

3  these paths?

4       They're called capacitors.  They're little circuit

5  components that you can think of as little tiny, chargeable

6  batteries.  So current flows on -- charge flows through a

7  circuit.  It will build up on these capacitors and get stored,

8  and then it can being passed on or used in the circuit later

9  only.  We've depicted them here with a couple things like --

10 they look like plankton to me from Sponge Bob, 'cause my

11 daughter was a big Sponge Bob fan, but it's a representation.

12      I want to show you the symbol on the right.  I want you to

13 look at these schematics.  I want you to look at these

14 drawings.  Look for that symbol with the "T" and the

15 upside-down "I" above it.  When engineers design these

16 circuits, that's how they draw a capacitor.  You'll be able to

17 spot it.  And if you see a capacitor on one of these paths,

18 you'll know it's accumulating charge.  It's their purpose in

19 life, these little guys.

20      So what you need to do is look for a path and then look

21 for those capacitors.  And I want you to because I think when

22 you see it, you'll see pretty clearly that we have multiple

23 charge accumulating paths.

24      So let's talk about the '597 invention briefly.  You saw

25 the figure on the right earlier, which is a single

1    charge-accumulating path.

2                    (Demonstrative published.)

3            **MR. HENDERSHOT:**  It's got that in blue.  It has

4    capacitors connected that will accumulate charge.  I want to

5    talk about how they got to that.

6        The left-hand side is something -- they put in what's

7    called an invention disclosure statement.  Their inventors

8    wrote to the company and said, hey, here's the invention I

9    came up with for the '597, and they put in a bunch of

10   different options and then it ultimately got filed with the

11   patent office.

12       The one on the left was something they said, look, this is

13   a two-path design, we don't want to do that.  That's not us.

14   That's known in the art.  We talked about the Mandal reference

15   earlier.  You heard about that.  I'll talk about it little

16   more.  They're saying we don't want the two-path design.

17       And why is that two paths?

18       There's a top path and a bottom path and you see

19   highlighted in yellow those capacitors.  Those are what I want

20   you to look for in these documents.  Those capacitors are what

21   accumulate charge.  So you have a top path and a bottom path

22   accumulating charge.  Impinj said that's the prior art, that's

23   not us.

24       So how did they get to a single path?

25                    (Demonstrative published.)

1          **MR. HENDERSHOT:**  The right-hand side is the same

2     invention disclosure document they said.  They took the same

3     known two-path rectifier with the yellow capacitors we saw

4     earlier and just put a box over the bottom path.  They

5     literally just took what was known and deleted the second

6     path.  That's how they got to in their invention disclosure

7     the single-path rectifier.

8          Now they made some tweaks along the way to some sequencing

9     in some things, but that's how they got from two paths to one

10    path.  They took what was known and just said let's just wipe

11    out all the transistors and the capacitors on the bottom.

12    That makes sense when you see the claims and they say there

13    can be no other, no other charge-accumulating path.  They

14    blocked them all out.  So that led to this bit in the patent

15    here.

16                    (Demonstrative published.)

17          **MR. HENDERSHOT:**  And the way I think about it, to use

18    an analogy, is I talked about having a cassette player, old

19    audio cassette player in my car earlier, during voir dire.  I

20    also had an AM/FM radio. AM/FM are two different bands on the

21    radio.  If I take that radio out of my car and I say, you know

22    what, this has AM and FM.  It's got these two bands.  I'm just

23    going to rip out the AM band.

24          If I do that to a known radio, have I invented a

25    single-band FM radio?

1        I have my thoughts on that.  You'll have to decide it.

2    But what I can't do under the law, and the Court will instruct

3    you on this, is I can't take out one of bands, go to the

4    patent office and say, hey, I came up with this one-band radio

5    that's just a one-band FM radio, get a patent on it, and then

6    come back years later and go after someone who's got an AM/FM

7    radio and say my patent covers both.  I know I took one out.

8    I know I said it's just one, but really it covers two.  And

9    when you see the documents and you see the evidence -- some of

10   which I'll walk through -- I think you're going to see that's

11   exactly what they're doing with these paths.

12                    (Demonstrative published.)

13        **MR. HENDERSHOT:**  So we've talked lots about circuitry

14   and everything you're going to learn:  Capacitors, rectifiers,

15   and the other patent's about shapes, a little less electrical.

16   At the end of day, you're going to be asked a pretty

17   straightforward question that you need to resolve.

18        Is there another path in NXP's products, one of these

19   lines, and does it have a capacitor on it?

20        If it does, that's a charge-accumulating path 'cause

21   that's why those capacitors exist, and we can't infringe.  The

22   patent doesn't say, no other big paths or no other little

23   paths. There's nothing in the claim you'll see about size like

24   he's talking about.

25        Is there a second path and does it have a capacitor on it?

1    That's why I took the time to talk about capacitors and

2    show you the image 'cause I want you to look for those.

3    'Cause if you've looked at that evidence carefully, you're

4    going to see multiple paths in our product and that means NXP

5    can't infringe.  And this is from the Mandal reference here

6    that was discussed, top path, blue; bottom path, red.  Both

7    have capacitors.  No dispute.  That is a stage of a two-path

8    rectifier.  That does not fall within their patent.

9        Now, that's important because you saw some pieces of

10   diagrams earlier.  I'm going to show you why this ties in.

11                    (Demonstrative published.)

12       **MR. HENDERSHOT:**  That's the Mandal piece of prior art

13   in the upper left.  We just talked about top path, bottom path

14   and, again, look for those capacitors in yellow, look at the

15   evidence.  Two-path rectifier.

16       The UCODE 7 product I talked about earlier, that first

17   universal chip, upper right.  That's one stage of that

18   rectifier.  It intentionally has a top path and a bottom path

19   in blue and red.  Both of them have capacitors in yellow that

20   accumulate charge.  They don't contend that infringes.  They

21   don't say that product infringes.

22       What did NXP do in UCODE 8?

23       They stayed with their two-path designs.  Now, these

24   drawings are straight out of the circuit schematics for these

25   chips, for these products.  You'll be able to see these.

 1          UCODE 8, top path, blue; bottom path, red.  Both have

 2     capacitors, one on top, one on the bottom.  They both

 3     accumulate charge.  Same design in the UCODE 9, the later

 4     chip.

 5          Now, is the bottom path in UCODE 8 smaller?

 6          Sure.  A lot of things got smaller in these chips as they

 7     needed to shrink components and the chips needed to get

 8     smaller.

 9          I will tell you designers on both sides of this case will

10     tell you there is cost pressure.  These are tiny chips.

11     There's real estate pressure on those tiny chips.  If you can

12     get rid of something or make it smaller, you do it.  You do it

13     in your design.  The one thing NXP has never gotten rid of is

14     that second path, and it won't.  It has a two-path rectifier

15     design.  It's stuck with it and that doesn't infringe.

16                        (Demonstrative published.)

17          **MR. HENDERSHOT:**  So here, I want you to look at the

18     evidence in this case.  I absolutely want you to.  This is a

19     schematic of an NXP rectifier.  Each of those boxes are what

20     are called stages.  There are multiple stages.  They have a

21     defined input on the left and output on the right.  Charge

22     comes in, it gets pumped up on those two paths, and comes out

23     on the right at a higher level.  Same to the next, same to the

24     next, same to the next, until the last one outputs power to

25     power the chip.  That is NXP's UCODE 8 rectifier on that

1    drawing there.

2        Now, if you look inside one of those stages, this

3    schematic is what I just showed you earlier.  You'll see in

4    the documents reference to those stage boxes.  They'll say go

5    see this diagram to see what's in inside here.  This is what's

6    inside there.

7        Top path in blue, bottom path in red, yellow capacitor,

8    top and bottom.  That's two charge accumulating paths and

9    you're going to find that in each stage.  They're there

10   intentionally.  That's how these products are designed to

11   operate.  They're two-path rectifiers.

12                    (Demonstrative published.)

13       **MR. HENDERSHOT:**  Now, this is three of those stages.

14   And what you -- and they're more than that, but this is what's

15   inside three of those stages showing you how they operate

16   together.  You have a top accumulating path in blue in each

17   with a yellow capacitor and a bottom accumulating path in red

18   with a capacitor in yellow.  One to the next to the next

19   passing it on.  Each of those is a stage, and you can see

20   those in NXP's drawings and documents.

21       So there are two paths here in each one of these stages.

22   You can see it -- you'll see it in the documents.  Go check my

23   work.  Each one has capacitors in yellow, and I don't think

24   anybody's going to tell you a capacitor doesn't accumulate

25   charge in this case.

1    So what does NXP do, or what does Impinj do?

2    They can't make those paths go away.  That's the circuit.

3  They can't make those capacitors go away.  Those are where the

4  charge accumulates.  Those are there.

5    So what do they do?

6    They do two big things.  First thing they do, they say,

7  well, if you take the schematic and kind of hold it at an

8  angle and squint and pick a starting point in one stage and

9  some random other endpoint, like two or three stages down, and

10  if you say that's a stage, if you just squint and look at

11  that, that's a charge-accumulating path and there's no other

12  path between those two points we've chosen.  Well, that

13  doesn't work because those aren't the stages.  You just saw

14  the stages.  It's plain as day.  That's the stage.  That's

15  what inside it.  So pay close attention with they're saying

16  this is a stage.

17    I look for teaching opportunities with my daughter.  She's

18  very smart and maturing and I'm running out of them, but I saw

19  a teaching opportunity today.

20    Derrick, can you pull up their opening Slide 64.

21            (Demonstrative published.)

22      **MR. HENDERSHOT:**  Thank you, Mr. Lewis.

23    So when I say that they're going to pick a random point

24  and another point and start drawing boxes around stages that

25  aren't stages, they're doing it already.  This is a slide they

1   presented in their opening.  If you look at this top figure --

2   if you could zoom in on that, Mr. Lewis.

3              (Demonstrative published.)

4        **MR. HENDERSHOT:**  You see the boxes here that are the

5   stages.  Those are the stages we just saw in NXP's schematics.

6   Those have been and always will be the stages in our products.

7        For them to prove infringement, they've got to draw this

8   yellow box here (indicating).  We're going to cut one stage in

9   half, we're going to grab the next one and cut the next one in

10  half and call that a stage, and then they're going to pick

11  points and stay, well, that's really infringement.

12       Well, they don't get to do that.  The claim requires a

13  stage.  You need to look at a stage, and see what's inside it

14  and what's required in that claim, and see if it's in the

15  stages in NXP's products.  You won't see it there 'cause I

16  just showed you the stages.  They've got those two paths.  To

17  avoid those two paths, they cherrypick these endings and they

18  carve these stages up, and they're just not permitted to do

19  that with the claim.

20       Now, Mr. Lewis, if you could zoom in on the bottom image.

21              (Demonstrative published.)

22       **MR. HENDERSHOT:**  So I said I want you to look at the

23  evidence.  I do.  The evidence is what you'll base your

24  decisions on.  Documents are evidence.  Schematics are

25  evidence.  This is a schematic that they showed you.  Be

1    careful what you're seeing when people annotate things in

2    that.  Look at the evidence, pay close attention to it.

3        This is actually part of the images I was showing you

4    earlier that had the two paths.  They were really clear:

5    Blue, red, capacitor on the top, capacitor on the bottom.

6    This is their rendition of it.  And they have cropped it a

7    little bit, and I said they kind of squint and look at parts

8    of it.  Let me show you.  (Indicating).  You remember that red

9    path?  That red path I showed you (indicating) is actually

10   right there.

11       So they say this is a single-path rectifier, but they

12   don't draw the other path.  And I know the claim doesn't just

13   say path, it says "charge-accumulating path."

14       And what did I talk about for charge accumulation?  I said

15   look for the capacitors, right?

16       They happened to have cropped this image to cut off the

17   bottom.  Do you know what's connected to that red path?  You

18   may be able to guess.  (Indicating.)  Capacitors.

19       That's a charge-accumulating path.  It's there.  They

20   can't make that or the capacitors go away by trying to point

21   at something else in the schematic.  So look at the evidence,

22   look at it carefully.

23       So that's the -- and they've also got a problem because of

24   this, when they cherrypick the start and endpoint, which

25   disregards stages altogether, and I don't think you even need

1    to get this point, they do that.  They say, well, if you pick

2    this, you pick this one over here, there's no other paths

3    between those.

4        Well, they've got a problem there, too, 'cause there

5    actually is.  Their patent is such a bad fit for our design,

6    they're just so fundamentally different that they've got to

7    carve out the stages, pick random spots, and they still can't

8    avoid a second path.

9        Now, they say that path is a leakage path.  So -- let me

10   clear this.

11       Can you go back to our slide presentation, Mr. Lewis?

12                  (Demonstrative published.)

13       **MR. HENDERSHOT:**  So when they pick their random

14   starting points, they say that there is no other

15   charge-accumulating path between this point and this point,

16   never mind that it's not a stage, it's actually like three

17   stages.  There's still a path where current flows even with

18   that.

19       So what's their response to that?

20       They start throwing out labels.  They say, well, this is a

21   bias path.  This is bias circuitry.  Well, this is a leakage

22   path, and it's much less.  Or this is parasitic.  And they use

23   those to say, well, this bottom path is too small, it's too

24   small to be considered, even though it's a path upon which

25   charge accumulates, and that's all that's required in the

1   claim to be there to get outside of it, they just say it's too

2   small.

3       Now you'll learn in this case and hear from people when

4   they say "parasitic," that means charge is accumulating still.

5   When they say "bias," you need charge to accumulate to bias

6   something.  And when they say "leakage," that means charge is

7   leaking and accumulating and flowing.  That doesn't get them

8   out of these claims.

9       The patent doesn't say -- and I encourage you, look at the

10  evidence, read the claims, and listen to the Court's

11  instructions and decide based on that.  You will not see

12  anything in the claim that says "no other big paths" or "no

13  other paths other than a bias path."  You won't see that.  It

14  says "no other path."  And we clearly have other paths in our

15  products as they're designed to operate with their stages

16  here, and even under their cherrypicked beginning and ending.

17  So importantly, look at the claim language, look at the

18  evidence, follow what Your Honor tells you.

19      And I think when you get there, you'll find that these

20  really are just fundamentally different designs.  They're

21  trying to fit a square peg in a round hole here.  We have a

22  two-path designs.  Look at the evidence, look for the

23  capacitors, and I think you'll conclude NXP cannot infringe.

24      So invalidity, it's another issue you will be asked to

25  deal with.  We need to show that by clear and convincing

1    evidence.  Counsel made a big deal about that standard, and

2    you should take the instructions and standards and evidence

3    very seriously and follow them.  But, I'll tell you what, I'm

4    not afraid of that standard here.  I'm not.  When you see the

5    evidence, I don't think it could be more clear.  And when you

6    look at it, I think you're going to find it convincing under

7    any standard.

8          So why do we look at invalidity?

9          You saw the video that the Court played for you.  We need

10   to assess, your job.  We need to present you evidence.  You

11   need to decide whether what's in that patent is new and not

12   obvious to someone of ordinary skill in the art in this field.

13         That's your obligation.  The law recognizes that.  The

14   patent office is a government agency.  They have a lot of good

15   people there.  I have some friends that worked at the patent

16   office.  They review a lot of applications.  Sometimes they

17   make mistakes.  That's why we need to do this job.

18         You need to assess whether these inventions are new and

19   whether they are something that are -- is non-obvious to a

20   person of ordinary skill in the art.  The law requires us to

21   address that here.  That's what that video explained.

22         Now, why do we do that?  There may be facts or evidence

23   that the examiner didn't get to appreciate.  It what's called

24   an ex-parte process.  If you're trying to get a patent, it's

25   just you and the patent office, and you're making your case to

1   give you the patent.  There's not another check, like another

2   party saying, hey, but you may want to look at this or this.

3   That's not the process there.  That's the process here.

4   That's why we need to do it.  As the video said, mistakes can

5   be made.  Important information could be overlooked.  The

6   examiners have a lot of work to do.  I think the video said

7   there were 600,000 patent applications in a year that they had

8   to deal with like the two that led to the patents you're

9   looking at here.  600,000 in a year.  And that number has not

10  gone down since the 2012 time when I think they're talking

11  about in that video.  No process is perfect.  It's our

12  obligation to take this up and assess it.

13       So, Mandal we talked about.  They pointed at a patent that

14  was considered by the patent office by Mandal.  He's a smart

15  guy, MIT guy.  Before their patent, he had two patents on this

16  and wrote a thesis about it as well.  You're going to see that

17  evidence.  Those are Exhibits 46 and 47 here, and you'll see

18  those exhibits in this case.

19       And again, it's really central here because if you look at

20  Mandal and its two-path stage there with the capacitors on the

21  top and the bottom and the blue path and the red path, that is

22  the design that NXP implements.  It is not different.

23       So, they've got a dilemma.  They've got two real

24  challenges and one real problem.

25       The first -- first challenge they've got is their

1    rectifier really may not be that new.  You saw the invention

2    disclosure.  They said two-path rectifiers were available.

3    They blocked out the bottom half and made some other tweaks.

4    They've got that challenge.

5         And the second challenge is they need their single-path

6    rectifier invention to cover a two-path rectifier here, so

7    they've got to strain and stretch and do it, and I don't think

8    they can have it both ways.  And I think you'll conclude that

9    when you see the evidence.

10        Now, the patent video talked about a patent being like a

11   deed to a piece of property and setting out fence lines.

12                    (Demonstrative published.)

13        **MR. HENDERSHOT:**  This sort of the highlights their

14   dilemma.  If their -- if their deed says they get a

15   single-path rectifier, they do.  But they can't get NXP with

16   that because NXP has two paths.  I just showed you the

17   pictures.  Mandal also has two paths, so they can avoid the

18   disclosure of Mandal.  There's another one we'll get to in

19   this case where even Mandal said, hey, you can actually split

20   my two-path rectifier into two separate paths, a lot like when

21   they drew a block over the bottom thing.

22        We'll get to that, but just focusing on the two paths

23   here, they can keep their deed as a single-path rectifier and

24   stay away from Mandal.  But they can't get NXP.

25        If they want to expand their deed to capture NXP and its

1    two-path rectifier and say we've covered multiple paths, they

2    get Mandal, and the patent's invalid.

3        You're going to hear evidence about this from people far

4    smarter than me, from experts that will testify and explain

5    this to you.  But that is the analogy used in the video, and

6    that is their fundamental dilemma with this '597 patent.

7        And it gets crystallized here, and you'll hear about this.

8    This is with their cherrypicked start and end points across

9    multiple stages, you'll see.  Their expert Dr. Durgin said

10   this blue path in Mandal is the charge-accumulating path.  But

11   because Mandal's prior art, they wanted to have a second path

12   so they could get away from it.

13       So he says, but look at this green path.  He talked about

14   leakage.  That's a leakage current.  That leakage current is a

15   second charge-accumulating path.  That's how he distinguishes

16   Mandal to say this -- this invention is patentable over those.

17       When he looks at NXP's product, when he picks again, you

18   see he's picking across three stages here.  I don't think he

19   should even get to that point.  But if you entertained their

20   choice of these starting and endpoints, he says, look at this

21   blue path.  That's the charge-accumulating path.  But because

22   he wants it to be infringement now, he can't have a second

23   charge-accumulating path.  So what does he say?  This green

24   path is a leakage path, and I would not consider a leakage

25   path a charge-accumulating path.

1       Now, prior art, leakage current, second

2  charge-accumulating path.  Got to prove infringement.  Leakage

3  paths are not charge-accumulating paths.  If that sounds

4  inconsistent to you, I think the evidence will show you that

5  it is.  It's one or the other.

6      If it's a charge-accumulating path, as he says, on the one

7  hand, NXP doesn't infringe even under their strained

8  multistage definition.  If it's not a charge-accumulating

9  path, then it's not a charge-accumulating path in Mandal, and

10  it's invalid.  Again, this -- you'll hear about this in

11  detail, but this crystallize it is limit that they've got.

12  And I don't think they can have it both ways.

13      So let's get to the '302 patent.  I agree with counsel

14  this one's about shapes.

15              (Demonstrative published.)

16      **MR. HENDERSHOT:**  This is the first claim of the '302

17  patent.  There are a lot of words there, but it really is

18  about shapes.  And because it's about shapes, pictures are

19  pretty useful.  These circuits are small, and you need to

20  attach an antenna to them -- antennas or antennae.

21      So you can do that a bunch of different ways.  You can use

22  bumps.  You can use pads.  Those would then know.  The

23  evidence is going to show you they didn't invent the idea of

24  gluing antennas to these.  They didn't invent the idea of

25  using pads.  They didn't invent the idea of using large pads.

1   They are down to the shapes, these shapes here.

2       You have basically two pads with a space or a channel

3   between them that's wider at the ends than it is in the

4   middle, kind of like a hour glass, roughly.  And they said,

5   that channel is going to help fluid flow.

6       And we'll get to the prior art on that.  But, yeah, the

7   court did conclude that NXP infringes this patent.  It did.

8   It said our shapes are within those shapes.  But that does not

9   impact the separate questions you are required to address and

10  it's your job to address here.  Are these shapes worthy of a

11  patent?  The patent video told us we need to look at that and

12  check.

13      If these shapes are worthy of a patent, did NXP really

14  intentionally copy these shapes or maybe use a design it

15  already had.  And if it copied these shapes, did it think, you

16  know what, maybe these shapes are -- aren't valid.  Or did

17  they deliberately, as an innovative company, make a decision

18  to say that is a valid patent?  We infringe it.  Let's go do

19  it anyway.  Or did they have reason to believe maybe they had

20  a defense?  That's what you're going to be asked to resolve.

21      And lastly, you'll be asked to determine the amount of

22  damages if you find the patent valid.  And we'll get to that

23  in a moment.

24      So they talked about this Eberhardt patent.  This

25  Eberhardt patent, they will tell you when they put up their

 1   charts and start checking boxes, has everything in their

 2   claims except the shape.  They don't dispute it.  It's nearly

 3   20 years before their patent.  It had the large pads for an

 4   RFID tag to which you're attaching antenna.

 5       Now, they -- you'll hear from people that it is ^ a

 6   dressed flip chip.  Absolutely is.  You'll get that explained

 7   to you.  But the big takeaway here is Eberhardt has big pads.

 8   Their patent had big rectangular pads, and they said

 9   rectangular pads are bad for fluid flow.  They're bad.  So you

10   want to cut off the corners, like making shapes, and that will

11   improve fluid flow.  So rectangle's bad.  Cut off the corners.

12   Make it like an hour glass.  The flow will improve.

13       The problem with that is Ching-San, a patent you'll see

14   from five years earlier, recognized that very problem and

15   solved it the exact same way.  Ching-San's directed to

16   attaching things with adhesives to a circuit.  It has these

17   little pins or pads that you see there.  And Ching-San said,

18   you know, when you're using adhesives, rectangular shapes are

19   bad.  Right angles are bad.  You should use a different shape

20   like these diamonds here.

21       So they said start with rectangles.  Those are bad.  Use a

22   different shape that has kind of an hourglass shape in

23   between.  You see that shape there.  This Ching-San patent is

24   '521.  Go read it.  You'll get a chance to look at it.  Check

25   my work.  It's got this in there.

 1              (Demonstrative published.)

 2         **MR. HENDERSHOT:**  On the right is a shape from the

 3   patent that embodies their invention.  Go from rectangles to

 4   another shape, same thing as Ching-San, just five years later.

 5         So that's one diagram from their patent.  What about the

 6   one with the octagons or the tampered edges where you cut off

 7   the corners of the rectangle?  Well, Ching-San's got that too.

 8   Start with rectangles, bad flow.  Let's improve it by adopting

 9   another shape, same shape in Ching-San as in the '302 patent.

10         And they put up a picture of the rounded one.  They have a

11   rounded one in their patent.  What about that?  Yeah, that's

12   got that too.

13              (Demonstrative published.)

14         **MR. HENDERSHOT:**  What about the rounded corners?

15   It's got that too.  They say their patent is about shapes, and

16   they use these shapes where you cut off the corners and have

17   the shape channel to improve fluid flow, and that's their

18   invention.  That's fine, but they didn't do it first.

19   Ching-San did it five years earlier.  And you're going to hear

20   that explained by Dr. Subramanian, who is an expert, I think

21   you'll find, in fluid dynamics with these kind of chips.

22         So we think when you review the evidence, you're going to

23   find this patent invalid as obvious.  Yeah, I'm not going to

24   shy away.  We have a clear and convincing burden we need to

25   satisfy.  I think that you'll see that those pictures are

1    clear.  I think when you hear them explained by -- by the

2    experts and you view the evidence in this case, you will be

3    utterly convinced that the stuff was in the prior art at least

4    five years before these guys.

5         So let's talk about the UCODE 8 and the shape here.

6                   (Demonstrative published.)

7         **MR. HENDERSHOT:**  They say, look how similar these

8    shapes are, had to have copied it, had to have copied it from

9    us.  The beauty of our system is, again, an accusation isn't

10   proof.  An accusation isn't evidence, and you will render your

11   decision on the facts as instructed on the law once you see

12   all the evidence.  And remember those three questions I wanted

13   to you think about earlier when they say we copied?  Do we

14   lack the expertise?  Do we have our own design before?  And do

15   we have products that perform better?

16        Well, we've seen how our products perform, so let's take

17   the first two questions.  They perform better than their

18   chips.

19        Look at the evidence here, and look carefully at it.  Some

20   of the evidence you'll see are a few of the documents they put

21   in their slides, these announcements and awards and press

22   releases they had, and press releases from NXP.  They

23   highlighted some words.  I actually caught some words they

24   didn't highlight in those when I was reading through it.

25        They said, we have a great two-pad design, two large pads

1    better than the four-pad stuff in the prior art,

2    distinguishing the classic four-pad design.  And when NXP

3    announced its UCODE 8 shape that they emphasized -- they said

4    we touted the shape -- he didn't highlight that it said, we

5    have a great four-pad design.

6        NXP had a four-pad design.  They have it for a reason.

7    Those small pads are called test pads.  They're used in the

8    manufacturing process, and they have to be separate from the

9    big ones for that to work.  Once this is in a tag, they're

10   dead.  They're not connected to the circuitry underneath.

11   Only those two big pads connect the antenna to the circuitry.

12       NXP thought, we have a four-pad design versus this two-pad

13   design, and if you look at -- there are things that actually

14   do something interactive.  They've got a different shape.  Did

15   the court conclude that they infringe?  Yes.  Does that mean

16   they didn't believe that?  No.  And you need to determine, if

17   you're assessing willful infringement, whether they believe

18   that.

19       And they talked about correspondence between the parties.

20   You're going to see evidence of a response from NXP to Impinj

21   to this letter saying, you infringed.  Please stop.  We

22   explained that to them exactly in that letter years before

23   this lawsuit.

24       We said, look, we see your design.  We have a four-pad

25   design, and these are actually test pads.  We don't think we

 1    infringe.  We thought it then.  We think it now.  The courts

 2    disagreed -- the court disagreed.  That they happened to be

 3    wrong ultimately at this point doesn't mean they didn't

 4    believe it.  It doesn't mean that they willfully infringed.

 5        So let's talk about copying.  They've got a big problem

 6    with their copying case, and he didn't show you this.  And

 7    he -- honestly, he didn't show you these Ching-San shapes,

 8    which he said the '302 patent was valid in his presentation.

 9        Look at all the evidence.  This is a high-tech product.

10    It's a passive RFID tag sold by NXP, sold today with these

11    pads in these shapes.  See those pads at the top?  They look

12    familiar.  NXP's been selling that for years.  It's never been

13    accused of infringement.  NXP sold this product with these

14    pads in 2010.  Never been accused of infringement.

15        So let's look at the progress here.  What's more likely

16    than not?  That NXP copied a patent and that figure there that

17    they didn't know about until after their product was designed

18    and released.  And it takes a long time to design these

19    products, a far amount of time.  That was designed before

20    May 2017.

21        If you look -- if it's the space between the pads we're

22    talking about, look at HITAG, look at UCODE 8.  It's a lot

23    closer than what's in their '302 patent.  That's not an

24    accident.  The same people that worked on HITAG are in the

25    same building that worked on UCODE 8.  And those -- those pads

1    and HITAG -- I love this name -- Mega Bumps.  They call them

2    Mega Bumps.

3        It's an interesting name.  It always stuck out to me in

4    this case.  And hopefully it sticks out to you because you

5    will see evidence in NXP design documents for the UCODE 8 when

6    they were coming up with that pad design they say infringed

7    and was copied where they called Mega Bumps.  They were

8    continuing that design that they had before, and that HITAG

9    product was sold before their patent even existed and sold

10   today with that pad shape, which is exactly what they're

11   saying in their claims cover.

12       So I'm going to talk briefly about damages.  I don't think

13   you're going to need to get to it in this case.  If you find

14   that the -- if you find invalidity or non-infringement, you

15   don't need to get to the question of damages.

16       But you saw the slide, and I'll have a couple to respond

17   to it.  But think about it.  Look at the evidence in this

18   case.  You have shapes and a patent where another patent had

19   those shapes for the very same reason five years earlier, and

20   they're saying that's worth $18 million.  You should give them

21   $18 million because of those shapes.

22       Or you should give them $18 million for half a rectifier

23   that we don't use when you look at our product and it stages

24   properly.  We'll put on evidence for Mr. Haas and others,

25   explaining to you why we think that number is inflated and

1    inflated significantly.  And part of that is they're saying we

2    lost sales because of infringement.  I think he actually said

3    that in his opening.  Look at their documents that they

4    prepare internally.  They're not in court doing that.  That's

5    when they're talking amongst themselves with nobody around.

6         We talked about their performance here.  This tells the

7    story, and this is -- this is a strategy document from them

8    after they filed this lawsuit.  They said performance sells

9    ICs, and NXP's chips outperform them every step of way.

10        They say we copy them.  We beat them.  We design better

11   chips because we have different ideas.  And the one thing this

12   shows is you is if the Monza 5, the Monza 6, and UCODE 8 all

13   use the same rectifier invention, the performance of those

14   chips that they say sells them is not tied to that rectifier.

15        So why did they lose sales?  This is another internal

16   strategy document they have.

17                    (Demonstrative published.)

18        **MR. HENDERSHOT:**  This is 2021 after they filed this

19   litigation.  Internally, when they're looking themselves in

20   the mirror and saying, why did we lose sales, they came up

21   with this timeline.  They don't say, NXP copied us.  They

22   don't say, they infringed our paths, or they're using one path

23   with a two-path rectifier.  No.  Go -- just read through this.

24   There are a series of bad business decisions along the way,

25   failed product features, mismanaged efforts.

1              And in 2018, the UCODE 8 beats the MR6 at ARC.  It beats

2       it.  ARC is the Auburn Research Center.  They qualify some of

3       these tags, and they test them.  The UCODE 8 beat them, and

4       that's 2018.  And that's going to be a relevant date when

5       you're trying to calculate damages.  So when they say they

6       lost all of these sales because of NXP's infringement to you,

7       I want you to think about what they said to themselves when

8       they're trying to determine why they lost share.

9          They don't mention copying.  They don't mention their

10      patent once.  The one time they mentioned NXP that I see, it

11      says they had a better product.  They did.  You don't build a

12      better product by copying someone else's answers.

13             So he'd asked the question, why are we here -- and I'm

14      going to wrap up shortly, and I appreciate your patience -- we

15      talked earlier about NXP and the windmills the tulips.  They

16      have something called Project Windmill that they did for quite

17      a long time at their company.  This document is from 2018, and

18      this is their senior executive leadership staff meeting and

19      discussing this.  The first one, Chris, there, is Mr. Diorio.

20      You're going to hear him testify tomorrow.  He's going to say

21      a lot of things about why we're here and all that.

22             But Project Windmill sounds clandestine, sounds

23      mysterious.  You've probably guessed what the windmill is.

24      It's NXP.  This was a campaign where their senior executives

25      were trying to slow the adoption of NXP's products that

1    performed better any way they could.  They are proposing

2    initiatives.  They are tracking progress.  They're identifying

3    future actions like it's a project management among their

4    senior leadership.  And one of those options they were

5    considering to attack NXP was litigation, litigation like the

6    one that's got us all here.

7        So when they talk about why they're here, why we're all

8    here for this litigation, think about this.  Think about what

9    they say internally, and they've got another internal document

10   that sets out what their goal was.  It's not subtle.  It's not

11   surprising.  They want to burn the windmill down.  That's

12   their goal.

13       Again, this is their senior leadership, including

14   Mr. Diorio.  This is a slide that they put into a presentation

15   amongst their senior executives.  They talk about targeting a

16   product and trying to compete with a product.  They want to

17   burn the windmill down.  That's the goal they set out with.

18   That's what they're trying to do.  But there are protections

19   against that.  There are protections against that in this.

20       And you know what the main protection is?  You.  You have

21   to hear the evidence.  They can't just make claims or try to

22   achieve a goal.  You need to hear the evidence, listen to the

23   instructions from the Court on the law, and render your

24   decisions as to the facts.  That evidence will be testimony

25   from witnesses.  That evidence will include documents that are

1   design sheets that have these shapes.  You can look at these

2   shapes and compare them.  There'll be circuit schematics.

3   Make sure you're looking at a whole circuit schematic, not one

4   that's cropped or kind squinted at where the capacitors aren't

5   there.  Look at what they said internally.  That's the

6   evidence you should consider when weighing your decisions and

7   rendering your decisions in this case.

8       So with that, I, again, thank you for your patience.  Next

9   thing we're going to do is get to evidence.  That's going to

10  start tomorrow.  But on behalf of NXP and my team that's proud

11  to be here and represent them, I want to thank you, again, for

12  your time, your attention, and your service.

13      At the end, you're going to be the ones deciding the facts

14  based on guidance on the law from the court.  Listen to these

15  witnesses, look at these documents, consider all the evidence,

16  all of it, not just part of a circuit diagram or a one-side

17  story.  We're confident if you do that, you're going the reach

18  the right result here.

19      So again, on behalf of NXP and those of us privileged

20  enough to stand up before you and defend them against these

21  accusations, I thank you, and I look forward to the rest of

22  trial.

23          **THE COURT:**  All right.  Thank you.

24      All right.  Members of the jury, before I release you,

25  just a few more words about your conduct as jurors.  First,

1    keep an open mind throughout the trial, and do not decide what

2    the verdict should be until you and your fellow jurors have

3    completed your deliberations at the end of the case.

4         Second, because you must decide this case based solely on

5    the evidence received in this case and on the instructions as

6    to the law that applies, you must not be exposed to any other

7    information about the case or to the issues it involves during

8    the course of your jury duty.

9         Thus, until the end of the case or unless I instruct you

10   otherwise, do not communicate with anyone in any way.  And do

11   not let anyone else communicate with you about the merits of

12   the case or anything to do with it.  This includes discussing

13   the case in person, in writing, by phone, tablet, or computer,

14   or any other electronic means, via email, text messaging, or

15   any Internet chat room, blog, website, or application,

16   including but not limited to Facebook, YouTube, Twitter,

17   Instagram, LinkedIn, Snapchat, Tiktok, or any other form of

18   social media.

19        This applies to communicating with your fellow jurors

20   until I give you the case for deliberation.  It applies to

21   communicating with everyone else, including your family

22   members, your employers, the media or the press, and the

23   people involved in the trial, although you may notify your

24   family and employer that you've been seated as a juror in the

25   case and how long you expect the case to last.

 1        But if you are asked and approached in any way about your

 2   jury service of anything about this case, you must respond

 3   that you have been ordered not to discuss the matter and

 4   report any contact to the court.

 5        Because you will not -- excuse me.  Because you will

 6   receive all the evidence and legal instruction you may

 7   properly consider to reach a verdict, do not read, watch, or

 8   listen to any news or media accounts or commentary about the

 9   case or anything to do it.  Do not do any research such as

10   consulting dictionaries, searching the Internet, or using any

11   reference materials.  And do not make any investigation or in

12   any way try to learn about the case on your own.

13        Do not visit or view any case -- excuse me -- do not visit

14   or view any place discussed in this case.  Do not use the

15   Internet or any resource to search for or view any place

16   discussed during the trial.  Do not research about the case,

17   the law, or the people involved, including the parties, the

18   witnesses, or the lawyers until you have been excused as

19   jurors.  If you happen to read or hear anything touching on

20   the case in the media, turn away, and report it to me as soon

21   as possible.

22        These rules protect each party's right to have this case

23   decided solely on the evidence that has been presented here in

24   Court.  Witnesses here in Court take an oath to tell the

25   truth, and the accuracy of their testimony is tested through

1    the trial process.

2        If you do any research or investigation outside of the

3    courtroom or gain any information through improper means, then

4    your verdict may be influenced by inaccurate, incomplete, or

5    misleading information that has not been tested through the

6    trial process.

7        Each of parties is entitled to a fair trial by an

8    impartial jury.  And if you decide the case based on

9    information not presented in Court, you will have denied the

10   parties a fair trial.

11       Remember, you've taken an oath to follow these rules, and

12   it's very important that you do so.  Any juror who violates

13   these restrictions jeopardizes the fairness of the

14   proceedings.  Again, if you're exposed to any information,

15   please contact me.

16       A couple of other small points.

17       One, you've been given a phone number to contact if anyone

18   needs to contact the Court.  While you're here in the trial, I

19   don't want you to worry that something has happened to any of

20   your loved ones or that something's going on and someone can't

21   find you.  You're going to have to have your phones off.  If

22   you give that number to whoever you need, they can -- they can

23   call that number.  The person who answers the phone will

24   communicate with my courtroom deputy electronically, and he

25   will communicate with me electronically.  I promise you I will

1   stop this trial, and I will get you that message so that you

2   don't have to worry.  Okay?

3       Next, as you think about -- and we'll start tomorrow --

4   oh, the second thing is we will have some -- some snacks for

5   you tomorrow.  Didn't happen today.  But we will have

6   tomorrow.  And as you saw, there's a microwave.  There's a

7   refrigerator if you want to bring anything for yourself.

8       What the -- what the lawyers did today is -- the way I

9   like to describe it is -- I do puzzles.  And all they really

10  did was give you what the cover of a puzzle box is, right?

11  Inside a puzzle box is -- think about it as the evidence.  We

12  have nothing in our puzzle box.  You have no evidence.  By the

13  end of trial, you will have all of pieces of evidence that you

14  can properly consider.

15      And then you'll put the puzzle together the way you think

16  it should fit, and that's going to be your verdict.  All

17  the -- all the attorneys did was tell you what they think that

18  cover looks like, nothing more.  It not evidence.  Okay?

19      Does anybody have any questions before I release you for

20  the day?

21      No?  All right.  I know it's been a long day.  Tomorrow

22  we'll finish up at 1:40.  Have a good night, and we'll see you

23  tomorrow.  We'll start promptly with you at 8:30 in the

24  morning.  Thank you.

25          **THE CLERK:**  Please rise for the jury.

1          (The following proceedings were heard out of the presence

2     of the jury:)

3          **THE COURT:**  Okay.  The record will reflect the jury

4     is gone.

5          So I need those deposition transcript cites sent to me and

6     then we can meet back here at 4:00, and we can go through them

7     and I can figure out what we're going to do about that witness

8     tomorrow.

9          All right.  We'll stand in recess until 4:00 o'clock.

10         (Recess taken at 3:09 P.M.; proceedings resumed at 4:01

11    P.M.)

12         (The following proceedings were heard out of the presence

13    of the jury:)

14         **THE COURT:**  Back on the record.

15         The record will reflect that I have the lawyers present,

16    the jury is obviously not here.

17         All right.  Counsel, come to the mics.

18         **MR. AL-SALAM:**  Excuse me?

19         **THE COURT:**  Come to the microphones.

20         Okay.  So back to where we were at the beginning of the

21    day.  I see that there are -- well, I see a couple -- I see a

22    number of things in the -- in what's been provided to me by

23    Ms. McCullough.  I'm assuming that -- yes, it looks like Jones

24    Day was copied.  So I don't exactly know what Oliver wants to

25    say.

1          Let's go back to this -- these slides.  And you told me

2     that 18, 20, and 22, right?

3          So on page 18, the title of the slide is "Impinj Monza R6

4     charge-accumulating path."  So there is some deposition

5     testimony with respect to this issue.

6               MR. RITCHIE:  The deposition testimony, Your Honor,

7     as I saw it, concerns how that path is described in the patent

8     with reference to Figure 8B.

9               THE COURT:  Right.

10         But that's what this slide refers to, isn't it?

11              MR. RITCHIE:  This is -- this is -- Slide 18 is

12    referring to the product, not -- not the -- not the figure

13    that's in the specification.

14              THE COURT:  In the deposition, he was asked about the

15    charge-accumulating path?

16              MR. RITCHIE:  That's correct.

17              THE COURT:  And he was designated on that topic?

18              MR. RITCHIE:  Yes.

19              THE COURT:  Okay.  So he testified about the issue.

20    And if you chose not to follow-up, that's on you.  That's not

21    on him.

22              MR. RITCHIE:  I understand.

23         In one of the other excerpts -- and I can point you to

24    page 180 at -- at row five to six, Mr. Oliver said --

25              THE COURT:  Hold on.

1              MR. RITCHIE:   I'll wait till you get there.

2              THE COURT:   So on the issue of biasing, that's what I

3      have from Page 180.

4              MR. RITCHIE:   That's correct.   And in row -- I just

5      want to point out, with respect to Slide 18, in his deposition

6      at 180, row five, he said "I don't see anything in claim one.

7              THE COURT:   Hold on.   Oh, I was on the wrong page.

8      180, line 5.

9              MR. RITCHIE:   He said, "So I don't see anything in

10     claim one that's addressing the bias on these transistors."

11         Now, in these slides, it --

12             THE COURT:   Where does the slide say that it

13     addresses something in claim one?

14             MR. AL-SALAM:   Exactly.   Thank you.

15             MR. RITCHIE:   The slides --

16             THE COURT:   Hold on.   I mean, it's a rhetorical

17     question.   There's nothing on this slide that says anything

18     about claim one, right?

19             MR. RITCHIE:   That's correct.

20             THE COURT:   So what does this relate to then,

21     Mr. Al-Salam?

22             MR. AL-SALAM:   This relates to him describing how the

23     Impinj circuit works, which he testified about.   He was

24     designated to testify about both the '597 patent and how the

25     Impinj products practiced the patent.

1          **THE COURT:**  Yeah, I agree.  I saw that -- I saw that

2     in the 30(b)(6) notice.

3          **MR. RITCHIE:**  Agreed, Your Honor.

4        And, again, I would -- just to expand on my point before,

5     he said that a bias circuit was not part of claim one, but

6     yet, the slides, 18 through 22, now, all talk about bias

7     circuits.

8          **THE COURT:**  Do they relate to claim one; yes or no?

9          **MR. RITCHIE:**  I understand that Mr. Oliver is going

10    to argue that in these slides, Your Honor.

11         **THE COURT:**  Hold on.

12         **MR. RITCHIE:**  Claim one does not --

13         **THE COURT:**  Stop.

14         **MR. RITCHIE:**  Claim one does not have bias circuit.

15         **THE COURT:**  When I say "stop," you need to stop,

16    right?  It's the end of the day.  We've been going a long

17    time.

18        Mr. Al-Salam, does this relate to claim one or not?

19         **MR. AL-SALAM:**  No, Your Honor.

20         **THE COURT:**  Okay.  If it doesn't relate to claim one,

21    then what does it relate to?

22         **MR. AL-SALAM:**  That he's describing how the Impinj

23    circuit works.

24         **THE COURT:**  He can testify as to that as long --

25    and -- and the other thing is if -- if he somehow says that

1  this applies to claim one, then you've got deposition

2  testimony on which you can cross-examine him on that.  And, in

3  fact, impeach him on it, right?

4          **MR. RITCHIE:**  (Nods head.)

5          **THE COURT:**  So he testified as to it.  He was

6  designated to testify as to it.  I don't know how I can

7  exclude it.

8      How can I exclude it when he was designated to talk about

9  it?

10          **MR. RITCHIE:**  Your -- Your Honor, just stepping back.

11          **THE COURT:**  All right.

12          **MR. RITCHIE:**  It's a negative limitation.  There is

13  no other path.  Impinj is attempting to introduce testimony

14  through Mr. Oliver that this term has a specific meaning and

15  is limited to paths that are dominant, not tiny.  And you can

16  see the words "dominant, not tiny" in 20 and 22.  And you

17  heard --

18          **THE COURT:**  Hold on.  I was on 18.  So now you want

19  me to move to 20?

20          **MR. RITCHIE:**  Twenty.  You can look at 20.

21          **THE COURT:**  Where is it on 20?

22          **MR. RITCHIE:**  The bubble at the left says the

23  charge-accumulating path, the charge fluid is dominant.  In

24  the bubble on the right, the bias circuit, the charge flow is

25  tiny.  So he's, through this, going to be arguing that there's

1    a specific meaning to this term "charge-accumulating path" as

2    opposed to describing its plain and ordinary meaning.

3           **THE COURT:**  Delete dominant.  Delete tiny.

4      What else?

5           **MR. RITCHIE:**  On Slide 21, he's comparing the

6    Monza --

7           **THE COURT:**  Okay.  Now this --

8           **MR. RITCHIE:**  -- product to the accused product.

9           **THE COURT:**   -- looks like a potential problem.

10         **MR. AL-SALAM:**  I'll say two things:  One is they

11    asked him at length about what the claims --

12          **THE COURT:**  Where -- you've given me deposition

13    testimony.  Where is that?

14      Because I've read -- during the break, I have read what

15    you gave me, and I didn't see any statements or testimony with

16    respect to a comparison to the UCODE 8.

17          **MR. AL-SALAM:**  He was designated as to provide

18    testimony as to the comparison of the Impinj products with

19    accused products.  Also, he was designated to provide

20    testimony on the teardown.  He was asked in the testimony we

21    identified whether he was familiar with the rectifier circuit

22    in the teardown.  He said "yes," and they didn't ask him

23    further questions about it.

24          **THE COURT:**  All right.  Hold on a second.  Let me

25    look at that one 'cause I was focused on the other.

```
 1            MR. AL-SALAM:  This is the teardown.

 2            THE COURT:  Oh, I see.  I'm looking at 48-20.  Hold

 3      on.

 4                  (Pause in the proceedings.)

 5            THE COURT:  Okay.  So here, Mr. Hendershot

 6      specifically asked him about topic number 28, which relates to

 7      his designation to provide testimony on, quote, All efforts to

 8      use, test, modify, reverse engineer, teardown or otherwise

 9      determine any functionality of the accused products, including

10      but not limited to technical performance comparisons.

11        So Mr. Hendershot starts the deposition with respect to

12      that topic and at a certain point moves to the teardown report

13      for the UCODE 8 product.

14        So why shouldn't I allow the testimony on Page 21, which

15      seems to be the same?

16            MR. RITCHIE:  It's -- it's more than about the

17      teardown, Your Honor.  As you can see in the upper right

18      corner, there's the claim language.  And so this is purporting

19      to analyze the products.

20            THE COURT:  Right.  But that is covered in topic 28.

21      It's within the scope of 28, and he was designated, and the

22      fact that you choose not to depose on that topic is on you,

23      not on plaintiff.

24            MR. RITCHIE:  I would agree with that, Your Honor,

25      but I will also say the standard for an expert is they produce
```

1   a report and it -- and this analysis was not disclosed in a

2   report form.  This was --

3         **THE COURT:**  He could have asked, and he didn't,

4   right?

5      Why didn't he ask?

6         **MR. RITCHIE:**  I guess I'd go back to what's the

7   distinction here between Mr. Oliver being an expert and

8   Mr. Oliver being a fact witness for Impinj.

9         **THE COURT:**  I agree.  My problem is, is that I looked

10  at this -- the standing order.  And while, in general, I issue

11  an order that has language that addresses this topic.  In your

12  particular case, I didn't because I used your proposed form of

13  order, and your collective proposed form of order did not

14  include that language, and I adopted your proposed form of

15  order.

16     And my standing order, which I also looked at, just says

17  they have to be designated so that you can depose, which you

18  did.  And you identified a topic, and he was designated.  And

19  you chose not to depose on that topic.  So, unfortunately, I

20  think I have to let it in.

21     And if I had it to do all over again, I wouldn't -- I

22  wouldn't take your proposed form of order, I'd use my own,

23  which actually addresses this issue, but I didn't.

24     So that's kind of the state of play.

25     Other than those two words, strike that from those slides,

1    and he can testify as to Slide 21.

2              MR. AL-SALAM:  Thank you, Your Honor.

3              THE COURT:  All right.  We're adjourned.  We'll see

4    you tomorrow at 8:00 a.m.

5              MR. AL-SALAM:  Thank you.

6              THE CLERK:  Court is adjourned.

7              (Proceedings were concluded at 4:15 P.M.)

8                          --o0o--

9

10

11                  **CERTIFICATE OF REPORTER**

12

13         I certify that the foregoing is a correct transcript

14    from the record of proceedings in the above-entitled matter.

15    I further certify that I am neither counsel for, related to,

16    nor employed by any of the parties to the action in which this

17    hearing was taken, and further that I am not financially nor

18    otherwise interested in the outcome of the action.

19

20    _____

21         Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

22              Wednesday, July 5, 2023

23

24

25