# ATTACHMENT 1

Tharan Gregory Lanier (State Bar No. 138784)
tglanier@jonesday.com
Michael C. Hendershot (State Bar No. 211830)
mhendershot@jonesday.com
JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
Telephone: (650) 739-3939
Facsimile: (650) 739-3900

[Additional counsel identified on signature pages]

Attorneys for Defendant
NXP USA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IMPINJ, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>NXP USA, INC.,<br><br>                    Defendant. | Case No. 4:19-CV-03161-YGR<br><br>**DEFENDANT NXP USA, INC.'S OPPOSITION TO PLAINTIFF IMPINJ, INC.'S MOTION TO EXCLUDE OPINIONS OF DEFENDANT'S EXPERT DAVID A. HAAS**<br><br>Hearing Date: January 31, 2023<br>Time: 2:00 P.M.<br>Location: Courtroom 1, 4th Floor<br>Judge: Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................. 1

II.     STATEMENT OF THE RELEVANT FACTS ...................................................... 3

        A.      Ms. Kindler's Opinions ............................................................................. 3

        B.      Haas's Opinions ........................................................................................ 4

III.    LEGAL STANDARD ........................................................................................... 7

IV.     ARGUMENT ......................................................................................................... 8

        A.      Mr. Haas Properly Opined That Ms. Kindler's Analysis Fails To Demonstrate
                Entitlement To Lost Profits ....................................................................... 9

        B.      Mr. Haas Properly Considered The Competitive Relationship Of The Parties ........... 11

        C.      Mr. Haas's Opinions Concerning Ms. Kindler's Split Lost Profits Scenario Are
                Reliable ................................................................................................... 14

                1.      Mr. Haas's Critiques Are Not Contrary To Law ...................................... 14

                2.      Ms. Kindler's Lost Profits Scenario Double Counts The Impact Of Impinj's
                        At-Risk Sales ...................................................................................... 17

                3.      Identification Of The Sales To Which A Reasonable Royalty Will Be Applied
                        Is A Proper Application Of The Book Of Wisdom ................................... 18

        D.      Impinj Fails To Provide Any Basis Or Argument As To Why The Court Should
                Exclude Certain Identified Portions Of Mr. Haas's Opinion ....................................... 20

V.      CONCLUSION .................................................................................................. 22

1

## **TABLE OF AUTHORITIES**

2

Page

3

CASES

4

*Apple Inc. v. Motorola, Inc.*,

5

  757 F.3d 1286 (Fed. Cir. 2014)...............................................................................7, 8

6

*Apple, Inc. v. Motorola, Inc.*,

7

  No. 1:11-cv-08540, 2012 WL 1959560 (N.D. Ill. May 22, 2012)..............................7

8

*Applied Med. Resources Corp. v. U.S. Surgical Corp.*,

9

  435 F. 3d 1356 (Fed. Cir. 2006)..............................................................................15

*Avila v. Willits Env't Remediation Trust*,

10

  No. C 99-3941 SI, 2008 WL 360858 (N.D. Cal. Feb. 6, 2008) ................................17

11

*bioMérieux, S.A. v. Hologic, Inc.*,

12

  No. 18-21-LPS, 2020 WL 327161 (D. Del. Jan. 21, 2020) .......................................13

13

*Clear-View Techs., Inc. v. Rasnick*,

  No. 13-cv-02744-BLF, 2015 WL 3509384 (N.D. Cal. June 3, 2015) ......................17

14

*D&D Grp. Pty Ltd. v. Nationwide Indus., Inc.*,

15

  No. 08 CV 0236 MMA (POR), 2010 WL 11508568 (S.D. Cal. Apr. 21, 2010) .......................7

16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,

17

  509 U.S. 579 (1993)...........................................................................................7, 8, 10

18

*Emblaze Ltd. v. Apple Inc.*,

  52 F. Supp. 3d 949 (N.D. Cal. 2014) .....................................................................7, 8

19

*Ergotron, Inc. v. Rubbermaid Commercial Prods. LLC*,

20

  No. 10-2010 ADM/JJG, 2012 WL 3733578 (D. Minn. Aug. 28, 2012)....................12

21

*Fujifilm Corp. v. Motorola Mobility LLC*,

22

  No. 12-cv-03587-WHO, 2015 WL 1265009 (N.D. Cal. Mar. 19, 2015)...................14

23

*Georgia–Pacific Corp. v. U.S. Plywood Corp.*,

  318 F. Supp. 1116 (S.D.N.Y. 1970).....................................................3, 11, 12, 15

24

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*,

25

  378 F. Supp. 2d 459 (D. Del. 2005) .........................................................................19

26

*i4i Ltd. P'ship v. Microsoft Corp.*,

  598 F.3d 831 (Fed. Cir. 2010)................................................................................7, 8

27

*ICM Controls Corp. v. Honeywell Int'l Inc.*,

28

  No. 5:12-CV-1766, 2021 WL 3403734 (N.D.N.Y. Aug. 4, 2021) ............................12

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001)............................................................................18, 19

*Kirola v. City and Cnty. of San Francisco*,
    No. C 07-03685, 2010 WL 3476681 (N.D. Cal. Sept. 2, 2010) ...............................12

*Lucent Techs., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)..............................................................................18

*Maxwell v. J. Baker, Inc.*,
    86 F.3d 1098 (Fed. Cir. 1996)................................................................................14

*Minco, Inc. v. Combustion Eng'g, Inc.*,
    95 F.3d 1109 (Fed. Cir. 1996)................................................................................15

*Mobility Workx, LLC v. Cellco P'ship*,
    No. 4:17-CV-00872, 2019 WL 5721814 (E.D. Tex. Nov. 5, 2019) ..........................13

*NexStep, Inc. v. Comcast Cable Commc'ns, LLC*,
    No. 19-1031-RGA-SRF, 2021 WL 4077778 (D. Del. Aug. 20, 2021) .....................13

*Open Text S.A. v. Box, Inc.*,
    No. 13-cv-04910-JD, 2015 WL 393858 (N.D. Cal. Jan. 29, 2015) ....................11, 12

*Pavo Sols. LLC v. Kingston Tech. Co.*,
    No. 8:14-cv-01352-JLS-KES, 2020 WL 9158697 (C.D. Cal. Aug. 7, 2020) ............11

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    No. C 09-5235 MMC, 2014 WL 4437631 (N.D. Cal. Sept, 9, 2014)............15, 16, 17

*Rite-Hite Corp. v. Kelley Co.*,
    56 F.3d 1538 (Fed. Cir. 1995)................................................................................14

*Rogers v. Raymark Indus., Inc.*,
    922 F.2d 1426 (9th Cir. 1991) ...............................................................................10

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,
    289 U.S. 689 (1933) ..............................................................................................18

*Sprint Commc'ns Co. v. Comcast Cable Commc'ns LLC*,
    225 F. Supp. 3d 1233 (D. Kan. 2016) .....................................................................12

*St. Clair Intellectual Prop. Consultants, Inc. v. Acer, Inc.*,
    935 F. Supp. 2d 779 (D. Del. 2013)........................................................................11

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015)................................................................................8

*TQP Dev., LLC v. Merrill Lynch & Co.*,
    No. 2:08-CV-471-WCB, 2012 WL 3283356 (E.D. Tex. Aug. 20, 2013)....................7

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014)................................................................................................12

*Whitserve, LLC v. Comput. Packages, Inc.*,
    694 F.3d 10 (Fed. Cir. 2012)..................................................................................................11

**OTHER AUTHORITIES**

Federal Rule of Evidence 403 ........................................................................................................9

Federal Rule of Evidence 702 ................................................................................................1, 7, 9

Patent Local Rule 3-8 ..................................................................................................................10

1     **I.     INTRODUCTION**

2         Impinj seeks between $2 and $6 million in monetary damages (depending on proof of lost

3     profits) in what started as a 26-patent case but which is now a 4-patent case.  In support of that

4     damages claim, Impinj offers the opinions of Lauren Kindler.  NXP's expert—David Haas—

5     pointed out numerous deficiencies in Ms. Kindler's opinions.  Perhaps understandably, Impinj

6     does not want to see its potential recovery shrink any further; however instead of defending Ms.

7     Kindler's opinions and cross examining Mr. Haas's valid criticisms at trial, Impinj takes a stab at

8     getting Mr. Haas's opinions excluded altogether.  But Impinj's arguments to exclude certain of

9     Mr. Haas's opinions under Federal Rule of Evidence 702 amount to nothing more than Impinj's

10    disagreement with, and in some cases apparent misunderstanding of, those opinions.  Rule 702

11    concerns the reliability and relevance of the methodologies employed by an expert.  So long as

12    the methodology is sound, questions of whether to rely on, and how much weight to give, any

13    particular piece of evidence, and the conclusions drawn from that evidence are reserved for the

14    jury and to be addressed on cross examination.

15        Impinj appears to seek exclusion of certain of Mr. Haas's opinions on the basis that they

16    would be too "prejudicial" to present to the jury.  For example, although Impinj admits that Mr.

17    Haas is allowed to opine that Ms. Kindler has failed to demonstrate entitlement to lost profits,

18    Impinj seeks to prevent Mr. Haas from affirmatively stating that Impinj is entitled to zero dollars

19    in lost profits because his wealth of experience might improperly sway the jury to simply accept

20    that conclusion.  Impinj also appears to ask the Court to prevent Mr. Haas from opining that Ms.

21    Kindler's lost profits methodology results in "double counting," arguing that "double counting" is

22    a loaded and prejudicial term.  Neither of these arguments can justify exclusion under Rule 702.

23        Impinj also claims certain of Mr. Haas's critiques do not properly account for the

24    competitive relationship between NXP and Impinj and Impinj's potential to lose sales.  In

25    support, Impinj argues that Mr. Haas opined that Impinj would be willing to take a 0% royalty

26    from its primary competitor.  Impinj is incorrect—Mr. Haas explicitly stated that he was *not*

27    offering that opinion.  And not only does Mr. Haas explicitly weigh the parties' competitive

28    relationship and Impinj's potential to lose sales, but the law is also clear that whether he

1   "properly" considered and weighed those factors goes to the weight, not admissibility, of his

2   opinions.  Impinj also claims that Mr. Haas misapplies the Book of Wisdom by opining that

3   during the hypothetical negotiation the parties would be aware that Impinj would seek and be

4   awarded lost profits.  Again, Impinj misstates Mr. Haas's opinion.  Ms. Kindler opined to a "lost

5   profits" scenario that is made up of two "buckets" of sales:  (1) sales on which Impinj can

6   demonstrate it is entitled to lost profits and (2) all the rest of the allegedly infringing sales on

7   which Impinj is entitled to a reasonable royalty.  Mr. Haas critiqued this particular scenario

8   because, among other reasons, Ms. Kindler failed to consider that it is only the second "bucket"

9   of sales that, by definition, Impinj could and would not have made (*i.e.*, those outside of the lost

10  profits bucket) that would have been the subject of the hypothetical negotiation in the first place.

11  Because the bucket of sales to which the royalty rate is to be applied (*i.e.*, the royalty base) is

12  different in Ms. Kindler's lost profits scenario than in her royalty only scenario (which would

13  apply a royalty rate to all allegedly infringing sales), there are differences in the considerations

14  that would have been applicable to the hypothetical negotiation, and Ms. Kindler should have

15  accounted for those differences.  Impinj may disagree with Mr. Haas's methodology, but that

16  does not make it unsound or unreliable, and any concerns Impinj has should be addressed through

17  cross examination.

18         Finally, Impinj asks the Court to strike paragraphs 16, 84, 97-100, 106, 107, 146, 174,

19  188, 189, and 191 from Mr. Haas's report, but provides no explanation as to the basis on which it

20  believes any of the opinions expressed in those paragraphs should be excluded.  For example,

21  paragraphs 106 and 107 contain opinions relating to Ms. Kindler's failure to apportion her royalty

22  rates to only the incremental value contributed by the asserted patents to the accused products, but

23  Impinj does not even discuss Mr. Haas's opinions relating to apportionment, much less explain

24  why they are in any way unreliable.  As a further example, paragraphs 16, 188, 189, and 191 all

25  summarize Mr. Haas's affirmative reasonable royalty conclusions, but Impinj offers no argument

26  as to why any of Mr. Haas's affirmative conclusions are unreliable.  Impinj may not seek

27  exclusion of opinions and testimony without even providing a basis for that request.

28

## II.     STATEMENT OF THE RELEVANT FACTS

### A.     Ms. Kindler's Opinions

Ms. Kindler rendered two alternative opinions concerning different damages scenarios, the principal difference being whether Impinj can demonstrate entitlement to lost profits.  In her first scenario (the "lost profits scenario"), Ms. Kindler opined that Impinj is entitled to lost profits on 57% percent of NXP's allegedly infringing sales, and a reasonable royalty on the remaining 43%.  In the event that Impinj cannot establish entitlement to lost profits, she offered a second scenario (the "royalty only scenario") opining to a reasonable royalty rate for all allegedly infringing sales.

| Lost Profits Scenario | | Royalty Only Scenario |
|---|---|---|
| lost profits on 57% of accused sales | reasonable royalty on 43% of accused sales | reasonable royalty on 100% of accused sales |

To determine the percent of allegedly infringing sales Impinj would have captured but for the infringement in her lost profits scenario, Ms. Kindler employed an "adjusted market share" analysis.  (Dkt. 254-6 (Kindler Rep.), ¶109(b).)  To determine a reasonable royalty under both scenarios, Ms. Kindler purported to apply the *Georgia-Pacific* framework to determine what she believed to be an appropriate rate.[1]  As an input to her royalty rate determination, Ms. Kindler used the conclusion she reached in her lost profits analysis that Impinj would expect to lose 57% of the allegedly infringing sales.  (*Id.*, ¶180(i).)  Specifically, she utilized an equation, which she used to determine the bargaining ranges for each asserted patent.  (*Id.*.)  By way of illustration, her calculation for the '597 patent is as follows:  57% (at risk sales) × 41.8% (profit margin) × 25% (incremental value for sensitivity improvements) × 50% (value attributable to '597 patent) = 3%.  She conducted a single analysis to determine a royalty rate for each of the four asserted

---

[1] As explained in NXP's Motion to Exclude Certain Opinions and Testimony of Lauren R. Kindler, Ms. Kindler's application of the *Georgia-Pacific* factors is superficial and unhelpful to the jury because she has no starting point to which she can apply the upward or downward pressure suggested by each factor.  (Dkt. 237-6 at 8-9.)  Instead, she uses a series of "mathematical" inputs to come up with an equation that yielded her royalty rate, which is divorced from and unaffected by her "analysis" of the *Georgia-Pacific* factors.  (*Id.* at 5-6.)

1   patents, which she applied in both the royalty portion of her lost profits scenario and to her

2   royalty only scenario.

3         **B.**      <u>**Mr. Haas's Opinions**</u>

4         Mr. Haas provided opinions rebutting several arguments advanced by Ms. Kindler.  As

5   relevant here, Mr. Haas identified two fundamental flaws in Ms. Kindler's analysis.

6         <u>***First***</u>: Mr. Haas opined that Ms. Kindler erred in using the same "reasonable royalty" rate

7   for the royalty portion of her lost profits scenario as she did in her royalty only scenario.  In

8   determining the royalty rate to be applied, Ms. Kindler conducted a single analysis and applied

9   the same royalty rates to both her royalty only scenario and to the reasonable royalty portion of

10  her lost profits scenario.  More specifically, as part of her overall royalty rate calculation, Ms.

11  Kindler relied on her conclusion that Impinj would have made 57% of NXP's sales in the absence

12  of infringement.  Using this 57% as an input, Ms. Kindler opined to specific royalty rates for each

13  of the four patents in suit.  However, Ms. Kindler applied the same royalty rates in both her

14  royalty only scenario *and* to the reasonable royalty portion of her lost profits scenario, which deal

15  with different royalty bases that would be subject to a hypothetical negotiation.  Mr. Haas

16  explained that because the hypothetical negotiation in the lost profits scenario would have been

17  limited to only the 43% of infringing sales which, according to Ms. Kindler, Impinj demonstrably

18  *would not have lost*, Ms. Kindler should not have used the same rates that she used in her royalty

19  only scenario, *i.e.*, rates that baked in the assumption that 57% of the sales in the royalty base

20  were still "at risk."  (Dkt. 254-4 (Haas Rep.), ¶¶91-96.)  To do so in her lost profits scenario

21  would "double count" the impact of Impinj's potential lost profits because it would assume that

22  Impinj risked losing 57% of the 43% of sales that Ms. Kindler herself opines it *would not have*

23  *lost*.  To correct for this error, Mr. Haas applied Ms. Kindler's "adjusted market share"

24  methodology and opined that for the purposes of determining the appropriate royalty rate, Ms.

25  Kindler should have used—at most—23% as an input, rather than 57%.  (Dkt. 254-4 (Haas Rep.),

26  ¶94.)  By way of illustration, he adjusted Ms. Kindler's calculation for NXP's maximum

27  willingness to pay on the '597 patent as follows:  <u>23%</u> (at risk sales) × 41.8% (profit margin) ×

28  25% (incremental value for sensitivity improvements) × 50% (value attributable to '597 patent) =

1   1.2%.

2        For each patent, Mr. Haas provided an adjusted bargaining range to account for the fact

3   that (1) the negotiated rate would apply only to sales Impinj could never have expected to make,

4   and (2) using the 23% as an input instead of 57%.  Fact (1) corrected Impinj's minimum

5   willingness to accept for each asserted patent to 0%[2]; fact (2) corrected NXP's maximum

6   willingness to pay for each asserted patent as shown:

**Figure 2: Bargaining Range by Patent – Kindler and Corrected Rates ("Lost Profits-Related Damages" Scenario)[193]**

| patent | Kindler Minimum | Kindler Maximum | Corrected Minimum | Corrected Maximum |
|---|---|---|---|---|
| '631 patent | 6.1% | 4.5% | 0% | 1.8% |
| '302 patent | 2.0% | 1.5% | 0% | 0.6% |
| '597 patent | 4.1% | 3.0% | 0% | 1.2% |
| '266 patent | 4.1% | 3.0% | 0% | 1.2% |
| Total | 16.3% | 12.0% | 0% | 4.8% |

18   (Dkt. 254-4 (Haas Rep.), ¶94, Fig. 2.)  The corrected maximums reflect the fact that, even if

19   Impinj could not recover any of the remaining 43% of sales, NXP still could have expected to

20   lose some sales to third-party competitors.  (Dkt. 254-4 (Haas Rep.), ¶94.)  Mr. Haas's "double

21   counting" critique applies *only* to the royalty rate to which Ms. Kindler opines in her lost profits

22   scenario.

23        ***Second***:  Mr. Haas opined that the methodology Ms. Kindler used to conclude that Impinj

24   could have made 57% of the allegedly infringing sales was flawed for several reasons.  Mr. Haas

---

[2] Contrary to Impinj's suggestion in its motion (Dkt. 254-2 at 11), Mr. Haas did <u>not</u> opine that Impinj might agree to a 0% royalty rate, which he explicitly confirmed  (Dkt. 254-4 (Haas Rep., ¶93 n. 191).  Rather, like the hypothetical negotiation itself, the bargaining range is a construct that sets the boundaries on the negotiation.  The rate the parties would ultimately agree to would fall somewhere within the bargaining range.  Where within that range the rate actually falls would be impacted by, *e.g.*, the competitive relationship between the parties.

1   employed a different methodology[3] to conclude that a more accurate estimation of the sales

2   Impinj potentially lost to the accused NXP products was 22.4%.  (Dkt. 254-4 (Haas Rep.), ¶¶97-

3   100.)  Using 22.4% instead of 57%, Mr. Haas corrected both Impinj's minimum willingness to

4   accept and NXP's maximum willingness to pay in Ms. Kindler's bargaining range.  (Dkt. 254-4

5   (Haas Rep.), ¶99.)  By way of illustration, her calculation of NXP's maximum willingness to pay

6   for the '597 patent would be adjusted as follows:  22.4% (at risk sales) × 41.8% (profit margin) ×

7   25% (incremental value for sensitivity improvements) × 50% (value attributable to '597 patent) =

8   1.2%.

9

10

11

12

13

14

15

16

17

18

19

20

**Figure 3: Bargaining Range by patent – Kindler and Corrected Rates ("Royalties Only" Scenario)[197]**

| patent | Kindler Minimum | Kindler Maximum | Corrected Minimum | Corrected Maximum |
|---|---|---|---|---|
| '631 patent | 6.1% | 4.5% | 2.4% | 1.8% |
| '302 patent | 2.0% | 1.5% | 0.8% | 0.6% |
| '597 patent | 4.1% | 3.0% | 1.6% | 1.2% |
| '266 patent | 4.1% | 3.0% | 1.6% | 1.2% |
| Total | 16.3% | 12.0% | 6.4% | 4.8% |

20   (Dkt. 254-4 (Haas Rep.), ¶98, Fig. 3.)  The adjustments to the bargaining ranges Mr. Haas made

21   using his conclusion that 22.4% is a better estimate of Impinj's lost sales are independent of the

22   adjustments to the bargaining ranges Mr. Haas provided with respect to the double counting error.

23       The arguments Impinj makes in its motion apply only to the first of these two errors

24   identified by Mr. Haas.  Impinj does not identify any basis for its request that the Court exclude

25

26

27       [3] Ms. Kindler's "adjusted market share" methodology compared sales of the non-accused UCODE 7 products to Impinj's Monza R6 products.  Mr. Haas's methodology measured shifts in the market that occurred when each party released products allegedly embodying the asserted patents (Impinj's Monza R6 and NXP's UCODE 8).

28

1  portions of Mr. Haas's opinion addressing Ms. Kindler's second error identified above, and that

2  request should be denied without further consideration.

3  **III.    LEGAL STANDARD**

4          Federal Rule of Evidence 702 creates "a gatekeeping role for the [trial] judge" in order to

5  "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task

6  at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 580, 597 (1993).  A

7  "two-step assessment requires consideration of whether: (1) the reasoning or methodology

8  underlying the testimony is scientifically valid (the reliability prong); and (2) whether the

9  reasoning or methodology properly can be applied to the facts in issue (the relevancy prong)."

10  *D&D Grp. Pty Ltd. v. Nationwide Indus., Inc.*, No. 08 CV 0236 MMA (POR), 2010 WL

11  11508568, at *5-7 (S.D. Cal. Apr. 21, 2010) (citing *Daubert*, 509 U.S. at 592–93 and *Kennedy v.*

12  *Collagen Corp.*, 161 F.3d 1226, 1228 (9th Cir. 1998)).  *Daubert* and Rule 702 are safeguards

13  against unreliable or irrelevant opinions, not guarantees of correctness.  *i4i Ltd. P'ship v.*

14  *Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010) "Vigorous cross-examination, presentation

15  of contrary evidence, and careful instruction on the burden of proof are the traditional and

16  appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.  The

17  Supreme Court emphasized that the focus "must be solely on principles and methodology, not on

18  the conclusions that they generate." *Id.* at 595.

19          "A judge must be cautious not to overstep its gatekeeping role and weigh facts, evaluate

20  the correctness of conclusions, impose its own preferred methodology, or judge credibility,

21  including the credibility of one expert over another. These tasks are solely reserved for the fact

22  finder." *Emblaze Ltd. v. Apple Inc.*, 52 F. Supp. 3d 949, 954 (N.D. Cal. 2014) (quoting *Apple Inc.*

23  *v. Motorola, Inc.*, 757 F.3d 1286, 1314 (Fed. Cir. 2014); *see also TQP Dev., LLC v. Merrill Lynch*

24  *& Co.*, No. 2:08-CV-471-WCB, 2012 WL 3283356, at *1 (E.D. Tex. Aug. 20, 2013) (J. Bryson,

25  sitting by designation) ("[T]he court's role under *Daubert* is not to weigh the expert testimony to

26  the point of supplanting the jury's fact-finding role; instead, the court's role is limited to that of a

27  gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the

28  issue before the jury that it is appropriate for the jury's consideration."); *Apple, Inc. v. Motorola,*

*Inc.*, No. 1:11-cv-08540, 2012 WL 1959560, at *1 (N.D. Ill. May 22, 2012) (J. Posner, sitting by designation) ("The biggest challenge to the judge at a *Daubert* hearing, if … the subject matter of the proposed expert testimony is within the judge's comprehension, is to distinguish between disabling problems with the proposed testimony, which are a ground for excluding it, and weaknesses in the testimony, which are properly resolved at the trial itself on the basis of evidence and cross-examination.").

"That the gatekeeping role of the judge is limited to excluding testimony based on unreliable principles and methods is particularly essential in the context of patent damages." *Emblaze*, 52 F. Supp. 3d at 954 (quoting *Apple Inc. v. Motorola, Inc.*, 757 F.3d at 1315)).  The Federal Circuit has recognized that questions regarding which facts are most relevant or reliable to calculating a reasonable royalty are "for the jury."  *i4i*, 598 F.3d at 856; *see also Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("[T]he question of whether the expert is credible or the opinion is correct is generally a question for the fact finder, not the court.")

## IV.  ARGUMENT

Because Ms. Kindler presented two different damages scenarios (one in which Impinj's damages are split between lost profits and reasonable royalty, and another in which Impinj recovers only a reasonable royalty), Mr. Haas evaluated and offered critiques as to both of her scenarios.  Beyond his critiques, Mr. Haas also offered an affirmative opinion as to an appropriate reasonable royalty rate.  Impinj acknowledges that Mr. Haas addressed Ms. Kindler's damages scenarios separately (Dkt. 254-2 at 7-9), but then proceeds to conflate all three portions of Mr. Haas's opinion in its requests for exclusion.  Impinj presents what it believes to be a flaw in his critique of Ms. Kindler's lost profits approach and asks the Court to also exclude his separate critiques of her reasonable royalty approach, and his own separate affirmative analysis that adjusts for certain errors in Ms. Kindler's analysis.  But neither of those separate opinions in any way depends on his critique of Ms. Kindler's lost profits approach about which Impinj now complains.  Moreover, all of the "errors" Impinj purports to identify either (1) are misunderstandings of Mr. Haas's report, (2) go to weight, not admissibility, and/or (3) are not

1  appropriate for resolution under the *Daubert* standard.  Impinj's motion should be denied.

2        **A.**     **Mr. Haas Properly Opined That Ms. Kindler's Analysis Fails To Demonstrate**

3                 **Entitlement To Lost Profits**

4        Impinj's argument concerning Mr. Haas's lost profits opinion is nonsensical.  Impinj

5  admits that Mr. Haas is allowed to the tell the jury that it is his opinion that Ms. Kindler has not

6  proven that the amount of lost profits is greater than $0 (in which case, as Impinj admits, the

7  appropriate lost profits award would be $0 (Dkt. 254-2 at 17)), but seeks to prevent him from

8  using the words "zero dollars" without accompanying those words with the caveat "has not

9  proven."  Impinj cites two reasons in purported support of excluding an affirmative statement that

10  lost profits are $0:  (1) to conclude that $0 is the right amount is a legal conclusion, and (2) that

11  Mr. Haas is unqualified to state that lost profits are $0, and such testimony would therefore be

12  prejudicial.  (Dkt. 254-2 at 17-18.)  Neither has merit.

13        Impinj first argues that to conclude that Impinj is entitled to $0 is lost profits is a legal

14  conclusion and that Mr. Haas should be entitled to offer only the opinion that Ms. Kindler *has not*

15  *proven* entitlement to lost profits.  (Dkt. 254-2 at 17.)  To present an opinion that Impinj is

16  entitled specifically to $0 in lost profits is no more a conclusion of law than Ms. Kindler's

17  opinion that Impinj is entitled to a specific amount greater than $0.

18        Impinj next argues that the Court should exclude Mr. Haas's "affirmative" lost profits

19  opinion because he is not "***qualified*** to render such an opinion absent a full and complete

20  analysis, which he has not performed."  (Dkt. 254-2 at 18 (emphasis added).)  But as Impinj goes

21  on to acknowledge in the next paragraph, Mr. Haas is highly qualified—so highly qualified that

22  Impinj believes that it will unfairly prejudice the jury for him to testify.  (*Id.* ("Mr. Haas is a

23  Managing Director of a financial advisory firm with 'over 30 years of experience specializing in

24  commercial damages and intellectual property valuation and commercialization"; "He has two

25  Masters' degrees and several technical certifications.").)  Impinj's apparent quarrel with the

26  "fullness" and "completeness" of Mr. Haas's analysis has nothing to do with whether Mr. Haas is

27  ***qualified*** to offer an opinion under Rule 702.  Impinj's citation to *Rogers*—finding no abuse of

28  discretion on a Rule 403 ruling that the testimony of an expert on a tangential issue would be

1    substantially more prejudicial than probative—is therefore inapposite.  *See Rogers v. Raymark*
2    *Indus., Inc.*, 922 F.2d 1426, 1430-31 (9th Cir. 1991).

3         Impinj makes a mountain out of a mole hill, latching on to a single statement in Mr.
4    Haas's report.  Mr. Haas stated repeatedly in his report that it is his opinion that Ms. Kindler
5    failed to prove any lost profits.  (Dkt. 254-4 (Haas Rep.), ¶15 ("The Kindler CA Report has not
6    demonstrated lost profits to a reasonable degree of certainty"); ¶52 ("I do not believe that Ms.
7    Kindler has demonstrated that Impinj has lost a measurable volume of sales or profits…nor do I
8    believe that she has reliably quantified her claimed lost profits."); ¶63 ("Without performing this
9    step, Ms. Kindler has not demonstrated any lost profits to a reasonable certainty, much less
10   reliably quantified any such lost profits"); ¶72 ("Ms. Kindler has not demonstrated lost profits to
11   a reasonable certainty, much less offered a quantification of any such damages"); ¶73 ("it is my
12   opinion that proven lost profits are $0."); ¶75 ("I still believe that Ms. Kindler has not
13   demonstrated lost profits attributable to the alleged infringement to a reasonable certainty.").)
14   While Mr. Haas explained in detail numerous reasons why Ms. Kindler failed to demonstrate the
15   amount of lost profits to which Impinj is entitled, or even that Impinj is entitled to lost profits at
16   all, he did not embark on a separate affirmative analysis with the goal of opining to an alternative
17   number.  Nor will he present a separate affirmative analysis to the jury.  To the extent Ms.
18   Kindler is permitted to tell the jury (1) that Impinj is entitled to lost profits, and (2) that
19   amount is something greater than $0,[4] Mr. Haas should be permitted to rebut Ms. Kindler's
20   opinion and explain to the jury that Ms. Kindler is incorrect as to both of those conclusions.

21        To the extent Impinj seeks to quibble over whether Mr. Haas may say "zero dollars"
22   without also stating that Impinj "has not proven" anything else due to its assertions of prejudice,
23   Impinj "seems to [] be overly pessimistic about the capabilities of the jury and of the adversary
24   system generally."  *Daubert*, 509 U.S. at 596.  As Impinj acknowledges, the jury will be carefully
25   instructed on the law and on the burden of proof.  There is no reason to expect that the jury will

26   _____

27        [4] NXP has separately filed a motion to strike Ms. Kindler's lost profits opinions because
     Impinj failed to disclose the theories on which she relies in its Patent L.R. 3-8 damages
28   contentions.  (*See* Dkt. 237-4 at 17-22.)

1  be unfairly swayed by Mr. Haas's credentials to award no lost profits and not be unfairly swayed

2  by Ms. Kindler's credentials in awarding all or some of the lost profits Impinj seeks.

3        **B.**    **Mr. Haas Properly Considered The Competitive Relationship Of The Parties**

4        Impinj first argues that the Court should exclude Mr. Haas's reasonable royalty opinion

5  "to the extent it ignores relevant factors." (Dkt. 254-2 at 11.) Specifically, Impinj asserts that

6  Mr. Haas ignored "the anticipated amount of profits that the prospective licensor reasonably

7  thinks he would lose as result of licensing the patent."[5] (Dkt. 254-2 at 11.) But Mr. Haas

8  explicitly took that consideration into account, both when he analyzed Ms. Kindler's lost profits

9  scenario and when he analyzed her royalty only scenario, concluding that Impinj would have

10  expected to lose 22.4% of the infringing sales. (*E.g.*, Dkt. 254-4 (Haas Rep.), ¶¶97-99, 183-185.)

11  In fact, it is Mr. Haas's opinion that it is *Ms. Kindler* who failed to properly analyze how Impinj's

12  anticipated lost sales should be factored into her two damages scenarios.

13        But even if Impinj were correct that Mr. Haas found that this consideration was wholly

14  inapplicable—and he did not—that conclusion would not render Mr. Haas's opinion inadmissible.

15  "Often, in determining the reasonable royalty, experts consider ***one or more*** of a non-exhaustive

16  list of fifteen factors set forth in *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp.

17  1116, 1120 (S.D.N.Y. 1970)." *Open Text S.A. v. Box, Inc.*, No. 13-cv-04910-JD, 2015 WL

18  393858, at *1 (N.D. Cal. Jan. 29, 2015) (emphasis added). The Federal Circuit "do[es] not

19  require that witnesses use any or all of the *Georgia-Pacific* factors when testifying about damages

20  in patent cases." *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012);

21  *see also Pavo Sols. LLC v. Kingston Tech. Co.*, No. 8:14-cv-01352-JLS-KES, 2020 WL 9158697,

22  at *9 n.11 (C.D. Cal. Aug. 7, 2020) (rejecting inadmissibility contention based on failure to

23  adequately address the competitive relationship of the parties because expert witnesses are not

24  required to rely on all *Georgia-Pacific* factors); *St. Clair Intellectual Prop. Consultants, Inc. v.*

25  

26  ────────────────────

27      [5] Impinj inexplicably also states that "Mr. Haas' approach would suggest the jury ignore some of the 'most relevant factors to the determination of a reasonable royalty in this case'" but immediately proceeds to pin-cite instances in Mr. Haas's report in which he admitted those

28  factors would have an overall upward impact on the royalty rate. (Dkt. 254-2 at 11.)

1   *Acer, Inc.*, 935 F. Supp. 2d 779, 781 (D. Del. 2013) ("Additionally, application of all the

2   *Georgia-Pacific* factors is not mandatory."); *Sprint Commc'ns Co. v. Comcast Cable Commc'ns*

3   *LLC*, 225 F. Supp. 3d 1233, 1240 (D. Kan. 2016) ("Sprint also argues that Dr. Putnam's analysis

4   ignores several of the *Georgia–Pacific* factors that address the infringer's revenues and profits,

5   but there is no requirement that an expert consider any or all of those factors…"); *Ergotron, Inc.*

6   *v. Rubbermaid Commercial Prods. LLC*, No. 10-2010 ADM/JJG, 2012 WL 3733578, at *13 (D.

7   Minn. Aug. 28, 2012) ("However, the weight given to each factor varies on context; not every

8   factor need be considered in every case or be given the same weight.").

9          Notably, "the anticipated amount of profits that the prospective licensor reasonably thinks

10  he would lose as result of licensing the patent" that Impinj "faults" Mr. Haas for improperly

11  weighing is not even an enumerated *Georgia-Pacific* factor (*See Georgia-Pacific Corp. v. U.S.*

12  *Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)), but rather is an input that may be

13  used and weighed as appropriate within other factors, such as Factor 5 ("[t]he commercial

14  relationship between the licensor and licensee, such as, whether they are competitors in the same

15  territory in the same line of business; or whether they are inventor and promoter") or Factor 13

16  ("[t]he portion of the realizable profit that should be credited to the invention as distinguished

17  from non-patented elements, the manufacturing process, business risks, or significant features or

18  improvement added by the infringer").  The inputs on which an expert chooses to rely and the

19  weight accorded to those inputs in evaluating and applying any given *Georgia-Pacific* factor goes

20  to weight, not admissibility.  *Open Text*, 2015 WL 393858, at *2 ("Overall, Open Text's

21  challenge goes to the facts Leonard used or omitted rather than the validity or reliability of his

22  methods. These 'questions regarding which facts are most relevant for calculating a reasonable

23  royalty are properly left to the jury.'" (quoting *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308,

24  1328 (Fed. Cir. 2014)); *Kirola v. City and Cnty. of San Francisco*, No. C 07-03685 SBA, 2010

25  WL 3476681, at *3 (N.D. Cal. Sept. 2, 2010) ("As a general rule, questions relating to the bases

26  and sources of an expert's opinion affect the weight to be assigned that opinion rather than its

27  admissibility and should be left for the jury's consideration." (citation omitted)); *see also ICM*

28  *Controls Corp. v. Honeywell Int'l Inc.*, No. 5:12-CV-1766 (LEK/ATB), 2021 WL 3403734, at *6

1  (N.D.N.Y. Aug. 4, 2021) ("The competitiveness inquiry for lost profits damages is different than

2  reasonable royalty damages and Mr. Bone appears to acknowledge this fact. Whether Mr. Bone's

3  testimony is correct regarding the competitiveness of ICM and Honeywell is best left to a fact

4  finder.").[6]

5          Impinj further wrongly states that Mr. Haas's conclusion is that "Impinj would have

6  accepted a royalty rate as low as 0% to allow its primary competitor to get access to its patented

7  technology." (Dkt. 254-4 at 11.) Mr. Haas drew no such conclusion, and in fact explicitly stated

8  "I am not offering the opinion that the parties would have agreed to a royalty of 0%." (Dkt. 254-4

9  (Haas Rep.), ¶93 n. 191.) Mr. Haas stated only that 0% represented the floor of the bargaining

10 range in the hypothetical construct because in Ms. Kindler's lost profits scenario (in which the

11 litigation-inspired construct of the hypothetical negotiation framework is applied only against the

12 43% of the sales that Impinj would not lose), any further royalty would constitute "found money."

13 (Dkt. 254-4 (Haas Rep.), ¶93; Ex. 14[7] (Haas Tr.), 139:3-8.) That is, because "any amount that

14 Impinj could generate, any amount of compensation would be better than the situation [of] not

15 being compensated for the sales and not having an opportunity to make those sales itself." (Ex.

16 14 (Haas Tr.), 138:23-139:2.) As Mr. Haas went on to opine, the rate to which the parties would

17 have actually agreed in the hypothetical negotiation is not 0%; it is somewhere between 0% and

18 the upper bounds that Mr. Haas identified, and various considerations (such as the parties'

19 competitive relationship) would govern where within that range the parties would land. Impinj

20

21 _____

22 [6] *See also NexStep, Inc. v. Comcast Cable Commc'ns, LLC*, No. 19-1031-RGA-SRF, 2021 WL 4077778, at *25 (D. Del. Aug. 20, 2021) ("To the extent that Plaintiff alleges Mr. Huston did not adequately consider factors such as the relative bargaining positions or objectives of the parties to the Comcast licenses, the extent of use, or the nature of Defendant's products at issue for each agreement, these matters go to the weight of Mr. Huston's opinion, and they are appropriately addressed on cross-examination."); *bioMérieux, S.A. v. Hologic, Inc.*, No. 18-21-LPS, 2020 WL 327161, at *1 (D. Del. Jan. 21, 2020) (rejecting challenge to use of a particular license agreement as an inputs in his "market approach" to determining a reasonable royalty); *Mobility Workx, LLC v. Cellco P'ship*, No. 4:17-CV-00872, 2019 WL 5721814, at *17 (E.D. Tex. Nov. 5, 2019) ("Any dispute that Verizon and Mobility Workx may have over the inputs utilized by Dr. Hernandez are better characterized as disputes over weight and credibility than admissibility.").

28 [7] Exhibits referenced herein are attached to the Declaration of Michael C. Hendershot filed concurrently herewith.

suggests that Mr. Haas's opinion contravenes the Patent Act because a patent owner is entitled to "damages adequate to compensate for the infringement" and Mr. Haas credits to Impinj only a windfall.  (Dkt. 254-2 at 13.)  But, again, Mr. Haas opined to no such thing.  Mr. Haas opined to the range in which the reasonable royalty would fall, with the floor of that range in that particular scenario being 0%, and then proceeded to opine that the actual royalty is something higher than that:

> Instead, it would be appropriate to conclude that the parties would have arrived at a reasonable royalty somewhere between Impinj's minimum willing to accept (0%) and NXP USA's per-patent maximum willingness to pay (ranging from 0.6% to 1.8% depending on the patent).

(Dkt. 254-4 (Haas Rep.), ¶95.)  And as Mr. Haas opined, the parties' competitive relationship is one factor that could affect where within that range the parties would have landed.  (*Id.*, ¶¶125, 129, 175, 180, 187, 188.)  Most tellingly, Mr. Haas has affirmatively opined to a non-zero reasonable royalty for each of the patents-in-suit.  Impinj's claim is simply wrong.

In any event, even if Impinj's mischaracterization of Mr. Haas's opinion setting forth the applicable bargaining range were correct, whether Mr. Haas's "opinion" that "Impinj would have accepted a royalty rate as low as 0% to allow its primary competitor to get access to its patented technology" is a matter of weight, not admissibility.  Whatever Impinj thinks of the proper weight to be accorded to the parties' competitive relationship and the at-risk sales, Mr. Haas's application of that consideration and the weight to which he accorded it should be addressed through cross examination.

### C.    Mr. Haas's Opinions Concerning Ms. Kindler's Split Lost Profits Scenario Are Reliable

#### 1.    Mr. Haas's Critiques Are Not Contrary To Law

Mr. Haas does not dispute that in Ms. Kindler's "lost profits" scenario Impinj may still collect a reasonable royalty on the 43% of NXP's sales that Impinj would not have been able to capture.  "A patentee is entitled to no less than a reasonable royalty on an infringer's sales for which the patentee has not established entitlement to lost profits."  *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 (Fed. Cir. 1995).  But "[t]he objective of [a] reasonable royalty calculation is

1  to determine the amount necessary to adequately compensate for an infringement." *Maxwell v. J.*

2  *Baker, Inc.*, 86 F.3d 1098, 1109 (Fed. Cir. 1996).  "[R]easonable royalty damages are not

3  calculated in a vacuum without consideration of the infringement being redressed." *Fujifilm*

4  *Corp. v. Motorola Mobility LLC*, No. 12-cv-03587-WHO, 2015 WL 1265009, at *4 (N.D. Cal.

5  Mar. 19, 2015) (quoting *Applied Med. Resources Corp. v. U.S. Surgical Corp.*, 435 F. 3d 1356,

6  1361 (Fed. Cir. 2006)).  "We are required to identify *the infringement requiring compensation*."

7  *Id.* (emphasis added).  "A *segment* of the infringer's sales may not warrant a lost profits award

8  because the patentee cannot establish causation for that *segment*."  *Minco, Inc. v. Combustion*

9  *Eng'g, Inc.*, 95 F.3d 1109, 1119 (Fed. Cir. 1996) (emphasis added).  "For instance, a patent owner

10  may not operate in the specific geographical area covered by the infringer or may not have had

11  the manufacturing or marketing capacity to make the infringer's sales."  *Id.*

12      Mr. Haas opined that in Ms. Kindler's lost profits scenario—and only in Ms. Kindler's

13  lost profits scenario—that the hypothetical negotiation analysis is applicable only to that portion

14  of sales for which Impinj is *not* seeking lost profits, and when considering *those 43% of sales*

15  *only*, Impinj would understand that it was not likely to lose any further sales from that "bucket."

16  (Dkt. 254-4 (Haas Rep.), ¶¶91-96.)  Contrary to Impinj's assertion, Mr. Haas does not opine that

17  Impinj and NXP would have considered whether or not Impinj would seek and be awarded lost

18  profits in a later litigation at the hypothetical negotiation table.  Impinj's claim that Mr. Haas

19  relies on a "fictional premise that the parties would know during the hypothetical negotiation that

20  Impinj would also receive lost profits" is just plain wrong.  (Dkt. 254-2 at 11.)  Rather, it is Mr.

21  Haas's opinion that in Ms. Kindler's lost-profits scenario in which a reasonable royalty is being

22  applied against only the 43% of NXP's sales that Impinj could not have made, it is only those

23  43% of sales would have been under consideration at the hypothetical negotiation.

24      Mr. Haas's opinion is consistent with approaches that have been taken in other cases.  For

25  example, in *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, the court approved of

26  a damages opinion in which the expert opined that "the parties would have arrived at a royalty

27  comprised of three components, the first two in recognition of losses [the patentee] would be

28  expected to incur by reasons of [the defendants'] competing sales and the third in recognition of

1    the benefit to [the defendant] in being able to make and sell products incorporating [the

2    patentee's] patented technology."  No. C 09-5235 MMC, 2014 WL 4437631, at *3 (N.D. Cal.

3    Sept, 9, 2014).  "[I]n assigning a value to **each of** the components of his reasonable royalty, the

4    [expert] considered the factors listed in [*Georgia-Pacific.*]"  *Id*. (emphasis added).  Although the

5    defendant argued that the expert applied a double recovery to sales for the second and third

6    components, the court disagreed:  "Although the monetary figure [for components 2 and 3] is the

7    same, [the expert] made clear that the sales to which it was applied are **separate and distinct** . . .

8    and, **in each instance**, he explained his reasoning in choosing the $0.20 as the appropriate

9    figure."  *Id.* (emphasis added, internal record citations omitted).  The expert in *Power*

10   *Integrations* structured his royalty opinion in three parts, assigning different values to different

11   types of losses, and combining those values to arrive at a final rate that appropriately accounted

12   both for profits the patentee expected to lose and the rate to which the parties otherwise would

13   have agreed as to sales the patentee could not have expected to make.  (Ex. 44 (3:09-cv-05235-

14   MMC, Dkt. 510, Trial Tr. Vol. 4), 938:8–946:10; 977:10–978:11).)  He carefully tailored

15   considerations associated with lost profits to only the "bucket" of sales that the patentee could

16   have recovered, and he applied different considerations to the "bucket" of sales that the patentee

17   could not have recovered.

18        Ms. Kindler should have employed a similar analysis in her attempt to split the award

19   between lost profits and reasonable royalty.   In her royalty only scenario (and setting aside other

20   flaws), while she did not mathematically separate the buckets of sales out as the *Power*

21   *Integrations* expert did, her rate reflects a blend of the considerations applicable to sales Impinj

22   would have expected to lose, and sales to which Impinj would recover only the amount NXP

23   would have paid for the right to use the patented inventions.  That combination of considerations

24   resulted in an overall rate that falls somewhere in between Impinj's profit margin and the rate to

25   which the parties would have otherwise agreed if Impinj did not stand to lose any sales.  But in

26   her lost profits scenario—where she does mathematically separate out the two buckets—she still

27   applied the same blended-consideration royalty rate to the bucket of sales for which lost sales was

28   not an applicable consideration (*i.e.*, sales she concedes Impinj could not have made and did not

1   lose).  In keeping with the approach the court approved of in *Power Integrations*, Mr. Haas

2   pointed out that this improperly inflates the reasonable royalty to which NXP and Impinj would

3   have agreed for that 43% of sales.  He properly opined that Ms. Kindler (like the expert in *Power*

4   *Integrations*) should have tailored the reasonable royalty portion of her lost profits scenario to

5   only the sales to which she claims a reasonable royalty should be awarded.  Determining what

6   royalty rate should be reasonably applied to a royalty base is inextricable from a proper

7   understanding of that royalty base.

8          **2.      Ms. Kindler's Lost Profits Scenario Double Counts The Impact Of**
                      **Impinj's At-Risk Sales**
9

10          Impinj complains that Mr. Haas has improperly accused Ms. Kindler of double counting

11   even though he acknowledges that Impinj seeks to recover only once per infringing sale.[8]  (Dkt.

12   254-2 at 15-16.)  But this is yet another mischaracterization of Mr. Haas's opinion.  Mr. Haas

13   opined that Ms. Kindler double counted the *impact* of lost sales in her royalty rate for her lost

14   profits scenario.  (*See* Dkt. 254-4 (Haas Rep.), ¶111.)  As explained above, setting aside the other

15   flaws, Ms. Kindler is free to use the amount of profits she believes Impinj lost as an input into the

16   royalty rate.  But when opining to a royalty rate that applies *only* to sales that she does not dispute

17   Impinj would not have captured, that same input is not appropriate because it assumes that the

18   parties would have agreed that Impinj still stood to lose 57% of the 43% of sales they also already

19   understood that Impinj could not capture.  Mr. Haas explained that Ms. Kindler's opinion

20   functionally results in a hypothetical negotiation in which the parties would have operated with

21   the understanding that Impinj actually risked losing 80% of the sales rather than only 57%.  (Dkt.

22

23   _____

24          [8] Impinj also cites two decisions from this District (not "this Court") for the proposition
     that "double counting" is a "loaded term[], legal conclusion[] and 'improper ad hominem
25   attack[].''  (Dkt. 254-2 at 16.)  Neither of these cases stand for the proposition that criticizing
     another expert's quantification as "double counting" is any of these things.  *See Avila v. Willits*
26   *Env't Remediation Trust*, No. C 99-3941 SI, 2008 WL 360858, at *16 (N.D. Cal. Feb. 6, 2008)
     (striking declaration characterizing defendants' witnesses and counsel as using "illegal" evidence
27   and characterizing their arguments as "delusional"); *Clear-View Techs., Inc. v. Rasnick*, No. 13-
     cv-02744-BLF, 2015 WL 3509384, at *7 (N.D. Cal. June 3, 2015) (precluding use of the term
28   "Ponzi scheme" because the expert had not cited evidence that the money was being used in that
     manner).

254-4 (Haas Rep.), ¶92.)

Impinj's argument that Mr. Haas's opinion deprives it of the statutory minimum reasonable royalty is nonsensical.  Impinj argues that it cannot be made whole and "stands to gain little because any additional recovery would be offset by a decreased reasonable royalty for the other sales."  (Dkt. 254-2 at 16-17.)  But by definition, an award of lost profits makes Impinj whole because it compensates Impinj for everything it could have made but for NXP's infringement.  And there is no dispute here that an award of lost profits on 57% of the sales (not counting the reasonable royalty on the other 43%) more than doubles the reasonable royalty to which Ms. Kindler opines for all of the sales together, *i.e.*, the floor.  (*See* Dkt. 254-6 (Kindler Rep.), ¶113 (Table 21) (Lost Profits Damages alone of $4.8 million); ¶183 (Table 23) (Total Reasonable Royalty Damages of $2.1 million).)  *Any* royalty awarded under her lost profits scenario on the sales that Impinj could not have made is a recovery *above and beyond* being made whole, and above and beyond the minimum threshold provided for by statute.  Nor does Mr. Haas's opinion increase or decrease "the value of the use of the patented technology" by NXP. (Dkt. 254-2 at 16.)  Ms. Kindler bases "the value of the use of the patented technology" on the "at risk" sales, and in her scenario in which Impinj has proven and collected its lost profits and has been made whole, she must then consider what the residual value of the patented technology is to the negotiating parties.

**3.  <u>Identification Of The Sales To Which A Reasonable Royalty Will Be Applied Is A Proper Application Of The Book Of Wisdom</u>**

The hypothetical negotiation is a method parties can employ to demonstrate a reasonable royalty.  But it is just that—hypothetical.  It is a construct of litigation. And because it is a construct of litigation, the Supreme Court has endorsed the use of the "Book of Wisdom," under which "[e]xperience is…available to correct uncertain prophecy.  Here is a book of wisdom that courts may not neglect."  *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933).

Impinj emphasizes that the hypothetical negotiation may not rely on an "after-the-fact" determination (Dkt. 254-2 at 14), but that directly contravenes the Book of Wisdom, which

1    concerns *only* "after-the-fact" determinations.  Curiously, Impinj seeks to preclude Mr. Haas from

2    offering an opinion that considers the profits Impinj claims—after the fact—that it lost, yet Ms.

3    Kindler herself used that very same "after-the-fact" determination.  The 57% of sales that Ms.

4    Kindler opines Impinj would have captured in the time *since* the hypothetical negotiation date

5    forms a *direct quantitative input* into Ms. Kindler's royalty rate determination.  Instead of relying

6    on a *qualitative* input that Impinj would have expected to lose *some* sales if it were to license the

7    asserted patents to NXP, Ms. Kindler's royalty rate is tied directly to Impinj's specific, after-the-

8    fact contention that it lost 57% of those sales.  Impinj cannot have it both ways.

9          Mr. Haas's tailored criticisms of Ms. Kindler's two damages scenarios does not "render[]

10   meaningless the date of the hypothetical negotiation."  (Dkt. 254-2 at 14.)  Impinj cites *Lucent* in

11   support of its argument, but *Lucent* does not foreclose Mr. Haas's opinion.  Indeed, *Lucent*

12   specifically considers that parties to the hypothetical negotiation would have after-the-fact data as

13   to "usage" and notes that "[t]he damages award ought to be correlated, in some respect, to the

14   extent the infringing method is used by consumers.  This is so because this is what the parties to

15   the hypothetical negotiation would have considered."  *Lucent Techs., Inc. v. Gateway, Inc.*, 580

16   F.3d 1301, 1334 (Fed. Cir. 2009).  And Impinj's citation to *Interactive Pictures* is inapposite.

17   The court in *Interactive Pictures* found that sales projections were relevant to the parties' state of

18   mind, and that failure to meet those projections should not discount the proper rate of the patented

19   technology itself.  *Interactive Pictures Corp. v. Infinite Pictures, Inc*., 274 F.3d 1371, 1384-85

20   (Fed. Cir. 2001).  Further, *Interactive Pictures* concerned a fully paid up lump sum royalty.  A

21   lump sum agreed to by the parties would not change if sales turned out to be lower or higher than

22   expected, and the lump sum calculus therefore specifically requires the parties to *anticipate* the

23   value of the volume of future sales and assume the risk of being wrong.  Here, Ms. Kindler opines

24   to a running royalty, which applies to actual sales, and only actual sales.  Mr. Haas does not

25   suggest that at the hypothetical negotiation, Impinj and NXP would have projected higher sales

26   than actually occurred.  Mr. Haas opines only that the parties in Ms. Kindler's lost profits

27   scenario would be negotiating only over the sales to which that royalty is to be applied because in

28   her scenario, Impinj has already been compensated for the other sales, and no hypothetical

1    negotiation over that bucket of sales occurs.  As such, *Interactive Pictures* is inapposite.

2    "[N]othing 'the court did' [in *Interactive Pictures*] prohibits the discretionary use of such [post

3    negotiation] information in future cases.  Rather, the most that can be inferred from *Interactive*

4    *Pictures* is that it is not an abuse of discretion in those circumstances for a district court to permit

5    the jury to disregard post-negotiation information."  *Honeywell Int'l, Inc. v. Hamilton Sundstrand*

6    *Corp.*, 378 F. Supp. 2d 459, 467 (D. Del. 2005).

7           Regardless, as noted above, Mr. Haas's criticism of Ms. Kindler's lost profits scenario

8    does not ask the parties to consider whether Impinj would seek lost profits in a later litigation.

9    Mr. Haas opines that because in Ms. Kindler's lost profits scenario she splits sales into two

10   buckets, to only one of which a reasonable royalty would apply, the hypothetical negotiation to

11   determine the reasonable royalty only for that second bucket of sales should be correlated to the

12   size of that second bucket.  The reasonable royalty rate should fit the royalty base to which it is

13   being applied.

14         **D.**      **Impinj Fails To Provide Any Basis Or Argument As To Why The Court**

15                     **Should Exclude Certain Identified Portions Of Mr. Haas's Opinion**

16           Setting aside all the flaws in Impinj's arguments, Impinj seeks the exclusion of a number

17   of paragraphs from Mr. Haas's report without explanation.  Impinj asks the court to exclude Mr.

18   Haas's "opinions on reasonable royalty damages" in paragraphs 15 (fourth bullet), 16, 84, 90–

19   100, 106–07, 111, 146, 160, 173–74, 183, 188–89, and 191.  (Dkt. 254-4 at 19.)  Of these,

20   Impinj's arguments do not address the substance of paragraphs 16, 84, 97–100, 106, 107, 146

21   174, 188, 189, and 191, much less explain on what basis Impinj seeks to exclude these

22   paragraphs.

23           Paragraphs 16, 188, 189, and 191 summarize Mr. Haas's affirmative opinions as to a

24   reasonable royalty.  Impinj offers no argument whatsoever as to how Mr. Haas's affirmative

25   opinions as to a reasonable royalty are unreliable.  As explained in detail above, Impinj's motion

26   is directed to Mr. Haas's critiques of Ms. Kindler's lost-profits damages scenario, and his critique

27   of Ms. Kindler's royalty only scenario and his own affirmative reasonable royalty opinions are

28   independent of the lost profits critiques.  Because Impinj did not even argue, much less show, that

NXP'S OPPOSITION TO IMPINJ'S MOTION TO
EXCLUDE OPINIONS OF DAVID A. HAAS
Case No. 4:19-CV-03161-YGR

1  Mr. Haas's affirmative reasonable royalty opinions are so methodologically flawed as to render

2  them unreliable, the Court should not exclude any of paragraphs 16, 188, 189 and 191.

3       Paragraph 84 simply recites that Ms. Kindler provided two different damages scenarios—

4  a fact about which there is no dispute.  Paragraph 90 states only that Mr. Haas disagrees with Ms.

5  Kindler's quantitative methodology.  It is not clear what Impinj believes warrants exclusion from

6  these paragraphs, and there is no reason to exclude them.

7       Paragraphs 97–100 and 174 all concern Mr. Haas's disagreement with how Ms. Kindler

8  *arrived* at 57% as the amount of sales Impinj lost over the damages period, not with what she did

9  with the balance of sales in the reasonable royalty portion of her lost profits damages scenario

10  (which is the critique to which Impinj's argument is directed).  In these paragraphs, Mr. Haas

11  opined as to what he believes is a more reliable methodology, concluded that a more accurate

12  reflection of the sales lost by Impinj during the damages period is 22.4%, and applied that 22.4%

13  in lieu of Ms. Kindler's 57% to determine the maximum royalty rate.  While Ms. Kindler may

14  disagree with how Mr. Haas determined that Impinj's lost sales were more appropriately

15  estimated to be 22.4% instead of 57%, Impinj offers no argument as to why Mr. Haas's

16  methodology resulting in that conclusion is unreliable and warrants exclusion.  Therefore, the

17  Court should not exclude any of paragraphs 97–100 and 174.

18       Paragraphs 106 and 107 relate to Mr. Haas's opinions that Ms. Kindler did not adequately

19  apportion the royalty rates to only the incremental benefit contributed by the asserted patents.

20  Impinj's motion says nothing at all about Mr. Haas's opinions concerning Ms. Kindler's failure to

21  apportion.  Therefore, the Court should not exclude either paragraph 106 or 107.

22       Paragraph 146 reflects Mr. Haas's opinion that the existence of non-infringing alternatives

23  and ready availability of alternative designs would have lessened NXP's willingness to pay

24  because, in the presence of those alternatives, Impinj would not have been able to capture a

25  significant portion of NXP's sales.  The arguments in Impinj's motion do not mention or relate to

26  Mr. Haas's opinions regarding the impact of the availability of existing non-infringing

27  alternatives (admitted by Ms. Kindler (Dkt. 254-6 (Kindler Rep.), ¶109(a)(ii)) and readily

28  available design alternatives (ignored by Ms. Kindler, but described by NXP's technical experts

NXP'S OPPOSITION TO IMPINJ'S MOTION TO
EXCLUDE OPINIONS OF DAVID A. HAAS
Case No. 4:19-CV-03161-YGR

1   (Dkt. 254-4 (Haas Rep.), ¶¶140-146)).  Therefore, the Court should not exclude this paragraph.

2   **V.      CONCLUSION**

3          For the reasons stated herein, NXP respectfully requests that the Court deny Impinj's

4   Motion.  With respect to paragraphs 16, 84, 97-100, 106, 107, 146 174, 188, 189, and 191, Impinj

5   fails to offer any explanation at all as to why the Court should exclude these paragraphs, and the

6   Court should deny Impinj's motion with respect to these paragraphs without further

7   consideration.  With respect to the remaining paragraphs for which Impinj seeks exclusion,

8   Impinj has not demonstrated that Mr. Haas's opinions are unreliable or contrary to law.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: November 7, 2022                 JONES DAY


                                         By: */s/ Michael C. Hendershot*
                                             Michael C. Hendershot

                                             Tharan Gregory Lanier
                                             (California State Bar No. 138784)
                                             tglanier@jonesday.com
                                             Michael C. Hendershot
                                             (California State Bar No. 211830)
                                             mhendershot@jonesday.com
                                             Gurneet Singh
                                             (California State Bar No. 333711)
                                             gsingh@jonesday.com
                                             JONES DAY
                                             1755 Embarcadero Road
                                             Palo Alto, CA 94303
                                             Telephone:  (650) 739-3939
                                             Facsimile:  (650) 739-3900

                                             Thomas W. Ritchie (admitted *pro hac vice*)
                                             (Illinois State Bar No. 6301954)
                                             twritchie @jonesday.com
                                             JONES DAY
                                             110 North Wacker Drive, Suite 4800
                                             Chicago, IL 60606
                                             Telephone:  (312) 782-3939
                                             Facsimile:  (312) 782-8585

                                             Yury Kalish (admitted *pro hac vice*)
                                             (D.C. State Bar No. 1020172)
                                             ykalish@jonesday.com
                                             Tracy A. Stitt (admitted *pro hac vice*)
                                             (D.C. State Bar No. 1015680)
                                             tastitt@jonesday.com
                                             JONES DAY
                                             51 Louisiana Ave., N.W.
                                             Washington, D.C. 20001
                                             Telephone:  (202) 879-3939
                                             Facsimile:  (202) 626-1700

                                             T. Kaitlin Crowder (admitted *pro hac vice*)
                                             (Ohio State Bar No. 0095796)
                                             Robert M. Breetz (admitted *pro hac vice*)
                                             (Ohio State Bar No. 0098968)
                                             kcrowder@jonesday.com
                                             JONES DAY
                                             901 Lakeside Ave. E.
                                             Cleveland, OH 44114
                                             Telephone:  (216) 586-7347
                                             Facsimile:  (216) 579-0212

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Jonathan McNeal Smith
(California State Bar No. 292285)
jonathansmith@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539

Attorneys for Defendant
NXP USA, INC.

NXP'S OPPOSITION TO IMPINJ'S MOTION TO
EXCLUDE OPINIONS OF DAVID A. HAAS
Case No. 4:19-CV-03161-YGR