1   Tharan Gregory Lanier (State Bar No. 138784)
    tglanier@jonesday.com
2   Michael C. Hendershot (State Bar No. 211830)
    mhendershot@jonesday.com
3   JONES DAY
    1755 Embarcadero Road
4   Palo Alto, CA  94303
    Telephone:  (650) 739-3939
5   Facsimile:   (650) 739-3900

6   [Additional counsel identified on signature pages]

7   Attorneys for Defendant
    NXP USA, INC.
8

9                   UNITED STATES DISTRICT COURT

10                 NORTHERN DISTRICT OF CALIFORNIA

11                        OAKLAND DIVISION

12

13   IMPINJ, INC.,                       Case No. 4:19-CV-03161-YGR

14              Plaintiff,               **NXP USA, INC.'S RESPONSE TO
                                         MOTION FOR PERMANENT
15        v.                             INJUNCTION**

16   NXP USA, INC.,                      Date: September 1, 2023
                                         Time: 2:00 p.m.
17              Defendant.               Location: Courtroom 1, 4th Floor
                                         Judge: Yvonne Gonzalez Rogers
18

19                                       ***REDACTED VERSION OF
                                         DOCUMENT FILED UNDER SEAL***

20

21

22

23

24

25

26

27

28

1
2

# **TABLE OF CONTENTS**

3   I.     INTRODUCTION ............................................................................................................ 1

4   II.    BACKGROUND ............................................................................................................. 2

5          A.    Impinj's Litigation Against NXP ......................................................................... 2

6          B.    The '302 Patent ..................................................................................................... 3

7          C.    The '597 Patent ..................................................................................................... 3

8          D.    The Jury's Damages Award .................................................................................. 4

9   III.   ARGUMENT .................................................................................................................. 4

10         A.    The Facts Do Not Support a Permanent Injunction. ............................................ 4

11               1.    Impinj Has Not Established Irreparable Harm. .......................................... 5

12                     (a)    Impinj Fails to Support the Harm It Alleges. ................................. 5

13                     (b)    There Is No Causal Nexus to Any of the Alleged Harm ................ 7

14               2.    Legal Remedies Are More Than Adequate ................................................ 16

15               3.    The Balance of Hardships Does Not Favor Impinj .................................... 17

16               4.    An Injunction Would Not Be in the Public's Interest. ............................... 18

17         B.    The Proposed Injunction Is Facially Overbroad ................................................. 20

18               1.    There Is No Basis to Enjoin NXP's Subsidiaries and Affiliates ............... 20

19               2.    The Injunction Cannot Extend to Inducement or Non-U.S. Conduct ........ 21

20               3.    There Is No Basis to Require a Notice With Sales. ................................... 23

21               4.    Any Injunction Should Be Tied to Specific Patented Features ................... 23

22               5.    The Injunction Omits an Appropriate Sunset Provision ............................ 24

23         C.    A Royalty Will Adequately Address Any Ongoing Harm ................................... 25

24   IV.    CONCLUSION .............................................................................................................. 25

25
26
27
28

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page**

3

4

Cases

5

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
6      694 F.3d 1312 (Fed. Cir. 2012)..................................................................................... 18

7

*Additive Controls & Measurement Sys., Inc. v. Flowdata, Inc.*,
      96 F.3d 1390 (Fed. Cir. 1996)....................................................................................... 21

8

*Apple, Inc. v. Samsung Elecs. Co.*,
9      909 F. Supp. 2d 1147 (N.D. Cal. 2012) ........................................................................ 12

10

*Apple, Inc. v. Samsung Elecs. Co. (Apple I)*,
11      678 F.3d 1314 (Fed. Cir. 2012)........................................................................................ 4

12

*Apple Inc. v. Samsung Elecs. Co. (Apple II)*,
13      695 F.3d 1370 (Fed. Cir. 2012)................................................................................... 4, 8

14

*Apple Inc. v. Samsung Elecs. Co. (Apple III)*,
15      735 F.3d 1352 (Fed. Cir. 2013)............................................................................ passim

16

*Apple Inc. v. Samsung Elecs. Co. (Apple IV)*,
      809 F.3d 633 (Fed. Cir. 2015)............................................................................... passim

17

*Asetek Danmark A/S v. CMI USA, Inc.*,
18      No. 13-CV-00457-JST, 2015 WL 5568360 (N.D. Cal. Sept. 22, 2015), *aff'd in*

19      *part, remanded in part*, 842 F.3d 1350 (Fed. Cir. 2016), *opinion modified and*
      *superseded on reh'g*, 852 F.3d 1352 (Fed. Cir. 2017), *and aff'd in part*,
20      *vacated in part*, 852 F.3d 1352 (Fed. Cir. 2017) ....................................................... 23

21

*Bright Data Ltd. v. Teso LT, UAB*,
22      584 F. Supp. 3d 193 (E.D. Tex. 2022) .......................................................................... 10

23

*Broadcom Corp. v. Emulex Corp.*,
24      732 F.3d 1325 (Fed. Cir. 2013)..................................................................................... 24

25

*Cave Consulting Grp., LLC v. Optuminsight, Inc.*,
26      No. 5:11-cv-00469-EJD, 2016 WL 4658979 (N.D. Cal. Sept. 7, 2016)............................ 5, 18

27

*Comedy Club, Inc. v. Improv W. Assocs.*,
      553 F.3d 1277 (9th Cir. 2009)....................................................................................... 21

28

*Conceptus, Inc. v. Hologic, Inc.*,
No. C 09-02280 WHA, 2012 WL 44064 (N.D. Cal. Jan. 9, 2012)...................... 16, 17, 18, 19

*Douglas Dynamics, LLC v. Buyers Products Co.*,
717 F.3d 1336 (Fed. Cir. 2013)............................................................................. 6, 17

*eBay Inc. v. MercExchange, LLC*,
547 U.S. 388 (2006) .................................................................................. 4, 5, 16, 20

*EcoServices, LLC v. Certified Aviation Servs., LLC*,
340 F. Supp. 3d 1004 (C.D. Cal. 2018), *aff'd in part and vacated in part on
other grounds*, 830 F. App'x 634 (Fed. Cir. 2020) ................................................. 16

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
No. 2:15-CV-1202-WCB, 2017 WL 3034655 (E.D. Tex. July 18, 2017) ............................. 25

*Extreme Networks, Inc. v. Enterasys Networks, Inc.*,
No. 07-CV-229-BBC, 2008 WL 4756498 (W.D. Wis. Oct. 29, 2008), *stay
granted, order amended*, No. 07-CV-229-BBC, 2009 WL 679602 (W.D. Wis.
Mar. 16, 2009), *and vacated and remanded on other grounds*, 395 F. App'x
709 (Fed. Cir. 2010) ............................................................................................ 22

*Genband US LLC v. Metaswitch Networks Corp.*,
861 F.3d 1378 (Fed. Cir. 2017)................................................................................ 8

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
No. 2:07-cv-00331-PMP-PAL, 2013 WL 3043668 (D. Nev. June 17, 2013) ....................... 23

*i4i Ltd. P'ship v. Microsoft Corp.*,
598 F.3d 831 (Fed. Cir. 2010)................................................................................ 24

*Illinois Tool Works, Inc. v. Grip-Pak, Inc.*,
906 F.2d 679 (Fed. Cir. 1990)................................................................................ 19

*Inguran, LLC v. ABS Glob., Inc.*,
72 F.4th 1272 (Fed. Cir. 2023)................................................................................ 23

*Jiaxing Super Lighting Elec. Appliance Co. v. CH Lighting Tech. Co.*,
No. 6:20-cv-00018-ADA, 2022 WL 3371630 (W.D. Tex. Aug. 16, 2022)........................... 12

*LA Alliance for Human Rights v. Cnty. of Los Angeles*,
14 F.4th 947 (9th Cir. 2021) ................................................................................ 22

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
851 F.3d 1275 (Fed. Cir. 2017)................................................................................ 10

*Minerva Surgical, Inc. v. Hologic, Inc.*,
No. 3:17-cv-02013-JD, 2018 WL 306689 (N.D. Cal. Jan. 5, 2018) ...................................... 15

*Monsanto Co. v. Geertson Seed Farms*,
561 U.S. 139 (2010) ............................................................................................................ 4

*Orantes–Hernandez v. Thornburgh*,
919 F.2d 549 (9th Cir. 1990) ............................................................................................ 22

*Paice LLC v. Toyota Motor Corp.*,
504 F.3d 1293 (Fed. Cir. 2007) ........................................................................................ 25

*Panduit Corp. v. Stahlin Bros. Fibre Works*,
575 F.2d 1152 (6th Cir. 1978) .......................................................................................... 10

*Pierce Mfg., Inc. v. E-One, Inc.*,
No. 8:18-cv-617-TPB-TGW, 2022 WL 479831 (M.D. Fla. Feb. 16, 2022) ......................... 10

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
No. C 09-5235 MMC, 2015 WL 604582 (N.D. Cal. Feb. 12, 2015) .............................. passim

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
702 F.3d 1351 (Fed. Cir. 2012) .......................................................................................... 7

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
No. 08-cv-335-IEG-NLS, 2013 WL 4068833 (S.D. Cal. Aug. 12, 2013) ........................... 21

*Prestige Flag Mfg. Co. v. Par Aide Prods. Co.*,
No. 14-CV-2711-H, 2015 WL 11990931 (S.D. Cal. Jan. 12, 2015) .................................. 19

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
659 F.3d 1142 (Fed. Cir. 2011) ........................................................................................ 17

*Spine Sols., Inc. v. Medtronic Sofamor Danek USA, Inc.*,
620 F.3d 1305 (Fed. Cir. 2010), *abrogated on other grounds by Halo Elecs.,*
*Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016) ..................................................................... 22

*TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*,
920 F.3d 777 (Fed. Cir. 2019) .................................................................................... 12, 24

*Toyo Tire & Rubber Co. v. CIA Wheel Grp.*,
No. CV 15-0246-DOC, 2017 WL 514324 (C.D. Cal. Jan. 23, 2017) .................................. 21

STATUTES

35 U.S.C.

§ 271(a) ................................................................................................................ 22
§ 271(b) ................................................................................................................ 22
§ 271(c) ................................................................................................................ 22
§ 283 ...................................................................................................................... 1

OTHER AUTHORITIES

Federal Rule of Civil Procedure 65 .......................................................................... 21

1    I.    **INTRODUCTION**

2           After claiming NXP's products infringed more than two dozen patents directed to an array

3    of RFID IC features, Impinj went to trial on direct infringement theories as to just two patents—

4    U.S. Patent No. 9,633,302 ("the '302 patent"), which claims a particular channel shape between

5    RF pads, and U.S. Patent No. 8,115,597 ("the '597 patent"), which claims a specific rectifier

6    design.  Having obtained an inconsistent verdict on the '302 patent's invalidity and persuaded a

7    jury that the '597 patent's claims could be mapped onto the accused products' rectifier if one

8    ignores how NXP designed that rectifier, Impinj seeks to enjoin sales of the products worldwide

9    and to bind entities that were not named as defendants in this litigation.  This would be a gross

10   abuse of 35 U.S.C. § 283 even if there were legitimate bases for an injunction.  But there are not.

11          To obtain a permanent injunction, a patent owner must establish that (1) infringement—

12   rather than lawful competition—caused it irreparable harm, (2) monetary damages are inadequate,

13   (3) the balance of hardships favors it, and (4) the public interest would be furthered by an

14   injunction.  Impinj trips out of the gate.  Rather than marshalling evidence of customer demand

15   for the specific features claimed by the '597 and '302 patents, Impinj relies almost entirely on its

16   executives' self-serving hearsay accounts of customer remarks, NXP evidence shorn of context,

17   and publicly available documents addressing general preferences related to RFID IC

18   performance.  Impinj does not offer any testimony or internal documents from its or NXP's

19   customers.  Nor does it offer any expert survey evidence regarding customer demand.  In short,

20   Impinj fails to meet its burden to prove the causal nexus required for irreparable harm.

21          That is reason enough to deny Impinj's motion.  But Impinj also fails to show why the

22   royalty rates its own expert calculated and the jury adopted are inadequate to remedy its purported

23   harm, why the balance of hardships favors it when it is seeking to shut down NXP's production of

24   chips that include scores of indisputably non-infringing features, or why disrupting the nation's

25   supply chain and obstructing the use of NXP's chips in the medical field would be in the public

26   interest.  In short, Impinj cannot satisfy its burden as to any of the injunction factors.

27          Given the absence of evidence to support an injunction in the first place, the overbreadth

28   of Impinj's request is glaring.  Having sued only NXP USA, Impinj asks to enjoin all of NXP

1   USA's affiliates without a shred of evidence as to the nature of their relationship to NXP USA or

2   whether they have any U.S. operations.  Having pleaded and tried only direct infringement

3   claims, Impinj requests a worldwide injunction that extends to inducement and imposes notice

4   requirements on manufacturers outside the U.S.  And having prevailed only on two patents

5   directed to two specific, physical features of RFID ICs, Impinj seeks to enjoin the accused

6   products outright without allowing NXP to satisfy supply chain commitments while any design-

7   around that may be required after the Court has ruled on NXP's post-trial motions is completed.

8   The injunction should be denied.  But in no event can it issue in the form proposed by Impinj.

9           Finally, Impinj seeks a compulsory license in the alternative.  Fair enough.  But Impinj

10   offers no evidence or authority to support its request for a royalty greater than that which the jury

11   already decided appropriately compensates Impinj for use of the specific features patented by the

12   '302 and '597 patents.  That is more than sufficient to remedy any ongoing harm.

13   **II.**      **BACKGROUND**

14        **A.**      **Impinj's Litigation Against NXP**

15           After spending the better part of two years seeking a negotiated resolution to the alleged

16   infringement of patents that NXP believed it did not infringe and that were in any event invalid,

17   Impinj filed this lawsuit in June 2019.  Dkt. 1.  Impinj asserted 26 patents, which it contended

18   "cover key Impinj technologies such as AutoTune, Integra, Enduro, and FastID, as well as Impinj

19   circuit designs and implementations."  Crowder Decl. Ex. E; *see also id.* ¶¶ 9–10, Ex. F–G.[1]

20   Twenty-four of those patents dropped out of this lawsuit before trial.  The Court entered summary

21   judgment of non-infringement on two of them.  *See* Dkt. 339.  Impinj voluntarily dismissed 22

22   others.  Of that group, five saw all claims canceled during *inter partes* review, three had some

23   claims canceled or narrowed by amendment during *inter partes* review, and seven are asserted by

24   Impinj in the parties' litigation currently pending in the United States District Court for the

25

26   _____

27       [1] Unless otherwise stated, all exhibit numbers, transcript citations, and deposition designations refer to trial exhibits, trial testimony, and deposition transcripts designated at trial

28   and appended to the daily trial transcripts.  The Declaration of Ralf Kodritsch ("Kodritsch Decl.") is attached as Exhibit A to the Declaration of T. Kaitlin Crowder ("Crowder Decl.").

1  Western District of Texas.  Crowder Decl. ¶¶ 3–4.  Thus, this case, in which Impinj now seeks to

2  enjoin NXP's market-leading UCODE 8 and UCODE 9 products, came down to just two patents

3  that cover a fraction of the many features that Impinj claimed are infringed.

4       **B.    The '302 Patent**

5       Six weeks before trial, the Court granted Impinj summary judgment of infringement of

6  claims 1, 3, 4, and 7 of the '302 patent after accepting Impinj's post-*Markman* argument that the

7  final limitation of independent claim 1 was non-substantive.  Dkt. 339 at 10–12.  Because that

8  claim construction made NXP's HITAG product data sheet anticipatory prior art—as Impinj's

9  counsel admitted when he "candidly" acknowledged, "I think it infringes," Tr. at 1388:12–13—

10  NXP moved to amend its invalidity contentions.  Dkt. 367.  The Court denied that motion as

11  untimely and answered the jury's question about the data sheet's status as prior art by telling the

12  jury that it "was not identified as 'a prior art reference.'"  Dkt. 428 at 6.  The Court also answered

13  two other jury questions related to the '302 patent (*id.* at 5, 7), yielding another candid admission

14  from Impinj's counsel—that claim 3 is no different from claim 1—and the Court's observation

15  that "if there is no difference, then 3 is invalid," Tr. at 1410:6–9.  Ultimately, the jury found that

16  NXP proved claims 4 and 7 were invalid as obvious, but reached an opposite conclusion as to the

17  broader, independent claim 1 and undifferentiated claim 3.  NXP has moved for a new trial on the

18  '302 patent's validity based on this irreconcilable inconsistency.  *See* Dkt. 446 at 3–10.

19       **C.    The '597 Patent**

20       The Court denied the parties' cross-motions for summary judgment on infringement of the

21  '597 patent.  *See* Dkt. 339.  In doing so, the Court declined to find the claim term "charge-

22  accumulating path" was narrowed by prosecution history disclaimer, finding "Impinj's arguments

23  about raising these disputes at claim construction … well-taken."  *Id.* at 16.  At trial, however, the

24  Court accepted Impinj's request to construe a different term—"stage"—largely adopting NXP's

25  proposed construction, which NXP believes is dispositive on infringement.  *See* Dkt. 410; Tr. at

26  644:13–15 (Impinj's counsel stating "we need to request that the court interpret that term because

27  it's purely an issue of law"); *id.* at 690:17–19 (the Court recognizing its decision "may have a

28  dispositive impact on this case").  While the jury found infringement of the '597 patent, NXP has

NXP USA, INC.'S RESPONSE TO
PERMANENT INJUNCTION MOTION
Case No. 4:19-CV-03161-YGR

1   renewed its motion for judgment as a matter of law on the basis that the Court's claim

2   construction and the evidence offered at trial precludes liability.  *See* Dkts. 419, 446 at 10–19.

3           **D.**       **The Jury's Damages Award**

4          In awarding damages, the jury accepted Impinj's expert's opinions on lost profits for the

5   percentage of NXP's sales of the accused products she contends Impinj would have made—57%,

6   not 100%—and a reasonable royalty rate for the use of those patents—3% for the '597 patent and

7   1.5% for the '302 patent.  *See* Dkt. 426 at 6, 7; Tr. at 753:17–754:20, 756:18–20, 760:15–761:3,

8   761:17–762:1.  As NXP explains in its motion for judgment as a matter of law, the evidence does

9   not support lost profits at all given Impinj's documented inability to meet its own customers'

10  demand, much less lost profits based on the 44% of sales of chips shipped to AdvanIDe in Hong

11  Kong.  *See* Dkt. 446 at 20–24.  Rather, the jury's damages verdict shows that Impinj's harm is

12  easily calculated.  The jury has already decided—based on Impinj's own expert testimony—what

13  the '302 and '597 patents are worth:  reasonable royalties in the low single digits.

14  **III.**     **ARGUMENT**

15         **A.**       **The Facts Do Not Support a Permanent Injunction.**

16         "'An injunction is a drastic and extraordinary remedy, which should not be granted as a

17  matter of course....'  Rather, 'if a less drastic remedy ... is sufficient to redress a plaintiff's injury,

18  no recourse to the additional and extraordinary relief of an injunction is warranted.'"  *Apple Inc.*

19  *v. Samsung Elecs. Co.* (*Apple III*), 735 F.3d 1352, 1359 (Fed. Cir. 2013) (quoting *Monsanto Co.*

20  *v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010)) (cleaned up).[2]  The Supreme Court has

21  expressly rejected any presumption of injunctive relief in patent cases.  *eBay Inc. v.*

22  *MercExchange, LLC*, 547 U.S. 388, 393–94 (2006).  Rather, consistent with "principles of

23  equity," a plaintiff "'must demonstrate: (1) that it has suffered an irreparable injury; (2) that

24  remedies available at law, such as monetary damages, are inadequate to compensate for that

---

26     [2] The Federal Circuit addressed the legal standards governing injunctions in depth in its

27  quartet of *Apple* decisions, requiring a "fact-specific application" of those legal principles.  *Apple III*, 735 F.3d at 1361 n.4; *see also Apple, Inc. v. Samsung Elecs. Co.* (*Apple I*), 678 F.3d 1314, 1316 (Fed. Cir. 2012); *Apple Inc. v. Samsung Elecs. Co.* (*Apple II*), 695 F.3d 1370, 1372 (Fed.

28  Cir. 2012); *Apple Inc. v. Samsung Elecs. Co.* (*Apple IV*), 809 F.3d 633, 637 (Fed. Cir. 2015).

1   injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a

2   remedy in equity is warranted; and (4) that the public interest would not be disserved by a

3   permanent injunction.'" *Apple III*, 735 F.3d at 1359 (quoting *eBay*, 547 U.S. at 391).  Impinj

4   cannot meet its burden on any of these factors, much less all of them.

5                   **1.      Impinj Has Not Established Irreparable Harm.**

6           In an effort to show irreparable harm, Impinj relies on two crutches:  (1) quoting legal

7   holdings without addressing the relevant facts, and (2) relying on its executives' hearsay about

8   general customer preferences in lieu of direct and specific evidence.  But the mere existence of

9   cases where injunctions issued when the parties compete and the plaintiff practices the patent—

10  isolated facts Impinj stresses here—is insufficient.  Courts have repeatedly found no irreparable

11  harm where those same facts are present, particularly where the plaintiff fails to offer evidence of

12  a causal nexus between the infringement of specific patented features and the harm alleged.  *See,*

13  *e.g.*, *Apple III*, 735 F.3d at 1366 (affirming finding of no causal nexus where plaintiff relied on

14  "isolated, anecdotal statements" regarding consumer demand); *Power Integrations, Inc. v.*

15  *Fairchild Semiconductor Int'l, Inc.*, No. C 09-5235 MMC, 2015 WL 604582, at *4 (N.D. Cal.

16  Feb. 12, 2015) (finding no irreparable harm where plaintiff "failed to make the requisite showing

17  as to a causal nexus between its alleged lost sales and the infringing feature").  Impinj also

18  ignores its six-year delay in seeking an injunction after first accusing NXP of infringement, which

19  "suggests that [it] did not suffer irreparable harm."  *Cave Consulting Grp., LLC v. Optuminsight,*

20  *Inc.*, No. 5:11-cv-00469-EJD, 2016 WL 4658979, at *22–23 (N.D. Cal. Sept. 7, 2016) (finding no

21  irreparable harm where plaintiff "delayed nearly five years in seeking an injunction").  It all

22  comes down to the facts.  And here, the facts do not support a finding of irreparable harm.

23                   **(a)      Impinj Fails to Support the Harm It Alleges.**

24          Impinj alleges six types of harm:  reputational harm, deterioration of brand distinction,

25  lost business opportunities, price erosion, lost sales, and lost market share.  With the exception of

26  its market share decreasing after NXP introduced a better product, Impinj proved none of them.

27          **Reputational Harm.**  As in *Power Integrations*, Impinj "submitted no evidence

28  suggesting [NXP]'s products are in any manner considered inferior to [Impinj]'s products, or that

NXP USA, INC.'S RESPONSE TO
PERMANENT INJUNCTION MOTION
Case No. 4:19-CV-03161-YGR

1 [NXP]'s inclusion of either patented feature has otherwise diminished [Impinj]'s reputation."

2 2015 WL 604582 at *5 (distinguishing *Douglas Dynamics, LLC v. Buyers Products Co.*, 717 F.3d

3 1336 (Fed. Cir. 2013), where "inclusion of the patented feature in products considered 'less

4 prestigious and innovative' constituted irreparable harm to … plaintiff's reputation").  To the

5 contrary, Impinj's CEO admitted that the UCODE 8 had "better performance" than the Monza

6 R6.  Tr. at 271:2–4 (Diorio); *see also* Ex. 1077 at 36.  And Impinj's investment in RAIN RFID

7 (*see* Dkt. 447 at 10–11) is irrelevant to whether it proved harm to its reputation as an innovator.

8 Impinj does not offer a single piece of evidence that anyone questioned that reputation.

9  **Deterioration of Brand Distinction.**  Much of what Impinj characterizes as reputational

10 harm goes to its argument that there was a "complete deterioration of Impinj's brand distinction"

11 because it had to "rearticulate or emphasize" that Monza R6 features were allegedly covered by

12 Impinj patents and customers purportedly "used Impinj trademarked feature names including

13 AutoTune, Enduro, and Integra" when describing UCODE 8.  Dkt. 447 at 11–12 (citations

14 omitted).  Putting aside that AutoTune and Integra are not at issue in this case, and that Enduro

15 encompasses many more features than the one claimed by the '302 patent, all of this is hearsay

16 that the Court held admissible, "not for its truth, but just for its effect … on the listener," Impinj

17 executive Jeff Dossett.  Tr. at 607:9–11.  Impinj did not offer any evidence from actual

18 customers—testimony, documents, or otherwise—that they were unable to distinguish between

19 Impinj and NXP.  Nor would any such evidence be credible given Impinj's extensive marketing

20 to its sophisticated customer base.  *See, e.g.*, Tr. at 331:5–332:19, 382:24–384:11 (Oliver

21 testimony about provision of Ex. 235 to "small set of companies" buying Impinj products).

22  **Lost Business Opportunities.**  Impinj relies on more of Mr. Dossett's say-so to argue lost

23 business opportunities, in particular, a single example of Nike, an end customer, choosing

24 UCODE 8 over Monza R6, which he viewed as "a watershed moment."  Dkt. 447 at 12 (citing Tr.

25 at 610:13–612:14).  Missing from Mr. Dossett's testimony is any explanation of *why* Nike chose

26 NXP over Impinj.  Mr. Dossett simply stated his "belie[f]" that Impinj would have kept more of

27 the Nike business had it only been competing against UCODE 7.  Tr. at 611:17–23.  Assertions

28 that infringement "impacted Impinj's relationship with its direct customers, including … Avery

NXP USA, INC.'S RESPONSE TO
PERMANENT INJUNCTION MOTION
Case No. 4:19-CV-03161-YGR

1 Dennison," and "'disadvantaged [Impinj] in the dialogue with TSMC,'" its wafer supplier, are

2 even more threadbare.  Dkt. 447 at 13.  Nothing prevented Impinj from deposing, calling as

3 witnesses, or seeking declarations from those third parties.  It chose not to do so.

4     **Price Erosion.**  Impinj again cites Mr. Dossett for the proposition that it "was forced to

5 lower prices."  Dkt. 447 at 12.  But Impinj recognizes the importance of driving down costs to

6 encourage RAIN RFID's adoption.  Crowder Decl. Ex. B at 128:24–129:18; *id.* Ex. C at 303:13–

7 18.  And Inlay customers expect RFID IC prices to decrease over time as their purchase volume

8 increases.  Kodritsch Decl. ¶ 12.  Notably, Impinj's damages expert did not opine about price

9 erosion.  Nor did Impinj raise price erosion as a basis for injunctive relief in its response to NXP's

10 interrogatory.  Crowder Decl. Ex. I at 15–17.  It cannot do so at this late stage.

11     **Lost Sales.**  Given its pending motion for judgment as a matter of law, NXP will not

12 belabor lost sales.  *See* Dkt. 446 at 23–24.  Put simply, testimony from Impinj's damages expert

13 that "Impinj had excess inventory of its Monza R6 product" (Dkt. 447 at 18) cannot be squared

14 with Impinj's repeated admissions that it could not keep up with customer demand (*see* Dkt. 446

15 at 23-24; Ex. 1046 at 6, 8, 11, 33; Ex. 1391; Ex. 1396).  Impinj cannot lose sales it cannot fulfill.

16 In any event, lost profits are not dispositive of irreparable harm particularly where, as here, the

17 jury also awarded a royalty.  *Cf. Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702

18 F.3d 1351, 1363 (Fed. Cir. 2012) (finding irreparable injury where the jury "awarded lost profit

19 damages, *while expressly finding a reasonable royalty not applicable*") (emphasis added).

20     **Lost Market Share.**  That leaves Impinj to point to its decreasing market share.  NXP

21 does not dispute that Impinj lost market share.  But, as explained below, that has nothing to do

22 with infringement and everything to do with vigorous competition from superior products.

23     **(b)**    <u>There Is No Causal Nexus to Any of the Alleged Harm.</u>

24     The Federal Circuit requires "a causal nexus linking the harm and the infringing acts" to

25 "ensure[] that an injunction is not entered on account of 'irreparable harm caused by otherwise

26 lawful competition.'"  *Apple IV*, 809 F.3d at 640 (quoting *Apple III*, 735 F.3d at 1361).  None of

27 Impinj's alleged harm was caused by infringement of the asserted claims of the '302 or '597

28 patents.  Rather, Impinj "seeks to leverage its patent[s] for competitive gain beyond that which

1  the inventive contribution and value of the patent[s] warrant." *Apple II*, 695 F.3d at 1375.

2          **(i)      The Accused Products Have Many Features that Impinj
3                    Ignores in Its Analysis.**

4          In this "multi-purchaser, multi-component situation in which only a component of a larger

5  product" is covered by the asserted patents, Impinj must proffer evidence "that the infringing

6  features" of the accused products "significantly increased the product's desirability" or evidence

7  that otherwise "soundly supports an inference of causation of a significant number of purchasers'

8  decisions" to buy NXP's UCODE 8 and UCODE 9 products. *Genband US LLC v. Metaswitch*

9  *Networks Corp.*, 861 F.3d 1378, 1384 (Fed. Cir. 2017).  But the patents here are directed to just

10  portions of two of an RFID IC's many features, as confirmed by NXP's data sheets, Impinj's

11  product documentation, and Impinj's original complaint.  Collectively, this evidence

12  demonstrates an absence of any causal nexus between NXP's infringement and harm to Impinj.

13          NXP's UCODE 8 data sheet evidences the myriad features and technologies embedded in

14  and responsible for customer demand for the UCODE 8 product:



Figure 1.  Block diagram of UCODE 8/8m IC

25  Ex. 423 at 6.  As Figure 1 of the UCODE data sheet shows, the IC itself includes three major

26  "blocks"—an analog RF interface, a digital control, and an electrically erasable programmable

27  read-only memory (EEPROM).  The '597 and '302 patents, however, are directed only to aspects

28  of the RF pads (RF1 and RF2 in Figure 1, above) and the rectifier (RECT in Figure 1, above),

1   which are two of many components of the analog RF interface.  The UCODE 8 datasheet

2   describes the importance of the other features of the IC, whether also housed in the analog RF

3   interface or other parts of the chip, that are unrelated to the '597 and '302 patents and drive

4   customer purchasing decisions.  Ex. 423 at 2–3, 18–25 (listing features such as Self Adjust,

5   Memory Safeguard, Brand Identifier, Untraceable, and a Kill Command, to name a few).[3]

6          Impinj's documentation touting its products that practice the '597 and '302 patents—the

7   Monza 4, Monza 5, Monza R6, and M700—similarly emphasizes the importance of general

8   features of the same type as, or wholly unrelated to, the claimed inventions.  For example, an

9   Impinj marketing document for the Monza 4 emphasizes its omnidirectional performance, its

10  ability to monitor and store longer serial numbers, and its FastID and TagFocus features.  Ex.

11  261.  It is silent about any benefits allegedly arising from its practice of the '597 patent.  So too

12  for the Monza 5, Monza R6, and M700, the documentation for which mentions only general

13  improvements in read sensitivity (while also highlighting many other features) without

14  referencing the invention claimed in the '597 patent.  Ex. 267 at 2; Ex. 218 at 2; Ex. 259.

15  Moreover, the documentation for Monza R6 and M700 similarly does no more than generalize

16  about the "large pad" feature in the Enduro pad technology.  Ex. 218 at 2; Ex. 259.  In fact, before

17  Impinj even applied for the '302 patent, it was marketing its Enduro technology, which was

18  already covered by three patents and several other patent applications.  *See* Ex. 235.

19         This litigation also illustrates the absence of a causal nexus.  The other 24 patents Impinj

20  asserted in this case are directed to such varied features and technologies as autotune, large pads,

21  oscillator calibration, flag circuits, and other circuit designs.  But none of the other 24 patents

22  made it to trial, and Impinj's motion does nothing to account for—indeed, the motion ignores—

23  how the features in its and NXP's ICs that practice these or similar technologies influence

24  customer purchases.  In short, "[h]ere the parties' competing products are circuits, i.e., chips,

25  which contain numerous features aside from the patented features" that Impinj disregards in

26  _____

27         [3] In fact, Impinj had to add a kill command into its Monza R6 P because it was losing
    market share in the EU due to GDPR requirements.  *See* Crowder Decl. Ex. B at 73:3-79:18

28  (discussing Ex. 1036 at 11); *id.* Ex. C at 369:4-370:5 (discussing Ex. 1077 at 2).

arguing customer demand.  *Power Integrations*, 2015 WL 604582, at *3 ("Customers may buy a

patentee's product because it contains a patented feature, but buy the defendant's infringing

product for entirely different reasons, e.g., additional or different features only available in the

defendant's product.").  Impinj must do more to establish a causal nexus.[4]

### (ii)   Consumer Interest in General Features Does Not Establish Demand for the Specific Claimed Inventions.

Impinj's causal nexus showing is deficient for another reason:  the "inquiry should focus

on the importance of the claimed invention in the context of the accused product, and not just the

importance, in general, of features of the same type as the claimed invention."  *Apple III*, 735

F.3d at 1364.  Yet Impinj's motion relies exclusively on general features.  Completely absent is

any evidence that the specific inventions claimed by the '597 patent and the '302 patent

"impact[ed] consumers' decisions to purchase the accused devices," *Apple IV*, 809 F.3d at 642,

much less that they are "drivers of consumer demand," *Apple III*, 735 F.3d at 1366.

**The '597 Patent.**  Impinj offers no evidence of a nexus between NXP's use of the

invention claimed in the '597 patent and any harm to Impinj.  It does not even try to argue that

consumers demanded the specific rectifier design claimed by the '597 patent.  Instead, it relies on

hearsay evidence of "industry praise and customer demand for the sensitivity improvements *that

are enabled by* the '597 patent."  Dkt. 447 at 14 (emphasis added); *see also* Tr. at 609:15–23

(Dossett hearsay that unidentified customers "spoke first and foremost about read sensitivity");

Ex. 55 (ChainLink Research article referencing Monza R6's improved "read sensitivity" without

any reference to its rectifier design); Ex. 229 at 4, 31 (NXP Customer Requirements Specification

---

[4] The jury's award of lost profits is no substitute for a finding of causal nexus.  The former requires a finding only of demand for the patented *products*, as the jury was correctly instructed. *See* Dkt. 427 at 12; *see also Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1156 (6th Cir. 1978) ("a patent owner must prove … demand for the patented product").  And while the absence of non-infringing alternatives is often viewed as proxy for demand for particular limitations of a claimed invention, *see, e.g., Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1285 (Fed. Cir. 2017), the jury was not instructed to consider such demand and Impinj conceded non-infringing alternatives existed in seeking lost profits on only some of NXP's sales. Indeed, courts routinely deny injunctions notwithstanding a lost profits award.  *See, e.g., Bright Data Ltd. v. Teso LT, UAB*, 584 F. Supp. 3d 193, 197 (E.D. Tex. 2022); *Pierce Mfg., Inc. v. E-One, Inc.*, No. 8:18-cv-617-TPB-TGW, 2022 WL 479831, at *2 (M.D. Fla. Feb. 16, 2022).

for UCODE 8 targeting increased "read sensitivity" without any reference to rectifier design and reflecting NXP's intention to "outperform" Monza R6); Ex. 288 (RFID Journal article noting that UCODE 8's "greater sensitivity comes from the company's engineering on the analog *and digital* portions of the chip" and "focus in process technology") (emphasis added); Tr. at 740:6–741:1, 741:17–742:7, 745:7–20 (Kindler characterizing Exhibits 55, 229, and 288). But the '597 patent does not claim sensitivity improvements. The word "sensitivity" does not even appear in the patent. *See* Ex. 1. Instead, the '597 patent claims a particular design for a particular portion of an RFID IC—a rectifier—and the evidence shows that an RFID IC's read sensitivity is driven by many aspects of circuit design that have nothing to do with the rectifier.

"Read sensitivity … is a combination of the current consumptions or voltage requirement of all the blocks [of the circuit]. You cannot simply optimize one block because this will not get you … a better chip." Tr. at 806:9–12 (Amtmann); *see also id.* at 806:13–17 ("read sensitivity" is "influenced by the design of the entire chip," "[n]ot just the rectifier"), 804:11–805:20 (describing the role of rectifier design in sensitivity).[5] The parties' competing products reflect this reality. Impinj's Monza 4 and Monza 5 were on the market at the same time as NXP's UCODE 7, and Impinj concedes that, while the former products practice the '597 patent, the latter does not. Tr. at 280:8–12, 284:5–24 (Diorio); Tr. at 355:13–18 (Oliver); Tr. at 738:21–23, 768:23–769:7 (Kindler). Yet UCODE 7 dominated Monza 4 and Monza 5 in the marketplace. *See* Tr. at 287:23–288:1 (Dr. Diorio testifying that UCODE 7 "beat" Monza 5 by "about 11 percent in read range"); Ex. 1077 at 36. As Impinj admits, it had to "[r]edesign" and "optimize" the patented rectifier used in Monza 4 and Monza 5 to compete with UCODE 7. Tr. at 283:10–21, 284:17–21 (Diorio). That "NXP was able to achieve better read sensitivity" in the non-infringing UCODE 7

---

[5] Impinj offers no contrary evidence. Dr. Diorio testified generally about rectifiers that "the higher the efficiency … the longer the read range, the better the readability of the chip, especially in difficult-to-read environments." Tr. at 261:20–25. But neither Dr. Diorio nor any other witness testified that the rectifier is the sole driver of read sensitivity or that the '597 patent's rectifier design is the sole way to improve read sensitivity. In fact, Dr. Durgin conceded many design choices contribute to RFID IC read sensitivity improvement. *See* Tr. at 571:13–573:8; *see also* Crowder Decl. Ex. H ¶¶ 81–82, 86. And Ms. Kindler testified that "there's other things that are contributing to improved sensitivity" while attributing 50% of that improvement to the '597 patent based on nothing but Mr. Oliver's say-so. Tr. at 760:17–25.

1   than Impinj achieved in the Monza 4 and Monza 5, which "actually practiced the '597 patent,"

2   leads to the inescapable "conclusion that the '597 patent was not the secret sauce."  Tr. at 1090:7–

3   13 (Haas).  Impinj also admits that UCODE 8 has "better performance" than the Monza R6,

4   reinforcing that there is far more to sensitivity than the '597 patent rectifier design.  Tr. at 271:2–

5   4 (Diorio); *see also* Ex. 1077 at 36.  Notably, Impinj has offered no customer evidence suggesting

6   that the specific rectifier design of the '597 patent influenced its purchasing decisions—no

7   customer testimony, no customer documents, not even customer survey evidence from an expert.

8   Indeed, Ms. Kindler admitted that whether Impinj was irreparably harmed was "not part of [her]

9   analysis, and … outside the scope of" her opinions.  Crowder Decl. Ex. D at 67:5–68:11.

10        As for Impinj's claim of "industry praise," even evidence of "awards recognizing [a

11   patent] says little, if anything, about consumer demand."  *Power Integrations*, 2015 WL 604582,

12   at *3.  Moreover, Impinj's evidence of "customer demand" comes not from customers, but from

13   its own say-so, from media reports, and from NXP's own internal targets.  In any event, this

14   evidence at best shows only that "sensitivity improvements" are a general design goal, not that

15   rectifier design alone, much less the '597 patent's rectifier design, achieves that goal.  None of

16   this evidence "prove[s] that [NXP's] incorporation of the patented features influenced demand for

17   its products."  *Apple III*, 735 F.3d at 1367; *see also Apple, Inc. v. Samsung Elecs. Co.*, 909 F.

18   Supp. 2d 1147, 1155 (N.D. Cal. 2012), *aff'd in relevant part by Apple III*, 735 F.3d at 1366 ("A

19   consumer may want a phone that is easy to use, but this does not establish that a tap-to-zoom

20   feature, for example, or any given type of gesture, is a driver of consumer demand.").  There is a

21   complete "absence of record evidence showing that customers care about [sensitivity] *particular*

22   *to the patented features.*"  *Jiaxing Super Lighting Elec. Appliance Co. v. CH Lighting Tech. Co.*,

23   No. 6:20-cv-00018-ADA, 2022 WL 3371630, at *18–19 (W.D. Tex. Aug. 16, 2022) (finding

24   evidence of consumer demand for "shock protection" "too general" where the asserted patent was

25   "directed to a specific shock protection circuit"); *cf. TEK Global, S.R.L. v. Sealant Sys. Int'l, Inc.*,

26   920 F.3d 777, 792 (Fed. Cir. 2019) (finding causal nexus where customer required specific

27   features—a "three-way valve and additional hose"—"in its tire repair kits").  In short, there is no

28   possible basis to find a causal nexus sufficient to enter an injunction based on the '597 patent.

1    **The '302 Patent.**  The same problem plagues Impinj's request for an injunction based on

2    the '302 patent, where it repeatedly points to general references to "large pads."  But the '302

3    patent does not claim "large pads" nor could it.  It is undisputed that such pads were in the prior

4    art Eberhart patent and offered by NXP long before the '302 patent.  *See* Ex. 518 (Eberhardt); Tr.

5    at 910:3–911:24, 913:9–914:18 (Zenz); Ex. 160 (HITAG data sheet).  And Impinj had a separate

6    patent directed to large pads that NXP was found not to infringe.  *See* Dkt. 339 at 6–9 (granting

7    summary judgment as to U.S. Patent No. 9,495,631 – "RFID Integrated Circuits with Contact

8    Islands").  Indeed, the only dispute at trial as to the '302 patent was over limitation 1(f)'s flared

9    channel shape.  Ex. 2, col. 21:21–28; *see also* Tr. at 1011:8–1017:4, 1038:7–1040:19 (Dr.

10   Subramanian addressing the presence in the prior art of the balance of the '302 patent claims'

11   limitations, which Dr. Thompson did not dispute); Tr. at 1162:6–9 (Thompson: "So keep in mind,

12   it's not just big -- big pads….  [W]hat the '302 basically -- patent basically has as its key element,

13   [is] this flared channel here."); *id.* at 1164:9–13 (same); *id.* at. 1177:7–9 (same).

14   Notwithstanding the narrow scope of the asserted '302 patent claims, Impinj rests its

15   causal nexus argument on the theory that customers sought out its "patented large pads."  Dkt.

16   447 at 13; *see also* Tr. at 248:18–21 (Diorio: "large pads instead of bumps"); Tr. at 270:9-16

17   (Diorio: "large pad shape"); Tr. at 323:16–22, 324:10–16 (Oliver: "large contact pads").  And it

18   attributes that same desire for Impinj's "large pads" to demand for NXP's accused products.

19   According to Ms. Kindler, UCODE product manager Hermann Zach "testified in his deposition

20   that the customer requirements, based on interviews with customers, was that they needed to be

21   able to offer the large pad technology that's covered by the '302 patent."  Tr. at 741:17–742:7.

22   But Mr. Zach said nothing about the technology covered by the '302 patent; he referred only to

23   the Monza R6 being the first UHF RFID IC with "bigger pads," noting that "[f]or other markets

24   … [NXP] had such large pads already … [b]ack in 2000 or 2001."  Zach Dep. at 107:15–24

25   (attached to Vol. 3, July 7, 2023 daily transcript).  Impinj cannot establish a causal nexus based

26   on customer interest in "large pads," in general; it must point to customer demand for the specific

27   design claimed by the patent—its "flared channel" shape.  *Apple III*, 735 F.3d at 1366.

28   Impinj's references to its Enduro technology not only fail to fill that gap, they establish

1   that there is no demand specific to the '302 patent.  Ms. Kindler referred to a press release by

2   Smartrac—a customer of both parties whom Impinj chose not to seek discovery from—which

3   refers to the Monza R6's "game-changing features like Enduro technology for better consistency

4   of tag performance."  Ex. 53; *see also* Tr. at 740:6–741:1.  She also emphasizes a statement in

5   NXP's Customer Requirements Specification for UCODE 8 that "Impinj introduced with their

6   'Enduro Technology' (2 big copper pads) a complete new concept into the UHF market which

7   based on feedback from the field is helping with respect to handling, assembly tolerances and

8   reliability."  Ex. 229 at 19; *see also* Tr. at 741:17–742:7 (Kindler).  But neither reference to the

9   "Enduro technology" calls out the '302 patent's channel shape.  In fact, Impinj was marketing

10  Enduro more than a year before it even applied for the '302 patent, and identified many other

11  patented or patent-pending features, none involving channel shape.  *See, e.g.*, Ex. 235 (Impinj

12  Enduro™ Technology marketing materials dated March 26, 2014).  Moreover, "even if [this

13  evidence] were sufficient to show the patented features drive demand for *[Impinj's] own

14  products*, [it] is insufficient to establish a causal nexus between those features and demand for

15  *[NXP's] competing products*."  *Power Integrations*, 2015 WL 604582, at *3 (emphasis added).

16        When it comes to NXP's products, the evidence Impinj relies on shows that the market

17  recognized UCODE 8 features that differed from the '302 patent's claimed features; namely, "the

18  unique shape of the [UCODE 8] chip's pads … with a four-sided pad structure that provides dual-

19  axis glue spacer (space for glue to affix the chip to the antenna) along with the UCODE's

20  standard, corrosion-free, large-area gold bumps."  Ex. 288, cited Tr. at 745:7–20 (Kindler); *see

21  also* Ex. 231 (NXP press release touting "dual axis glue spacer design and large area contact

22  pads").  The '302 patent claims neither a four-sided pad structure nor a dual-axis glue spacer, as is

23  evident from a side-by-side comparison of the patent and the UCODE 8 data sheet:

24

25

26

27

28

   

1  Ex. 2, FIG. 12; Ex. 18 at 7.  And NXP used gold before Impinj did.  *See* Tr. at 391:6–12 (Oliver).[6]

2  At a minimum, this evidence shows that RAIN RFID ICs are marketed for many reasons and

3  reinforces that Impinj failed to offer any specific facts to show that any customer chose UCODE

4  8 based on the shape of the channel claimed by the '302 patent rather than any other features

5  unique to UCODE 8.  *See Minerva Surgical, Inc. v. Hologic, Inc.*, No. 3:17-cv-02013-JD, 2018

6  WL 306689, at *5 (N.D. Cal. Jan. 5, 2018) (finding patentee failed to establish a causal nexus

7  because it "present[ed] no specific facts suggesting that account chose ADVANCED because of

8  its narrower sheath, rather than because of ADVANCED's lower price or for other reasons").

9       Finally, Impinj falls back on its accusations of copying.  NXP did not copy.  Rather, the

10  record is replete with evidence that NXP independently designed its products.  *See* Tr. at 788:14–

11  790:20, 803:6–806:4, 816:11–820:10 (Mr. Amtmann testifying about his work with UHF RFID

12  products at NXP since 2000 and the development of the UCODE 8's rectifier design); Tr. at

13  909:4–911:23, 914:20–916:2 (Dr. Zenz testifying about the development of the pads on the

14  UCODE 8).[7]  In any event, "evidence of copying … may be relevant, but it is insufficient by itself

15  to establish the requisite causal nexus."  *Apple III*, 735 F.3d at 1367.  Here, there is no evidence

16  of copying, no evidence of customer demand for the specific patented features of the '597 and

17  '302 patents, and thus no irreparable harm.  Impinj's motion may be denied on this basis alone.

18  _____

19       [6] Impinj cites a single reference to "channel architecture" as a purported priority of

20  UCODE 8 customers.  *See* Tr. at 609:9–23 (Dossett).  But, as shown above, the UCODE 8's channel architecture differs from the '302 patent's claimed design, as it has a second channel

21  perpendicular to the main channel (the "dual-axis glue spacer design").  So this testimony does not establish demand for the specific claimed feature of the '302 patent.  Moreover, Mr. Dossett

22  did not "ma[k]e clear that his opinion was based on any specified customer input as opposed to his own subjective assessment."  *Power Integrations*, 2015 WL 604582 at *3.

23       [7] NXP's purchase of a teardown report for its files, *see* Amtmann Dep. at 30:8–14

24  (attached to Vol. 3, July 7, 2023 daily transcript), does not show copying.  Rather, teardowns are common in the industry notwithstanding Impinj's attorney argument to the contrary.  *Compare*

25  Dkt. 447 at 5 n.2, *with* Heinrich Dep. at 357:01–12 (attached to Vol. 6, July 12, 2023 daily transcript) ('302 patent inventor agreeing that analysis of competitor products is "not uncommon"

26  and "often" involves teardowns); Tr. at 814:8–16 (Amtmann:  "NXP has a teardown of the Monza R6 because it is common practice in the industry" and there are teardowns for "a lot of

27  NXP products" on the Internet); Crowder Decl. Ex. J (TechInsights homepage touting 100,000+ chips torn down, including 3,200+ reports published in the last 12 months).  In fact, Impinj's

28  counsel argued the opposite at trial, calling a teardown report "a publication that's regularly relied upon in this business."  *See* Tr. at 210:1–2.

1          **2.      Legal Remedies Are More Than Adequate.**

2          "In the absence of a finding of irreparable injury, there can be no finding that legal

3   remedies are 'inadequate to compensate for that injury.'"  *Power Integrations*, 2015 WL 604582,

4   at *5 (quoting *eBay*, 547 U.S. at 391).  But even if Impinj had established irreparable harm,

5   monetary damages are a more than adequate remedy.  That much is clear from the jury's adopting

6   Impinj's proposed royalty rates for the '597 and '302 patents in addition to awarding lost profits

7   for some sales.  The damages award shows that Impinj can be adequately compensated.

8          To begin, Impinj does not argue that the jury verdict of lost profits and royalty rates was

9   incorrect.  "And it would [be] disingenuous to do so because [Impinj]'s own expert argued for

10  both amounts."  *Conceptus, Inc. v. Hologic, Inc.*, No. C 09-02280 WHA, 2012 WL 44064, at *2

11  (N.D. Cal. Jan. 9, 2012).  Moreover, in calculating royalty rates, Ms. Kindler took into account

12  "what Impinj is expecting it would lose … in terms of lost sales and profitability."  Tr. at 758:22–

13  25.  In other words, lost sales are already baked into the royalty.  *See also EcoServices, LLC v.*

14  *Certified Aviation Servs.*, LLC, 340 F. Supp. 3d 1004, 1026 (C.D. Cal. 2018), *aff'd in part and*

15  *vacated in part on other grounds*, 830 F. App'x 634 (Fed. Cir. 2020) ("While Plaintiff argues it

16  lost customers such as Jet Blue, and had to lower prices as to Southwest, both are forms of

17  quantifiable harm compensable by monetary damages.").  And Impinj has not offered any proof

18  of *prospective* loss of customers, market share, or sales, as all of its evidence is retrospective.

19         To challenge the adequacy of monetary damages, Impinj falls back on the patent holder's

20  right to exclude.  But that right has never been absolute.  While Impinj argues that its purported

21  refusal to license its patents deserves respect, it has been anything but consistent on this front.  At

22  the outset of this litigation, Impinj sent an open letter to its "partners and end users," emphasizing

23  its "unwavering support for global royalty-free standards" and claiming that it would "continue to

24  provide reciprocal royalty-free access to [Impinj] intellectual property necessary to practice the

25  GS1® Gen2 protocol."  Crowder Decl. Ex. E, F.  And at trial, Impinj's counsel suggested that

26  Impinj spent "almost two years" pushing for "licensing discussions," but that NXP failed to

27  engage.  Tr. at 1073:4–17.  The evidence simply does not support the notion that Impinj is

28  unequivocally opposed to licensing its patents.  Similarly, bald assertions that monetary damages

1    are inadequate if there is no reason to believe the infringer will stop are of little value.  Dkt. 447

2    at 16 (citing *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1155 (Fed. Cir. 2011)).

3    Were that true, a patent owner would always be entitled to an injunction.  That is not the reality.

4    Indeed, in *Bosch*, "more important[]" was the fact of the defendant's "questionable financial

5    condition."  659 F.3d at 1155.  But Impinj "does not dispute that [NXP] can pay the judgment and

6    ongoing damages.  Because [Impinj] can be adequately compensated for its harm, this factor

7    weighs against a permanent injunction."  *Conceptus*, 2012 WL 44064, at *3.

8              **3.      The Balance of Hardships Does Not Favor Impinj.**

9              The scope of a requested injunction and the availability of design-arounds is critical to the

10   balance of hardships.  *See Apple IV*, 809 F.3d at 645–46 (finding balance weighed in plaintiff's

11   favor where, among other things, "'proposed injunction targets only specific features, not entire

12   products,'" and defendant "'repeatedly told the jury that designing around the asserted claims of

13   the three patents at issue would be easy and fast'").  Here, rather than seeking a "narrowly

14   tailored" injunction, *id.* at 646, Impinj casts a broad net, extending its requested injunction

15   beyond specific features to the worldwide sales of multi-featured products without any

16   consideration for the status or anticipated duration of design-around efforts.

17             Impinj mischaracterizes the record in stating that NXP has expressed "confidence in its

18   ability and readiness to design around the infringing components of its UCODE 8 and 9

19   products."  Dkt. 447 at 17.  The only testimony it cites concerns the shape of the pads and channel

20   claimed by the '302 patent.  *See* Tr. at 971:7–11 (Zenz); Tr. at 1093:15–21 (Haas).  It offers no

21   evidence regarding the ease of designing around the '597 patent, a tacit recognition that

22   redesigning a rectifier is no small task, particularly where Impinj's theory of infringement has

23   been flexibly applied to cover "stages" that were not designed as stages and to exclude additional

24   "charge-accumulating paths" by characterizing them as mere "leakage paths."  *Cf. Douglas*

25   *Dynamics, LLC v. Buyers Prod. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) (finding "balance of

26   hardships would suggest that Buyers should halt infringement" only "[i]f indeed Buyers had a

27   non-infringing alternative which it could easily deliver to the market").  In fact, Impinj offered

28   evidence that its own "technical experts" do not believe NXP "could have offered an alternative

1    product to UCODE 8 and 9 that would offer the same … benefits associated with the[] patented

2    features."  Tr. at 747:20–25 (Kindler).

3          Moreover, "[t]he fact that [a patent owner] is a smaller company or that it is more reliant

4    on … patents than [defendant] does not mean that there is a hardship absent an injunction."

5    *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1341 (Fed. Cir. 2012).  To

6    the contrary, an injunction would threaten NXP's investment in its own technologies that are

7    incorporated into the UCODE 8 and 9, as the rectifier and pads are just two of many features of

8    an RFID IC chip.  *See supra* Part III.A.1(b)(i).  As shown above, the UCODE 8 (and UCODE 9)

9    "is not a copycat product.  It was independently developed and provides important advantages

10   over" Impinj's products.[8]  *Conceptus*, 2012 WL 44064, at *3; *see also supra* Part III.A.1(b)(ii).

11   "At the same time, [NXP]'s reputation with customers will likely be diminished if those

12   customers are forced to expend the time, effort, and costs necessary to acquire and implement a

13   replacement product."  *Cave Consulting*, 2016 WL 4658979, at *23.  Put simply, that NXP is a

14   "large and more diversified company" does not defeat the conclusion that it would face a

15   substantial hardship outweighing any hardship to Impinj where, as here, an ongoing royalty "will

16   adequately compensate for [Impinj's] harm."  *Conceptus*, 2012 WL 44064, at *3.

17          **4.       An Injunction Would Not Be in the Public's Interest.**

18         "[T]he public's interest in enforcing patent rights must also be weighed with other aspects

19   of the public interest."  *Apple III*, 735 F.3d at 1372.  In particular, courts must "consider the scope

20   of [the] requested injunction relative to the scope of the patented features and the prospect that an

21   injunction would have the effect of depriving the public of access to a large number of non-

22   infringing features."  *Id.* at 1372–73.  Impinj initially accused NXP of infringing 26 patents

23   covering a fraction of the many features of the accused products, and only ended up proceeding to

24   _____

25         [8] For this same reason, the notion that it would be unfair to require Impinj to compete
     against its own inventions does not track.  The UCODE 8 and 9 include many features beyond the
26   narrow ones claimed by the '597 and '302 patents, including in their rectifier and pad designs,
     which include elements going beyond the claims of those patents.  *See* Tr. at 818:18–819:6 (Mr.
27   Amtmann explaining that design of rectifier was dictated by decreasing power requirements of
     the rest of the chip); Tr. at 922:6–924:5, 960:17–963:3 (Dr. Zenz discussing the benefits of the
28   perpendicular channel on the UCODE 8 and 9).

1    trial on 2 of those patents.  Even if Impinj could meets its burden on the other *eBay* factors—

2    which it cannot—it would be unable to establish that it is in the public interest to block access to

3    the scores of non-infringing features—many found non-infringing in these cases—of NXP's

4    products.  And that is particularly true given that this is functionally a two-player market and

5    excluding NXP from participation would exclude its products that are used in both the medical

6    industry and as critical components of the U.S. and global retail and medical supply chain.

7        To be clear, "the right to compete in a free, competitive market" serves the public interest.

8    *See Prestige Flag Mfg. Co. v. Par Aide Prods. Co.*, No. 14-CV-2711-H, 2015 WL 11990931, at

9    *5 (S.D. Cal. Jan. 12, 2015) (citing *Illinois Tool Works, Inc. v. Grip-Pak, Inc.*, 906 F.2d 679, 684

10   (Fed. Cir. 1990)).  It spurs innovation—as shown by the parties' trading places as performance

11   "leader" over the past decade.  Tr. at 287:6–288:11 (Diorio).  But it also ensures that consumers

12   are not left with a single supplier.  *See* Heinrich Dep. at 363:8–364:11 (attached to Vol. 6, July

13   12, 2023 daily transcript) ('302 patent inventor recognizing "customers['] desire to have multiple

14   suppliers in the marketplace and … the competition [it] breeds"); Tr. at 773:5–15 (Kindler

15   acknowledging inlay customers that "want to make sure they have backup suppliers").  For good

16   reason.  UCODE 8 and UCODE 9 are used for applications such as tagging surgical sponges to

17   improve patient care and to monitor supply chains in a wide variety of fields.  *See* Tr. at 1067:2–

18   1068:3 (Kodritsch); *see also Conceptus*, 2012 WL 44064, at *3 (finding harm to public interest

19   where "[r]emoving Adiana from the market would have eliminated an important alternative for

20   patients.").  Depriving the public of these products to protect the exclusivity of the narrow

21   implementations of two among many features would disserve the public interest.

22       In fact, Impinj's request to enjoin UCODE 8 and 9 contradicts the representation it made

23   to its "partners and end users in the RAIN RFID community" upon filing this suit that it "is

24   making every effort to avoid disrupting your supply chains, for example by not seeking an

25   injunction on NXP's highest-volume endpoint IC."  Crowder Decl. Ex. E, F.  While "NXP's

26   highest-volume endpoint IC" in 2019 was UCODE 7—which Impinj does not accuse of

27   infringing the '302 or '597 patents—it has been UCODE 8 or 9 since 2020.  Kodritsch Decl. ¶ 13.

28   By Impinj's admission, enjoining UCODE 8 and 9 would disrupt supply chains and harm the

1    RAIN RFID community.  *Cf. Apple IV*, 809 F.3d at 647 (finding injunction in public interest

2    where features could be removed "without … disrupting customer use of [the] products").

3         Of course, harm to the public interest is amplified where a party is incapable of satisfying

4    demand for the products it seeks to enjoin.  Recognizing this, Impinj tries to minimize its inability

5    to satisfy customer demand for much of the past three years.  *Compare* Dkt. 446 at 23–24, *with*

6    Dkt. 447 at 18.  But Impinj again relies on speculation and attorney argument in lieu of evidence.

7    It offers no evidence from TSMC that Impinj's "wafer allocation … would increase once NXP's

8    infringement ceases."  Dkt. 447 at 18.  And it provides no support at all for the proposition that it

9    could "simply source additional wafers from another supplier to the extent TSMC is unable to

10   meet Impinj's additional demand."  *Id.*  Were that true, Impinj would have already done so, rather

11   than report quarter after quarter that "endpoint IC demand exceeded shipments by more than

12   50%."  Ex. 1391.  In fact, it's false.  *See* Ex. 1077 at 30 ("Recommendation: Do not entertain a

13   2nd Source").  In any event, what Impinj would hypothetically do is irrelevant to whether it is

14   entitled to an injunction based on the facts as they exist today.

15        In short, "[w]hen the patented invention is but a small component of the product the

16   companies seek to produce and the threat of an injunction is employed simply for undue leverage

17   in negotiations, … an injunction may not serve the public interest."  *eBay*, 547 U.S. at 396–97

18   (Kennedy, J., concurring).  The Court should not reward Impinj's negotiating tactics at the

19   expense of the public interest.  The request for an injunction should be denied.

20        **B.     The Proposed Injunction Is Facially Overbroad.**

21        An injunction should not issue, period.  The overbreadth of Impinj's requested injunction

22   confirms as much.  *See Apple IV*, 809 F.3d at 640 ("To be sure, the scope of an injunction plays a

23   role in determining whether that injunction is awarded.").  Indeed, it would be error to enter the

24   requested injunction, which extends far beyond Federal Rule of Civil Procedure 65's boundaries.

25        **1.     There Is No Basis to Enjoin NXP's Subsidiaries and Affiliates.**

26        In mischaracterizing its requested injunction as "narrow," Impinj argues that "the

27   injunction applies only to NXP and its subsidiaries and affiliated companies, and NXP's

28   successors, assigns, officers, directors, agents, servants, employees, attorneys, and persons acting

1    in concert or participation with such entities." Dkt. 447 at 19; *see also id.* at 1; Dkt. 447-2 at 1.

2    But Rule 65(d)(2) refers to "(A) the parties; (B) the parties' officers, agents, servants, employees,

3    and attorneys; and (C) other persons who are in active concert or participation with anyone

4    described in Rule 65(d)(2)(A) or (B)." And "[t]he text of Rule 65(d) is exclusive, stating that an

5    injunction can permissibly bind 'only' those persons listed in Rule 65(d)." *Comedy Club, Inc. v.*

6    *Improv W. Assocs.*, 553 F.3d 1277, 1287 (9th Cir. 2009) (requiring vactur of injunction that

7    extended to relatives of enjoined parties); *see also Presidio Components, Inc. v. Am. Tech.*

8    *Ceramics Corp.*, No. 08-cv-335-IEG-NLS, 2013 WL 4068833, at *8 (S.D. Cal. Aug. 12, 2013)

9    (declining to include "parent and subsidiary entities in the language of the injunction because

10   [Rule] 65(d) does not include these entities as among those that an injunction order binds").

11   Impinj's attempt to extend the injunction to non-party "subsidiaries and affiliate[s]" is improper.

12       This conclusion flows from the principle that "an injunction ordinarily cannot be imposed

13   on a non-party that has not had the opportunity to contest its liability." *Additive Controls &*

14   *Measurement Sys., Inc. v. Flowdata, Inc.*, 96 F.3d 1390, 1397 (Fed. Cir. 1996). Not only did

15   Impinj decline to name any other defendants in this case, but it also fails to offer any evidence

16   regarding any entities other than NXP. To the extent an injunction were to issue and Impinj

17   believes any specific entity acted in concert with NXP in violating that hypothetical injunction,

18   Impinj may seek appropriate relief upon making a sufficient evidentiary showing as to that entity.

19   *See, e.g.*, *Toyo Tire & Rubber Co. v. CIA Wheel Grp.*, No. CV 15-0246-DOC, 2017 WL 514324,

20   at *3 (C.D. Cal. Jan. 23, 2017) (finding affiliates bound by injunction where plaintiff "offer[ed]

21   significant evidence to support its assertions that QDT and DGC are either acting in concert and

22   had notice of the Injunction and/or are in privity with DDF"). At points, Impinj seems to

23   recognize this, by referring to "affiliated entities" in a parenthetical after reciting Rule 65's

24   "active concert or participation" language. *See* Dkt. 447 at 1. But Impinj cannot shortcut the

25   evidentiary requirements for enforcing an injunction by expressly naming persons or categories of

26   persons—i.e., subsidiaries and affiliated companies—that are not listed in Rule 65.

27                    **2.      The Injunction Cannot Extend to Inducement or Non-U.S. Conduct.**

28       Impinj's injunction also extends far beyond the theory of infringement tried. The jury

1    exclusively heard and decided claims of direct infringement: "whoever without authority makes,

2    uses, offers to sell, or sells any patented invention, *within the United States* or imports *into the*

3    *United States* any patented invention during the term of the patent therefor, infringes the patent."

4    35 U.S.C. § 271(a) (emphasis added).  The jury neither heard evidence of nor found NXP liable

5    for indirect infringement, which is separately addressed by the prohibitions on inducement and

6    contributory infringement in §§ 271(b) and (c).  Nonetheless, Impinj requests an injunction that

7    omits any territorial restrictions and expressly extends to "infringing, directly or indirectly, or

8    inducing infringement."  Dkt. 447 at 1; Dkt. 447-2 at 1.  This, too, is improper.

9           To begin, "an injunction must be narrowly tailored to give only the relief to which

10    plaintiffs are entitled."  *Orantes–Hernandez v. Thornburgh*, 919 F.2d 549, 558 (9th Cir. 1990).

11    Impinj is not entitled to a prohibition on extraterritorial manufacturing, use, sales, or offers to sell

12    given that the Patent Act's prohibition on direct infringement extends only to U.S. conduct.  *See*

13    *Spine Sols., Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1320 (Fed. Cir. 2010),

14    *abrogated on other grounds by Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93 (2016)

15    (directing court "to vacate the extraterritorial portion of the injunction").  Any injunction should

16    be expressly limited to activities (i.e., "making, using, selling, or offering") within the U.S.

17           In addition, the injunction cannot extend to "indirect" infringement, on a theory of

18    "inducing infringement" or otherwise.  A court "only ha[s] equitable power to grant relief on 'the

19    merits of the case or controversy before it,' and 'does not have the authority to issue an

20    injunction' 'based on claims not pled in the complaint.'"  *LA Alliance for Human Rights v. Cnty.*

21    *of Los Angeles*, 14 F.4th 947, 957 (9th Cir. 2021) (citation omitted).  Impinj's operative complaint

22    did not allege indirect infringement nor was indirect infringement tried to or decided by the jury.

23    *See* Dkt. 71 (SAC); Dkt. 262 (denying leave to assert inducement); Dkt. 427 (jury instructions);

24    Dkt. 426 (jury verdict).  Having only pursued direct infringement at trial, it may not now obtain

25    an injunction extending to unpled and unproven claims of "inducing infringement" or "indirectly"

26    infringing.  *See, e.g., Extreme Networks, Inc. v. Enterasys Networks, Inc.*, No. 07-CV-229-BBC,

27    2008 WL 4756498, at *4-5 (W.D. Wis. Oct. 29, 2008), *stay granted, order amended*, No. 07-CV-

28    229-BBC, 2009 WL 679602 (W.D. Wis. Mar. 16, 2009), *and vacated and remanded on other*

1   *grounds*, 395 F. App'x 709 (Fed. Cir. 2010).  To do so would "improperly broaden[] the scope of

2   the … judgment to address induced infringement activity" that was not adjudicated.  *Inguran,*

3   *LLC v. ABS Glob., Inc.*, 72 F.4th 1272, 1281 (Fed. Cir. 2023) (noting the Federal Circuit has

4   "admonished district courts for sweeping injunctions that cover potential infringing activities").

5            **3.       There Is No Basis to Require a Notice With Sales.**

6            For similar reasons, a notice provision would be unwarranted.  Absent a finding of

7   induced infringement, there is no basis to require notice to third parties.  Indeed, the sole decision

8   cited by Impinj in support of its request for a notice provision acknowledged the centrality of

9   induced infringement to the analysis in declining to require the defendant's manufacturers—akin

10  to NXP's inlay customers here—to include a copy of the injunction with the bill of sale because

11  the patentee did not pursue claims based on induced infringement.  *See Asetek Danmark A/S v.*

12  *CMI USA, Inc.*, No. 13-CV-00457-JST, 2015 WL 5568360, at *19 (N.D. Cal. Sept. 22, 2015),

13  *aff'd in part, remanded in part*, 842 F.3d 1350 (Fed. Cir. 2016), *opinion modified and superseded*

14  *on reh'g*, 852 F.3d 1352 (Fed. Cir. 2017), *and aff'd in part, vacated in part*, 852 F.3d 1352 (Fed.

15  Cir. 2017).  Indeed, a finding of inducement is effectively a prerequisite to the type of notice

16  provision that Impinj requests here.  *See, e.g.*, *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, No. 2:07-cv-

17  00331-PMP-PAL, 2013 WL 3043668, at *12 (D. Nev. June 17, 2013) (allowing notice provision

18  because it was "narrowly tailored to prevent *further induced infringement* in a minimally invasive

19  and burdensome manner") (emphasis added).  The Court should deny that request.

20           **4.       Any Injunction Should Be Tied to Specific Patented Features.**

21           Where an injunction issues in a case involving "multifaceted, multifunction technology,"

22  only a "narrow feature-based injunction commensurate in scope with the [patent owner's patent]

23  rights" is warranted.  *Apple IV*, 809 F.3d at 647.  That is particularly important here, given

24  Impinj's failure to establish a causal nexus between the specific, physical features claimed by the

25  '597 and '302 patents.  Therefore, if an injunction issues, it should not extend to the "UCODE 8,

26  UCODE 8m, and UCODE 9 products" in their entirety (Dkt. 447 at 1), but rather to the specific

27  features claimed by the asserted patents that have a causal nexus to Impinj's harm.  Put otherwise,

28  if the Court concludes that Impinj has established a causal nexus with respect to only one of the

1  two asserted patents, the injunction should extend only to the inventive feature claimed by that

2  patent (e.g., enjoining making, using, selling, or offering in the U.S. UCODE 8, UCODE 8m, or

3  UCODE 9 products that have the channel shape of the '302 patent or any other integrated circuit

4  no more than colorably different from such products). Any injunction broader than that would

5  provide Impinj with a windfall for incremental technological improvements.

6  **5.    The Injunction Omits an Appropriate Sunset Provision.**

7  Finally, unlike many of the cases it relies on, Impinj fails to include a sunset provision to

8  avoid disruption to customers while NXP implements a design-around. As one decision

9  recognized, a "well-crafted sunset provision mitigates any negative effects on end users and …

10  customers due to the injunction." *TEK Global*, 920 F.3d at 793. Another affirmed an "eighteen

11  month sunset period," which "allowed for time to remove the infringing product from the market

12  without causing significant downstream disturbance for OEMs and consumers" to account for

13  "the design process and product qualification." *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325,

14  1339 (Fed. Cir. 2013). And a third delayed an injunction's effective date to provide additional

15  time for compliance. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 864 (Fed. Cir. 2010).

16  Here, NXP is preparing a design-around for the '302 patent, but qualification of that

17  design by its customers will extend the timeline to approximately ▮▮▮▮. Kodritsch Decl.

18  ¶¶ 4–5. If the injunction is limited to the '302 patent, a sunset provision of that length would

19  properly mitigate the injunction's negative effects on both direct customers and end users. On the

20  other hand, were an injunction to issue based on the '597 patent, ▮▮▮▮▮▮▮▮

21  ▮▮▮▮▮▮▮▮▮ Kodritsch Decl. ¶¶ 7–9. Unlike the shape of the channel

22  between RF pads, the '597 patent's rectifier design is literally a moving target, as Impinj's expert

23  found infringement only by "tracing" through the schematic for NXP's eight-stage rectifier to

24  identify "different transistor connections" across three separate stages of that rectifier. Tr. at

25  553:13–16. The nature of Impinj's infringement theory complicates designing around that patent.

26  Moreover, a sunset provision also is necessary to account for the nature of NXP's sales to

27  its customers. ▮▮▮▮▮▮▮▮▮▮▮. Kodritsch

28  Decl. ¶ 11. Delaying the effective date of any injunction through at least 2024 will ensure ▮▮

1   ███████████████████████████████████████████████████████.

2           **C.     A Royalty Will Adequately Address Any Ongoing Harm.**

3           This is precisely the type of case in which "awarding an ongoing royalty for patent

4   infringement in lieu of an injunction [is] appropriate."  *Paice LLC v. Toyota Motor Corp.*, 504

5   F.3d 1293, 1314 (Fed. Cir. 2007).  And the jury has already determined the appropriate rate—

6   1.5% for the '302 patent and 3% for the '597 patent.  *See* Dkt. 426 at 6, 7; Tr. at 753:17–754:20,

7   756:18–20, 760:15–761:3, 761:17–762:1.  Notwithstanding its own expert's conclusion that these

8   rates are proper, Impinj requests a royalty of an indeterminate amount—though Impinj suggests

9   even a 13.5% rate would not be enough—"that accounts for Impinj's lost profits and NXP's

10  willful post-verdict infringement."  Dkt. 447 at 19.  Impinj is not entitled to the windfall it seeks.

11          Impinj's request for an increased royalty rate assumes enhanced damages.  But, putting

12  aside that the jury solely found willfulness as to the '302 patent that it inconsistently found only

13  partially valid—perhaps in view of the HITAG reference that only became anticipatory after the

14  Court construed a claim limitation as non-substantive—willfulness does not dictate enhanced

15  damages.  That is a question for the Court, and Impinj has waived its right to seek enhanced

16  damages as to pre-verdict infringement by failing to move for such damages on the post-trial

17  motion schedule set by the Court.  *See* Dkt. 421 at 2 ("Any post trial motion shall be filed by July

18  28, 2023.").  But enhanced damages for post-verdict infringement would not be appropriate here

19  in any event given Impinj's tenuous infringement theories and NXP's efforts to implement

20  design-arounds.  Rather, the royalty rates Impinj's own expert calculated are the proper ones, as

21  those rates were already based on a hypothetical negotiation "in which the patent is assumed to be

22  infringed and valid," which "is highly pertinent to the Court's equitable task of determining a

23  post-verdict award."  *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, No. 2:15-CV-1202-

24  WCB, 2017 WL 3034655, at *7 (E.D. Tex. July 18, 2017); *accord* Tr. at 757:16–19 (Kindler).

25  **IV.     CONCLUSION**

26          The Court should deny Impinj's motion for a permanent injunction and award an ongoing

27  royalty for use of the '302 and '597 patents.

28

1    Dated: August 11, 2023                    JONES DAY

2

3                                              By: */s/ Michael C. Hendershot*
                                                   Michael C. Hendershot

4
                                                   Tharan Gregory Lanier
5                                                  (California State Bar No. 138784)
                                                   tglanier@jonesday.com
6                                                  Michael C. Hendershot
                                                   (California State Bar No. 211830)
7                                                  mhendershot@jonesday.com
                                                   Gurneet Singh
8                                                  (California State Bar No. 333711)
                                                   gsingh@jonesday.com
9                                                  JONES DAY
                                                   1755 Embarcadero Road
10                                                 Palo Alto, CA 94303
                                                   Telephone:  (650) 739-3939
11                                                 Facsimile:  (650) 739-3900

12                                                 Thomas W. Ritchie (admitted *pro hac vice*)
                                                   (Illinois State Bar No. 6301954)
13                                                 twritchie @jonesday.com
                                                   Lisa L. Furby (admitted *pro hac vice*)
14                                                 (Illinois State Bar No. 6312855)
                                                   lfurby@jonesday.com
15                                                 John M. Michalik (admitted *pro hac vice*)
                                                   (Illinois State Bar No. 6280622)
16                                                 jmichalik@jonesday.com
                                                   Timothy J. Heverin (admitted *pro hac vice*)
17                                                 (Illinoi State Bar No. 06243107)
                                                   tjheverin@jonesday.com
18                                                 JONES DAY
                                                   110 North Wacker Drive, Suite 4800
19                                                 Chicago, IL 60606
                                                   Telephone:  (312) 782-3939
20                                                 Facsimile:  (312) 782-8585

21                                                 Yury Kalish (admitted *pro hac vice*)
                                                   (D.C. State Bar No. 1020172)
22                                                 ykalish@jonesday.com
                                                   Tracy A. Stitt (admitted *pro hac vice*)
23                                                 (D.C. State Bar No. 1015680)
                                                   tastitt@jonesday.com
24                                                 Robert Levent Herguner (admitted *pro hac
                                                   vice*)
25                                                 (New York State Bar No. 5722228)
                                                   rlherguner@jonesday.com
26                                                 JONES DAY
                                                   51 Louisiana Ave., N.W.
27                                                 Washington, D.C. 20001
                                                   Telephone:  (202) 879-3939
28                                                 Facsimile:  (202) 626-1700

NXP USA, INC.'S RESPONSE TO
PERMANENT INJUNCTION MOTION
Case No. 4:19-CV-03161-YGR

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

T. Kaitlin Crowder (admitted *pro hac vice*)
(Ohio State Bar No. 0095796)
Robert M. Breetz (admitted *pro hac vice*)
(Ohio State Bar No. 0098968)
kcrowder@jonesday.com
JONES DAY
901 Lakeside Ave. E.
Cleveland, OH 44114
Telephone:  (216) 586-7347
Facsimile:  (216) 579-0212

Jonathan McNeal Smith
(California State Bar No. 292285)
jonathansmith@jonesday.com
JONES DAY
555 South Flower Street, Fiftieth Floor
Los Angeles, CA 90071
Telephone:  (213) 489-3939
Facsimile:  (213) 243-2539

Matthew J. Silveira
(California State Bar No. 264250)
JONES DAY
555 California Street, 26th Floor
San Francisco, CA 94104
Telephone: (415) 626-3939
Facsimile: (415) 875-5700
msilveira@jonesday.com

Attorneys for Defendant
NXP USA, INC.