1   Ramsey M. Al-Salam, Bar No. 109506
    Christina J. McCullough, Bar No. 245944
2   Antoine M. McNamara, Bar No. 261980
    R. Tyler Kendrick, admitted *pro hac vice*
3   Jessica J. Delacenserie, admitted *pro hac vice*
    PERKINS COIE LLP
4   1201 Third Avenue, Suite 4900
    Seattle, WA 98101
5   Tel: 206.359.8000 / Fax: 206.359.9000
    RAlsalam@perkinscoie.com
6   CMcCullough@perkinscoie.com
    AMcNamara@perkinscoie.com
7   RKendrick@perkinscoie.com
    JDelacenserie@perkinscoie.com
8
    Daniel T. Shvodian, Bar No. 184576
9   PERKINS COIE LLP
    3150 Porter Drive
10  Palo Alto, CA 94304-1212
    Tel: 650.838.4300 / Fax: 650.737.5461
11  DShvodian@perkinscoie.com
12  Daniel T. Keese, Bar No. 280683
    PERKINS COIE LLP
13  1120 NW Couch Street, 10th Floor
    Portland, OR 97209-4128
14  Tel: 503-727-2000 / Fax: 503-727-2222
    DKeese@perkinscoie.com
15
16  Attorneys for Plaintiff Impinj, Inc.

17              UNITED STATES DISTRICT COURT

18            NORTHERN DISTRICT OF CALIFORNIA

19  IMPINJ, INC.,                          Case No. 4:19-cv-03161-YGR

20                      Plaintiff,
                                           **PLAINTIFF IMPINJ, INC.'S OPPOSITION**
21       v.                                **TO NXP USA, INC.'S RETRIAL MOTIONS**
                                           **IN LIMINE NUMBERS 1-5**
22  NXP USA, INC.,

23                      Defendant.

24

25

26

27

28

1

2

TABLE OF CONTENTS

3

4

I.      OPPOSITION TO MOTION IN LIMINE NO. 1:  IMPINJ SHOULD BE
        ALLOWED TO INTRODUCE EVIDENCE OF "COPYING" INCLUDING
        PRODUCT "TEARDOWNS" ............................................................................................. 1

5

6

II.     OPPOSITION TO MOTION IN LIMINE NO. 2: NXP'S INFRINGEMENT OF
        THE '302 PATENT IS RELEVANT TO VALIDITY ....................................................... 4

7

III.    OPPOSITION TO MOTION IN LIMINE NO. 3: IMPINJ SHOULD BE
        ALLOWED TO INTRODUCE WHO IT AND NXP ARE ................................................ 7

8

9

IV.     OPPOSITION TO MOTION IN LIMINE NO. 4: IMPINJ SHOULD BE
        ALLOWED TO CONNECT THE '302 PATENT WITH THE "ENDURO"
        INNOVATIONS ............................................................................................................ 11

10

V.      OPPOSITION TO MOTION IN LIMINE NO. 5: THE '302 PATENT IS
        PRESUMED VALID BY LAW AND IMPINJ SHOULD BE ABLE TO SAY SO ........ 11

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TABLE OF AUTHORITIES

**CASES**

*Advanced Display Sys., Inc. v. Kent State Univ.*,
212 F.3d 1272 (Fed. Cir. 2000)........................................................................3

*Amgen Inc. v. Sandoz Inc.*,
66 F.4th 952 (Fed. Cir. 2023)............................................................................2

*Barry v. Medtronic, Inc.*,
250 F. Supp. 3d 107 (E.D. Tex. 2017) ..............................................................2

*Biscotti Inc. v. Microsoft Corp.*,
No. 2:13-CV-01015-JRG-RSP, 2017 WL 2537021 (E.D. Tex. May 30, 2017)........................7

*Borders v. Arch Aluminum & Glass Co.*,
No. 07-2188-JPO, 2008 WL 5427711 (D. Kan. Dec. 30, 2008)................................7

*Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*,
45 F.3d 1550 (Fed. Cir. 1995)...........................................................................2

*HTC Corp. v. Tech. Props. Ltd.*,
No. 5:08-cv-00882-PSG, 2013 WL 4782598 (N.D. Cal. Sept. 6, 2013) .................................7

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
802 F.2d 1367 (Fed. Cir. 1986)........................................................................12

*ICU. Med. Inc. v. RyMed Techs., Inc.*,
752 F. Supp. 2d. 486 (D. Del. 2010) .................................................................3

*Innovention Toys, LLC v. MGA Ent., Inc.*,
No. 07-6510, 2012 WL 5384933 (E.D. La. Nov. 1, 2012) .......................................6

*Leviton Mfg. Co. v. Pass & Seymour, Inc.*,
No. 17-cv-46 (BMC), 2021 WL 1648229 (Apr. 27, 2021, E.D.N.Y.).......................................2

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
449 F.3d 1209 (Fed. Cir. 2006), cert. denied, 127 S. Ct. 599 (2006) .........................................2

*Liqwd, Inc. v. L'Oreal USA, Inc.*,
941 F.3d 1133 (Fed. Cir. 2019)........................................................................3

*Loggerhead Tools, LLC v. Sears Holdings Corp.*,
No. 12-cv-9033-RRP, 2017 WL 4161976 (N.D. Ill. Apr. 11, 2017) ........................................4

*Marine Polymer Techs., Inc. v. HemCon, Inc.*,
No. 06-cv-100-JD, 2010 WL 1451171 (D.N.H. Apr. 8, 2010).................................6

*Medtronic, Inc. v. Cardiac Pacemakers, Inc.*,
    721 F.2d 1563 (Fed.Cir.1983) ................................................................................................12

*Medtronic, Inc. v. Teleflex Innovations S.a.r.l.*,
    70 F.4th 1331 Fed. Cir. 2023 ...................................................................................................4

*Microsoft Corp v. I4I Ltd. P'ship*,
    131 S. Ct. 2238 (2011) ............................................................................................................11

*Novartis Pharms. Corp. v. Teva Pharms. USA, Inc.*,
    No. CIV.A.05-CV-1887 DMC, 2009 WL 3754170 (D.N.J. Nov. 5, 2009) ..............................6

*Olaf Sööt Design, LLC v. Daktronics, Inc.*,
    No. 15 Civ. 5024 (RWS), 2018 WL 6929176 (S.D.N.Y. Dec. 7, 2018) ...................................4

*Pfizer Inc. v. Teva Pharm. USA, Inc.*,
    460 F. Supp. 2d 650 (N.J. 2006) ..............................................................................................2

*Roeder v. DIRECTV, Inc.*,
    No. C14-4091-LTS, 2017 WL 11458456 (N.D. Iowa May 31, 2017) ......................................7

*Ruiz v. A.B. Chance Co.*,
    234 F.3d 654 (Fed. Cir. 2000) ..................................................................................................2

*Stryker Corp. v. Intermedics Orthopedics, Inc.*,
    96 F.3d 1409 (Fed. Cir. 1996) ..................................................................................................2

*WBIP, LLC v. Kohler Co.*,
    829 F.3d 1317 (Fed. Cir. 2016) ................................................................................................4

*Wonderland Switz. AG v. Evenflo Co., Inc.*,
    No. 1:20-cv-00727-JPM, 2022 WL 20591121 (D. Del. Dec. 29, 2022) ...................................3

**STATUTES**

35 U.S.C. § 282 ..............................................................................................................................11

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.   OPPOSITION TO MOTION IN LIMINE NO. 1:  IMPINJ SHOULD BE ALLOWED TO INTRODUCE EVIDENCE OF "COPYING" INCLUDING PRODUCT "TEARDOWNS"

NXP seeks to exclude any evidence that it copied the ideas underlying the '302 invention. NXP also seeks to introduce, however, evidence that it independently developed its infringing pads and, possibly, that such development was based on the tags it used for a different product—called HITAG—that is very different from the products at issue.  The motion should be denied, or, at the least, to the extent it is granted, NXP should at least be precluded from introducing its HITAG product and any evidence of independent development. [1]

First, there is substantial evidence that NXP copied the innovations claimed in the '302 Patent. There was essentially undisputed testimony that customers liked the patented antenna pads incorporated in Impinj's Monza R6 integrated circuit ("IC") and, in the Court's words, "clamored" for their inclusion in NXP's next generation UCODE 8 product.  Dkt. No. 472 ("Impinj has shown a connection between the harm and the infringement where, in this basically two-player market, customers have clamored for the large pads of the '302 patent.").   More specifically, because NXP was losing market share to the Monza R6, it developed a plan to "target" Impinj's Monza R6 IC. Zach Dep. at 78:11–17, May 13, 2022 (played at July 7, 2023, Trial Tr. at 493:3); *id*. at 51:20–52:10 (played at July 7, 2023, Trial Tr. at 493:3) (admitting large pads were incorporated based on customer interviews); Trial Exs. 157, 229 (Dkt. No. 499-4) at 19 (customers wanting the large pads introduced by Impinj), 1327.   As part of that plan, NXP paid tens of thousands of dollars to purchase a teardown of the Monza R6 and asked its customers what features they wanted in NXP's next-generation product. Amtmann Dep. at 30:19-31:23, Apr. 5, 2022 (played July 7, 2023, Trial Tr. 491:11 to 492:25). NXP's witnesses admitted that they adopted the Monza R6 patented pad design at the request of and for the convenience of customers. *See, e.g.,* July 11, 2023, Trial Tr. (Zenz) at 914:20-916:6 ("And by that, our — basically, it's for the customer

---

[1] There is no evidence that NXP used the HITAG pads on its infringing products. *See, e.g.,* July 12, 2023, Trial Tr. (Zenz) at 984:16-985:18, 988:9-989:3. The undisputed evidence is that the patented and accused products are designed for "flip chip" attachment, which is different from the wire-bonded attachment used for HITAG. The undisputed evidence is that NXP adopted large pads for its infringing products because of the popularity of that feature on Impinj's UHF RAIN products, not because of the pads on a different non-UHF wire-bonded NXP product.

much more convenient if they have set up a production line for UHF production, yeah, and to use Impinj. … They can use … the same design and — from NXP and vice versa. Because then they save all the conversion time on the equipment to set up the equipment newly for a kind of different pad design.")  *see also* July 12, 2023, Trial Tr. (Zenz) at 974:10-976:17, 980:7-18. Indeed, NXP's "Customer Requirements Document" for UCODE 8, which was the blueprint for the UCODE 8 IC, states as much.  Trial Ex. 229 (Dkt. 499-4) at 229.19 (referring to positive customer feedback regarding for large copper pads first introduced by Impinj in the UHF market); *see also* Dkt. 499-3 (unredacted Impinj MIL) at 3:5-7.  Based at least in part on this copying evidence, the jury found that NXP's infringement of the '302 Patent was willful.

Second, the law is clear that secondary considerations must be considered in connection with the obviousness inquiry, and that copying is one such consideration.  "It is well-established that secondary considerations, such as commercial success, long-felt but unresolved need, unexpected results, copying, and the failure of others to develop the invention, must be considered as part of a court's obviousness analysis." *Pfizer Inc. v. Teva Pharm. USA, Inc.*, 460 F. Supp. 2d 650, 652 (N.J. 2006) (*citing Glaverbel Societe Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1555, (Fed. Cir. 1995)); *cf. Leviton Mfg. Co. v. Pass & Seymour, Inc.*, No. 17-cv-46 (BMC), 2021 WL 1648229, at *4 (Apr. 27, 2021, E.D.N.Y.) (granting new trial on validity because of improper exclusion of secondary considerations of non-obviousness); *Amgen Inc. v. Sandoz Inc.*, 66 F.4th 952, 963 (Fed. Cir. 2023) (quoting *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 660 (Fed. Cir. 2000)) ("Thus, there are a variety of objective indicia of nonobviousness that may inform the circumstances surrounding the origin of the subject matter sought to be patented including, but not limited to, … copying ….")

Third, when discussing copying generally, the courts have made clear that slavish copying is not required—copying the patented "ideas" is sufficient. *See Stryker Corp. v. Intermedics Orthopedics, Inc.*, 96 F.3d 1409, 1414 (Fed. Cir. 1996); *Liquid Dynamics Corp. v. Vaughan Co., Inc.*, 449 F.3d 1209, 1225–26, (Fed. Cir. 2006), cert. denied, 127 S. Ct. 599 (2006); *Barry v. Medtronic, Inc.*, 250 F. Supp. 3d 107, 112, 114 (E.D. Tex. 2017) (granting enhanced damages after

finding copying where competing patent applications were similar, such as the placement of the devices' handles, and citing that "slavish copying" of a commercial embodiment is not required).

Fourth, the teardowns are relevant to NXP's state of mind in connection with copying. Courts have consistently allowed evidence of teardown as relevant to copying, and there is no reasonable basis for excluding them in this case. *See Liqwd, Inc. v. L'Oreal USA, Inc.*, 941 F.3d 1133, 1137 (Fed. Cir. 2019) ("Evidence of copying may include internal documents, direct evidence such as photos of patented features or disassembly of products, or access and similarity to a patented product."); *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1285–86 (Fed. Cir. 2000) (finding copying to be "compelling evidence of nonobviousness"); *Wonderland Switz. AG v. Evenflo Co., Inc.*, No. 1:20-cv-00727-JPM, 2022 WL 20591121, at *4 (D. Del. Dec. 29, 2022) (denying motion to exclude teardowns because they are relevant to both willfulness and nonobviousness). NXP argues that the teardowns do not display the Impinj pads, which can be observed without a teardown. But the fact that NXP performed a teardown of Impinj products, and systematically analyzes Impinj's patented products, is at least relevant to whether NXP intended to copy the patented features. In other words, such evidence is relevant to NXP's state of mind, which is relevant to copying.

Fifth, NXP's argument that Impinj did not specifically refer to copying as a secondary consideration in response to a contention interrogatory regarding nonobviousness is not persuasive. NXP has the burden of proving invalidity, and of setting forth its contentions in detail. The Local Rules reflect this allocation of burdens by requiring Impinj to serve infringement contentions and NXP to serve invalidity contentions. Further, Impinj made clear both before and during the trial that NXP had copied Impinj's pad design and there is no plausible prejudice NXP can claim from Impinj not specifically setting forth that such copying was relevant to both willful infringement and nonobviousness. All evidence of copying was exclusively in NXP's possession so it cannot claim that it would have conducted other discovery if the interrogatory response were different.

Sixth, the cases relied upon by NXP do not warrant a different result. Some are easily distinguishable. *E.g.*, *ICU. Med. Inc. v. RyMed Techs., Inc.,* 752 F. Supp. 2d 486, 493 (D. Del. 2010) (excluding evidence that defendant "many years ago copied other ICU products — not the

ones at issue here….”); *Olaf Sööt Design, LLC v. Daktronics, Inc.*, No. 15 Civ. 5024 (RWS), 2018 WL 6929176 (S.D.N.Y. Dec. 7, 2018) (granting motion for reconsideration excluding evidence that non-party copied the patent without explanation). Others undermine NXP's arguments. *See Loggerhead Tools, LLC v. Sears Holdings Corp.,* No. 12-cv-9033-RRP, 2017 WL 4161976 at \*1 (N.D. Ill. Apr. 11, 2017) ("This ruling does not preclude admission of evidence of copying or non-copying."); *Medtronic, Inc. v. Teleflex Innovations S.a.r.l.,* 70 F.4th 1331, 1340-41 Fed. Cir. 2023) (holding that there was "more than sufficient circumstantial evidence to support the Board's finding of copying [to support non-obviousness]," and that copying can "be established through evidence of access to and substantial similarity with a patented *product*.") (emphasis in original).

For at least these reasons, the Court should deny NXP's motion and allow the jury to consider NXP's copying in connection with its obviousness analysis. To the extent the Court excludes evidence of copying, however, it should also exclude NXP from introducing evidence or arguing independent development based on the HITAG product or otherwise. As set forth in Impinj's motion *in limine* (Dkt. No. 500), such evidence at best is misleading because there is no evidence that the HITAG pads, which are not even directed to the flip chip technology at issue, were adapted for the infringing ICs. Further, as described above, there is more than sufficient evidence that NXP's decision to incorporate the pad design covered by the '302 Patent was not a result of "independent development"—it was based on customer "clamor" for Impinj's design.

## II.     OPPOSITION TO MOTION IN LIMINE NO. 2: NXP'S INFRINGEMENT OF THE '302 PATENT IS RELEVANT TO VALIDITY

NXP seeks to prevent the jury from learning that it is infringing the '302 Patent, arguing that the finding of infringement is irrelevant to whether the '302 Patent is invalid. The motion should be denied because the finding of infringement is relevant to nonobviousness for at least two reasons. First, praise of a product that incorporates the patented innovation is strong evidence of nonobviousness. *See, e.g.*, *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1334 (Fed. Cir. 2016) ("Evidence that the industry praised a claimed invention or a product which embodies the patent claims weighs against an assertion that the same claim would have been obvious. Industry participants, especially competitors, are not likely to praise an obvious advance over the known art.

1  Thus, if there is evidence of industry praise in the record, it weighs in favor of the nonobviousness

2  of the claimed invention.").  In the instant case, NXP documents reflect that NXP believed its

3  infringing pad design helped expel glue and enhanced antenna assembly speed.  For example, the

4  images below are from the official datasheet for the UCODE 8/8m and promote that the large pads

5  with flared channels are more "rotation tolerant" and expel adhesive through the channel ends:



*E.g.*, Trial Ex. 18 at 24.

Impinj should be allowed to introduce admissions about the efficacy and benefits of the

inventions of the '302 Patent to the jury, but the admissions are only meaningful if the jury also

understands that that the NXP pad design in its commercially successful UCODE products practices

the '302 Patent, as the Court determined as a matter of law.  This is a sufficient basis to allow

Impinj to introduce, or the Court to introduce through its instructions, that the NXP pad design has

been found to infringe.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

In addition, commercial success of a product embodying an invention is well-established as evidence of nonobviousness and, where the defendant's product is infringing, the success of that product is evidence of the commercial success of the invention.  For this reason, courts have held that a jury should be informed that a defendant's product has been found to be infringing where the success of that product is relied on to show commercial success of the invention.  *See Marine Polymer Techs., Inc. v. HemCon, Inc.*, No. 06-cv-100-JD, 2010 WL 1451171, at *1 (D.N.H. Apr. 8, 2010): (evidence of infringement allowed during validity trial because "evidence of commercial success of [an infringing] product might be introduced in the context of invalidity based on obviousness.   Therefore, the jury will be informed of the infringement determination."); *Innovention Toys, LLC v. MGA Ent., Inc.*, No. 07-6510, 2012 WL 5384933, at *1-2 (E.D. La. Nov. 1, 2012) (denying motion to exclude infringement determination during invalidity trial because "Plaintiff relies on the commercial success of MGA's infringing Laser Battle game.  Furthermore, in order for Plaintiff to submit that Laser Battle's commercial success is an objective indicator of non-obviousness, Plaintiff must demonstrate that Laser Battle practices the '242 patent, which constitutes infringement.  The Court concludes the jury should be informed of Defendants' infringement…").

The cases relied upon by NXP do not warrant a different outcome.  There is no indication in any of the cases cited by NXP, for example, that the plaintiff was relying on defendant's admissions concerning its own product or the commercial success of that product.  Further, at least in the *Novartis* decision, the plaintiff had to admit infringement to challenge the validity of a patent on a pharmaceutical compound.  *Novartis Pharms. Corp. v. Teva Pharms. USA, Inc.,* No. CIV.A.05-CV-1887 DMC, 2009 WL 3754170, at *2 (D.N.J. Nov. 5, 2009).  Impinj should be allowed to introduce the fact that NXP's products are infringing for these limited purposes.

While Impinj does not object to a limiting instruction of some sort, and will not dwell on NXP's infringement, it should be allowed to inform the jury that the NXP products practice the invention and explain the connection to the UCODE products' commercial success.

1  **III.    OPPOSITION TO MOTION IN LIMINE NO. 3: IMPINJ SHOULD BE
2           ALLOWED TO INTRODUCE WHO IT AND NXP ARE**

3          Impinj has never used the relative size, wealth, or number of employees of the parties to

4  suggest that NXP is somehow a "bad" company or that Impinj should prevail on any issue, and

5  agrees not to do so in the upcoming trial.  Impinj should, however, be allowed to introduce the

6  parties to the jury, including their business, location, and size.  This context is necessary for the

7  jury to even understand who the parties are and their dispute.  None of the cases cited by NXP

8  prohibit the use of such information for this limited purpose.  *See* Mot. (Dkt. No. 498) at 9 (citing

9  *HTC Corp. v. Tech. Props. Ltd.,* No. 5:08-cv-00882-PSG, 2013 WL 4782598, at *6 (N.D. Cal.

10  Sept. 6, 2013) (prohibiting "the use of a company's overall size or revenue as a check to confirm

11  the reasonableness of a jury award"); *Roeder v. DIRECTV, Inc.,* No. C14-4091-LTS, 2017 WL

12  11458456, at *3 (N.D. Iowa May 31, 2017) (rejecting argument "that evidence related to the

13  comparative bargaining power between the parties is relevant to the economic realities test that the

14  jury must apply to determine whether plaintiffs were employees of DIRECTV" and therefore

15  excluding evidence plaintiffs intended to use for only that purpose); *Biscotti Inc. v. Microsoft Corp.*,

16  No. 2:13-CV-01015-JRG-RSP, 2017 WL 2537021, at *1 (E.D. Tex. May 30, 2017) (granting MIL

17  "as to Microsoft's overall size, net worth, market capitalization, or stock value" without

18  explanation, but noting that this merely means that a "party must approach the bench before

19  introducing evidence or argument about [that] subject matter"); *Borders v. Arch Aluminum & Glass

20  Co.*, No. 07-2188-JPO, 2008 WL 5427711, at *3 (D. Kan. Dec. 30, 2008) (precluding reference to

21  an individual defendant's personal wealth in a racial discrimination case).

22          NXP's assertion that Impinj should be precluded from introducing such context is based on

23  the meritless accusation that, in the first trial, "Impinj's lawyers and witnesses repeatedly contrasted

24  Impinj's size and implied value of Impinj with NXP's" and will do so again "in an attempt to paint

25  NXP in a bad light."  Mot. at 8.  In support of this allegation, NXP points to three instances in

26  which Impinj made (indisputably factual and nonprejudicial) statements about the size, location,

27  and/or business of the parties, and complains that such statements are "unfairly prejudicial to NXP."

28  *Id*.  First, NXP complains about counsel for Impinj's reference to Impinj in opening as a "small

company" with "400 employees" that "do[es]n't really have the time or money or desire to just pay lawyers" as part of the reason why Impinj is not a litigious company:

> We spent two years trying to talk to them in — in correspondence, trying to avoid having to file suit. Impinj is a small company, 400 people. They don't really have the time or money or desire to just pay lawyers like me and my colleagues. They have better things to do. But they had to file suit because they couldn't get it resolved.

July 5, 2023, Trial Tr. at 125:10–15; *see* Mot. at 8 (citing Tr. at 125:11–14).

NXP complains about a similar characterization made during closing to emphasize the importance of Impinj's assertions in this case to its overall business, which is focused entirely on RAIN RFID:

> As I said in opening, the reason we're here is because Impinj is a relatively small company, 400 employees. And unlike NXP, as Mr. Amtmann said, this is a small part of their business. This is all of Impinj's business. Impinj really has to protect its innovations.

Mot. at 8 (citing July 13, 2023, Trial Tr. at 1257:15–19).

These statements are focused on relevant aspects of who Impinj is that are based, in part, on the size and scope of its business—independent of the supposedly prejudicial size and scope of NXP's business. Nothing in these statements (or any statements made by or on behalf of Impinj at trial) suggests that being a large and financially successful company somehow means NXP is "bad." To the contrary, counsel for Impinj expressly acknowledged during opening, for example, that NXP has "a lot to be proud of" as a large and successful company, including that they have "lots of patents themselves on lots of things" in a variety of industries. July 5, 2023, Trial Tr. at 112:7–9.

The third and final instance NXP points to as an allegedly prejudicial comparison of the parties is a line of questioning during the direct examination of Impinj's co-founder and CEO, Dr. Diorio, about Impinj's significant contributions to the development of RAIN RFID. During this exchange, Dr. Diorio answered questions about the size and scope of both parties' businesses, which helped put the magnitude of such contributions into perspective:

> Q.  … What is the RAIN Alliance?
>
> A.  The RAIN Alliance is an organization that today has more than 150 member companies. That is essentially an alliance of all the member companies to represent the industry to – to governments, to

1   get — further spectrum allocations to basically advance the overall
2   industry. Pretty much every industry has some sort of the consortium
    of its member companies, and the RAIN Alliance is the consortium
3   for the RAIN industry.

4   Q.  Who started is the RAIN Alliance?

5   A.  I did.

    …

6   Q.  And have you worked with NXP on things in this industry?

7   A.  Yes, we have.

    Q.  What type of things?
8
9   A.   We worked together in the early days to develop the — the
    international standard, the standard for communicating information
10  over the air… NXP was — was a member of the working group that
    was participating, and so I worked with NXP in developing that
11  standard as well as many other companies that were present.

12  Q.  …Does Impinj have patents relating to RAIN RFID?

13  A.  Impinj has more than 300 patents relating to RAIN RFID.

    Q.  Do you have any reason to think any company in the world has
14  more?

15  A.  I do not. I believe we have the most number of patents in our
    industry.
16
    Q.  And how many employees does Impinj have?
17
    A.  Roughly 400 today.
18
    Q.  How many offices does Impinj have?
19
    A.  We have one primary office in Seattle. …
20
    Q.  And how about NXP? What do you know about NXP?
21
    A.   NXP is a large multinational headquartered in the Netherlands
22  with, according to their filings, 33,000 employees, and they have a
    number of different businesses.
23
    Q.  And so their only — their business isn't just RAIN RFID; is that
24  correct?

    A.   It is not. They have many businesses. They make all kinds of
25  semiconductor products. One of their businesses is RAIN RFID.

26  July 6, 2023, Trial Tr. at 236:12–238:16; *see* Mot. at 8 (citing July 6, 2023, Trial Tr. at 237:24–

27  238:7, 238:9–11).

28

IMPINJ'S OPPOSITION TO NXP'S
RETRIAL MOTIONS IN LIMINE NOS. 1-5
CASE No. 4:19-CV-03161-YGR

In doing so, Dr. Diorio specifically acknowledged NXP's involvement in and developing the industry standard.  *Id*. at 237:5–14.  He did not, however, in any way suggest that NXP is "bad" because it is a large company with more employees, locations, and businesses.  Indeed, Dr. Diorio admitted in the Washington trial that Impinj "aspire[s] to be a big company someday, too," and has never feigned ignorance or embarrassment with respect to Impinj's financial success:

> Q. And Impinj is worth about $3 billion right now; right?
>
> A. That is correct. If you take all of our stock and mult — that's issued to investors — and you multiply it by the stock price, the company is worth about $3 billion.
>
> Q. So we heard something from the opening and we've heard it suggested through this trial that it's bad to be a big company.
>
> Are you embarrassed by Impinj's success?
>
> A. I don't — I am not embarrassed by Impinj's success. I never said it was bad to be a big company. We aspire to be a big company someday, too. Right now, we're a 400-person company.
>
> Q. So hundreds of employees, billions in stock market capitalization, publicly trade; is that fair?
>
> A. Those are all correct statements.
>
> Q. And you hope to get bigger.
>
> A. Indeed, I do.

Al-Salam Dec. Exh. A (June 13, 2023, W.D.WA trial transcript) at 82:3–18.

Dr. Diorio also agreed that "the size of a company [does not] determine whether or not its patent is valid" (or infringed).  *Id*. at 83:24–84:4.  This is hardly denigrating NXP for its size or purported wealth, or suggesting that Impinj should win on any issue due to its relative size or wealth.

Accordingly, there is no basis for NXP's assertion that Impinj will reference the relative size, wealth, or number of employees of the parties "in an attempt to paint NXP in a bad light" to the jury, which, in any event, Impinj agrees not to do.  Impinj should, however, be permitted reference such characteristics in an effort to introduce the parties to the jury.

**IV.    OPPOSITION TO MOTION IN LIMINE NO. 4: IMPINJ SHOULD BE ALLOWED TO CONNECT THE '302 PATENT WITH THE "ENDURO" INNOVATIONS**

After reviewing NXP's motion in limine number 4, Impinj will not oppose the narrow relief that is requested—specifically, Impinj will not refer to the '302 Patent as the "Enduro Patent." Impinj should, however, be allowed to refer to its innovative large pads as part of its "Enduro" innovations.  There is no dispute that Impinj has marketed its large pad innovations as "Enduro.". NXP is correct that the Enduro innovations go beyond the inventions claimed in the '302 Patent, but that does not warrant excluding any references to Enduro.  Further, the '302 Patent is directed large contact pads with a specific channel shape.  This is the fundamental aspect of the Enduro innovations and is the specific aspect that NXP infringed.  Indeed, the "Summary of Benefits" cited by NXP for Enduro, including the larger connection area, the wider tolerance of assembly parameters, connection resistance, etc., (Mot. at 12 citing Crowder Decl., Exh. H) are directly a result of the '302 Patent inventions.  NXP, of course, can point out that there are other aspects of Enduro that are not specifically claimed in the '302 Patent.

**V.    OPPOSITION TO MOTION IN LIMINE NO. 5: THE '302 PATENT IS PRESUMED VALID BY LAW AND IMPINJ SHOULD BE ABLE TO SAY SO**

NXP's fifth motion in *limine* seeks to have the Court and jury ignore the presumption of validity that attaches to all patents and does so based on a misleading description of the prosecution history of the '302 Patent.  Issued patents are presumed valid and NXP has the burden of overcoming that presumption.  This is black-letter statutory law:

> *A patent shall be presumed valid.* Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. *The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.*

35 U.S.C. § 282 (emphasis added); *Microsoft Corp v. I4I Ltd. P'ship*, 131 S. Ct. 2238, 2245 (2011) ("By its express terms, § 282 establishes a presumption of patent validity, and it provides that a challenger must overcome that presumption to prevail on an invalidity defense.").  Indeed, the presumption can be overcome only by clear and convincing evidence.  *Id.* at 2246.  The presumption

of validity applies with even more force where the Patent Office already considered the art, but "the presumption of validity is not weakened or destroyed where merely pertinent non-considered prior art is introduced, [although] the offering party is more likely to carry the burden of persuasion imposed by 35 U.S.C. § 282 when art more pertinent than that considered is introduced." *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 1566 (Fed.Cir.1983); *see also Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed. Cir. 1986) ("Notwithstanding that the introduction of prior art not before the examiner may facilitate the challenger's meeting the burden of proof on invalidity, the presumption remains intact and on the challenger throughout the litigation, and the clear and convincing standard does not change.").

NXP requests relief that directly contradicts the black latter law. Even worse NXP does so based on a misleading description of the file history. The claim language that was rejected by the examiner included a limitation of facilitating fluid flow from the center to the end of the channel ("the channel is shaped to facilitate a fluid flow from the center of the channel to the end of the channel"). (Dkt. No. 498-14 (Crowder Decl. Ex. L) at 5-6.) What secured the allowance of the claims was amending them to specify the shape of the channel with two ends being substantially wider than the center, not adding the fluid flow limitation. (Dkt. No. 498-14 at 11 (amending to add that the channel has a cross-section that is substantially the same at both ends and that is substantially wider than the cross-section at the center).) As part of the response, Impinj specifically highlighted the amendments to specify the channel shape having wider ends and a narrower center, rather than the fluid flow limitation. (Dkt. No. 498-14 at 15-16 ("Nowhere in his teachings, does Koepp provide what is recited in amended Claim 1 at least '*a first transverse channel cross-section at the first end is substantially the same size as a second transverse cross-section at the second end and substantially larger than a third transverse channel cross-section at the center'*.") (emphasis in original).) There simply is no evidence that the Examiner failed to consider the amended claim language or the validity issues or that the Examiner only allowed the claims because of a different interpretation of the fluid flow limitation than the one applied by the Court. Indeed, this Court expressly addressed the file history argument in its previous order addressing summary judgment and the parties' motions to exclude, noting:

IMPINJ'S OPPOSITION TO NXP'S
RETRIAL MOTIONS IN LIMINE NOS. 1-5
CASE NO. 4:19-CV-03161-YGR

1
2
3
4
5
6
7

> The Court rejects NXP's arguments that Impinj may not now argue
> that the facilitation of fluid flow language is not a substantive
> limitation on the ground that Impinj pointed out that prior art includes
> such a limitation. (Dkt. No. 294 at 10.) Impinj detailed many
> differences between the prior art and the claimed invention,
> including specifics about how the shape of the channel facilitates
> fluid flow (i.e., this is far from the only difference between the
> claimed invention and the prior art, and it is arguably not a material
> difference at all). … the relevant wherein/whereby clause merely
> states the intended purpose of the claim, not a substantive limitation.
> Merely providing that as a distinction from prior art does not render
> it substantive.

8
9
10

Dkt. No. 339 at 18 (excluding Dr. Subramanian from offering opinions that amounted to claim

construction to the jury); *see also id.* at 10-12 (granting summary judgment of infringement).

11
12

NXP in effect seeks to prevent the jury from being properly informed regarding the law and the

facts—that the claims were examined, were allowed, and that the claims are entitled to a rebuttable

13
14

presumption of validity.  This would be error.  NXP is, of course, able to introduce evidence and

argument attempting to demonstrate that the claims should not have been allowed and are invalid,

15
16

thus rebutting the presumption of validity.  But the presumption of validity is required by law and

NXP's motion *in limine* number 5 should be denied in its entirety.

17
18
19
20
21
22
23
24
25
26
27
28

IMPINJ'S OPPOSITION TO NXP'S
RETRIAL MOTIONS IN LIMINE NOS. 1-5
CASE NO. 4:19-CV-03161-YGR

Dated January 24, 2024

By: */s/ Ramsey M. Al-Salam*
    Ramsey M. Al-Salam, Bar No. 109506
    Christina J. McCullough, Bar No. 245944
    Antoine M. McNamara, Bar No. 261980
    R. Tyler Kendrick (admitted *pro hac vice*)
    Jessica J. Delacenserie (admitted *pro hac vice*)
    PERKINS COIE LLP
    1201 Third Avenue, 49th Floor
    Seattle, WA 98101
    Tel: 206.359.8000
    Fax: 206.359.9000
    RAlSalam@perkinscoie.com
    CMcCullough@perkinscoie.com
    AMcNamara@perkinscoie.com
    RKendrick@perkinscoie.com
    JDelacenserie@perkinscoie.com

    Daniel T. Shvodian, Bar No. 184576
    PERKINS COIE LLP
    3150 Porter Drive
    Palo Alto, CA 94304
    Tel: 650.838.4300
    Fax: 650.737.5461
    DShvodian@perkinscoie.com

    Daniel T. Keese, Bar No. 280683
    PERKINS COIE LLP
    1120 N.W. Couch Street, 10th Floor
    Portland, OR 97209-4128
    Tel: 503.727.2000
    Fax: 503.727.2222
    DKeese@perkinscoie.com

    *Attorneys for Plaintiff Impinj, Inc.*

IMPINJ'S OPPOSITION TO NXP'S
RETRAL MOTIONS IN LIMINE NOS. 1-5
CASE NO. 4:19-cv-03161-YGR