Ramsey M. Al-Salam, Bar No. 109506
Christina J. McCullough, Bar No. 245944
Antoine M. McNamara, Bar No. 261980
Stevan R. Stark, admitted *pro hac vice*
R. Tyler Kendrick, admitted *pro hac vice*
Jessica J. Delacenserie, admitted *pro hac vice*
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101
Tel: 206.359.8000 / Fax: 206.359.9000
RAlsalam@perkinscoie.com
CMcCullough@perkinscoie.com
AMcNamara@perkinscoie.com
SStark@perkinscoie.com
RKendrick@perkinscoie.com
JDelacenserie@perkinscoie.com

Daniel T. Keese, Bar No. 280683
PERKINS COIE LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Tel: 503.727.2000
Fax: 503.727.2222
DKeese@perkinscoie.com

[Additional counsel identified on signature page]

Attorneys for Plaintiff Impinj, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IMPINJ, INC.,<br><br>    Plaintiff,<br><br>  v.<br><br>NXP USA, INC.,<br><br>    Defendant. | Case No. 4:19-cv-03161-YGR-AGT<br><br>**PLAINTIFF IMPINJ, INC.'S BRIEF RE INJUNCTIVE RELIEF PER DKT. 519** |

**TABLE OF CONTENTS**

I. Introduction ............................................................................................................. 1

II. *eBay* Factor 1: Irreparable Harm ........................................................................... 2

III. *eBay* Factor 2: Inadequacy of Monetary Damages ................................................ 4

IV. *eBay* Factor 3: Balance of Hardships ..................................................................... 7

V. *eBay* Factor 4: Public Interest ................................................................................ 9

VI. Scope of the Injunction .......................................................................................... 10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# TABLE OF AUTHORITIES

**CASES**

*Acumed LLC v. Stryker Corp.*,
 551 F.3d 1323 (Fed. Cir. 2008) ................................................................................................ 8

*Adv. Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*,
 579 F. Supp. 2d 554 (D. Del. 2008) .......................................................................................... 7

*Apple Inc. v. Samsung Elecs. Co.*,
 735 F.3d 1352 (Fed. Cir. 2013) ........................................................................................ 4, 5, 6

*Apple Inc. v. Samsung Elecs. Co.*,
 809 F.3d 633 (Fed. Cir. 2015) .................................................................................................. 9

*Apple, Inc. v. Samsung Elecs. Co.*,
 678 F.3d 1314 (Fed. Cir. 2012) (O'Malley, J., concurring-in-part) .......................................... 6

*Broadcom Corp. v. Emulex Corp.*,
 732 F.3d 1325 (Fed. Cir. 2013) ........................................................................................ 4, 5, 9

*Douglas Dynamics, LLC v. Buyers Prods. Co.*,
 717 F.3d 1336 (Fed. Cir. 2013) ......................................................................................  passim

*eBay Inc. v. MercExchange, L.L.C.*,
 547 U.S. 388 (2006) ........................................................................................................ passim

*Hecht Co. v. Bowles*,
 321 U.S. 321 (1944) .................................................................................................................. 1

*i4i Ltd. P'ship v. Microsoft Corp.*,
 598 F.3d 831 (Fed. Cir. 2010) ........................................................................................ 5, 7, 8, 9

*Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd.*,
 788 F. Supp. 2d 71 (E.D.N.Y. 2011) ..................................................................................... 7, 9

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
 702 F.3d 1351 (Fed. Cir. 2012) ............................................................................................ 2, 7

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
 659 F.3d 1142 (Fed. Cir. 2011) ...................................................................................... 2, 5, 6, 8

*Roper Corp. v. Litton Sys., Inc.*,
 757 F.2d 1266 (Fed. Cir. 1985) ................................................................................................ 5

*Sanofi-Synthelabo v. Apotex, Inc.*,
 470 F.3d 1368 (Fed. Cir. 2006) ................................................................................................ 9

Case 4:19-cv-03161-YGR   Document 530   Filed 03/11/24   Page 4 of 16

*TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*,
    920 F.3d 777 (Fed. Cir. 2019)..................................................................................................2

*Weinberger v. Romero–Barcelo*,
    456 U.S. 305 (1982)..................................................................................................................1

*Windsurfing Int'l, Inc. v. AMF, Inc.*,
    782 F.2d 995 (Fed. Cir. 1986)...................................................................................................9

**OTHER AUTHORITIES**

Fed. R. Civ. P. 65(d)(2)...................................................................................................................10

CASE NO. 4:19-CV-03161-YGR-AGT

Pursuant to the Court's Pretrial Order No. 3A (Dkt. 519), Plaintiff Impinj, Inc. ("Impinj") provides the below outline of its position regarding injunctive relief as to the '302 patent.

## I.   INTRODUCTION

Impinj respectfully submits that a permanent injunction barring Defendant NXP USA, Inc. ("NXP") and any affiliated entities and other persons in active concert with NXP USA from continuing their willful infringement of the '302 patent is necessary to prevent ongoing irreparable harm to Impinj.[1] This Court has the power, and responsibility, to grant such relief "[a]ccording to well-established principles of equity" once Impinj demonstrates: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "As [the Supreme] Court has long recognized, 'a major departure from the long tradition of equity practice should not be lightly implied.'" *Id.* (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 320 (1982)); *see also Hecht Co. v. Bowles*, 321 U.S. 321, 329–30 (1944).

The Court already found that "Impinj has established at least some irreparable harm" and "has shown a connection between the harm and the infringement" of the '302 patent, as required by the first *eBay* factor. Dkt. 472 at 3. This is consistently recognized as the most important and difficult prerequisite to obtaining injunctive relief. Indeed, the irreparable harm Impinj has suffered (and continues to suffer) as a result of NXP's willful infringement—including "lost sales and market share" to its "direct competitor[]," *id.*—has persistent, ensuing negative impacts on Impinj's business as a whole that are next to impossible to quantify. Lost sales and market share are recognized examples of irreparable harm that cannot be adequately compensated with monetary damages.  Further, enjoining NXP's ongoing willful infringement would not impose any legitimate hardship on NXP that outweighs the ongoing harm to Impinj, nor would an injunction disserve the public interest.

---

[1] On May 22, 2023, the Court granted Impinj's request for summary judgment that NXP's UCODE 8 and UCODE 9 products infringe the '302 patent, and on July 14, 2023, the jury found such infringement to be willful. Dkts. 339 & 426 at 8.

The relevant facts, evidence in the trial record, and legal principles are explained in detail in Impinj's briefing in support of its Motion for a Permanent Injunction, which was directed to both the '302 and the '597 patents. Dkts. 447 & 461. With respect to the '302 patent, the Court expressly found the first *eBay* factor satisfied, but "decline[d] to consider the other [three *eBay*] factors" or issue an injunction until after a re-trial on validity. Dkt. 472 at 2–3, n.3. Accordingly, the only issues left for the Court to resolve regarding injunctive relief for the '302 patent relate to *eBay* factors 2–4 and the proper scope of such relief. Impinj's positions regarding each of these issues, including evidence and legal authority in support thereof, are summarized below. For completeness, Impinj also summarizes the evidence and legal principles upon which the Court previously found *eBay* factor 1 satisfied. Impinj will be prepared to present this and additional evidence while the jury deliberates at the upcoming trial in accordance with any forthcoming guidance of the Court and in response to evidence presented by NXP.[2] *See* Dkt. 519 at 2.

## II.   *eBAY* FACTOR 1: IRREPARABLE HARM

Impinj and NXP directly compete in the "basically two-player market" for RAIN RFID, which "creates an inference that an infringing sale amounts to a lost sale for the patentee" and thus "may well serve as a substantial ground for *granting* an injunction." Dkt. 472 at 3 (citing *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012)); *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1151–52 (Fed. Cir. 2011) (emphasis in original); *see also, e.g., Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013) ("Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions."); *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 793 (Fed. Cir. 2019) ("Head-to-head competition and lost market share tend to evidence irreparable harm.").

Indeed, as the Court already found, Impinj has suffered irreparable harm at least in the form of "lost sales and market share." Dkt. 472 at 3. More specifically, it is undisputed that Impinj lost

---

[2] The below summaries are illustrative and based on Impinj's current understanding of NXP's positions. To the extent NXP presents additional evidence or legal arguments that it did not raise in response to Impinj's Motion for a Permanent Injunction (*see* Dkt. 452), Impinj may present additional evidence and/or legal authority in response thereto.

(and NXP gained) ten points of market share when NXP released its first infringing product, UCODE 8—three years *after* Impinj had released its Monza R6 chip with the '302 patented large pad design, which was the first UHF/RAIN RFID chip with large pads. *E.g.*, Ex.[3] 1327 (Haas Rebuttal Exhibit 5); Tr. Vol. 2 (Diorio) at 241–45, 248–49, 269; Tr. Vol. 2 (Oliver) at 323, 237; Zach 5/13/22 Dep. (*see* Tr. Vol. 3 at 493:3) at 51, 55, 107; Tr. Vol. 6 (Haas) at 1098, 1107–08.

The Court also agreed there was a connection between this seismic shift in the market and NXP's infringement of the '302 patent. *See* Dkt. 472 at 3. For example, there is overwhelming evidence that, as the Court so aptly put it, "customers have clamored for the large pads of the '302 patent"—first, in Impinj's Monza R6 products and then, after customers specifically requested that NXP implement Impinj's patented large pad design, three years later in NXP's infringing UCODE 8 products. *Id.*; *see*, *e.g.*, Tr. Vol. 2 (Diorio) at 245–48 (explaining that the '302 patented pad design "reduce[s] misalignment when the chip is mounted to the antenna," resulting in "better performance, higher yields, and overall improved usability" of the chips, and was therefore "very well received by customers"), 269–70 (explaining benefits of the patented "large pad shape" to customers and that, when "NXP copied it, [Impinj] lost the market benefit of our innovation"); Tr. Vol. 2 (Oliver) at 320–33 (similar, noting that "the reception [of Impinj's patented pad design] was so strong, it has become in effect mandatory for us … all ICs since [Monza R6] have used it," as have all of NXP's RAIN RFID ICs, including a "retrofit onto a previous product [UCODE 7]"); Zach 5/13/22 Dep. (*see* Tr. Vol. 3 at 493:3) at 52–56 (admitting that "large pads were new in the UHF market after Monza R6 introduced them" and that he included them in NXP's UCODE 8 "customer requirements specification" (Ex. 229) based on his "collection of market requirements, [] meaning interviews with customers"), 106–07 (similar); Exs. 53–55, 235 (publications touting or praising benefits of the patented large pad shape in Monza R6); Exs. 231, 288, 289 (publications touting or praising benefits of the infringing large pad shape in UCODE 8).

Moreover, there is ample evidence that NXP analyzed and copied Impinj's patented large pad design in Monza R6 because, "for the customer[, it's] much more convenient if they have set

---

[3] As used herein, "Ex." refers to a trial exhibit unless otherwise indicated, and "Tr. Vol." refers to a particular volume of the trial transcript.

up a production line for UHF production [] to use Impinj['s] [] same design … [b]ecause then they save all the conversion time on the equipment to set up the equipment newly for a kind of different pad design." Tr. Vol. 5 (Zenz) at 914–916; *see also*, *e.g.*, Amtmann 4/5/22 Dep. (*see* Tr. Vol. 3 at 491:11) at 26–29 (admitting that NXP did "physical analysis" and obtained "a teardown report" of at least Impinj's Monza 4, Monza R6, and M700 products); Zach 5/13/22 Dep. (*see* Tr. Vol. 3 at 493:3) at 32–34 (similar regarding teardowns), 78 (discussing statements about Impinj's large pad technology and that UCODE 8 "needs to target Impinj R6" in an internal NXP presentation dated Sept. 10, 2014 (Trial Ex. 157)), 82 (similar); Ex. 229 (NXP "Customer Requirements Specification" for UCODE 8, dated March 14, 2016) at 9, 19; *Apple Inc. v. Samsung Elecs. Co.*, 735 F.3d 1352, 1368 (Fed. Cir. 2013) ("*Apple III*") (vacating district court's finding of no irreparable harm and remanding to consider "ease-of-use evidence and evidence of copying").

As explained in Impinj's earlier briefing, NXP's infringement of the '302 patent has also caused Impinj to suffer other forms of irreparable harm, including erosion of its reputation as the leading innovator of RAIN RFID technology, deterioration of its brand distinction, and loss of business opportunities. *See* Dkt. 447 at 10–13; Dkt. 461 at 6–7; *see also*, *e.g.*, Tr. Vol. 2 (Diorio) at 228–32, 236–38 (describing Impinj's efforts to create and grow the RAIN RFID industry, and that Impinj has never licensed its patented technology); Tr. Vol. 3 (Dossett) at 605–16 (describing, e.g., customer confusion, opportunities Impinj lost with major customers, and that Impinj had to routinely "clarify about our innovations and our leadership" in the market after NXP released UCODE 8); *Douglas Dynamics*, 717 F.3d at 1344–45 ("Irreparable injury encompasses different types of losses that are often difficult to quantify, including [] erosion in reputation and brand distinction. … As just one example, [plaintiff's] reputation as an innovator will certainly be damaged if customers found the same 'innovations' appearing in competitors' [products]."); *Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1337 (Fed. Cir. 2013) (finding that exclusion from fair opportunity to compete in a "design win" scenario irreparably harmed patentee).

### III. *eBAY* FACTOR 2: INADEQUACY OF MONETARY DAMAGES

Neither Impinj's proven irreparable harm in the form of "lost sales and market share," Dkt. 472 at 3, nor its other irreparable harms detailed above, can be adequately compensated by

monetary damages. As an initial matter, NXP's likely "*ability* to pay a judgment does not defeat a claim that an award of damages would be an inadequate remedy"; it "merely indicates that [the C]ourt should look to other considerations to determine whether a damages award will adequately compensate the patentee for the harm caused by continuing infringement." *Apple III* at 1369 (citing *Roper Corp. v. Litton Sys., Inc.*, 757 F.2d 1266, 1269 n.2 (Fed. Cir. 1985) (rejecting the view that an infringer's "ability to compensate" ends the court's inquiry)); *see* Dkt. 452 at 17.[4] Here, there are several considerations that compel a finding that monetary damages would be inadequate.

First, all of the irreparable harm described above is, in and of itself, "difficult to quantify" and will continue unless NXP is permanently enjoined. *E.g.*, *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010) ("In this case, a small company was practicing its patent, only to suffer a loss of market share, brand recognition, and customer goodwill as the result of the defendant's infringing acts. Such losses may frequently defy attempts at valuation, particularly when the infringing acts significantly change the relevant market, as occurred here. … The loss associated with these effects is particularly difficult to quantify. Difficulty in estimating monetary damages is evidence that remedies at law are inadequate." (citing *Broadcom*, 543 F.3d at 703–04)); *Robert Bosch*, 659 F.3d at 1155 (agreeing that plaintiff "will continue to suffer irreparable harm due to lost market share, lost business opportunities … unless [defendant] is permanently enjoined," and therefore "money damages alone cannot fully compensate [plaintiff] for these

---

[4] NXP also previously argued that "the jury's adoption of Impinj's proposed royalty rate[] for the [] '302 patent[] in addition to awarding lost profits for some sales" makes "clear" that "monetary damages are a more than adequate remedy." Dkt. 452 at 16. In doing so, NXP apparently argues that, by requesting damages in the first place (and being awarded the full amount requested), Impinj has somehow conceded that it can be adequately compensated monetarily. This is nonsensical, and clearly inconsistent with Impinj's position since the outset of this litigation. This argument is also severely undermined by NXP's position that any ongoing royalties for its continued willful infringement should ignore the vast majority of damages awarded by the jury in the form of lost profits, and instead be limited to the jury's reasonable royalty rate. Dkt. 452 (NXP Opp. to Mot. for Injunction) at 25; *see also* Dkt. 483 (NXP Opp. to Mot. for Ongoing Royalty) at 7–15; Dkt. 426 (Jury Verdict) at 7. Moreover, the full jury award (including lost profits) does not even adequately compensate for NXP's *past* willful infringement because the jury was was not allowed to consider its willfulness finding when awarding damages. Dkt. 426 (Jury Verdict) at 7–8; Dkt. 427 (Final Jury Instructions) at 8 ("If you decide that any infringement was willful, that decision should not affect any damages award you give. I will take willfulness into account later."). Accordingly, to the extent the Court is inclined to award ongoing royalties based on the jury verdict in lieu of injunctive relief, the royalty rate should account for **all** of the jury's relevant findings as to the '302 patent, including those regarding lost profits (as well as the Court's own finding of irreparable harm in the form of "lost sales"), reasonable royalties, and willfulness.

harms"); *Douglas Dynamics*, 717 F.3d at 1344.

Indeed, nearly every time NXP makes an infringing sale, Impinj loses a sale and market share. *See Robert Bosch*, 659 F.3d at 1151 ("the existence of a two-player market … creates an inference that an infringing sale amounts to a lost sale for the patentee"). Impinj similarly continues to lose out on sales to this day as a result of "los[ing] the market benefit of [its '302 patented] innovation," as well as opportunities with important partners and end customers, when NXP released UCODE 8. *See, e.g.*, Tr. Vol. 2 (Diorio) at 269–70; Tr. Vol. 3 (Dossett) at 606–09 (explaining customer confusion regarding features in UCODE 8, which forced him to spend "so much time" clarifying that Impinj "brought [the large pad and other] innovations to the market two years earlier and that our product was proven in the marketplace" and "was a frustration … it was a feeling that our innovation had been copied, and [] we were now competing against ourself"), 610–16 (describing specific opportunities Impinj lost with major customers and lingering impacts thereof). "Because the loss of customers and the loss of future downstream purchases are difficult to quantify, these considerations support a finding that monetary damages would be insufficient to compensate [Impinj]." *Apple, Inc. v. Samsung Elecs. Co.*, 678 F.3d 1314, 1337 (Fed. Cir. 2012) ("*Apple I*") (O'Malley, J., concurring-in-part); *see also Apple III*, at 1368.

It is also highly relevant that Impinj has invested an extraordinary amount of time and money in developing RAIN RFID and building the industry (from which NXP has greatly benefitted), and that Impinj has never licensed any of its "more than 300 patents relating to RAIN RFID" to "any competitor."[5] *E.g.*, Tr. Vol. 2 (Diorio) at 237–38, 228–30 (explaining that "when Impinj got into this RFID industry in the year 2002, there was no international standard that described how information is communicated… So one of the first things I did is I put some effort into creating [] a standard, [] called Gen2" and "came up with a different name called RAIN"), 231–32 (explaining that, unlike NXP, Impinj "invest[s] in readers in order to drive adoption across

---

[5] In an effort to build the RAIN RFID industry, Impinj (along with other key players in the industry) has committed to licensing *other* patents royalty-free to the extent necessary to practice the GS1® Gen2 protocol. Impinj has not, however, licensed any patents that are not necessary to comply with this international standard (which Dr. Diorio played a critical role in developing), including the '302 patent and the vast majority of its "more than 300 patents relating to RAIN RFID." Tr. Vol. 2 (Diorio) at 237.

1    the industry" even though "Readers are not profitable for us"), 236–37 (explaining that he "started
2    [] the RAIN Alliance" "to represent" and "basically advance the overall industry"); Tr. Vol. 2
3    (Oliver) at 323–26 (explaining the extensive experimentation, testing, and "work with our
4    customers [] to qualify this [] process of using the large contact pads" as the first to introduce such
5    pads in the industry); Tr. Vol. 5 (Zenz) at 914–16 (explaining that, when Impinj released Monza
6    R6, customers "had to adapt [their manufacturing] process" to account for the change in "pad
7    structure," and therefore it was "more convenient" for customers if NXP used the "same design");
8    Ex. 603 (announcing Dr. Diorio as the 2007 recipient of the "RFID Visionary of the Year" award,
9    as the "individual with the greatest impact on the industry, sharing their vision and championing
10   the value of RFID technology"); *Douglas Dynamics*, 717 F.3d at 1345 ("More relevant is the rise
11   in [defendant's] market share [] while infringing [plaintiff's] patents. This record evidence
12   underscores the profitability of infringement and suggests that mere damages will not compensate
13   for a competitor's increasing share of the market, a market which [plaintiff] competes in, and a
14   market that [plaintiff] has in part created with its investment in patented technology."); *i4i*, 598
15   F.3d at 862 (affirming district court's conclusion "that there were inadequate remedies at law to
16   compensate [plaintiff] for its injury" based, in part, on finding "no evidence that [plaintiff] had
17   previously licensed the patent, instead finding evidence that [plaintiff] sought to retain exclusive
18   use of its invention"); *Metso Minerals, Inc. v. Powerscreen Int'l Distribution Ltd.*, 788 F. Supp.
19   2d 71, 75–76 (E.D.N.Y. 2011) ("a refusal to license does weigh in favor of finding irreparable
20   harm" and "that remedies at law available to the plaintiff are insufficient" (citing *Presidio*, 723
21   F.Supp.2d at 1337; *Adv. Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d
22   554, 560–61 (D. Del. 2008) (noting that a refusal to license a patent to a direct competitor favors
23   a finding of irreparable injury))).

24   **IV.    *eBAY* FACTOR 3: BALANCE OF HARDSHIPS**

25          The Federal Circuit consistently finds "the parties' sizes, products, and revenue sources"
26   highly relevant to assessing "the relative effect of granting or denying an injunction on the parties."
27   *I4i*, 598 F. 831 at 862. Such factors show that the balance of hardships squarely falls on Impinj.
28   For example, it is undisputed that Impinj is a comparatively small company "solely focus[ed] on

RAIN RFID." Tr. Vol. 2 (Diorio) at 231–32, 237–38, 268. Each lost sale to NXP therefore impacts the entirety of Impinj's business, including Impinj's ability to recoup its investments in building the industry and driving adoption of RAIN RFID technology, including through its significant contributions to, e.g., the development of the international standard for RAIN RFID, the creation and success of the RAIN Alliance, and the development of readers to support advancements in chip technology. *See*, *e.g.*, Tr. Vol. 2 (Diorio) at 228–38; Ex. 603. As explained above, NXP's past (and ongoing) infringement has also impacted (and will continue to impact) Impinj's reputation as the leading innovator of RAIN RFID technology and the strength of its extensive patent portfolio, which Impinj has sought to retain exclusive use of. *Id*.

NXP, on the other hand, is part of a large multinational semiconductor conglomerate with over 30,000 employees and several businesses, a small fraction of which relates to RAIN RFID. *See*, *e.g.*, Tr. Vol. 2 (Diorio) at 238, 268; Tr. Vol. 6 (Kodritsch) at 1060–61. NXP is a "fast follower" of Impinj in the RAIN RFID industry and benefits greatly from Impinj's investments in research and development, e.g., with respect to readers (which NXP does not develop or sell), and in building the industry and promoting adoption of RAIN RFID worldwide. *Id*.

Accordingly, "requiring [Impinj] to compete against its own patented invention, with the resultant harms described above, places a substantial hardship on [Impinj]" and, "therefore, favors entry of an injunction." *Robert Bosch*, 659 F.3d at 1156; *see also*, *e.g.*, *i4i*, 598 F.3d at 863 ("[I]t is clear that the patented technology is central to i4i's business. Because most of i4i's products are based on the '449 patent, i4i's market share, revenues, and business strategy are similarly tied to the patented method[, but] relate[] only to a small fraction of Microsoft's sizeable business. The far greater importance of the patented method to i4i, combined with the demonstrated past effects of infringement on i4i, favors issuance of a permanent injunction."); *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1329–30 (Fed. Cir. 2008) (affirming grant of injunction where patentee was a small company and the patent protected its flagship product, whereas infringer was a large corporation with alternative products).

By contrast, the only possible hardship an injunction would place on NXP relates to its inability to sell products with the infringing pad design. "That hardship, however, is not

cognizable." *Metso Minerals*, 788 F. Supp. 2d at 76 (citing *i4i*, 598 F.3d at 863 ("[N]either commercial success, nor sunk development costs, shield an infringer from injunctive relief. [The defendant] is not entitled to continue infringing simply because it successfully exploited its infringement." (internal citations omitted)); *Broadcom*, 543 F.3d at 704 ("At the outset, we note that '[o]ne who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.'" (quoting *Windsurfing Int'l, Inc. v. AMF, Inc.*, 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986))). Indeed, NXP has had over six years since it was first notified of its infringement by Impinj to design around the '302 patent and admitted at trial that, if unable to infringe, "we know what we would do." Tr. Vol. 6 (Zenz) at 971. This could include using the non-infringing "bump" design in UCODE 7 that, for purposes of defending against Impinj's lost profits claim, NXP consistently touted as successful and desirable. *See*, *e.g.*, Tr. Vol. 6 (Haas) at 1088–89, 1091–94, 1097, 1111–13; Tr. Vol. 6 (Subramanian) at 1045; *Douglas Dynamics*, 717 F.3d at 1345 ("If indeed Buyers had a non-infringing alternative which it could easily deliver to the market, then the balance of hardships would suggest that Buyers should halt infringement and pursue a lawful course of market conduct."); *Apple Inc. v. Samsung Elecs. Co.,* 809 F.3d 633, 641 (Fed. Cir. 2015) ("*Apple IV*") (finding balance of hardships "strongly weighs in favor of an injunction" where infringement caused "lost market share and lost downstream sales" and forced plaintiff "to compete against its own patented invention" in what "is essentially a two-horse race," particularly in view of testimony at trial "that design-around to the infringing features would be 'simple or already exist'").

## V. *eBAY* FACTOR 4: PUBLIC INTEREST

The "public interest nearly always weighs in favor of protecting property rights in the absence of countervailing factors, especially when the patentee practices his inventions." *Apple IV* at 647 (citing *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) ("[T]he encouragement of investment-based risk is the fundamental purpose of the patent grant, and is based directly on the right to exclude.")). NXP previously argued that it is against "public interest to block access to the scores of non-infringing features [] of NXP's products" and that Impinj would be unable to satisfy customer demand if an injunction were to issue. Dkt. 452 at 18–20. But

the injunction would only apply to NXP's UCODE 8 and 9 products *in the U.S.* and only until NXP replaces the infringing pad design on such products, which, as discussed above, it has apparently been ready and able to do for quite some time. *See*, *e.g.*, Tr. Vol. 6 (Zenz) at 971; Tr. Vol. 6 (Subramanian) at 1045. And while Impinj experienced supply constraints years ago (as did the entire industry), that has no bearing on its ability to fully meet market demand today. On August 17, 2023, Dr. Diorio submitted a declaration explaining why "Impinj has the capacity and ability to supply what [he] estimate[s] the infringing United States sales of UCODE 8 and 9 would be in 2023 and 2024." Dkt. 461-1, ¶¶ 3–4. Impinj representative(s) will be prepared to answer any questions the Court may still have and present additional testimony regarding capacity.

## VI.   SCOPE OF THE INJUNCTION

In connection with its earlier motion, Impinj submitted a proposed order regarding a permanent injunction as to both the '302 and '597 patents. Dkt. 447-2. Impinj maintains that the terms proposed therein, as they relate to the '302 patent, are well within established legal boundaries, reasonable, and necessary to provide meaningful safeguards against circumvention. As noted above, the proposed injunction extends only to the infringing pad design, and expressly allows NXP to engage in design-around efforts. *Id*. And the persons Impinj seeks to bind by the injunction are consistent with the "scope of every injunction" under Fed. R. Civ. P. 65(d)(2), regardless of whether such persons' activities constitute direct or indirect infringement. *See* Dkt. 461 at 11–13. The proposed requirement that a written notice to third parties accompany every bill of sale is also typical in cases where there is a strong possibility of downstream infringement via importation. *See id*. at 13; Dkt. 447 at 19. Finally, a sunset provision is not warranted for at least the reasons explained above regarding *eBay* factors 3 and 4. *See also* Dkt. 461 at 14.

Dated: March 11, 2024

By: */s/ Ramsey M. Al-Salam*
Ramsey M. Al-Salam, Bar No. 109506
Christina J. McCullough, Bar No. 245944
Antoine M. McNamara, Bar No. 261980
Stevan R. Start (admitted *pro hac vice*)
R. Tyler Kendrick (admitted *pro hac vice*)
Jessica J. Delacenserie (admitted *pro hac vice*)
PERKINS COIE LLP
1201 Third Avenue, 49th Floor
Seattle, WA 98101
Tel: 206.359.8000
Fax: 206.359.9000
RAlSalam@perkinscoie.com
CMcCullough@perkinscoie.com
AMcNamara@perkinscoie.com
SStark@perkinscoie.com
RKendrick@perkinscoie.com
JDelacenserie@perkinscoie.com

Daniel T. Shvodian, Bar No. 184576
PERKINS COIE LLP
3150 Porter Drive
Palo Alto, CA 94304
Tel: 650.838.4300
Fax: 650.737.5461
DShvodian@perkinscoie.com

Daniel T. Keese, Bar No. 280683
PERKINS COIE LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR 97209-4128
Tel: 503.727.2000
Fax: 503.727.2222
DKeese@perkinscoie.com

*Attorneys for Plaintiff Impinj, Inc.*

# **CERTIFICATE OF SERVICE**

I certify under penalty of perjury that on March 11, 2024, I caused to be electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send a notification of the filing to the email addresses indicated on the Court's Electronic Mail Notice List.

Dated: March 11, 2024

/s/ *Ramsey M. Al-Salam*
Ramsey M. Al-Salam